UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**THE HUMANE SOCIETY OF
THE UNITED STATES**
2100 L St., NW
Washington, DC 20037,

        Plaintiff,

   v.

**UNITED STATES POSTAL SERVICE**
475 L'Enfant Plaza SW
Washington, DC 20260,

        Defendant.

Civ. No.

## COMPLAINT

This action challenges a June 26, 2007 decision by the United States Postal Service denying The Humane Society of the United States' petition to prohibit the mailing of animal fighting materials – namely, two catalog-type monthly publications that consist predominantly of advertisements for fighting animals and weapons that are illegal to buy and sell under federal law – in direct contravention of a Congressional command prohibiting the mailing of such materials. *See* Pub. L. No. 110-22, § 3, 121 Stat. 88 (2007) (amending 7 U.S.C. § 2156). USPS's decision not only flouts Congress's clear intent in enacting the Animal Fighting Prohibition Enforcement Act of 2007 ("the Act"), it also violates the Animal Welfare Act ("AWA"), the Postal Act, and the USPS's own regulations, in contravention of the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").

Plaintiff is filing this action as a related case to *The Humane Society of the United States v. Amazon.com, Inc., et al.*, Civ. No. 07-0623 (CKK), currently pending before this Court, as the two matters present common issues of law and fact. Plaintiff may request that the Court adjudicate this matter first, since this case presents a narrow legal issue based on an Administrative Record, the resolution of which would, as a practical matter, most likely moot further proceedings in *The Humane Society of the United States v. Amazon.com, Inc., et al.*, Civ. No. 07-0623.

## JURISDICTION

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 39 U.S.C. § 409(a).

## VENUE

2.     Venue is proper under 28 U.S.C. § 1391(b).

## THE PARTIES

3.     Plaintiff The Humane Society of the United States (hereinafter "The HSUS") is a nonprofit animal protection organization headquartered in the District of Columbia and incorporated in Delaware, with over 25,000 members and constituents in the District of Columbia, and nearly 10 million members and constituents nationwide.  Plaintiff brings this action on its own behalf and on behalf of its members.

4.     For more than five decades, The HSUS has engaged in public education, advocacy, training and legislative activities to curb animal fighting. Plaintiff was instrumental in securing the passage of the Federal Animal Welfare

2

Act Amendments of 1976, 2002, and 2007 relating to animal fighting, including the Animal Fighting Prohibition Enforcement Act of 2007 at issue here. *See*, *e.g.*, H.R. REP. NO. 110-27, 2 (2007) (Judiciary Committee report acknowledging HSUS' role in advocating for passage of the Act).

5.     In addition to these efforts, Plaintiff has also been called upon by law enforcement agencies to respond to dozens of law enforcement raids at animal fighting ventures and to provide direct care and shelter for fighting animals seized by law enforcement agents, at a total cost to Plaintiff of hundreds of thousands of dollars' worth of equipment, transportation, veterinary supplies, and personnel.

6.     For instance, on May 15, 2005, Plaintiff responded to law enforcement authorities' requests to provide critical animal handling and technical expertise in a law enforcement raid on an unlawful commercial cockfighting and gamefowl breeding operation in Fiddletown, California owned by one of the advertisers in the publications at issue here – where police arrested 28 people for cockfighting and seized copies of those publications as evidence.

7.     In addition, Plaintiff also provided an emergency grant to pay for the care of the 58 roosters seized at the Fiddletown raid as evidence pending trial, and to build makeshift housing after the affected communities could no longer make room for the aggressive birds in their animal shelter dog runs without euthanizing more stray or surrendered dogs. The owner awaits trial on felony charges but nonetheless continues to advertise fighting birds in the publications at issue here,

where his advertisements state that the compound is "still alive and – well!" and that he will continue to "ship" fighting birds "Anytime, anywhere."

8.     Additionally, Plaintiff participated at the request of Louisiana State Police, U.S. Customs agents, and local SWAT teams, in the law enforcement action on March 9, 2005 that resulted in the arrest of fighting dog breeder Floyd Boudreaux, who now awaits trial on forty-eight felony counts of dog fighting arising out of his breeding and sale of dogs for fighting purposes.  Despite the pending felony charges, Boudreaux's fighting dogs and "stud service" have been advertised for sale in five of the most recent issues of one of the publications at issue here.

9.     Plaintiff is presently assisting federal and state law enforcement officers with preparation for upcoming raids at animal fighting ventures in several jurisdictions which are promoted and furthered by the publications at issue here and by the Publications' delivery through the mail service.  This preparation includes arrangements for the handling and care of fighting animals to be seized.

10.     When the raids described in the foregoing paragraph are executed, the care and handling of these animals will fall upon Plaintiff, because local animal shelters do not have the resources, expertise, or personnel to handle, transport, and house dozens or even hundreds of aggressive and abused animals at a time.

11.     Defendant's actions as set forth below impede Plaintiff's actions and frustrate Plaintiff's ability to pursue its goals for several reasons.  For instance, the delivery of the publications at issue here through the mail service promotes and furthers unlawful animal fighting ventures, which requires Plaintiff to divert its

limited organizational and programmatic resources to law enforcement actions and the care and handling of fighting animals seized at these ventures. These resources would otherwise be spent on programmatic and advocacy activities to prevent cruelty to animals, in furtherance of Plaintiff's goals.

12.    Defendant's unlawful actions cause Plaintiff to divert and devote significant resources to identify and counteract the unlawful animal fighting ventures that would not exist but for Defendant's unlawful actions. But for Defendant's unlawful actions, Plaintiff would not be required to handle, house, and care for hundreds of aggressive animals from these unlawful animal fighting ventures, which would cease to exist without the nationwide market made available by the publications at issue here. Since these resources would otherwise be spent on advocacy, legislation, and the sheltering and care of homeless animals, Defendant's unlawful conduct directly impedes Plaintiff's activities, and causes a significant drain on its resources and time.

13.    Additionally, when Plaintiff is required to respond to or assist with a law enforcement raid on an unlawful animal fighting venture, it ties up Plaintiff's personnel, equipment, vehicles, and supplies, such that those resources cannot be used for days or even weeks. Plaintiff is the lead emergency response entity in the United States for animals during natural disasters and other emergencies. If Plaintiff's finite resources are tied up on a raid of one of the many unlawful animal fighting ventures that would cease to exist but for Defendant's unlawful actions,

Plaintiff cannot respond to assist people and animals during a flood, storm, natural disaster, or other rescue operation during that time.

14.    Plaintiff's injuries will be redressed if Plaintiff prevails in this action, because if the publications at issue here are declared nonmailable, animal fighting and trafficking in fighting animals will be substantially reduced, and Plaintiff will not be required to divert its programmatic resources to respond to law enforcement actions against those illegal animal fighting ventures.

15.    The injuries described in this Section will be redressed if Plaintiff prevails in this action.

16.    Defendant the United States Postal Service (hereinafter "USPS") is an establishment of the executive branch of the United States, headquartered in the District of Columbia, which is responsible for the delivery of mail in the United States, subject to limitations established by Congress.  *See* 39 U.S.C. § 201.

## STATUTORY AND REGULATORY FRAMEWORK

### A.    *Federal Animal Welfare Act*

17.    On May 3, 2007, President Bush signed into law the Federal Animal Fighting Prohibition Enforcement Act of 2007, H.R. 137/S. 261, Public Law No. 110-22 ("the Act").  The Act, which went into effect immediately, amends the animal fighting provisions of the federal Animal Welfare Act ("AWA"), 7 U.S.C. § 2156.

18.    As amended by the Act, it is now a felony under the AWA for "any person" to "knowingly use the mail service of the United States Postal Service or any instrumentality of interstate commerce for *commercial speech* for purposes of

*promoting or in any other manner furthering* an animal fighting venture." Pub. L. No. 110-22, § 3, 121 Stat. 88 (2007) (amending 7 U.S.C. § 2156(c)) (emphasis added).

19. In addition to this statutory modification, the legislative history accompanying the Act sets forth Congress's findings that the mailing of animal fighting publications, such as those at issue here, "promot[es]" or "further[s]" animal fighting in violation of 7 U.S.C. § 2156(c), and is therefore unlawful.

20. For instance, as House lead sponsor Rep. Elton Gallegly (R-CA) explained, "cockfighting magazines . . . *promote* animal fights in every State—they are sent to or read by buyers in many States, who buy the fighting animals and implements and then use them in animal fights in States where cockfighting is illegal." 110 CONG. REC. E656 (daily ed. Mar. 28, 2007).

21. Rep. Gallegly also stated:

subsection (c) of section 26 of the Animal Welfare Act, which is about interstate instrumentalities and commercial speech, prohibits the websites and the magazines where fighting animals are advertised for sale. These publications are commercial speech, and also clearly promote animal fighting.

110 CONG. REC. E656 (daily ed. Mar. 28, 2007).

22. Rep. Gallegly continued:

[t]he [magazines] advertise fighting animals and weapons for sale in interstate commerce. For example, over the last 12 months, there have been over 1,600 pages worth of advertisements for illegal interstate commercial transactions in the *two main cockfighting magazines.*

*Id.* (emphasis added).

23. In the House Judiciary Committee report, the only Congressional report to accompany the Act, the Judiciary Committee, explaining the "need for the

legislation," found that "[t]he animal fighting industry continues to thrive . . . . despite 50 State laws that ban dogfighting and 48 State laws that ban cockfighting [because] [n]umerous nationally circulated animal fighting magazines still *promote* these cruel practices, and advertise fighting animals and the accouterments of animal fighting."  H.R. REP. NO. 110-27, at 2 (2007) (emphasis added).

24.     The Chairman of the House Subcommittee on Crime and Terrorism, which held hearings on the bill, stated on the floor of the House that "[n]umerous nationally circulated animal fighting magazines advertise fighting animals. . . . [t]hankfully, H.R. 137 will seek to bring an end to these practices."  110 CONG. REC. H3032 (Mar. 26, 2007) (remarks of Rep. Scott).

25.     Other members of the House Subcommittee on Crime and Terrorism noted that materials such as the publications at issue here promote or further animal fighting in violation of the law.  Rep. Sheila Jackson-Lee explained that "[r]azor-sharp knives known as 'slashers' and ice pick-like gaffs . . . used only in cockfights, are sold through cockfighting magazines. . . ." 110 CONG. REC. H3035 (daily ed. Mar. 26, 2007).  Rep. Jackson-Lee further noted that "there has been a dramatic increase in the number of animal fighting raids by state and local authorities.  Yet numerous nationally circulated animal fighting magazines still *promote* these cruel practices and advertise fighting animals and the accoutrements of animal fighting."  *Id.* (emphasis added).

26.     The Senate also made specific findings that materials like the publications at issue here "promote" animal fighting in violation of 7 U.S.C. § 2156.

Lead sponsor Senator Maria Cantwell, introducing the bill on the Senate floor, stated that "the animal fighting industry . . . continues unabated nationwide.  These enterprises depend on interstate commerce, as evidenced by the animal fighting magazines that advertise and *promote* them." 110 Cong. Rec. S451 (Jan. 11, 2007) (emphasis added).  Senator Cantwell explained that "[c]ockfighting magazines . . . contain hundreds of advertisements for mail-order knives and gaffs, revealing a thriving interstate market for the weapons used in cockfights."  *Id.*

27.    The Act also adds an express felony ban on the transport and delivery of the cockfighting knives and gaffs which are prominently advertised in the publications at issue here.  It is now a felony

> for any person to knowingly sell, buy, transport, or deliver in interstate or foreign commerce a knife, a gaff, or any other sharp instrument attached, or designed, or intended to be attached, to the leg of a bird for use in an animal fighting venture.

Pub. L. No. 110-22, § 3, 121 Stat. 88 (2007) (amending 7 U.S.C. § 2156(e)).

28.    In passing the Act, members of Congress stated that the "cockfighting magazines with all of their advertisements for contraband . . . are basically just catalogs, with hundreds of advertisements per issue for illegal transactions," whereby "[t]he sellers are just soliciting the buyers to commit criminal acts."  110 Cong. Rec. E656 (daily ed. Mar. 28, 2007) (remarks of Rep. Gallegly).

29.    The AWA also makes it a federal crime for "any person" to "knowingly sell, buy, transport, deliver, or receive for purposes of transportation, in interstate or foreign commerce, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture."  *Id.* § 2156(b).

30.    The Act also upgrades the criminal penalty for violating 7 U.S.C. § 2156 from a misdemeanor to a felony.   Each violation is punishable by up to three years in prison and a $250,000 fine.  *See* Pub. L. No. 110-22, § 3, 121 Stat. 88 (2007) (amending 7 U.S.C. §2156(i) and 18 U.S.C. § 49); 18 U.S.C. § 3571 (setting default fine provision for felony).

## B.    *The Postal Act*

31.    In the Postal Act, Congress mandated that "matter the deposit of which in the mail is punishable under . . . section 26 of the Animal Welfare Act [7 U.S.C. § 2156] is nonmailable."  39 U.S.C. § 3001(a).

32.    When USPS denies a petition to declare materials nonmailable, that ruling is a final agency action that is reviewable under the APA.  39 U.S.C. § 3001(m) (providing that "proceedings concerning the mailability of matter under this chapter . . . shall be conducted in accordance with chapters 5 and 7 of title 5 [of the U.S. Code; the APA]").

33.    Additionally, this Court has held that "[w]hile the Postal Service is generally exempt from the provisions of the [APA], . . . the APA specifically applies to proceedings concerning the mailability of matter."  *Aimes Publications, Inc. v. U.S. Postal Serv.*, No. CIV.A.86-1434, 1988 WL 19618, at *5 n.10 (D.D.C. Feb. 23, 1988).

### C.    The Domestic Mailing Manual

34.    To implement the Congressional directives of the Postal Act, USPS publishes and maintains the Domestic Mail Manual ("DMM"), a loose-leaf document that is a part of USPS's regulations.  *See* 39 C.F.R. § 211.2(a)(2).

35.    The DMM provides that "[w]ritten, printed, or graphic matter (e.g., advertisements) promoting or furthering an animal fighting venture conducted in any state (except a venture involving live birds permitted under the laws of the state in which the fight is conducted) is nonmailable under 7 USC 2156."  DMM 601.12.5.7.

36.    The DMM also states that "any advertising, promotional, or sales matter that solicits or induces the mailing of any article described in 8.0, 9.0, or 10.0 is nonmailable."  DMM 601.12.4.1.

37.    Because the DMM describes "adult fowls" in section 9.3.4 and prohibits the mailing of any "live animal" for the purpose of participating in an animal fighting venture in section 9.3.1, any advertising, promotional, or sales matter that solicits or induces the mailing of gamecocks, roosters, or adult fowl is thereby nonmailable.

### D.    Administrative Procedure Act

38.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . .  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIM FOR RELIEF

### A.    *The Animal Fighting Industry*

39.    Dog fighting is illegal in every state and in the District of Columbia. On June 27, 2007, Louisiana became the last state to pass a cockfighting ban.  H.B. 108, 2007 Reg. Sess. (La. 2007) (to be codified at LA. REV. STAT. § 14:102.23). Cockfights in Louisiana with gambling, such as those advertised in the publications at issue here, are outlawed effective August 15, 2007, and cockfights without gambling are outlawed effective August 15, 2008.  *Id.*; *see also* S.B. 221, 2007 Reg. Sess. (La. 2007) (to be codified at LA. REV. STAT. § 14:90.6).

40.    Additionally, thirty-six states prohibit the sale, purchase, and/or possession of fighting animals or implements, and twenty-seven states and the District of Columbia further criminalize other acts that "promote," D.C. CODE ANN. § 22-1015(a)(1), or "further" animal fighting, such as "advertising" or "us[ing] any means of communication for the purpose of promoting [ ] a fight."  *See*, *e.g.*, FLA. STAT. ANN. § 828.122(2)(d) (West 2006); COLO. REV. STAT. ANN. § 18-9-204(1)(b)(V).

41.    At an animal fight, two or more animals specially trained and bred for aggression are pitted against one another in a small enclosure and provoked by their handlers to attack the other animal, usually until one or both of the animals dies from injuries inflicted in the fight, with gamblers betting on the outcome. Birds fight with knives or "gaffs" affixed to their legs.

42.    Dogs and birds wounded or killed in a fight suffer painful, disfiguring, and debilitating injuries, including lacerations, ruptured organs, broken or severed

limbs, gouged eyes, punctured lungs, head injuries, broken necks and backs, internal bleeding, shock, and partial or full paralysis.

43.    If an animal loses a fight by running away, it causes the handler embarrassment and loss of reputation.    A runaway dog's handler will often electrocute her as punishment, using a car battery or other crude methods. Handlers of runaway roosters have been observed slamming the birds into walls as punishment.

44.    If a bird is injured but not killed after the fight, it is customary for the handler not to provide veterinary care, food, or water for the animal, but rather, to abandon the animal, causing the animal to suffer from injuries, starvation, or dehydration for up to several days before dying.    At raids, officials have observed injured, live animals trapped at the bottom of trash barrels under the bodies of dead animals.    These animals may suffer for several days before being crushed in a trash compactor or otherwise disposed of.

45.    Fighting birds and dogs are typically injected with steroids, speed, and other substances before the fight, including blood-clotting drugs expressly designed and marketed to ensure that gravely wounded animals will fight longer, thereby deliberately prolonging the animals' suffering prior to death.    Handlers also inflict pain upon the roosters by sawing or shearing off certain appendages for the purpose of fighting, including the birds' waddles, combs, and spurs.    Dog fighters also create painful stimuli in order to provoke the dogs' aggression prior to the fight, such as by

sewing bottle caps into the dogs' skin or burning the dogs' paw pads with cigarette lighters.

46.     Dog fighters typically obtain fighting dogs by purchasing dogs from, or using the breeding or "stud services" of, breeders who are known to selectively breed and train dogs for gameness, and whose reputation is based on these dogs' "victories" in fights.

47.     To train dogs for fighting or to be sold for fighting purposes, dog fighters and the breeders and sellers of fighting dogs use smaller or less aggressive "bait" dogs (and cats) whom the fighting dogs maim or kill for practice.  Fighters obtain "bait" dogs by breeding them, or from "Free to a Good Home" advertisements, or from puppy mills, or by stealing them from homes and back yards.

48.     Each year, hundreds of millions, and possibly billions of dollars of unreported income changes hands at cockfights and dog fights from illegal gambling, in addition to entry fees and prize money.  Some cockfighting events involve hundreds of matches, with prizes in the tens of thousands of dollars. Accordingly, handlers often travel across state lines to fight animals, as documented by the Federal Bureau of Investigation ("FBI").  FBI Special Agents have observed children as young as six years old taking bets at animal fights.

49.     A variety of criminal activities, including gambling, drug possession, rape, illegal weapon possession, and homicide have been associated with animal fighting.  Drug money is also laundered through animal fighting operations.

50.    Because of the gambling, money, weapons, and illegal drugs involved, dog fighting and cockfighting contributes to a rise in other types of crime in the affected communities, such as personal violence and property crime.

51.    The gambling associated with dog fighting and cockfighting is illegal in every state, and those who cross state lines or use the mail service to "promote . . . or facilitate the promotion" of such gambling also violate federal racketeering laws. *See*, *e.g.*, 18 U.S.C. § 1952.

52.    Cockfighting also poses a public health and biosecurity threat.  As confirmed by the World Health Organization, cockfighting was responsible for at least eight human cases of avian influenza between January 2004 and April 2005, due to the bloody nature of the fights, and the fact that cockfighters occasionally put their mouths over the heads of wounded birds to resuscitate them during the fight. In 2003, the Governor of California declared a State of Emergency after cockfighting birds from Mexico spread Exotic Newcastle Disease to poultry flocks in the United States, resulting in the deaths of 3.4 million birds and the loss of more than 200 million dollars, including reimbursements made to poultry producers at taxpayer expense.

53.    Dog fighting also threatens public health and safety, by increasing the risk to law enforcement officers and to the public – especially children and the elderly – of dog bites and dog attacks.  Dog fighting also facilitates the spread of transmissible diseases from dog to dog and dog to human, such as heartworm and rabies.

**B.    *Animal Fighting Publications***

54.    Notwithstanding bans having been passed in all fifty states, animal fighting is still a multi-million dollar business, due in large part to two catalog-type monthly animal fighting publications – *The Feathered Warrior* and *The Gamecock* (hereinafter "the Publications").

55.    The Publications are circulated by way of the U.S. Postal Service to a total circulation of over 10,000 subscribers.

56.    The publishers enjoy discounted-rate periodical mailing privileges for the Publications from USPS.

57.    Advertisements comprise approximately 64 percent of the total content of the Publications as measured over a twelve month period – a total of over 2,500 advertisements for commercial transactions.  Of these advertisements – more than 1,700 pages' worth as measured over a twelve month period – over 90 percent are criminal solicitations to purchase fighting animals and weapons that are illegal to buy and sell under federal law and the laws of many states.

58.    For instance, the Publications contain advertisements for fighting birds who "want to hurt something," such as one in particular that was marketed for his fighting prowess on the basis that he had impaled an opposing bird "through [the] neck and kill[ed] [him] outright."  THE FEATHERED WARRIOR 15 (Verna Dowd, ed., May 2007); THE GAMECOCK 89 (J.C. Griffiths, ed., May 2007) (advertising fighting birds for "$1,000 & up" that are "still winning in major competition in gaff, short knife & long knife").

59.   The Publications also advertise dogs intended for fighting purposes, including dogs bred and sold by dog fighting kingpin Floyd Boudreaux. *See id.* at 63 (Dec. 2006).  Boudreaux was arrested in March of 2005 and presently awaits trial on forty-eight felony counts of animal fighting, based on the breeding and sale of dogs intended for fighting.

60.   The Publications also advertise animal fighting venues for purchase, such as the "Sally Gap Game Club," a "10,000 Sq. Ft." cockfighting club that "Is Up And Running!!!!" in Kentucky, where cockfighting is illegal.  THE GAMECOCK 37 (Dec. 2006).  Cockfighting pits and cages are pictured in the advertisement, along with rows of bleachers where spectators observe the fights.  *Id.*

61.   A recent undercover investigation confirmed that the sole function of this facility is to host unlawful animal fighting events.  Specifically, the seller of the cockfighting pit told an investigator by telephone that the weekly events feature both "short knife" and "long knife" cockfights, and that prospective purchasers of the pit need not worry about being prosecuted because the local sheriff already knew about the pit and would not take action.

62.   Undercover video footage taken on February 3, 2007 reveals over 400 people from several states in attendance at the Sally Gap Game Club, with an estimated $500,000 in illegal wagers being handled by the house.  None of this income, on information and belief, is reported to the Internal Revenue Service as required by law.  Therefore, the Publication in which this advertisement appears promotes and furthers unlawful animal fighting ventures and other crimes.

63. The Publications also advertise illegal animal fights. *See*, *e.g.*, THE FEATHERED WARRIOR 5 (Apr. 2004) (listing schedule for Oklahoma cockfights, months after Oklahoma Supreme Court had affirmed the validity of the statewide cockfighting ban, which also makes it a felony to advertise a cockfight); *id.* at 6 (June 2007) (advertising "entry fee" wagers for cockfight "long knife derby" in jurisdiction where such an arrangement amounts to an illegal animal fight).

64. The Publications also list the results and champions from recent cockfights, including fights in states where cockfighting is illegal. *See*, *e.g.*, THE FEATHERED WARRIOR 61 (July 2006); *id.* at 37 (Jan. 2004). These accolades, including "victories" at "derbies" or cockfights in jurisdictions where cockfighting is illegal, are then used by winning handlers and breeders to market and sell birds intended for fighting and to obtain premium prices based on their fighting reputation. THE GAMECOCK 103, 107 (Feb. 2006) (advertising birds for sale that were illegally transported in interstate commerce and fought at illegal cockfights in Virginia, Alabama, California, Kentucky, Tennessee, Texas, Oklahoma, and Hawai'i).

65. The advertisements also include cockfighting supplies such as "gaffs" or knives attached to the legs of birds for purposes of fighting. *See*, *e.g.*, *id.* at 117 (Jan. 2006) (Tennessee supplier advertising fighting blades that are designed for "maximum cutting and penetration"); THE FEATHERED WARRIOR at 13 (June 2007) (advertising cockfighting knives even after passage of the Act making the interstate sale, purchase, and shipment of such items a federal felony).

66.    The Publications also advertise steroids, "speed," and other drugs for fighting purposes.    *See*, *e.g.*, THE FEATHERED WARRIOR 12, 15 (Jan. 2006) (advertising hormones that encourage "pure aggression" to "prepare your cock for battle"); THE GAMECOCK 1 (May 2007) (advertising substance that "helps prevent easy bleeding in the pit" and that is "formulated to fighting cocks"); *id.* at page T (Jan. 2004) (advertising injectable "Nicoramin" stimulant that allows birds to "fight longer even when injured").    The sale, purchase, and transport of these drugs is prohibited by the AWA and the laws of twenty-three states, and may also violate controlled substances laws.

67.    The Publications are found at 75 percent or more of all law enforcement raids of illegal animal fights.    Judges and juries have considered possession of the Publications to be evidence of criminal culpability under animal cruelty prohibitions.    *See*, *e.g.*, *Com. v. Balog*, 672 A.2d 319, 322-24 (Pa. Super. Ct. 1996) (affirming cockfighting conviction on basis of circumstantial evidence including "36 magazines on fighting birds, and two sets of [gaffs]").

68.    On May 19, 2007, federal, state and local law enforcement officers raided a cockfighting facility near Van Buren, Arkansas and arrested more than 80 people on federal and state animal fighting, animal cruelty, and gambling charges. Two of the individuals arrested on multiple charges have substantial ties to *The Gamecock* publication.

69.    The first is Bill Ray McNatt, who was arrested for "animal cruelty" and "operating a gambling house."    Mr. McNatt is the owner of "Cherokee Game Farm

Supply," a regular advertiser in *The Gamecock* that offers a "full line of game fowl supplies." *See* THE GAMECOCK at 90 (Jul. 2006) (listing "Bill McNatt" in the advertisement as the seller). At the time of the raid, Mr. McNatt was selling cockfighting equipment at a stand next to the cockfighting pit. Therefore, Mr. McNatt now faces criminal animal fighting charges for doing the same thing that he does every month – only to a much wider audience – in *The Gamecock*.

70.     Police officers also reported that roosters seized during the raid had been injected with methamphetamines. Local reports state that the "concession stand" sold "needles to inject vitamins, or even methamphetamine, to get roosters ready to fight." The concession stand is also identified in the Affidavit of FBI Special Agent T. Akins, which was filed in federal court on May 21, 2007 in support of the government's *in rem* forfeiture complaint against the property on which the cockfighting pit was located.

71.     The second individual is Hayden C. Hise, who was arrested on charges of "operating a gambling house, criminal use of property, animal cruelty, and engaging in gambling." Investigators identified Mr. Hise as the "head referee" who was presiding over the cockfighting matches at the pit at the time of the raid.

72.     *The Gamecock* publishes monthly fight results and photographs of fight winners submitted by "HCH" – or Hayden C. Hise. *See*, *e.g.*, THE GAMECOCK 82 (May 2007). On information and belief, the fighting facility identified in those photographs as "the Outback" is the Arkansas pit raided by law enforcement on May 19, 2007.

73.    The publisher of a dog fighting magazine pled guilty last year in Pennsylvania to two felony animal fighting and conspiracy charges based entirely on his publishing and distributing the magazine, under a statute that prohibits "encouraging" animal fighting, similar to the AWA provision at issue here.  *See Com. v. Fricchione*, Crim. No. 0012396-2004 (Pa. Ct. Comm. Pleas, sentenced March 13, 2006).

74.    Like the Publications here, the dog fighting magazines at issue in the *Fricchione* criminal action listed the winners from recent animal fights, advertised fighting animals marketed based on their "victories" in those fights, advertised dog fighting implements, and contained some non-advertising content.

75.    On information and belief, most of the fighting animals and fighting implements advertised in the Publications are not advertised in any other medium, paper or electronic.

76.    The publishers of the Publications, and their employees and agents, knowingly publish and distribute the Publications through the mail service of the U.S. Postal Service for the purpose of promoting and/or furthering unlawful animal fighting ventures.

77.    The distribution through the mail service of the Publications promotes and furthers hundreds if not thousands of specific unlawful animal fighting ventures, including those expressly named in the text and advertisements of the Publications, as well as those that are not expressly named but would not exist but for the commercial transactions made possible only by the Publications.

**C.**    ***Administrative Proceedings***

78.    On April 26, 2006, Plaintiff petitioned USPS to declare the

Publications nonmailable.  In support of its request, Plaintiff explained that

> The AWA prohibits "any person to knowingly use the mail service of
> the [USPS] . . . for purposes of promoting or . . . furthering an animal
> fighting venture."  7 U.S.C. § 2156(c).  For mail matter that is in
> violation of this provision of the AWA, the Postal Act deems such
> matter to be nonmailable.  39 U.S.C. § 3001(a) ("matter the deposit of
> which in the mail is punishable under . . . section 26 of the [AWA] *is*
> *nonmailable*") (emphasis added).

Petition of The Humane Society of the United States before the United States

Postal Service, at 12 (Apr. 26, 2006) (hereinafter "Petition").

79.    In the Petition, Plaintiff further explained that

> Likewise, the DMM explicitly declares such matter to be nonmailable
> by providing that "[w]ritten, printed, or graphic matter (e.g.,
> advertisements) promoting or furthering an animal fighting venture . .
> . *is nonmailable* under 7 USC 2156."  DMM 601.12.5.7 (emphasis
> added).  Additionally, "any advertising, promotional, or sales matter
> that solicits or induces the mailing of [live animals for the purpose of
> participating in an animal fighting venture or adult fowls] *is*
> *nonmailable*."  DMM 601.12.4.1, 601.9.3.4, and 601.9.3.1 (emphasis
> added).

*Id.* at 12-13.

80.    Plaintiff submitted twenty attachments with the Petition, including

copies of the Publications, to demonstrate that, among other things, the

Publications promote or further unlawful animal fighting ventures in violation of

the AWA, and that the Publications contain "advertising, promotional, or sales

matter that solicits or induces the mailing of" "a live animal for the purpose of

participating in an animal fighting venture."  DMM 601.12.4.1; 601.9.3.1.

81.    Plaintiff also petitioned USPS to revoke the reduced-rate periodical mailing privileges enjoyed by the Publications, explaining that "'[o]nly newspapers and periodical publications meeting the mailability standards in [Chapter] 601 . . . may be authorized mailing at the Periodicals rates.'"  Petition at 10 (quoting DMM 707.4.3).

82.    On June 5, 2006, USPS denied Plaintiff's Petition, on the sole basis that the House Report to the 1976 amendments to the AWA stated that "'[g]ame fowl publications would be unaffected except that advertising of fights involving live birds would be prohibited except in those instances where such fights are to be held in a State or territory where they are not unlawful.'"  Letter from Sherry Suggs to Jonathan Lovvorn at 1 (quoting H.R. REP. NO. 94-976, 23 (1976), reprinted in 1976 U.S.C.C.A.N. 783, 797).  USPS invited Plaintiff to inform USPS of "further developments in this law."  *Id.* at 2.

83.    Acting upon this invitation, on May 3, 2007, Plaintiff supplemented and requested reconsideration of its Petition to USPS to declare the Publications nonmailable in light of the Act, which made substantial upgrades to the animal fighting provisions of the AWA, as explained above, and which went into effect that day.  Letter from Jonathan Lovvorn to Sherry Suggs at 2 (May 3, 2007).

84.    Specifically, Plaintiff explained that:

The Publications unquestionably fall within this [new] "commercial speech" prohibition.  They are little more than catalogs featuring hundreds of advertisements per issue for fighting dogs and birds, fighting animal weapons, and blood-clotting drugs that are illegal to buy and sell in interstate commerce under federal law and also under the laws of many states.

23

*Id.* at 2 (citing attachments with copies of the recent issues of the Publications in their entirety).

85.     In its May 3, 2007 letter, Plaintiff also quoted and attached hard copies of the statutory text and legislative history of the Act as quoted in paragraphs 15-28 above, and explained that the plain text of the law, along with the "voluminous and uncontested legislative history . . . contradicts and supersedes the 1976 House Report which forms the basis for the denial of the [April 2006] Petition." *Id.* at 5.

86.     On June 26, 2007, Defendant denied Plaintiff's May 3, 2007 request, on the grounds that "the Act did not alter [the statute's] direct application to the Postal Service." Letter from Sharon Daniel to Jonathan Lovvorn at 1 (Jun. 26, 2007).   Defendant further stated that "[t]he absence of any change to the plain language of the statute which addresses the Postal Service prevents me from" granting Plaintiff's Petition.   *Id.*

87.     Although Defendant acknowledged that "these magazines . . . appear to contain such advertisements" for "the sale, purchase, transport or delivery in interstate or foreign commerce of bird-fighting accessories," Defendant concluded that the Publications were nonetheless mailable because "the Act did not include among its provisions any ban on advertising of such items." *Id.* at 1.

## PLAINTIFF'S CLAIM FOR RELIEF

### *Claim One – Violation of The Administrative Procedure Act, 5 U.S.C. § 706*

88.     Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

89.    The use of the mail service to ship the Publications violates the AWA, 7 U.S.C. § 2156; therefore, Defendant's ruling denying Plaintiff's Petition and request for reconsideration, and declaring the Publications to be mailable, is arbitrary and capricious, an abuse of discretion, and is not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

90.    The use of the mail service to ship the Publications is punishable under 7 U.S.C. § 2156, and the Postal Act declares to be "nonmailable" any "matter the deposit of which in the mail is punishable under . . . section 26 of the Animal Welfare Act [7 U.S.C. § 2156]," 39 U.S.C. § 3001(a); therefore, Defendant's ruling denying Plaintiff's Petition and request for reconsideration, and declaring the Publications to be mailable, is arbitrary and capricious, an abuse of discretion, and is not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

91.    The Publications contain "[w]ritten, printed, or graphic matter (e.g., advertisements) promoting or furthering an animal fighting venture conducted in" many states where animal fighting is illegal, and the Domestic Mail Manual mandates that such material "is nonmailable under 7 USC 2156," DMM 601.12.5.7; therefore, Defendant's ruling denying Plaintiff's Petition and request for reconsideration, and declaring the Publications to be mailable, is arbitrary and capricious, an abuse of discretion, and is not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

92.    The Publications contain hundreds of pages per year of advertisements for the mail-order purchase of fighting animals, and the Domestic Mail Manual mandates that "advertising, promotional, or sales matter that solicits or induces the mailing of" "a live animal for the purpose of participating in an animal fighting venture," "is nonmailable," DMM 601.12.4.1; 601.9.3.1; therefore, Defendant's ruling denying Plaintiff's Petition and request for reconsideration, and declaring the Publications to be mailable, is arbitrary and capricious, an abuse of discretion, and is not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

93.    Defendant's ruling denying Plaintiff's Petition and request for reconsideration is also arbitrary and capricious because it fails to make a reasonable explanation of the specific analysis and evidence upon which Defendant relied, and fails to furnish a coherent or reasoned explanation for its decision, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests that the Court issue an Order:

A.    Declaring that Defendant's ruling denying Plaintiff's Petition and request for reconsideration and finding the Publications to be mailable, is arbitrary and capricious, an abuse of discretion, and not in accordance with the Animal Welfare Act, 7 U.S.C. § 2156; the Postal Act, 39 U.S.C. § 3001(a), and/or sections 601.12.5.7, 601.12.4.1, and 601.9.3.1 of the Domestic Mail Manual;

B.  Declaring that the interstate shipment of the Publications violates the Animal Welfare Act, 7 U.S.C. § 2156(c).

C.  Setting aside Defendant's June 5, 2006 and June 26, 2007 rulings regarding the Publications;

D.  Enjoining Defendant from accepting the Publications for mailing;

E.  Awarding Plaintiff its costs and reasonable attorneys' fees; and

F.  Awarding Plaintiff any other relief that is just and proper.

Respectfully submitted,

Ethan Carson Eddy (D.C. Bar No. 496406)

Jonathan R. Lovvorn (D.C. Bar No. 461163)

Rebecca G. Judd (D.C. Bar No. 486315)

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2329
(202) 778-6132 (fax)
eeddy@hsus.org

*Counsel for Plaintiff*

Stuart Philip Ross (D.C. Bar No. 031658)
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 662-2000

July 10, 2007              *Of Counsel for Plaintiff*

27

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|

The Humane Society of the United States

United States Postal Service

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Washington, DC | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Washington, DC |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Ethan Carson Eddy, Esq. The Humane Society of the United States 2100 L St. NW Washington, DC 20037 (202) 676-2329 | Jeffrey A. Taylor, U.S. Attorney 555 Fourth St. NW Washington, DC 20530 (202) 514-7566 |

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Administrative Procedure Act, 5 U.S.C. 706; agency action arbitrary and capricious, an abuse of discretion, and not in accordance with law.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  **DEMAND $** _____  Check YES only if demanded in complaint  **JURY DEMAND:** YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE __July 10, 2007__  SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.