UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                         )
THE HUMANE SOCIETY                         )
OF THE UNITED STATES,                       )
                                                         )
            Plaintiff,                                  )            Civil Action No.: 07-1233-CKK
                                                         )
      v.                                                 )
                                                         )
UNITED STATES POSTAL SERVICE,        )
                                                         )
            Defendant.                              )
_____)

**DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

Defendant, the United States Postal Service ("Postal Service"), respectfully moves to dimiss this case, pursuant to Rule 12(b)(1), for lack of standing, lack of a waiver of sovereign immunity, and Rule 12(b)(6) for failure to state a claim.  In the alternative, the Postal Service moves for summary judgment pursuant to Rule 56.

Planitiff's Complaint must be dismissed for lack of jurisdiction because the Humane Society lacks standing.  Additionally, Plaintiff's claims under the Administrative Procedure Act ("APA") must be dismissed because the Defendant is exempt from the judicial review provisions of the APA.  Even if the Court determines that Defendant is subject to the APA generally in this action, two exceptions therein apply.  First, Plaintiff's Complaint is not based on any final agency decision subject to judicial review.  Second, the agency's response to Plaintiff's requests is committed to agency discretion by law.  Further, no private right of action is implicit or explicit in the text or the legislative history of the statutes that plaintiff cites as the basis for its Complaint.

In the alternative, this Court should grant summary judgment in Defendant's favor because the distribution of the subject Publications via the Postal Service is not unlawful under the Animal Welfare Act and the publications are, therefore, mailable under 39 U.S.C. § 3001(a). There is no genuine issue of material fact.

A memorandum of points and authorities, a statement of material facts, and supporting exhibits are attached.

October 16, 2007                          Respectfully submitted,

                                          _____
                                          JEFFREY A. TAYLOR, D.C. Bar # 498610
                                          United States Attorney

                                           /s/
                                          _____
                                          RUDOLPH CONTRERAS, D.C. Bar # 434122
                                          Assistant United States Attorney

                                           /s/
                                          _____
                                          ALAN BURCH, D.C. Bar # 470655
                                          Assistant United States Attorney
                                          555 4th St., N.W.
                                          Washington, D.C. 20530
                                          (202) 514-7204, alan.burch@usdoj.gov

Of counsel:

ANTHONY F. ALVERNO, ESQ.
DC Bar # 499580
Chief Counsel, Customer Programs
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6138
Washington, DC 20260-1135
(202) 268-2997, 268-5418

MATTHEW J. CONNOLLY, ESQ.
Attorney, Corporate Law
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6332
Washington, DC 20260-1135
(202) 268-8582, 268-5418

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
THE HUMANE SOCIETY                   )
OF THE UNITED STATES,                  )
                                                  )
             Plaintiff,                          )          Civil Action No.: 07-1233-CKK
                                                  )
             v.                                   )
                                                  )
UNITED STATES POSTAL SERVICE,    )
                                                  )
             Defendant.                        )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendant, the U.S. Postal Service (USPS or Postal Service), respectfully moves to

dismiss this case under Rule 12(b)(3), or in the alternative, for summary judgment per Rule 56.

Plaintiff, The Humane Society of the United States ("HSUS") alleges that the Postal Service's

letters declining to declare two publications, *The Gamecock* and *The Feathered Warrior*

("Publications"), nonmailable violated the Animal Welfare Act (AWA) and 39 U.S.C. § 3001(a).

Complaint, at 1, 24-26.  The Complaint further asserts that the Postal Service's letter dated June

26, 2007, declining to grant the relief HSUS requested constituted a "final agency action" or

"ruling" reviewable under the Administrative Procedure Act ("APA").  Plaintiff alleges that the

Postal Service's continued acceptance and distribution of the Publications are inconsistent with

certain postal regulations set forth in the Domestic Mail Manual ("DMM").  Complaint, at 24-27.

Plaintiff requests, *inter alia*, an order declaring that the interstate shipment of both publications

violates the AWA and enjoining the Postal Service from accepting the publications for mailing.

## SUMMARY OF ARGUMENT

Planitiff's Complaint must be dismissed for lack of jurisdiction because the Humane Society lacks standing. Additionally, Plaintiff's claims under the Administrative Procedure Act ("APA") must be dismissed because the Defendant is exempt from the judicial review provisions of the APA. Even if the Court determines that Defendant is subject to the APA generally in this action, two exceptions therein apply. First, Plaintiff's Complaint is not based on any final agency decision subject to judicial review. Second, the agency's response to Plaintiff's requests is committed to agency discretion by law. Further, no private right of action is implicit or explicit in the text or the legislative history of the statutes that plaintiff cites as the basis for its Complaint.

In the alternative, this Court should grant summary judgment in Defendant's favor because the distribution of the subject Publications via the Postal Service is not unlawful under the Animal Welfare Act and the publications are, therefore, mailable under 39 U.S.C. § 3001(a). There is no genuine issue of material fact.

## PROCEDURAL AND FACTUAL BACKGROUND

### A.    The Publications

*The Gamecock* and *The Feathered Warrior* ("Publications") are published eleven times per year by "Marburger Publishing Co." and "DOWD Publishing," respectively. Daniel Dec. ¶ 10, Exhibits B and C. *The Gamecock* is presented for mailing at a post office in De Queen, Arkansas, and *The Feathered Warrior* is presented for mailing at a post office in Harford, Arkansas. Daniel Dec. ¶ 9. According to their Statements of Ownership, Management, and Circulation for 2006, *The Gamecock* has a total paid and/or requested distribution of 9007

subscribers and *The Feathered Warrior* has a total paid distribution of 2314 copies.[1]  Daniel

Dec., Exhibits B and C.  Both Publications include editorial content, such as essays and articles

on a variety of topics, including cockfighting, breeding of fowl processes and techniques,

politics, and legislation.  Daniel Dec. ¶ 12.  For example, the March 2007 edition of *The*

*Feathered Warrior* includes an article on the Animal Fighting Prohibition Enforcement Act and

includes opinion pieces that appear to have been submitted by readers.  Daniel Dec. Ex. D.  Both

Publications contain advertisements for game fowl, game fowl breeders, and game fowl supplies

such as cords, feed, vitamins, antibiotics, breeding handbooks, etc.  The August/September 2007

issue of *The Gamecock* and the August 2007 issue of *The Feathered Warrior*, the most recent

issues of both Publications submitted to the Postal Service for mailing, do not contain

advertisements for animal fights or advertisements for knives, spurs, gaffs, and other piercing

instruments.  Daniel Dec. ¶ 15, Exs. G & K.  While the May 2007 and June 2007 issues of *The*

*Gamecock* contained advertisements for spurs, gaffs, and other piercing instruments, the July

2007 issue did not.  Daniel Dec. ¶ 13, Exs. D through F.  The May 2007 through July 2007 issues

of *The Feathered Warrior* each contained advertisements for game clubs, but the August 2007

issue did not.  Daniel Dec. ¶ 14, Exs. H-J.

Both Publications are authorized to be mailed as "Periodicals," a class of mail that

includes subscription magazines, newsletters, and newspapers.  Daniel Dec. ¶ 17.  Because the

educational, cultural, social, and informational value of this class of mail is relatively high, the

rates for this category of mail have traditionally been very favorable compared to other classes of

mail.  Id.  The Postal Service has established detailed eligibility requirements to ensure that the

---

[1] Circulation figures relect average number distributed in the preceeding 12 months.

high value associated with this class of mail is preserved.  Id.  These requirements are discussed below.

**B.      Legal Background**

        **1.      The Animal Welfare Act and the Animal Fighting Prohibition Enforcement Act of 2007**

The Animal Welfare Act ("AWA") is codified in Title 7 of the U.S. Code.  Section 2156(a) of this title prohibits "sponsoring or exhibiting" an animal in an animal fighting venture. Section 2156(b) prohibits "buying, selling, delivering, or transporting animals for participation in animal fighting venture."  An "animal fighting venture" is defined as "any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment" but does not include "any activity the primary purpose of which involves the use of one or more animals in hunting another animal."  7 U.S.C. § 2156(g)(1).

The provision of the AWA central to this case appears in paragraph (c), and the original version of it provided:

> [i]t shall be unlawful for any person to knowingly use the mail service of the United States Postal Service or any interstate instrumentality for purposes of promoting or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.

Former 7 U.S.C. 2156(c) (2006).  The AWA defined "animal fighting venture" as "any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment."  7 U.S.C. § 2156(g)(1) (2006).  The term did not include "any activity the primary purpose of which involves the use of one or more animals in hunting another animal."  7 U.S.C. § 2156(g)(1) (2006).  The AWA also provided that:

> [n]otwithstanding the provisions of [7 U.S.C. 2156(c)], the activities prohibited by such subsection shall be unlawful with respect to fighting ventures involving live birds *only if* the fight is to take place in a State where it would be in violation of the laws thereof.

7 U.S.C. § 2156(d) (2006) (emphasis added).  Penalties for violating the prohibitions of 7 U.S.C.

2156 included a fine of up to $15,000 or imprisonment for not more than one year, or both, for

each violation.  7 U.S.C. 2156(e) (2006).  Additionally, 7 U.S.C. § 2156(f) authorized the

Secretary of Agriculture to investigate violations of the sections' prohibitions and to request

assistance from the Federal Bureau of Investigation ("FBI") as well as other law enforcement

agencies.

These provisions were first introduced in section 17 of the Animal Welfare Act

Amendments of 1976 ("AWA Amendments"), Pub. L. 94–279, 90 Stat. 417.  The originally

proposed bill prohibited only dog fighting ventures; however, the Committee on Agriculture later

amended the bill to include cockfighting within its provisions.  H.R. Rep. No. 94–801, 10 (1976),

reprinted in 1976 U.S.C.C.A.N. 758, 762.  The provisions were further amended in a joint

conference to permit the continued practice of cockfighting in states recognizing these fights as

legal.  H.R. Rep. No. 94–976, 23 (1976), reprinted in 1976 U.S.C.C.A.N. 783, 797.  This

Conference Report further stated that "[g]ame fowl publications would be unaffected except that

advertising of fights involving live birds would be prohibited except in those instances where

such fights are to be held in a State or territory where they are not unlawful."  Id.

The Animal Fighting Prohibition Enforcement Act of 2007 ("AFPEA"), 7 U.S.C. §

2156(c), enacted on May 3, 2007, amended 7 U.S.C. § 2156(c) by replacing the words "interstate

instrumentality" with the words "instrumentality of interstate commerce for commercial speech."

Thus, subsection 2156(c) currently reads as follows:

> It shall be unlawful for any person to knowingly use the mail service of the United States
> Postal Service or any instrumentality of interstate commerce for commercial speech for
> purposes of promoting or in any other manner furthering an animal fighting venture
> except as performed outside the limits of the States of the United States.

The term "instrumentality of interstate commerce" was defined to include "any written, wire, radio, television or other form of communication in, or using a facility of, interstate commerce." See 7 U.S.C. § 2156(g)(3) (2007). The AFPEA also expanded upon the existing prohibitions in 2156 by adding a provision stating that:

> [i]t shall be unlawful for any person to knowingly sell, buy, transport, or deliver in interstate or foreign commerce a knife, a gaff, or any other sharp instrument attached, or designed or intended to be attached, to the leg of a bird for use in an animal fighting venture.

7 U.S.C. § 2156(e) (2007). Additionally, the AFPEA replaced subsection 7 U.S.C. § 2156(e) concerning penalties and added a provision that provides criminal penalties for violations of the prohibitions in section 2156.[2] 7 U.S.C. § 2156(i). The AFPEA did not further define the terms "promoting" or "furthering" or clarify the application of 7 U.S.C. § 2156(c) to the Postal Service. The AFPEA also did not amend the AWA's definition of "animal fighting venture" or the Act's exemption for bird fighting ventures in states where such activities are not illegal.

### 2.    Postal Statutes and Regulations Concerning Mailability

The federal statutes concerning mailability appear in Chapter 30 of Title 39 of the U.S. Code. Subsection 39 U.S.C. § 3001(a)[3] provides that "[m]atter[,] the deposit of which in the mails is punishable under . . . section 26 of the Animal Welfare Act[,] is nonmailable."[4] Subsection 3001(b) of Title 39 generally provides the Postal Service with the authority to dispose of nonmailable matter which reaches the office of delivery, or which may be seized or detained

---

[2] 18 U.S.C. § 49 provides that "[w]hoever violates subsection (a), (b), (c), or (e) of section 26 of the Animal Welfare Act shall be fined under this title, imprisoned for not more than 3 years, or both, for each violation."

[3] Available online at http://pe.usps.gov.

[4] This subsection, formerly codified in 39 U.S.C. § 4001, was recodified in § 3001 by the Postal Reorganization and Salary Adjustment Act of 1970 ("PRA"), Pub. L. No. 91-375. HSUS refers to the PRA as the "Postal Act." See, e.g., Complaint ¶ 31.

for violation of law, as the Postal Service shall direct.  Pursuant to 39 U.S.C. § 3001(m), proceedings concerning the mailability of matter under 39 U.S.C. § 3001 must be conducted in accordance with chapters 5 and 7 of Title 5 U.S. Code which contain provisions concerning judicial review under the APA.

The Domestic Mail Manual ("DMM") contains the mailing standards of the Postal Service.  These standards are incorporated into the Code of Federal Regulations by reference at 39 C.F.R. § 111.1, and thus have the legal effect of federal regulations.  Chapter 601 of the DMM contains the Postal Service's standards for mailability.  As illustrated below, however, Postal Service regulations provide only limited bases for administrative determinations of non-mailability.  DMM § 601.9.3.1 states that "the mailing of a live animal for the purpose of participating in an animal fighting venture is prohibited (regardless of whether such venture is permitted under the laws of the state in which it is conducted)."  Additionally, DMM § 601.12.4.1 generally provides that "[a]ny advertising, promotional, or sales matter that solicits or induces the mailing of any article described in [Chapter 601, sections] 8.0, 9.0, or 10.0 is nonmailable[.]"  Thus, this section, in conjunction with DMM § 601.9.3.1, prohibits the mailing of "advertising, promotional, or sales matter" that solicits or induces the mailing of "live animal[s] for the purpose of participating in an animal fighting venture[s]."

During the time between the Postal Service's receipt of HSUS's Petition to Declare Animal Fighting Publications Nonmailable, dated April 26, 2006, and the date of the filing of the instant complaint, July 10, 2007, the DMM provided that:

> [w]ritten, printed, or graphic matter (e.g., advertisements) promoting or furthering an animal fighting venture conducted in any state (except a venture involving live birds permitted under the laws of the state in which the fight is conducted) is nonmailable under 7 USC 2156.

DMM § 601.12.5.7.  The term "animal fighting venture" mirrored the definition provided in the AWA.[5]  On August 30, 2007, the Postal Service revised this provision by replacing the word "advertisements" with "advertisements or other commercial speech."  Additionally, a new section was added to prohibit the mailing of animal fighting accessories such as knives, gaffs, or any other sharp instruments attached, or designed to be attached to the leg of a bird for use in an animal fighting venture.  These revisions were intended to bring the DMM into conformity with the Animal Fighting Prohibition Enforcement Act ("AFPEA").  Daniel Dec. ¶ 4.  The revisions were published on page 18 of the August 30, 2007 edition of the Postal Bulletin (Exhibit E) and were incorporated into the September update of the DMM online.  Id. Ex. A.

Title 39 of the Code of Federal Regulations also contains the rules of practice and procedure for mailability proceedings relating to the following types of matter: articles and substances other than written, printed, or graphic matter, false advertising matter, and lottery matter.  Mailability proceedings concerning articles and substances are conducted in accordance with 39 C.F.R. Part 953, while mailability proceedings concerning false advertising matter and lottery matter are conducted in accordance with 39 C.F.R. Part 952.  As with the rules for proceedings concerning the denial, suspension, or revocation of Periodicals mail privileges, these provisions generally provide the mailer with notice, an opportunity for a hearing, and an opportunity to submit evidence on the record.  Under these rules an Administrative Law Judge issues the initial decision concerning the mailability of the matter under dispute, and a final agency decision is issued by the Judicial Officer.  39 C.F.R. § 952.26; 39 C.F.R. § 953.4.  Title 39 C.F.R. does not contain procedures for determining the mailability of other types of matter

---

[5] "Animal fighting venture means any event involving a fight between at least two animals that is conducted for sport, wagering, or entertainment. The term does not include any activity whose primary purpose involves using one or more animals in hunting other animals."  DMM § 601.12.5.7(b).

such as the written, printed, or graphic matter contained in the subject publications.  Daniel Dec.

¶ 7.

     Although postmasters[6] may provide customers with guidance on whether written,

printed, or graphic matter may be mailed under postal regulations, local postmasters are not

authorized to decide whether such matter is nonmailable based on its content and are not

permitted to deny entry to such matter or exclude it from the mail.  Id.; DMM § 601.12.11.

Postmasters are instructed to send a report to the Inspection Service regarding written, printed, or

graphic matter that is found in the mail and that appears, in the postmaster's view, to be

nonmailable (i.e., obscenity), in accordance with section 138.14 of the Postal Operations Manual

("POM"), which is the manual that sets forth the policies, regulations, and procedures of the

Postal Service governing retail, philatelic, collection, mail processing, transportation, delivery,

and vehicle operations.  See 39 C.F.R. § 211.2(a)(2).  The Inspection Service reviews this report

and to determine whether, in its judgment, a criminal investigation is warranted.  Daniel Dec.

¶ 8.  If so, then the matter is referred to the Department of Justice so that it can decide whether to

prosecute criminally.  Id.

     **3.**    **Federal Statutes and Regulations Pertaining to Periodicals**

     The term "Periodical" is defined in DMM § 707.4.4.1.  Daniel Dec. ¶ 18.[7]  Generally, a

periodical is published at a stated frequency with the intent to continue publication indefinitely,

has as its primary purpose the transmission of information, and exhibits continuity from issue to

issue.  See DMM §§ 707.4.4.2 and 707.4.4.3.  To receive authorization to mail at the rate for

Periodicals, a publication must satisfy certain specific requirements, originally prescribed by

Congress in the Act of March 3, 1879, 20 Stat. 355, 358-359, and carried forward with certain

---

[6] Postmasters are the managers of particular post offices.
[7] The class for Periodicals was formerly referred to as "Second-Class."  See DMM § 707.4.1.

modifications and refinements in subsequent legislation and postal regulations.[8]  See e.g., former

39 U.S.C. § 4354, Pub. L. No. 86-682, 74 Stat. 667 (Sep. 2, 1960).  Publishers prefer the

Periodicals rate because it is lower than the usual alternatives, such as First-Class Mail.  Daniel

Dec. ¶ 17.

Among other requirements, DMM § 707.4.3 provides, in part, that only newspapers and

other periodical publications that comport with the mailability standards in Chapter 601 of the

DMM may be authorized for mailing at the rates for Periodicals.  See DMM § 707.4.3.  See also

DMM § 707.4.2 (other requirements for Periodicals).  These requirements generally reflect the

legislative intent that favorable rates for Periodicals (formerly known as second-class) should be

reserved for publications issued for "the dissemination of information of a public character",

rather than those "designed primarily for advertising purposes."[9]  See Act of March 3, 1879 (20

Stat. 355, 359).  Thus, catalogs and other publications primarily intended for advertising

purposes do not qualify for Periodicals rates.  See The Enterprise, Inc. v. United States, 833 F.2d

1216, 1225 (6th Cir. 1987).[10]

---

[8] Eligibility standards for Periodicals are found in the DMM and the Domestic Mail
Classification Schedule (DMCS), which is published at 39 C.F.R. Part 3001, Subpt. C, App. A..
Basically, the DMCS describes the different groupings of mail, and in some instances, states
conditions of eligibility for certain rates.  All mail preparation requirements, including those
outlined in the DMCS, are ultimately presented in the DMM.  While the DMM offers
substantially greater detail, however, it must conform to the provisions of the DMCS, and DMM
regulations cannot be inconsistent with DMCS provisions that specifically describe conditions of
eligibility.

[9] Thus, for example, the paid subscription requirement for "general publications," set forth at
DMM § 703.6.1.2, furthers "[t]he governmental interest . . . of limiting the second-class subsidy
to material of demonstrable value to the recipients and not primarily designed for advertising
purposes."  Enterprise, 833 F.2d at 1225 (6th Cir 1987) (discussing former 39 U.S.C.
§ 4354(a)(5), (c), codified by Pub. L. No. 86-682, 74 Stat. 666 (1960)).

[10] These requirements have withstood repeated constitutional challenges largely because they
condition Periodicals entry upon the circulation and other objective characteristics of a
publication (i.e., percentages of subscribers and advertising content per issue), standards that do
not primarily depend upon the subjective judgment of postal personnel.  See e.g., Lewis

Specific procedures for applying for Periodicals authorization are provided in DMM §

707.5.1.  Section 707.5.3.1 of the DMM vests the Pricing and Classification Service Center

(PCSC) manager with the authority to rule on all applications for Periodicals mailing privileges.

However, a PCSC manager's ruling granting such application does not represent a USPS

determination that a publication is mailable under 39 U.S.C. § 3001(a).  DMM § 707.5.3.3.  If

the PCSC manager denies an application, the denial or revocation is considered the final agency

decision.  DMM §§ 707.5.3.3. and 707. 5.4.3.  See generally 39 C.F.R. § 954 (rules of practice

for revocation of Periodicals mail privileges).

### 2. Nonfederal Laws

Cockfighting is not illegal in all fifty states and U.S. Territories.  On July 13, 2007, the

Governor of Louisiana signed Act No. 425 which contains provisions prohibiting persons from

organizing or conducting "any commercial or private cockfight . . . in which it is intended or

reasonably foreseeable that…chickens would be injured, maimed, mutilated, or killed" in the

State.  2007 La. Acts 425, at 2.  This law also contains provisions that prohibit "possessing,

training, purchasing, or selling any chicken . . . with the intent that the chicken shall be engaged

in an unlawful commercial or private cockfight" but contains exemptions for hunting or trapping,

herding of domestic animals, activities for the purposes of scientific or medical research, and

certain Mardi Gras-related activities involving chickens.  Id. at 1-2.  But these provisions will not

become effective until August 15, 2008, and so such fights remain legal in the state of Louisiana

unless such fights include gambling or wagering.  2007 La. Acts 223, at 1.  Similarly in Virginia,

---

Publishing Company v. Morgan, 229 U.S. 288, 301-05 (1913); Enterprise, 833 F.2d at 1225-26;
Lewis Publishing Company v. Wyman, 182 F. 13, 16-17 (8th Cir. 1910).  Attempts to condition
Periodicals mailing privileges on the worthiness of a publication's contents have generally been
thwarted by courts.  See United States ex rel. Milwaukee Social Democratic Publishing
Company v. Burleson, 255 U.S. 407, 417-38 (1921); Hannegan v. Esquire, 327 U.S. 146, 157
(1946); Sunshine Publishing Company v. Summerfield, 184 F. Supp. 767, 771-72 (D.D.C. 1960).

cockfighting is illegal only when a person wagers money, for money, prizes, or anything of value. Va. Code Ann. § 3.1-796.125 (2007). Cockfighting is also currently legal in Guam where such fights are licensed and controlled by the government established Cockpit License Board. 11 Guam Code Ann. §§ 34205, 76216, 39101.

**C.      Correspondence Between HSUS and USPS Prior to the Filing of HSUS's Complaint**

**1.      HSUS's April 26, 2006 Letter and Petition Requesting that the Postal Service Declare Nonmailable and Refuse to Mail Certain Animal Fighting Publications**

Jonathon Lovvorn, Vice President, Animal Protection Litigation, HSUS, sent a letter dated April 26, 2006, on behalf of HSUS to John E. Potter, Postmaster General, USPS ("Initial Request Letter"), requesting that the Postal Service declare the Publications nonmailable. Daniel Dec. ¶ 21, Ex. L. Attached to this letter was a document titled "Petition to Declare Animal Fighting Publications Nonmailable" ("Petition") which requested that the Postal Service (1) declare the Publications nonmailable and prohibit them from being mailed, and (2) revoke the Periodicals mailing privileges for the Publications. Daniel Dec. ¶ 21, Ex. M; accord Plf. Petition at 1. HSUS alleged that the Publications and their distribution via the Postal Service promote illegal animal fighting throughout the United States. Daniel Dec. ¶ 22; accord Plf. Petition at 3. HSUS also stated that the January 2006 edition of *The Gamecock* contains advertisements for knives and gaffs that there are "numerous advertisements in *The Gamecock* for birds for sale for fighting purposes." Daniel Dec. ¶ 22; accord Plf. Petition at 3. HSUS asserted that the Publications were nonmailable under the AWA, 39 U.S.C. § 3001(a), and the DMM. Daniel Dec. ¶ 22, accord Plf. Petition at 13-14. HSUS claimed that because the Publications did not meet the mailability standards set forth in Chapter 601 of the DMM, the publications were not authorized to receive Periodicals mailing rates from the USPS. Id. at 10, 15. HSUS further requested that the PCSC manager "hold a hearing and make a determination that [the

Publications] are no longer eligible for Periodicals mailing privileges," and "initiate revocation procedures, including sending a revocation notice to publishers of [the Publications]." Id. at 15.

### 2. Postal Service Response to HSUS's Initial Request Letter and Petition

In a letter dated June 5, 2006, from Sherry Suggs, the former Manager of Mailing Standards, to Mr. Lovvorn ("Response Letter I") the Postal Service responded by declining to grant the HSUS the remedy it requested. Daniel Dec. ¶ 24, Ex. N. The Postal Service opined that the Publications were mailable under the applicable statutes and regulations as long as the publications did not contain advertisements promoting bird fights which are to take place in states where such fights are outlawed. Response Letter I at 1. Additionally, the Postal Service informed HSUS of its determination that the AWA's prohibition on "promoting or in any other matter furthering an animal fighting venture" was ambiguous and that the Postal Service interpreted this provision to comport with the AWA's then current legislative history which indicated that "Congress intended that '[g]ame fowl publications would be unaffected' and 'that advertising of fights involving live birds would be prohibited except in those instances where such fights are to be held in a State or territory where they are not unlawful.'" Id. (quoting H.R. Rep. No. 94-976, at 23 (1976), reprinted in 1976 U.S.C.C.A.N. 783, 797) (emphasis added).

The Postal Service also explained that under its mailings standards, "bird fighting magazines are generally mailable; however, advertisements of bird fights are nonmailable if the fights are to take place in states that have outlawed the practice." Daniel Dec. ¶ 26. The Postal Service informed HSUS that because the Publications did not contain advertisements for bird fights in states where bird fights were illegal, the publications were not nonmailable under the DMM, and therefore, the Postal Service had no basis to deny Periodicals mailing privileges to the Publications. Id. at 1, 2; Daniel Dec. ¶ 27. The Postal Service stated that it would be willing to revisit these conclusions if HSUS could identify another authority that would suggest an

alternative interpretation of the AWA.  Daniel Dec. ¶ 28.  Finally, the Postal Service emphasized that it only administers the mailability portions of the AWA and that Congress specifically vested the Secretary of Agriculture with the authority to enforce the AWA generally.  Id. at 2. The Postal Service recommended that HSUS direct its concerns to the U.S. Department of Agriculture ("USDA").  Id.

### 3.    HSUS's May 3, 2007 Letter Seeking Reconsideration of its April 26, 2006 Petition

Subsequently, Mr. Lovvorn sent a letter dated May 3, 2007, on behalf of HSUS to Ms. Suggs, with a courtesy copy to the Postmaster General, seeking reconsideration of its Petition in light of the AFPEA's 2007 amendments to the AWA ("Reconsideration Letter").[11]  Daniel Dec. ¶ 29, Ex. O.  In addition to describing these amendments, HSUS quoted from various portions of the Congressional Record to support HSUS's claim that the amendments were intended to criminalize the mailing of the Publications.  Id. at 2-4.  HSUS also alleged that the AFPEA's ban on animal fighting paraphernalia provided an additional basis for finding the Publications nonmailable under the DMM and stated that the December 2006 publication of *The Gamecock* included an advertisement for a bird fighting venue for purchase in a state where bird fighting was illegal.  Id. at 4.  HSUS renewed its request for the Postal Service to declare the Publications nonmailable and to "initiate proceedings to revoke the Publications' Periodicals mailing privileges."  Id. at 5; Daniel Dec. ¶ 30.

### 4.    Postal Service Response to HSUS's Reconsideration Letter

On June 26, 2007, the Postal Service responded to HSUS's Reconsideration Letter in a letter from Sharon Daniel, Manager, Mailing Standards, to Mr. Lovvorn ("Response Letter II")

---

[11] The Petition was attached to this letter and incorporated by reference.  Reconsideration Letter, at 1.

Daniel Dec. ¶ 31, Ex. P.  The Postal Service stated that because the AFPEA did not change the

plain language of the provision of the AWA pertaining to animal fighting ventures or alter the

provision's application to the Postal Service, the Postal Service declined to interpret the AWA to

permit a determination that the Publications were nonmailable.  Id. at 1.  Additionally, the Postal

Service stated that because the "[a]ct's addition of a provision criminalizing the sale, purchase,

transport, or delivery…of bird-fighting accessories" did not include "any ban on advertising of

such items . . . the mailability of these magazines, which appear to contain such advertisements,

remains unchanged."  Response Letter II at 1 (emphasis added).  The letter concluded with an

invitation for HSUS to inform the Postal Service regarding further developments in the law or to

bring other authorities to the attention of the Postal Service.  Id. at 2.

### ARGUMENT

## I.    LEGAL STANDARDS FOR MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 12(b)(1), Plaintiff bears the burden of

establishing that the court has jurisdiction.  Grand Lodge of the Fraternal Order of Police v.

Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). The Court must accept the factual allegations in

the complaint as true but may consider material other than the allegations of the complaint in

determining whether it has jurisdiction.  Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d

1249, 1253-54 (D.C. Cir. 2005).  On a motion to dismiss for failure to state a claim upon which

relief can be granted pursuant to Rule 12(b)(6), the Court will dismiss a claim if Plaintiff fails to

plead "enough facts to state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v.

Twombly, 127 S. Ct. 1955, 1974 (2007).  The court must construe the allegations and facts in the

complaint in the light most favorable to Plaintiff and must grant Plaintiff the benefit of all

inferences that can be derived from the facts alleged.  Barr v. Clinton, 370 F.3d 1196, 1199 (D.C.

Cir. 2004) (citing <u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994))).

However, the court need not accept asserted inferences or conclusory allegations that are

unsupported by the facts set forth in the complaint. <u>Kowal</u>, 16 F.3d at 1276.

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment

when the evidence in the record demonstrates that there are no disputed issues of material fact

and that the moving party is entitled to judgment on the undisputed facts as a matter of law. A

genuine issue of material fact exists if the evidence, when viewed in light most favorable to the

nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party."

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The burden is on the movant to

make the initial showing of the absence of a genuine issue of material fact in dispute. <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party is then entitled to a judgment as a

matter of law if the nonmoving party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial." <u>Catrett</u>, 477 U.S. at 322.

## II.    PLAINTIFF HSUS LACKS STANDING TO CHALLENGE THE CONTINUED DISTRIBUTION OF THE PUBLICATIONS THROUGH THE POSTAL SERVICE.

Plaintiff's Complaint fails to allege facts sufficient to satisfy each of the essential

elements for standing under Article III of the U.S. Constitution, and should therefore be

dismissed. To establish standing, the Plaintiff must demonstrate (1) a personal injury in fact that

is (2) "fairly traceable" to the defendant's conduct ("causation" or "traceability"), and (3)

redressable by the relief requested. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61

(1992). Plaintiff purports to have filed its Complaint "on its own behalf and on behalf of its

members." Complaint ¶¶ 3.

As shown below, however, the Complaint fails to allege any facts that "demonstrate that the organization has suffered injury in fact, including such concrete and demonstrable injury to the organization's activities including a consequent drain on the organization's resources as opposed to a setback to the organization's abstract social interests."  See A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d 34, 43 (D.D.C. 2007) (citing Nat'l Taxpayers Union, Inc. v. United States, 314 U.S. App. D.C. 377, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  As a result, HSUS cannot establish "organizational standing" that would allow Plaintiff to challenge the Postal Service's conduct "on its own behalf."

Moreover, the Complaint also contains no factual allegations that could demonstrate that (a) HSUS members would otherwise have standing to sue in their own right; (b) the interests HSUS seeks to protect are germane to the organization's purpose; and (c) that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See Kempthorne, 493 F. Supp. 2d at 43 (D.D.C. 2007) (citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)).  As a result, Plaintiff cannot establish "representational standing" in the instant action that would allow Plaintiff to challenge the Postal Service's conduct "on behalf of its members."

**A.     The Plaintiff's Alleged Harms Are Insufficient to Establish Injury In Fact.**

HSUS's Complaint fails to identify any "injury in fact" that is both (a) "concrete and particularized" and (b) "actual or imminent" as opposed to conjectural or hypothetical.  See Lujan, 504 U.S. at 560; Rainbow/PUSH Coalition v. FCC, 396 F.3d 1235, 1240 (D.C Cir. 2005). The Complaint identifies several harms allegedly attributable to animal fighting ventures generally.  These alleged harms appear to fall into two categories:

(1) the "diversion" of Plaintiff's "programmatic resources" to provide care and shelter for animals injured as the result of animal fighting ventures (Complaint ¶¶ 5, 7, 9-12); and

- 17 -

the costs HSUS incurs in responding to requests from "law enforcement authorities" to

assist in "raids at animal fighting ventures" (Complaint ¶¶ 5, 6, 8, 9, 13),

(2) "[a] variety of criminal activities, including gambling, drug possession, rape, illegal

weapon possession, and homicide," as well as violations of "federal racketeering laws"

(Complaint ¶¶ 39,40, 48-51, 57, 60-74, 76-77, 89-93); violations of federal tax laws

(Complaint ¶¶ 61-62), and threats to "public health" and "biosecurity" (Complaint ¶¶ 52-

35).

The Plaintiff's complaint manifests none of the identified harms that would be sufficient

to establish "injury in fact". First, the harms described in category (1) above, i.e., the "diversion"

of Plaintiff's "programmatic resources" to provide care and shelter for animals injured as the

result of animal fighting ventures and the costs HSUS incurs in responding to requests from "law

enforcement authorities" to assist in "raids at animal fighting ventures," are also insufficient for

establishing "actual or imminent" injury because those harms stem from actions voluntarily

undertaken by HSUS. See Fair Employment Council of Greater Wash., Inc. v. BMC Mktg.

Corp., 28 F.3d 1268, 1278 (D.C. Cir. 1994). In Fair Employment, the plaintiff, an organization

whose programs included community outreach and public education intended to promote equal

opportunity in employment, alleged that an employment agency was engaging in discriminatory

activities that interfered with the organization's programs and required the organization to

expend resources to counteract the agency's alleged discrimination. Id. The court found that the

expenses incurred by the organization in detecting the alleged discriminatory practices of the

employment agency through the use of "testers" did not constitute an injury in fact because such

expenses were the result of the organization's budgetary choices, not the actions of the

employment agency. See id. at 1276. The court further noted that the organization's stated

injury was "not really a harm at all; assuming that BMC's actions did not have any other effect on the Council's programs independent of its efforts to increase legal pressure on possible open housing violators, the Council and its programs would have been totally unaffected if it had simply refrained from making the re-allocation." See id. at 1276.

Similar to the plaintiffs in Fair Employment, HSUS alleges injuries resulting from activities that, presumably, it voluntarily chooses to perform. The Complaint provides no basis for concluding that HSUS is obligated or required to provide assistance to law enforcement authorities or to provide for the care and handling of seized animals. Complaint ¶¶ 5-13, at 3-6. Thus, such allegations are insufficient to establish "actual or imminent" injury-in-fact. See also National Family Planning and Reproductive Health Assn. Inc., v. Gonzalez, 468 F.3d 826, 830-31 (D.C. Cir. 2006); Animal Legal Def. Fund v. Espy, 23 F.3d 496, 500-01 (D.C. Cir. 1994) (finding that statements in plaintiff's affidavit, indicating that her further research would "require" her to use rats and mice that could be subject to inhumane treatment due to USDA's failure to regulate the treatment of such animals, were insufficient to demonstrate that her injury was "imminent" because her decision to proceed with her research and suffer further injury was within her control and discretion).

Second, the Complaint contains no allegations that any of the harms identified in category (2) above pose a "concrete and demonstrable" injury to the organization's activities with a "consequent drain on the organization's resources," a requirement for organizational standing. Arden Wood, Inc. v. United States Citizenship & Immigration Servs., 480 F. Supp. 2d 141, 148 (D.D.C. 2007). See also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 183-84 (2000); Brady Campaign To Prevent Gun Violence United With The Million

Mom March v. Ashcroft, 339 F. Supp. 2d 68, 74-75 (D.D.C. 2004); accord Animal Legal Def.
Fund v. Glickman, 154 F.3d 426, 431 (D.C. Cir 1998).

In Glickman, the Animal Legal Defense Fund challenged USDA's alleged failure to
promulgate "specific minimum standards" for the physical environment of primates in zoos
under certain provisions of the AWA.  Glickman, 154 F.3d at 430.  Plaintiff's complaint was
based in part on the affidavit of an individual plaintiff who had been an employee and volunteer
for various human and animal relief and rescue organizations, who frequently visited certain
zoos where certain primates were held, and who claimed to suffer "aesthetic" and "emotional"
injuries as the result of viewing primates in allegedly "inhumane conditions."  Id. at 429-30.  The
court found that the plaintiff's allegations were sufficient to establish that the plaintiff "suffered
direct, concrete, and particularized injury to this aesthetic interest in observing animals living
under humane conditions."  Id. at 432.  Similarly, the plaintiff environmental organizations in
Laidlaw were able to establish a "concrete and particularized" injury in fact through affidavits
and deposition testimony from members of the organizations who lived near a particular river
and who alleged that certain pollutants had curtailed those members' recreational use of the river
and subjected them to other economic and aesthetic harms.  Id. at 183-84.

Unlike the plaintiffs in Glickman and Laidlaw who could demonstrate that they were
personally and individually affected by the harms they identified, Plaintiff HSUS, through its
Complaint, provides no basis for inferring that the HSUS organization has been affected or will
be affected in a direct and individual way from the "variety of criminal activities," the violations
of "federal racketeering laws" or federal tax laws, or threats to "public health" and "biosecurity"
allegedly associated with animal fighting ventures.  As a result, the Complaint fails to provide
any basis for inferring that these harms constitute "concrete and particularized" injuries in fact.

See The Wilderness Society v. Norton, 434 F.3d 584, 590 (D.C. Cir. 2006) (holding that Plaintiff could not establish concrete and particularized injury by relying on affidavits containing broad assertions that the affiant would suffer harm as the result of federal inaction).

Third, Plaintiff's Complaint does not contain any factual allegation that could support an inference that any of the harms identified in its Complaint are "actual or imminent." To establish "actual or imminent" injury in fact, a Plaintiff must allege facts that demonstrate that the Plaintiff will be affected by the Defendant's allegedly unlawful conduct at a specific future point in time. See Lujan, 504 U.S. at 564 ("'some day; intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require); Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1278 (D.C. Cir. 1994); Friends of the Earth, Bluewater Network Division v. Dep't of Interior, 478 F. Supp. 2d 11, 15 (D.D.C. 2007); Brady, 339 F. Supp. 2d at 74-75.

In Friends of the Earth, the plaintiffs challenged a rulemaking petition that would have restricted or prohibited the operation of off-road-vehicles ("ORVs") in certain areas of the National Park System ("NPS"). Id. at 12. In its discussion of injury in fact, the court paid special attention to certain affidavits submitted by members of one of the plaintiff organizations demonstrating that the members were or had been regular users of the NPS and intended to visit specific areas of the NPS in the future. Id. at 18-19. The affidavits also included specific descriptions of the adverse impacts of ORV use on specific areas of the parks and described how ORV use would impede the members' enjoyment of the those areas in the future. Id. at 18-19. The court found that because these affidavits "identified specific harms" associated with ORV use which supported a "reasonable inference" that the members would return to the affected park

areas in the future, the affidavits were sufficient to establish injury in fact.  Id. at 19-20; see also

Glickman, 154 F.3d at 431-432 (emphasizing that the plaintiff's regular visits to animal

exhibitions such as zoos as well as his plans to continue such visits in the future were sufficient

to establish "actual or imminent" injury-in-fact).  Similarly, the court in Brady found that the

plaintiff organizations challenging a policy by the federal Bureau of Alcohol, Tobacco, and

Firearms and Explosives ("ATF") pertaining to semiautomatic assault weapons ("SAWs")

established "actual" injury in fact through depositions from several members of one organization

alleging injury due to increased risk of SAW-related violence in the neighborhoods in which they

lived.

     Unlike the plaintiffs in Brady and Glickman, Plaintiff's Complaint contains no specific

factual allegations that would support an inference that any one of the alleged harms will affect

HSUS or its members in the near future.  Rather, the Complaint contains only general

descriptions of unspecific harms and specific descriptions of harms that have already occurred.

Such descriptions are insufficient to establish "actual or imminent" injury in fact.  See Lujan,

504 U.S. at 564 (finding that affidavits from the members of the Respondent organization,

describing the member's past visits to areas containing species that would allegedly be

threatened by certain agency funded projects, and containing vague statements of their intent to

revisit those areas, were insufficient to establish "actual or imminent" injury in fact); Branton v.

FCC, 993 F.2d 906, 909 (D.C. Cir. 1993) ("a discrete, past injury cannot establish the standing of

a complainant").

     **B.    Plaintiff Cannot Demonstrate That The Alleged Harms Are Caused By the
          Postal Service's Continued Distribution of the Publications, Or That The
          Relief Requested Will Redress The Alleged Harms**

     Plaintiff's Complaint does not contain any factual allegation that could support an

inference that the distribution of the Publications via the Postal Service "causes" the harms set

forth in Plaintiff's complaint or that the relief requested, including an order or declaration prohibiting the mailing of the subject Publications, would redress the alleged harms. HSUS does not contend that any of these alleged harms are directly attributable to the mailing or distribution of the Publications *per se* via the Postal Service. Rather, causation for all of the harms alleged flows from the alleged "unlawful animal fighting ventures" that Plaintiff claims "<u>would not exist</u> but for Defendant's unlawful actions." <u>See e.g.</u>, Complaint ¶¶ 12, at 5 (emphasis added). Because Plaintiff's Complaint contains no allegations that the Postal Service or its agents directly engage in or facilitate animal fighting ventures, the harms HSUS alleges are necessarily based on the independent, intervening actions of third parties not before the Court, i.e., those individuals or entities that facilitate or engage in unlawful animal fighting ventures. Therefore, Plaintiff cannot establish causation or redressibility. <u>Branton v. FCC</u>, 993 F.2d 906, 910-11 (D.C. Cir. 1993); <u>see also</u> <u>Lujan</u>, 504 U.S. at 560-61 (quoting <u>Simon v. Eastern Ky. Welfare Rights Organization</u>, 426 U.S. 26, 41-42 (1976)); <u>Friends of the Earth</u>, 478 F. Supp. 2d at 11, 15 (quoting <u>Tozzi v. HHS</u>, 271 F.3d 301, 309 (D.C. Cir. 2001)); <u>Brady</u>, 339 F. Supp. 2d at 77 ("[w]hen the alleged injury stems not directly from governmental action, but rather from 'the government's allegedly unlawful regulation (or lack of regulation) of someone else,' more exacting scrutiny is called for with respect to the traceability and redressability requirements") (citing <u>Lujan</u>, 504 U.S. at 562; <u>Freedom Republicans, Inc. v. Federal Election Comm'n</u>, 13 F.3d 412, 416 (D.C. Cir. 1994)).

### i.    None of the Alleged Facts In Plaintiff's Complaint Support an Inference that Defendant's Conduct Caused the Alleged Harms

Plaintiff has not alleged any facts that could support an inference that the Defendant's failure to prohibit the distribution of the Publications through the mails is a "substantial factor" in the decisions of the third parties to engage in the activities that form the basis of the alleged

harms, a sufficient condition for establishing "causation."  For example, in Friends of the Earth, the court found that because the National Park Service governed the use of ORVs within the national park system, alleged injuries stemming from ORV use in those parks were "fairly traceable" to the agency's alleged failure to adequately regulate ORV use.  Friends of the Earth, 478 F. Supp. 2d at 21.  In Glickman, the court concluded that the USDA had caused the plaintiff's injuries when it failed to issue regulations or take actions that could have protected the plaintiff's interest in observing animals living under humane conditions.  See 154 F.3d at 439-41. The court explained that if the USDA "had found a [particular zoo] out of compliance with current regulations, or if the governing regulations had themselves been more stringent, [the zoo's] owners would have been forced (in order to remain in accord with the law) to either alter their practices or go out of business and transfer their animals to exhibitors willing to operate legally."  Id. at 440.  In both cases, the court found that the defendant agency's failure to regulate the activities that allegedly harmed the plaintiff was a "substantial factor" in the decisions of third parties to engage in those activities, and therefore, the Plaintiff was able to establish the element of "causation."

Unlike the defendant agencies in Friends of the Earth and Glickman who had direct authority to regulate the activities that formed the basis of the plaintiff's injuries, the AWA does not explicitly identify the Postal Service as the agency charged with responsibility for enforcing restrictions on animal fighting ventures, the basis for HSUS's alleged injuries.  Rather, its role is presumably more limited to enforcement of the mailability provisions of the AWA.  As a result, Plaintiff's complaint cannot support an inference that the continued distribution of the Publications via the Postal Service is a "substantial factor" in the decisions of third parties to

facilitate or engage in animal fighting ventures.  Friends of the Earth, 478 F. Supp. 2d at 11, 15

(quoting Tozzi v. HHS, 271 F.3d 301, 309 (D.C. Cir. 2001)).

    Moreover, HSUS's Complaint does not support an inference that animal fighting venture

participants and enthusiasts will not use other means to promote their activities if the

Publications are prohibited from the mailstream, a requirement for establishing causation.  See

Brady, 339 F. Supp. 2d at 77-78.  In Brady, the court concluded that the plaintiff organizations

could not establish traceability in their suit against the ATF because they could not produce facts

showing that SAW manufacturers "would *not* seek some alternative means to repair [certain]

SAWs or take other actions that would continue to increase the number of available SAWs" if

the ATF discontinued its policy whereby SAW manufacturers could repair certain SAWs and

provide them to their owners.  Id. (emphasis added).  Similarly, HSUS has not alleged facts

sufficient to demonstrate that cockfighting venture participants and enthusiasts will not use

alternative channels of communication (e.g., underground magazines, internet chatrooms, email,

etc.) to promote and facilitate their activities.[12]

### ii.    None of the Alleged Facts In Plaintiff's Complaint Support an Inference That The Relief Requested By Plaintiff Will Redress the Alleged Harms

    Plaintiff's Complaint alleges no set of facts that would support a reasonable inference

that the remedies sought by Plaintiff are "likely" to redress the alleged harms.  Branton, 993 F.2d

at 908 (citing Allen v. Wright, 468 U.S. 737 (1984)).  To establish redressability, Plaintiff must

demonstrate that each form of relief sought would redress the alleged injury.  Norton, 434 F.3d

at 590-91.  In Glickman, the court found that the plaintiff satisfied the element of redressibility

---

[12] A recent news article pertaining to dogfights states that because dogfighting is illegal everywhere in the country, breeders and fighters "stay in touch through secret networks and underground magazines."  Paul Duggan, *A Blood Sport Exposed, Vick's Case Puts Dogfighting Culture in the Spotlight*, Washington Post, Aug. 22, 2007, at A1.

on the basis of a member's affidavit alleging that he had a current routine of regularly visiting a specific zoo were certain primates were allegedly mistreated, providing a finite time period within which he would make his next visit, and arguing that the USDA's promulgation of more stringent regulations would necessarily alleviate his aesthetic injury during his planned, future trips. 154 F.3d at 443.

In contrast, the plaintiff in Norton, who challenged the Department of the Interior and the National Park Service ("NPS") for allegedly failing to undertake various legal obligations with respect to the identification and management of certain areas of the National Park System, could not show how an order compelling the NPS to issue boundary maps and legal descriptions identifying certain area of a park as "wilderness" would reduce ORV use in that area, the basis for the alleged injury, especially given that most of the park had previously been identified as "wilderness." Id. at 592. Additionally, the plaintiff could not show how a court order compelling the NPS to review certain areas for "wilderness suitability" would lead to a change in the NPS's management of the land in a way that would reduce or eliminate the use of ORVs in those areas. Id. at 593. Therefore, the court concluded that the plaintiffs could not establish that the relief sought would redress the alleged injury. Norton, 434 F.3d at 593-594. Similarly, in Branton, the court found that a plaintiff who alleged injury from an "indecent" radio broadcast could not establish "causation" or "redressability" in his suit challenging the FCC's decision not to sanction National Public Radio ("NPR") because he could not show that the FCC's failure to sanction NPR would lead NPR or another broadcaster to "injure" the plaintiff in the future. The court in Branton noted that it was "conjectural" whether an order compelling the FCC to sanction the broadcaster NPR would reduce the amount of indecent broadcasts in the future, especially when "favorable impact of the official action that the complainant seeks to compel depends

utterly upon the actions of 'third parties not before the court,'…whose behavior is difficult to predict." Id. at 911 (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26 (1976)).

The Complaint contains only conclusory assertions that provide no basis for inferring that any of the forms of injunctive relief its seeks will eliminate or even reduce animal fighting ventures. See Complaint ¶¶ 11-15, 75-77. Plaintiff's Complaint contains no examples of any specific unlawful animal fighting venture that would not have taken place had the Postal Service refused to accept or distribute the Publications, nor does it identify any future unlawful animal fighting venture that will not take place if the publications are banned from the mail. The Complaint also provides no basis for inferring that a prohibition on animal fighting publications that do not contain advertisements for unlawful animal fighting ventures, or on publications without any advertisements for animal fighting ventures, would eliminate or even curtail the unlawful animal fighting ventures Plaintiff describes in its Complaint. Moreover, as with the Plaintiff in Branton, HSUS's alleged harms stem from the activities of actors other than the defendant, and therefore, it is "merely speculative" as opposed to "likely" that the alleged harms will be redressed by a favorable decision even if one accepts all the factual allegations in the complaint as true. Lujan, 504 U.S. at 561 (quoting Simon, 426 U.S. at 43).

### C.    Plaintiff Does Not Meet The Requirements For Prudential Standing Under The Zone-of-Interests Test

The plain language and legislative history of 39 U.S.C. § 3001 indicate that neither HSUS nor its members fall within the "zone-of-interests" to be protected or regulated by that statute, a requirement for establishing standing. See Bennett v. Spear, 520 U.S. 154, 162-63 (1996) (quoting Ass'n of Data Processing Serv.Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)); Air Courier Conf. v. American Postal Workers Union, 498 U.S. 517 (1991); Glickman, 154 F.3d

at 444 (citing NCUA v. First Nat'l Bank & Trust Co., 118 S. Ct. 927, 935 (1998); FEC v. Akins,

118 S. Ct. 1777, 1783 (1998)).  In Glickman, the court found that the plaintiff's asserted

interests, i.e., observing primates humane conditions, was within the zone of interests protected

by certain amendments to the AWA concerning "the humane handling, care, treatment, and

transport of animals…by animal exhibitors."  See id. at 428 (citing Pub. L. No. 99-198, § 1752,

99 Stat. 1354, 1645 (1985) (codified at 7 U.S.C. § 2143(a) (1994))).  The court emphasized that

the zone-of-interests test "focuses, not on those who[m] Congress intended to benefit, but on

those who in practice can be expected to police the interests that the statute protects."  Id. at 444;

see also Federation for American Immigration Reform, Inc. v. Reno, 93 F.3d 897, 900-04 (D.C.

Cir. 1996) (finding that a statute placing certain limits on the Attorney General's parole and

adjustment authority for aliens (e.g., Cuban nationals) was not intended to protect the interests of

the Plaintiff, an association concerned with the effects of immigration on certain geographic

areas, because the plain meaning and legislative history of the provision did not suggest that

Congress intended to benefit the association's members in particular or specifically identify

those members as suitable challengers of violations of the provision).  The court supported its

conclusion by citing to legislative history suggesting that the AWA and certain amendments to

the AWA were promulgated with the public's interests in mind and that "the AWA anticipated

the continued monitoring of concerned animal lovers to ensure that the purposes of the Act were

honored."  Id. at 444-45.

    Neither HSUS nor its members satisfy the "zone-of-interests" test articulated in

Glickman because the plain language and legislative history of section 3001 do not indicate that

HSUS is a "suitable challenger" under that statute.  Although HSUS arguably has an interest in

ensuring that the mailability statutes are properly applied and enforced, the text and legislative

history of section 3001 neither indicates nor even suggests that individuals or organizations are suitable challengers under that statute.

The legislative history of the AFPEA does not suggest that Congress intended to identify HSUS as a suitable challenger to enforce the animal fighting venture provisions of the AWA. Rather the legislative history only acknowledges the contributions of animal rights organizations and their support for this legislation.  See e.g., 153 Cong. Rec. E630 (March 23, 2007) ("I applaud the work done by animal rights organizations and law enforcement agencies to assist with protecting animals from inhumane treatment.") (remarks of Rep. Rangel); 153 Cong. Rec. H3031 (March 23, 2007) ("The Humane Society, the American Veterinary Medical Association, the National Sheriffs Association, and nearly 400 local law enforcement agencies covering all 50 states have all come out in support of this legislation.") (remarks of Rep. Conyers).  There is no mention in the legislative history that Congress expected such organizations to serve in an enforcement capacity.  To the contrary, Congress gave enforcement power only to the USDA and law enforcement agencies.

Additionally, there is no "integral relationship" between 39 U.S.C. § 3001 and the provisions of the AWA sufficient to afford HSUS standing to challenge the Postal Service's alleged violation of 3001(a).  See Air Courier, 498 U.S. at 525-26.  In Air Courier, the court concluded that the Private Express Statutes ("PES"), a collection of federal civil and criminal laws that generally make it unlawful for any entity other than the Postal Service to carry letters over post routes, were not intended to protect the interest of the plaintiff, a union of postal workers, in retaining employment opportunities because the plain meaning and legislative history of the PES indicated that Congress' concern in enacting the PES was to ensure the receipt of necessary postal revenues.  Id.  The court concluded that there was no "integral relationship"

between the PES and the labor management provisions in the Postal Reorganization Act

("PRA").  Id. (discussing Clarke v. Securities Industry Assn., 479 U.S. 388 (1987)).

Like the statutory provisions discussed in Air Courier, there is no integral relationship

between the AWA and 39 U.S.C. § 3001 which identifies as nonmailable any matter that is

prohibited from the mail under the AWA (see 39 U.S.C. § 3001(a)) because the provisions are

not intended to protect the same interests.  A fair reading of section 3001 indicates that the

statute only protects the interests of the Postal Service in excluding nonmailable matter from the

mails.  HSUS's interest in curbing animal fighting and providing shelter to injured animals is, at

best, tangential to this interest and should be insufficient to establish an "integral relationship"

between the two statutes.  A contrary finding necessarily means that persons may challenge the

mailability of third-party's mail, apparently without the involvement of the third party.

## III.    THE CORRESPONDENCE UPON WHICH THE UNDERLYING CONTROVERSY IS PREMISED, AND THE OPINIONS AND CONCLUSIONS THEREIN, ARE NOT SUBJECT TO JUDICIAL REVIEW.

The Postal Service's Response Letter II in which the Postal Service declined to take the

actions requested by HSUS in its Petition and Reconsideration Letter is judicially not reviewable

because the Postal Service is exempt from the judicial review provisions of the Administrative

Procedure Act ("APA").  Alternatively, even if the APA applied generally, two of its exceptions

would apply and give the same result.  First, the Postal Service's response letters giving the

Postal Service's interpretation of the AWA with respect to mailability of the Publications were

not "final agency action."  Second, any decisions by Inspection Service not to refer the matter to

the Department of Justice to pursue criminal investigations, as well as any decision by the latter

to prosecute, are committed to agency discretion by law and are not subject to judicial review.

**A.    Defendant's Claims Under The Administrative Procedure Act ("APA") Must Fail Because The Postal Service Is Exempt From The APA In The Context of The Instant Proceeding.**

Under 39 U.S.C. § 410(a), et seq., the Postal Service is generally exempt from the provisions of the APA codified in chapters 5 and 7 of title 5 of the United States Code.  See Morris v. Runyon, 870 F. Supp. 362, 368 (D.D.C. 1994) (citing National Easter Seal Society for Crippled Children and Adults v. United States Postal Service, 656 F.2d 754, 767 (D.C. Cir. 1981)).  Although 39 U.S.C. § 3001(m) states that proceedings concerning the mailability of matter under 39 U.S.C. § 3001 must be conducted in accordance with those chapters, this statute does not extend the scope of judicial review under the APA to the opinions and conclusions contained within the correspondence between HSUS and the Postal Service concerning the mailability of the Publications.  The plain language of this provision indicates that its purpose is to ensure that the Postal Service adheres to the APA in mailability "proceedings."  HSUS's reliance on this provision is misplaced because the correspondence between the Postal Service and HSUS, which is similar to the correspondence the Postal Service conducts with outside parties in the ordinary course of business, does not constitute "proceedings concerning the mailability of matter."  See Blount v. Rizzi, 400 U.S. 410, 412-13 (1971) (describing "proceedings" under former postal statute 39 U.S.C. § 4006 as including the filing of a written complaint by the General Counsel of the former Post Office Department, notice, a hearing, and the rendering of an opinion by the Judicial Officer); see also Daniel Dec. ¶ 32.  Neither the text of 39 U.S.C. § 3001 nor the text of the provisions set forth in 39 C.F.R. Part 953, contemplate that letters to private parties concerning the mailability of certain matter of third party mailers, and the opinions and conclusions therein, are subject to judicial review under the APA.

Moreover, section 3001 can only logically be interpreted to afford APA rights in mailers who are affected by adverse mailability rulings that could lead to certain restrictions on their

mailing activities.  Daniel Dec. ¶ 5.  If a mailer challenges a hypothetical action by the Postal

Service to deny entry of its mail, the APA would apply.  In this case however, HSUS is acting in

a capacity completely unrelated to its status as a mailer or customer because the Postal Service is

not contemplating any action that would affect HSUS's mailing activities, and therefore, the

APA does not apply in the instant proceeding.

      **B.**     **Defendant's Letter Declining To Declare The Subject Publications Nonmailable Or Ineligible for Periodicals Mailing Privileges Is Not A "Final Agency Decision" Subject to Judicial Review.**

      Assuming arguendo that HSUS could successfully claim that it can avail itself of the

judicial review provisions of the APA pursuant to 3001(m), the Postal Service's letter declining

to declare the Publications nonmailable or revoke their Periodicals mailing status (Response

Letter II) is not a final agency decision that may be subject to judicial review.  To be considered

"final," Plaintiff must point to an action that marks the consummation of the agency's

decisionmaking process.  The action must also be one by which rights or obligations have been

determined or from which legal consequences will flow.  See Spear, 520 U.S. at 177-78; John

Doe, Inc. v. DEA, 484 F.3d 561, 566 (D.C. Cir. 2007); Role Models America, Inc. v. White, 317

F.3d 327 (D.C. Cir. 2003) (base closings decisions held to be final agency action); American

Telephone & Telegraph Co. v. EEOC, 270 F.3d 973, 975 (D.C. Cir. 2001) (decision to sue over

alleged violation did not constitute final agency action); Appalachian Power Co. v. EPA, 208

F.3d 1015, 1022 (D.C. Cir. 2000).

> Two conditions must be satisfied for agency action to be 'final': First, the action must
> mark the 'consummation' of the agency's decisionmaking process--it must not be of a
> merely tentative or interlocutory nature. And second, the action must be one by which
> 'rights or obligations have been determined,' or from which 'legal consequences will
> flow[.]

Appalachian Power, 208 F.3d at 1022 (citations omitted).  In analyzing whether an agency

decision is final, courts have looked primarily to whether the agency's position on an issue is

"definitive" and whether the action has a "direct and immediate effect on the day-to-day business of the parties challenging the action." See e.g., John Doe, 484 F.3d at 566.

The Postal Service's Response Letter II to HSUS was not "definitive" because it did not unequivocally state the agency's position regarding the mailability of the Publications. See Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 436-437 (D.C. Cir. 1986). Rather, the letter provided Plaintiff with an opportunity to present further information and evidence that the Publications were nonmailable. See Response Letter I, at 2 (issued before the enactment of the AFPEA); Response Letter II, at 1.

Additionally, Response Letter II had no direct or immediate effect on the day-to-day business of the Plaintiff. The letter simply provided HSUS with an interpretation of the applicable postal mailability statutes and regulations to the subject Publications. Daniel Dec. ¶ 32. Because the letter did not impose any obligation on HSUS, deny HSUS any rights, or fix any legal relationships, the Response Letter II and the tentative conclusions therein are not final agency action. See also Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n, 324 F.3d 726, 732 (D.C. Cir. 2003) (finding that the agency had not yet made any determination or issued any order imposing any obligation on the plaintiff because the agency had not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences). Thus, there is no final agency action reviewable under the APA.

**C.    Decisions Concerning Whether To Investigate Alleged Unlawful Written, Printed, Or Graphic Matter Are Committed to Agency Discretion by Law.**

Decisions by the Department of Justice over whether to conduct criminal investigations into the mailing of certain written, printed, or graphic matter referred to it by the Inspection Service are similar to prosecutorial and investigative decisions by other agencies that have been found to be exempt from judicial review. See Assoc. of Irradiated Residents v. EPA, 494 F.3d

1027, 1030 (D.C. Cir. 2007); Secr'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 156-57

(D.C. Cir. 2007); Jerome Stevens Pharmaceuticals v. FDA, 402 F.3d 1249, 1256-67 (D.C. Cir.

2005); Drake v. FAA, 291 F.3d 59 (D.C. Cir. 2002); accord Sierra Club v. Whitman, 268 F.3d

898 (9th Cir. 2001); American Disabled for Attendant Programs Today v. United States HUD,

170 F.3d 381, (3d Cir. 1999).  As noted above, administrative procedures for agency

adjudication of disputes concerning the mailability of matter are explicitly provided for lottery

matter, false advertising matter, and articles and substances.  39 C.F.R. Parts 952 and 953.  With

respect to written, printed, or graphic matter that falls outside of these categories, Postmasters are

instructed to send a report to the Inspection Service when such matter is found in the mail and

appears to be nonmailable (i.e., mail matter that appears to contain obscene material), in

accordance with section 138.14 of the POM.  The Inspection Service may then decide to notify

the Department of Justice so that the Department can determine whether a criminal investigation

is warranted.  Daniel Dec. ¶ 8.  Such determinations are analogous to the government's exercise

of investigatory discretion which is generally found to be exempt from judicial review.  See

ADAPT, 170 F.3d at 384 (3d Cir. 1999) (noting that "the Supreme Court has established a

presumption against judicial review of agency decisions that involve whether to undertake

investigative or enforcement actions") (citing Heckler v. Chaney, 470 U.S. 821, 838 (1985)).

Similarly, DOJ has discretion as to whether to prosecute, and it would serve little purpose to

force the Postal Service to make a referral to DOJ, because the Court cannot force DOJ to act on

the referral.

## IV.    NEITHER THE ANIMAL WELFARE ACT NOR THE POSTAL REORGANIZATION ACT AFFORD PLAINTIFF A PRIVATE RIGHT OF ACTION

As explained by the Supreme Court, the "central inquiry remains whether Congress

intended to create, whether expressly or by implication, a private cause of action" and "the

question of the existence of a statutory cause of action is, of course, one of statutory

construction." Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 76 (1979).  Neither HSUS

nor its members have an explicit or implied right of action under 39 U.S.C. § 3001 or the AWA

to challenge the Postal Service's letter declining to declare the Publications nonmailable and

refusing to revoke their Periodicals status.  "While it is possible in some cases for courts to imply

private rights of actions into statutes not expressly providing for them, in recent decades the

Supreme Court has 'retreated from [its] previous willingness to imply a cause of action where

Congress has not provided one.'"  Prunte v. Universal Music Group, 484 F. Supp. 2d 32, 42

(D.D.C. 2007) (quoting Corr. Serv. Corp. v. Malesko, 534 U.S. 61, 67 n.3 (2001)).  In Cort v.

Ash 422 U.S. 66 (1975), the Supreme Court held that several factors inform the determination of

whether a private right of action is implicit in a statute, including (1) whether the statute was

enacted to benefit the plaintiff; (2) whether there is evidence of legislative intent to create or

deny such a right, explicitly or implicitly; (3) whether implying such a right is consistent with the

overall purpose of the legislation; and (4) whether the cause of action is one traditionally

relegated to state law.  422 U.S. 66, 78 (1975).  Subsequent Supreme Court opinions indicate

that, although the four factors set forth in Cort are guides to discerning congressional intent, the

factors are not entitled to equal weight, and the first three constitute the central inquiry.  See e.g.,

Touche Ross & Co. v. Redington, 442 U.S. 560, 575-76 (1979); see also Tax Analysts v. IRS,

214 F.3d 179, 185-86 (D.C. Cir. 2000).

     An analysis of the first three factors demonstrates that Congress did not intend to create a

private right of action under 39 U.S.C. § 3001 that would serve as a basis for the HSUS's claim

in the instant action.  First, neither the plain language nor the legislative history of 39 U.S.C. §

3001 indicate that Congress specifically intended for the statute to benefit HSUS or its members.

See <u>Dial A Car v. Transportation, Inc.</u>, 132 F.3d 743, 745 (D.C. Cir. 1998) (holding that there was no implied right of action under a statute prohibiting unlicensed taxicab operations in the District of Columbia because the plaintiff taxicab company could not show that the statute was specifically enacted to benefit members of the taxicab industry "as opposed to the taxicab-using public at large").

Second, the plain language and legislative history of the PRA do not indicate that Congress intended to create a private right of action.  The key inquiry in determining whether a statute contains an implied right of action is "whether Congress intended to create a private right of action under a federal statute without saying so explicitly."  <u>See</u> <u>Nat'l Postal Prof'l Nurses v. U.S. Postal Servce</u>, 461 F. Supp. 2d 24, 31, 32 n. 1 (D.D.C. 2006) (quoting <u>Thompson v. Thompson</u>, 484 U.S. 174, 179 (1988)).  In <u>Nat'l Postal Prof'l Nurses</u>, the court held that plaintiffs, a union representing nurses employed by the Postal Service, could not establish a private right of action against the Postal Service under section 1001(b) of the Postal Reorganization Act ("PRA") (39 U.S.C. § 1001) to challenge the Postal Service's employment of certain contract physicians.  <u>Id.</u> at 26-28.  The court analyzed the statutory provision in the PRA that provided "in general terms for the appointment and status of USPS employees…in career and contract positions," and certain portions of the House Report accompanying the PRA pertaining to the working conditions of employees in 1970.  <u>Id.</u>  The court concluded that the plain language and legislative history of the PRA did not demonstrate that Congress intended to create a private cause of action to enforce a statute allegedly prohibiting the hiring of contract employees.  <u>Id.</u> at 32-33.  The court emphasized that the "general prescriptive character of § 1001(b) which merely directs the Postal Service to establish personnel management procedures" does not indicate a Congressional intent to create a private remedy.  <u>Id.</u>

The plain language of 39 U.S.C. § 3001, which pertains to the nonmailability of certain matter and provides the Postal Service with the authority to dispose of such matter under certain conditions, nowhere indicates that interested members of the public other than mailers are afforded a private right of action to enforce the nonmailability provisions as those provisions are applied to their particular mailings.  Although 39 U.S.C. § 3001(m) provides an avenue for legal challenges to final orders issued by the Postal Service concerning the nonmailability of certain matter, the most sensible reading of section 3001(m) in the context of the chapter in which it is codified (Chapter 30), demonstrates that this provision is only intended to provide customers that may be adversely affected by an official mailability determination with an administrative process through which they can contest such determinations.  For example, section 3001(m) in conjunction with 39 U.S.C. § 3005 provides mailers with an administrative procedure for challenging complaints alleging that they have conducted a scheme for obtaining money or property through the mail by means of false representations.  See 39 C.F.R. § 952.  Additionally, the PRA provides the Postal Service with the broad authority to adopt, amend, and repeal rules and regulations necessary to carry out Title 39 and exempts the Postal Service from the APA and other federal laws, thereby limiting the opportunities for judicial review.  See 39 U.S.C. §§ 401, 410(a).  These provisions show that Congress did not intend to create a private right of action that would expand such review.

Third, portions of the PRA's legislative history indicate that Congress intended for the Postal Service to have substantial freedom in the conduct of its operations so that it could operate more along the lines of a private company.  See e.g., H.R. Rep. No. 91-1104, 91st Cong., 2d Sess. 1-2, 7; see also Runyon, 870 F. Supp. at 371 ("the purpose of the statutory reorganization of the Postal Service was 'to permit the Postal Service to operate like a business and to respond

with flexibility and imagination to the task of moving the mail'…If this goal is to be effectuated, the courts must permit the Postal Service to Act like a business, without subjecting routine decisions to the cost and delay of judicial interference."). Implying a right of action would contravene the purposes of the PRA by expanding the scope of judicial review of Postal Service decisionmaking well beyond the circumstances Congress envisioned. Thus, the three key factors for determining whether Congress intended to create a private right of action inescapably lead to the conclusion that HSUS is afforded no such private right of action under 39 U.S.C. § 3001.

Likewise, the plain language and legislative history of the AFPEA and the AWA will likely preclude a finding that Congress intended to create a private right of action under the AWA. The AWA does not explicitly provide for private citizens or organizations to file private causes of action for violations of the AWA. Additionally, the legislative history of the AFPEA does not indicate that the AWA and its amendments were specifically intended to benefit HSUS or its members over other members of the public, a key factor to the decision in Dial A Car. 132 F.3d at 745. The AWA's explicit provisions for the public enforcement of the animal fighting venture provisions is a strong indication that Congress did not intend to create a vehicle for private enforcement of these provisions.[13] See e.g., id. at 745 ("The DCCA has been reluctant to

---

[13] The animal fighting venture provisions specifically identify USDA, in conjunction with federal and state law enforcement agencies including the Federal Bureau of Investigation, as the agency responsible for investigating potential violations of these provisions, including 7 U.S.C. § 2156(c) and (e). See 7 U.S.C. § 2156(f). The legislative history of the AFPEA also contemplates that law enforcement agencies will enforce the AWA provisions. See e.g., 153 Cong. Rec. H3023 (March 26, 2007) ("One of the primary reasons for enacting the increased penalties under title 18 is the reluctance of U.S. Attorneys to pursue animal fighting cases under the current misdemeanor provisions because they view the penalties as ineffective against an animal fighting industry, which has continued unabated nationwide") (remarks of Rep. Scott); 153 Cong. Rec. S451 (January 11, 2007) ("It's time for Congress to strengthen the federal law so that it can provide a meaningful deterrent against animal fighting. State and local law enforcement will have a tough law on the books necessary to help them crack down on this interstate industry.") (remarks of Sen. Cantwell).

find a private right of action implicit in a statute that provides for public enforcement.") <u>See also</u>

<u>International Primate Protection League v. Institute for Behavioral Research</u>, 799 F. 2d 934, 940

(4th Cir. 1986) (finding no provision for lawsuits by private individuals in the text and legislative

history of the AWA and reasoning that Congress intended the administrative remedy to be the

exclusive remedy).

**V.    THE POSTAL SERVICE LETTERS REFLECT CORRECT INTERPRETATIONS OF THE ANIMAL WELFARE ACT, AS WELL AS THE POSTAL STATUTES AND REGULATIONS ON MAILABILITY.**

The Animal Welfare Act does not prohibit the mailing of the Publications because the

Publications do not "promot[e] or in any other manner [further]" animal fighting ventures within

the meaning of 7 U.S.C. § 2156(c).  Whether the Publications may be accepted and delivered by

the Postal Service consistent with 7 U.S.C. § 2156(c) turns on how the phrase "promoting or in

any other manner furthering" is construed.  Although the legislative history of the AWA and the

AFPEA provide little guidance on how to interpret 7 U.S.C. § 2156(c), Congress expressly

addressed the subject of "game fowl publications" in the Conference Report accompanying the

Animal Welfare Act Amendments of 1976.  H.R. Rep. No. 94–976, 23 (1976), <u>reprinted in</u> 1976

U.S.C.C.A.N. 783, 797.  The report indicated that a cockfighting publication would be mailable

unless it contained "advertising of fights involving live birds" occurring in a state that has

outlawed such fighting ventures.  Congress indicated that in all other instances, "[g]ame fowl

publications would be unaffected" by the AWA Amendments.  <u>Id.</u>  Although certain portions of

the legislative history of the AFPEA suggest that Congress intended to prohibit the mailing of

these publications, Congress did not amend the salient language in 7 U.S.C. § 2156(c) (i.e.,

"promoting or in any other manner furthering") to clarify the statute's application to cockfighting

publications or the advertisements therein.  The AFPEA amendment to this provision which

replaced "interstate instrumentality" with "instrumentality of interstate commerce for

commercial speech" only pertains to the channels of communication that fall within the scope of 7 U.S.C. § 2156(c), not to the types of communication prohibited under the statute.

As noted above, the most recent issues of *The Feathered Warrior* (August 2007) and *The Gamecock* (August/September 2007) did not contain any advertisements for animal fighting ventures. The June and July 2007 issues of *The Feathered Warrior* contained an advertisement for a bird fight; however, based on the address listed in the advertisement, that particular fight appeared to be located in Louisiana where cockfights free of wagering are still currently legal.[14] Furthermore, while it is illegal to transport a bird in interstate commerce for the purpose of participating in an animal fighting venture, the plain language of 7 U.S.C. § 2156 does not explicitly prohibit birds that are advertised as fighting birds from being lawfully transported across state lines for purposes other than participation in an animal fighting venture, such as for display.

Plaintiff's allegations that the Publications are nonmailable because they contain advertisements for animal fighting paraphernalia prohibited from transport or delivery under 7 U.S.C. § 2156(e) is also without merit. Unlike 7 U.S.C. § 2156(c) discussed above, 7 U.S.C. § 2156(e) is not ambiguous; it only criminalizes transactions through interstate commerce. Thus, the selling, buying, transporting, and delivering of matter prohibited by section 2156(e) can be legal when not conducted via interstate commerce. More importantly however, such advertisements have been removed from the most recent issues of the Publications and therefore do not provide a basis for declaring the Publications nonmailable at the present time.

The rule of lenity, a tool of statutory construction that courts have invoked to construe ambiguous criminal statutes in favor of a defendant, also cautions against a broad reading of 7

---

[14] The advertisement referred to Milkdairy Game Club. Its website (http://fowlplaygamefarm.homestead.com/mdsat.html) states that it is located in Louisiana.

U.S.C. § 2156(c).  The Supreme Court has stated that the rule is generally limited to "situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute."  See Moskal v. United States, 498 U.S. 103, 108 (1990) (quoting Bifulco v. United States, 447 U.S. 381, 387 (1980)); United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1352 (D.C. Cir. 2002).  In light of the ambiguous scope of 7 U.S.C. § 2156(c) and the statute's legislative history, and because 7 U.S.C. § 2156(c) provides criminal penalties for violations, the rule of lenity may provide an additional basis for interpreting the statute to apply only to advertisements for illegal animal fighting ventures.  See United States v. Anderson, 59 F.3d 1323, 1326 (D.C. Cir. 1995) (applying the rule of lenity to a criminal statute that contained an ambiguous phrase that could reasonably be interpreted two ways, but where one interpretation would have resulted in more substantial criminal penalties against the defendant than the other).

The presence of an explicit prohibition on the selling, buying, transporting, or delivering of animal fighting accoutrement such as knives, gaffs, or other sharp objects in interstate or foreign commerce in 7 U.S.C. § 2156(e) suggests that Congress intended for 7 U.S.C. § 2156(c) to be read narrowly.  Because there is a strong presumption against interpreting statutes in a way that would render other statutory language superfluous, this Court should be wary of construing the scope of 7 U.S.C. § 2156(c) too broadly.  See McCloy v. USDA, 351 F.3d 447, 451 (10th Cir. 2003) ("Under a long-standing canon of statutory interpretation, one should avoid construing a statute so as to render statutory language superfluous.").  This follows because, in isolation, the prohibition on the use of the mail service for "purposes of promoting or in any other manner furthering an animal fighting venture" in 7 U.S.C. § 2156(c) could be interpreted to apply to a broad range of activities that are arguably associated with animal fighting ventures, but are one

step removed from the actual fights, e.g., (1) advertising the fights and (2) selling fighting

accoutrement.  However, such an interpretation would render superfluous subsection 2156(e)

which explicitly prohibits the latter already.  If subsection (c) should not be interpreted to reach

those activitives one step removed from the actual fights, it makes little sense to interpret it to

reach those activities two steps removed, e.g., marketing or advertising the selling of fighting

accoutrement.  Therefore, (c) should be read narrowly to reach only running or advertising actual

fights.  This reasoning is fully consistent with the rule of lenity described above.

## CONCLUSION

For the foregoing reasons, Defendant Postal Service respectfully requests that

Defendant's motion to dismiss be granted and that the Plaintiff's Complaint be dismissed in its

entirety with prejudice, or in the alternative, that Defendant's motion for summary judgment be

granted in Defendant's favor.


October 16, 2007                    Respectfully submitted,

                                    _____
                                    JEFFREY A. TAYLOR, D.C. Bar # 498610
                                    United States Attorney

                                     /s/
                                    _____
                                    RUDOLPH CONTRERAS, D.C. Bar # 434122
                                    Assistant United States Attorney

                                     /s/
                                    _____
                                    ALAN BURCH, D.C. Bar # 470655
                                    Assistant United States Attorney
                                    555 4th St., N.W.
                                    Washington, D.C. 20530
                                    (202) 514-7204, alan.burch@usdoj.gov

Of counsel:

ANTHONY F. ALVERNO, ESQ.
DC Bar # 499580
Chief Counsel, Customer Programs
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6138
Washington, DC 20260-1135
(202) 268-2997, 268-5418

MATTHEW J. CONNOLLY, ESQ.
Attorney, Corporate Law
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6332
Washington, DC 20260-1135
(202) 268-8582, 268-5418

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| THE HUMANE SOCIETY | ) | |
| OF THE UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 07-1233-CKK |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE</u>

Pursuant to Local Rules 7(m) and 56.1, Defendant respectfully files this Statement of

Material Facts in support of its alternative motion for summary judgment.

1.      Title 39 C.F.R. does not contain explicit procedures for determining the

mailability of written, printed, or graphic matter other than false advertising matter and lottery

matter.  Declaration of Sharon Daniel ("Daniel Decl.") ¶ 7.

2.      Postmasters are instructed to send a report to the U.S. Postal Inspection Service

("IS"), a law enforcement agency of the Postal Service, regarding written, printed, or graphic

matter that is found in the mail and that appears to be nonmailable (e.g., if the matter appears to

be obscene or appears to contain child pornography), in accordance with section 138.14 of the

Postal Operations Manual ("POM").  Daniel Decl. ¶ 8.  The IS may then decide to notify the

Department of Justice so that the Department can determine whether a criminal investigation is

warranted.  <u>Id.</u>

3.    *The Gamecock* and *The Feathered Warrior* ("Publications") are published eleven times per year by "Marburger Publishing Co." and "DOWD Publishing," respectively.  Daniel Decl. ¶ 10, Exs. B, C.

4.    The Publications include editorial content, such as essays and articles, on a variety of topics including cockfighting, processes and techniques for breeding fowl, politics, legislation, and government.  Daniel Decl. ¶ 12.

5.    The May 2007 and June 2007 issues of *The Gamecock* contain advertisements for knives and other piercing instruments.  Daniel Decl. ¶ 13, Exs. D, E.  The July 2007 issue of *The Gamecock* contains no such advertisements.  Daniel Decl. ¶ 13, Ex. F.

6.    The May 2007 through July 2007 issues of *The Gamecock* contain no advertisements for animal fights.  Daniel Decl. ¶ 13, Exs. D through F.

7.    The May 2007 through June 2007 issues of *The Feathered Warrior* contain advertisements for knives and gaffs.  Daniel Decl. ¶ 14, Exs. H, I.  The July 2007 issue of *The Feathered Warrior* contains no such advertisements.  Daniel Decl. ¶ 14, Ex. J.

8.    The May 2007 through July 2007 issues of *The Feathered Warrior* appear to contain advertisements for bird fights in Louisiana.  Daniel Decl. ¶ 14, Exs. H through J.

9.    The August/September 2007 issue of *The Gamecock* and the August 2007 issue of *The Feathered Warrior*, are the most recent issues of both Publications submitted to the Postal Service for mailing as of the filing of this motion.  Daniel Decl. ¶ 15.

10.    HSUS and the Postal Service corresponded to each other through four letters, all of which are attached.  Specifically, HSUS wrote a letter dated April 26, 2006, from Jonathon Lovvorn, Vice President, Animal Protection Litigation, The Humane Society of the United States ("HSUS"), to John E. Potter, Postmaster General, USPS ("Initial Request Letter"), in which

HSUS requested that the Postal Service declare the Publications nonmailable. Daniel Decl. ¶ 21, Ex. L. The Initial Request Letter included a document titled "Petition to Declare Animal Fighting Publications Nonmailable" ("Petition") which contained numerous attachments, including copies of certain pages from issues of *The Gamecock* and *The Feathered Warrior*. Daniel Decl. ¶¶ 22-23, Ex. M. The Postal Service responded in a letter dated June 5, 2006, from Sherry Suggs, the former Manager of Mailing Standards to Mr. Lovvorn, and declined to grant the relief HSUS requested in its Initial Request Letter and Petition. Daniel Decl. ¶ 24, Ex. N. HSUS then sought "reconsideration," via letter dated May 3, 2007, from Mr. Lovvorn to Ms. Suggs, pointing to the recent AFPEA amendments to the AWA. Finally, the Postal Service responded, via letter dated June 26, 2007, in which the Postal Service again declined to grant the relief HSUS requested in its Initial Request Letter and Petition. Daniel Decl. ¶ 31, Ex. P.

11.    Neither of these issues of the Publications HSUS included with its two letters to the Postal Service contained advertisements for bird fights in states where bird fights were illegal. See Daniel Decl. ¶ 29, Ex. O.

12.    The letters that the Postal Service sent to HSUS, referenced in paragraph 10 above, are examples of the type of correspondence that Mailing Standards issues in the ordinary course of business. Id.

13.    Such correspondence does not constitute official mailablity determinations or rulings that could potentially have an adverse affect on a mailer's mailing privileges (e.g., suspension or withdrawal of a mailer's mailing privileges). Id.

October 16, 2007                     Respectfully submitted,


                                     _____
                                     JEFFREY A. TAYLOR, D.C. Bar # 498610
                                     United States Attorney

_/s/_
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_/s/_
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204, alan.burch@usdoj.gov

Of counsel:

ANTHONY F. ALVERNO, ESQ.
DC Bar # 499580
Chief Counsel, Customer Programs
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6138
Washington, DC 20260-1135
(202) 268-2997, 268-5418

MATTHEW J. CONNOLLY, ESQ.
Attorney, Corporate Law
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6332
Washington, DC 20260-1135
(202) 268-8582, 268-5418