UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ ) | | |
| THE HUMANE SOCIETY ) | | |
| OF THE UNITED STATES, ) | | |
| ) | | |
| Plaintiff, ) | | Civil Action No.: 07-1233-CKK |
| ) | | |
| v. ) | | |
| ) | | |
| UNITED STATES POSTAL SERVICE, ) | | |
| ) | | |
| Defendant. ) | | |
| _____) | | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## Introduction

Defendant, the U.S. Postal Service ("USPS" or "Postal Service"), respectfully moves to dismiss this case under Rules 12(b)(1) and 12(b)(6), or in the alternative, for summary judgment per Rule 56.  Plaintiff, The Humane Society of the United States ("Humane Society" or "HSUS") claims that the Postal Service's letters declining to declare two publications, *The Gamecock* and *The Feathered Warrior* ("Publications"), "nonmailable" violated the Animal Welfare Act ("AWA") and 39 U.S.C. § 3001(a).  Complaint at 1, 24-26.  The Complaint further asserts that the Postal Service's letter dated June 26, 2007, declining to grant the relief HSUS requested constituted a "decision" or "ruling" reviewable under the Administrative Procedure Act ("APA").  Id. at 1, 10.  Plaintiff claims that the Postal Service's continued acceptance and distribution of the Publications are inconsistent with certain postal regulations set forth in the Domestic Mail Manual ("DMM").  Complaint, at 24-27.  Plaintiff requests, *inter alia*, an order

(1) declaring that the interstate shipment of both publications violates the AWA and (2) enjoining the Postal Service from accepting the publications for mailing.  Id. at 26-27.

## Summary of Argument

Plaintiff's Complaint must be dismissed for lack of jurisdiction under Rule 12(b)(1) because the Humane Society lacks standing and because decisions regarding whether to investigate instances of alleged unlawful written, printed, or graphic matter are committed to agency discretion by law.  Additionally, Plaintiff's claims under the APA must be dismissed under Rule 12(b)(6) because the Defendant is exempt from the judicial review provisions of the APA and because Plaintiff's Complaint is not premised on any final agency action.  Further, no private right of action is implicit or explicit in the text or the legislative history of the statutes that plaintiff cites as the bases for its Complaint.

In the alternative, summary judgment is proper because acceptance and distribution of the Publications via the Postal Service are not unlawful under the AWA.  The publications are therefore mailable under the Postal Reorganization Act ("PRA") and postal regulations on mailability set forth in the DMM.  There is no genuine dispute of material fact.

## Procedural and Factual Background

**A.**    **The Publications**

The Gamecock and The Feathered Warrior ("Publications") are published eleven times per year by "Marburger Publishing Co." and "DOWD Publishing," respectively.  Decl. Sharon Daniel ("Daniel Decl.") ¶ 10, Exs. B, C.  They have circulation of 9007 and 2314 copies per year, respectively.  Daniel Decl., Exs. B, C. [1]  Both Publications include editorial content, such as essays and articles on a variety of topics, including cockfighting, the processes and techniques

---

[1] Circulation figures reflect average number distributed in the preceding 12 months.

for breeding fowl, politics, and legislation.  Daniel Decl. ¶¶ 12, 16, Exs. D-K.  Both Publications

contain advertisements for game fowl, game fowl breeders, and game fowl supplies such as

cords, feed, vitamins, antibiotics, breeding handbooks, etc.  The August/September 2007 issue of

*The Gamecock* and the August 2007 issue of *The Feathered Warrior* do not contain

advertisements for animal fights or advertisements for knives, spurs, gaffs, and other piercing

instruments.  Daniel Decl. ¶ 15, Exs. G, K; but see Plf. Mot. Sum. J. at 5-7, 15.  While the May

2007 and June 2007 issues of *The Gamecock* contained advertisements for spurs, gaffs, and other

piercing instruments, the July 2007 issue did not.  Daniel Decl. ¶ 13, Exs. D-F; but see Plf. Mot.

Sum. J. at 5-7, 15.  The May 2007 through July 2007 issues of *The Feathered Warrior* each

contained advertisements for bird fights in Louisiana, but the August 2007 issue did not.  Daniel

Decl. ¶ 14, Exs. H-J.

Both Publications are authorized to be mailed as "Periodicals," a class of mail that

includes subscription magazines, newsletters, and newspapers.  Daniel Decl. ¶ 17.  Because the

educational, cultural, social, and informational value of this class of mail is relatively high, the

rates for this category of mail have traditionally been very favorable compared to other classes of

mail.  Id.  Accordingly, the Postal Service has established detailed eligibility requirements

(discussed below) for this class of mail.  Id.

## B.    Legal Background

### 1.    The Animal Welfare Act

The Animal Welfare Act ("AWA") prohibits "sponsoring or exhibiting" an animal in an

"animal fighting venture."  7 U.S.C. § 2156(a).  Subsection 2156(b) prohibits "buying, selling,

delivering, or transporting animals for participation in animal fighting venture."  The provision

of the AWA central to this case appears in paragraph (c), and the original version of it provided:

[i]t shall be unlawful for any person to knowingly use the mail service of the United

> States Postal Service or any interstate instrumentality for purposes of promoting or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.

7 U.S.C. 2156(c) (2006) (later amended, as discussed below). The AWA defined "animal fighting venture" as "any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1) (2006). The term did not include "any activity the primary purpose of which involves the use of one or more animals in hunting another animal." Id. The AWA also provided that:

> [n]otwithstanding the provisions of [7 U.S.C. 2156(c)], the activities prohibited by such subsection shall be unlawful with respect to fighting ventures involving live birds *only if* the fight is to take place in a State where it would be in violation of the laws thereof.

7 U.S.C. § 2156(d) (2006) (emphasis added). Penalties for violating section 2156 included fines and/or imprisonment for up to one year. 7 U.S.C. § 2156(e) (2006). Subsection 2156(f) authorizes the Secretary of Agriculture to investigate violations and to request assistance from the Federal Bureau of Investigation ("FBI") as well as other law enforcement agencies.

The provisions discussed above were first introduced in 1976, in section 17 of the Animal Welfare Act Amendments of 1976 ("AWA Amendments"), Pub. L. 94–279, 90 Stat. 417. The provisions were amended to permit the continued practice of cockfighting in states recognizing these fights as legal. H.R. Rep. No. 94–976, 23 (1976), reprinted in 1976 U.S.C.C.A.N. 783, 797. The Conference Report further stated that "[g]ame fowl publications would be unaffected except that advertising of fights involving live birds would be prohibited except in those instances where such fights are to be held in a State or territory where they are not unlawful." Id.

The Animal Fighting Prohibition Enforcement Act of 2007 ("AFPEA"), enacted on May 3, 2007, amended 7 U.S.C. § 2156(c) by replacing the words "interstate instrumentality" with the words "instrumentality of interstate commerce for commercial speech." The term "instrumentality of interstate commerce" was defined to include "any written, wire, radio,

- 4 -

television or other form of communication in, or using a facility of, interstate commerce." See 7

U.S.C. § 2156(g)(3) (2007).  The AFPEA also expanded upon the existing prohibitions in

§ 2156, otherwise referred to as section 26 of the AWA, by adding a provision stating that:

> [i]t shall be unlawful for any person to knowingly sell, buy, transport, or deliver in
> interstate or foreign commerce a knife, a gaff, or any other sharp instrument attached, or
> designed or intended to be attached, to the leg of a bird for use in an animal fighting
> venture.

7 U.S.C. § 2156(e) (2007).  Additionally, the AFPEA deleted the language in subsection 2156(e)

pertaining to penalties and added a provision that provides criminal penalties for violations of the

prohibitions in section 2156.[2]  7 U.S.C. § 2156(i).

The AFPEA did not further define the terms "promoting" or "furthering" or clarify the

application of 7 U.S.C. § 2156(c) to the Postal Service.  The AFPEA also did not amend the

salient language in 7 U.S.C. § 2156(g)(1) which defines the term "animal fighting venture" or the

Act's exemption for bird fighting ventures in states where such activities are not illegal.

### 2.      Postal Statutes and Regulations Concerning Mailability

Federal law governs mailability of material and 39 U.S.C. § 3001(a) provides that

"[m]atter[,] the deposit of which in the mails is punishable under . . . section 26 of the Animal

Welfare Act[,] is nonmailable."[3]  Thus, section 3001 governs the Postal Service's response to

matter submitted for mailing, whereas the AWA applies to individuals attempting to use the

Postal Service to mail the matter.  Subsection 3001(b) of Title 39 generally provides the Postal

Service with the authority to dispose of nonmailable matter which reaches the office of delivery,

---

[2] 18 U.S.C. § 49 provides that "[w]hoever violates subsection (a), (b), (c), or (e) of section 26 of
the Animal Welfare Act shall be fined under this title, imprisoned for not more than 3 years, or
both, for each violation."

[3] This subsection, formerly codified in 39 U.S.C. § 4001, was recodified in § 3001 by the Postal
Reorganization Act of 1970 ("PRA"), Pub. L. No. 91-375.  HSUS refers to the PRA as the
"Postal Act."  See, e.g., Complaint ¶ 31.

or which may be seized or detained for violation of law, as the Postal Service shall direct.[4]
Pursuant to 39 U.S.C. § 3001(m), "proceedings concerning the mailability of matter" under 39
U.S.C. § 3001 must be conducted in accordance with chapters 5 and 7 of Title 5 of the U.S.
Code.  These chapters contain provisions concerning judicial review under the APA.

The DMM contains the mailing standards promulgated by the Postal Service.[5]  These
standards are incorporated into the Code of Federal Regulations by reference at 39 C.F.R.
§ 111.1 and thus have the legal effect of federal regulations.  Chapter 601 of the DMM contains
the Postal Service's standards for mailability, but these regulations provide only limited bases for
administrative determinations of nonmailability; as argued below, these procedures do not apply
to HSUS's requests for actions by the Postal Service.

DMM § 601.9.3.1 states that "the mailing of a live animal for the purpose of participating
in an animal fighting venture is prohibited (regardless of whether such venture is permitted under
the laws of the state in which it is conducted)."  During the time between the Postal Service's
receipt of HSUS's Petition to Declare Animal Fighting Publications Nonmailable, dated April
26, 2006, and the date of the filing of the instant complaint, July 10, 2007, the DMM provided:

> [w]ritten, printed, or graphic matter (e.g., advertisements) promoting or furthering an
> animal fighting venture conducted in any state (except a venture involving live birds
> permitted under the laws of the state in which the fight is conducted) is nonmailable
> under 7 USC 2156.

---

[4] Plaintiff cites 39 U.S.C. § 3001(d) to support its statement: "When Congress declares an item to
be nonmailable, it '*shall not* be carried or delivered by mail'."  Pl.'s Mot. Sum. J. at 3.  Plaintiff's
reliance on 3001(d) is misplaced because that provision pertains to a certain type of nonmailable
matter, i.e., Solicitations in Guise of Bills, Invoices, or Statements of Account, rather than
nonmailable matter generally
[5] Available online at http://pe.usps.gov.

DMM § 601.12.5.7.  The term "animal fighting venture" mirrored the definition provided in the AWA.[6]  On August 30, 2007, the Postal Service revised this provision by replacing the word "advertisements" with "advertisements or other commercial speech."  Additionally, a new section (DMM § 601.11.20) was added to prohibit the mailing of animal fighting accessories such as knives, gaffs, or any other sharp instruments attached, or designed to be attached to the leg of a bird for use in an animal fighting venture.  The August 2007 revisions were intended to bring the DMM into conformity with the AFPEA.  Daniel Decl. ¶ 4.  The revisions were published on page 18 of the August 30, 2007 edition of the Postal Bulletin and were incorporated into the September 2007 update of the DMM online.  Id. Ex. A.

    Title 39 C.F.R. contains rules of practice for mailability proceedings relating to the following types of matter: articles and substances other than written, printed, or graphic matter, false advertising matter, and lottery matter.  See 39 C.F.R. Parts 953, 952.  As with the rules for proceedings concerning the denial, suspension, or revocation of Periodicals mail privileges (discussed below), these provisions generally provide the mailer with notice, an opportunity for a hearing, and an opportunity to submit evidence.  Under these rules, an Administrative Law Judge issues the initial decision concerning the mailability of the matter, and a final agency decision is issued by the Judicial Officer.  39 C.F.R. §§ 952.26, 953.4; Daniel Decl. ¶ 5.  Title 39 C.F.R. does not contain procedures for determining the mailability of other types of matter such as the written, printed, or graphic matter contained in the subject publications.  Daniel Decl. ¶ 7.

---

[6] "Animal fighting venture means any event involving a fight between at least two animals that is conducted for sport, wagering, or entertainment. The term does not include any activity whose primary purpose involves using one or more animals in hunting other animals."  DMM § 601.12.5.7(b).

Although postmasters[7] may provide customers with guidance on whether written, printed, or graphic matter may be mailed under postal regulations, local postmasters are not authorized to decide whether such matter is nonmailable based on its content and are not permitted to deny entry to such matter or exclude it from the mail.  Id.; DMM § 601.12.11.  Postmasters are authorized to send a report to the United States Postal Inspection Service ("IS") regarding written, printed, or graphic matter that is found in the mail and that appears, in the postmaster's view, to be nonmailable (e.g., obscenity), in accordance with section 138.14 of the Postal Operations Manual ("POM").[8]  The IS reviews this report to determine whether, in its judgment, a criminal investigation is warranted.  Daniel Decl. ¶ 8.  If so, the matter is referred to the Department of Justice so that it can decide whether to prosecute criminally.  Id.

3.     **Federal Statutes and Regulations Pertaining to Periodicals**

The term "Periodical" is defined in DMM § 707.4.4.1.  Daniel Decl. ¶ 18.[9]  Generally, a periodical (1) is published at a stated frequency with the intent to continue publication indefinitely, (2) has as its primary purpose the transmission of information, and (3) exhibits continuity from issue to issue.  See DMM §§ 707.4.4.2, 707.4.4.3.  To receive authorization to mail at the rate for Periodicals, a publication must satisfy certain specific requirements, originally prescribed by Congress in the Act of March 3, 1879, 20 Stat. 355, 358-359, and carried forward with certain modifications and refinements in subsequent legislation and postal

---

[7] Postmasters are the managers of particular post offices.

[8] The Postal Operations Manual sets forth the policies, regulations, and procedures of the Postal Service governing retail, philatelic, collection, mail processing, transportation, delivery, and vehicle operations.  See 39 C.F.R. § 211.2(a)(2).

[9] The class for Periodicals was formerly called "Second-Class Mail."  See DMM § 707.4.1.

regulations.[10]  See e.g., former 39 U.S.C. § 4354, Pub. L. No. 86-682, 74 Stat. 667 (Sep. 2, 1960).  Publishers prefer the Periodicals rate because it is lower than the usual alternatives, such as First-Class Mail.  Daniel Decl. ¶ 17.

Among other requirements, DMM § 707.4.3 provides that only newspapers and other periodical publications that comport with the mailability standards in Chapter 601 of the DMM may be authorized for mailing at the rates for Periodicals.  See DMM § 707.4.3.  See also DMM § 707.4.2 (other requirements for Periodicals).  These requirements generally reflect legislative intent that favorable rates for Periodicals should be reserved for publications issued for "the dissemination of information of a public character", rather than those "designed primarily for advertising purposes."[11]  See Act of March 3, 1879 (20 Stat. 355, 359).  Thus, catalogs and other publications primarily intended for advertising purposes do not qualify for Periodicals rates.  See The Enterprise, Inc. v. United States, 833 F.2d 1216, 1225 (6th Cir. 1987).[12]

Specific procedures for applying for Periodicals authorization are provided in DMM § 707.5.1, which vests the Pricing and Classification Service Center ("PCSC") manager with the authority to rule on all applications for Periodicals mailing privileges.  DMM § 707.5.3.1; Daniel

---

[10] Eligibility standards for Periodicals are found in the DMM and the Domestic Mail Classification Schedule ("DMCS"), 39 C.F.R. Part 3001, Subpt. C, App. A..  The DMCS describes the different categories of mail, and for some, eligibility for certain rates.  All mail preparation requirements, including those in the DMCS, are presented in the DMM.  While the DMM offers substantially greater detail, it does not modify the DMCS's conditions of eligibility.

[11] See, e.g., The Enterprise, Inc. v. United States, 833 F.2d 1216 (6th Cir. 1987).

[12] These requirements have withstood repeated constitutional challenges because they turn on circulation and other objective characteristics and not on subjective judgments of postal personnel.  See e.g., Lewis Publishing Co. v. Morgan, 229 U.S. 288, 301-05 (1913); Enterprise, 833 F.2d at 1225-26; Lewis Publishing Co. v. Wyman, 182 F. 13, 16-17 (8th Cir. 1910).  Mailing rates based on the worthiness of a publication's contents have generally been invalidated by courts.  See United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 417-38 (1921); Hannegan v. Esquire, 327 U.S. 146, 157 (1946); Sunshine Publishing Co. v. Summerfield, 184 F. Supp. 767, 771-72 (D.D.C. 1960).

Decl. ¶ 20.[13]  The PCSC manager's ruling granting such application does not represent a USPS

determination that a publication is mailable under 39 U.S.C. § 3001(a).

       **2.**     **Nonfederal Laws**

       Cockfighting is not banned in all fifty states and U.S. Territories, contrary to Plf. Mot.

Sum. J. at 5.  On July 13, 2007, the Governor of Louisiana signed Act No. 425 which contains

*inter alia* provisions prohibiting persons from organizing or conducting "any commercial or

private cockfight . . . in which it is intended or reasonably foreseeable that . . . chickens would be

injured, maimed, mutilated, or killed" in the State.  2007 La. Acts 425, at 2.  Because these

provisions will not become effective until August 15, 2008, such fights remain legal in the state

of Louisiana unless they include gambling or wagering.  2007 La. Acts 223, at 1.  Similarly in

Virginia, cockfighting is illegal only when a person wagers money, for money, prizes, or

anything of value.  Va. Code Ann. § 3.1-796.125 (2007).  Cockfighting is also currently legal in

Guam where such fights are licensed and controlled by the government established Cockpit

License Board.  11 Guam Code Ann. §§ 34205, 76216, 39101.

**C.**     **Correspondence Between HSUS and USPS Prior to the Filing of HSUS's Complaint**

       **1.**     **HSUS's April 26, 2006 Letter and Petition**

       Jonathon Lovvorn, Vice President, Animal Protection Litigation, HSUS, sent a letter

dated April 26, 2006, on behalf of HSUS to John E. Potter, Postmaster General, USPS ("Initial

Request Letter"), requesting that the Postal Service declare the Publications nonmailable.  Daniel

---

[13] If the PCSC manager denies an application or issues a ruling suspending or revoking a
publication's Periodicals status, it takes effect in 15 days unless the applicant appeals.  DMM
§§ 707.5.3, 707.5.4.  See also  DMM §§ 707.5.3, 707.5.4; Daniel Decl. ¶ 20.  See generally 39
C.F.R. § 954 (rules of practice for revocation of Periodicals mail privileges).

Decl. ¶ 21, Ex. L; Administrative Record ("A.R.") 1-2.[14]  HSUS attached a document titled

"Petition to Declare Animal Fighting Publications Nonmailable" ("Petition") which requested

that the Postal Service (1) declare the Publications nonmailable and prohibit them from being

mailed, and (2) revoke the Periodicals mailing privileges for the Publications.  Daniel Decl. ¶ 21,

Ex. M; A.R. 3-122; accord Pl. Petition at 1.  HSUS asserted that the Publications and their

distribution via the mail promote illegal animal fighting throughout the United States.  Daniel

Decl. ¶ 22; A.R. 4-5; accord Pl. Petition at 2-3.  HSUS also stated that the January 2006 edition

of *The Gamecock* contains advertisements for knives and gaffs that there are "numerous

advertisements in *The Gamecock* for birds for sale for fighting purposes."  Daniel Decl. ¶ 22;

A.R. 5; accord Pl. Petition at 3.  HSUS asserted that the Publications were nonmailable under the

AWA, 39 U.S.C. § 3001(a), and the DMM.  Daniel Decl. ¶ 22; A.R. 15-16; accord Pl. Petition at

13-14.  HSUS claimed that because the Publications did not meet the mailability standards set

forth in Chapter 601 of the DMM, the publications were not authorized to receive Periodicals

mailing rates from the USPS.  Daniel Decl. ¶ 22; A.R. 12, 17; accord Pl. Petition at 10, 15.

HSUS further requested that the PCSC manager "hold a hearing and make a determination that

[the Publications] are no longer eligible for Periodicals mailing privileges," and "initiate

revocation procedures, including sending a revocation notice to publishers of [the Publications]."

Daniel Decl. ¶ 22; A.R. 17; accord Pl. Petition at 15.  Plaintiff's allegations that the Publications

fail to meet the mailability standards set forth in Chapter 601 of the DMM are the only basis

upon which Plaintiff contends that the Publications' Periodicals status should be revoked.

##### 2.      Postal Service Response to HSUS's Initial Request Letter and Petition

---

[14] Defendant cites both the A.R. and the Daniel Declaration because the more recent editions of the publications are not in the A.R.  Moreover, Defendant takes the position that this case is not controlled by the APA, as explained below.

In a letter dated June 5, 2006, Sherry Suggs, then Manager of Mailing Standards,[15] responded to Mr. Lovvorn ("Suggs Letter"), by declining to grant HSUS's request. Daniel Decl. ¶ 24, Ex. N; A.R. 128-29. The Suggs Letter opined that the Publications were mailable under the applicable statutes and regulations as long as the publications did not contain advertisements promoting bird fights which are to take place in states where such fights are outlawed. Daniel Decl. ¶ 24, Ex. N; A.R. 128. Additionally, the letter advised HSUS that the AWA's prohibition on "promoting or in any other matter furthering an animal fighting venture" was ambiguous and should be interpreted to comport with the AWA's then current legislative history which indicated that "Congress intended that '[g]ame fowl publications would be unaffected' and 'that <u>advertising</u> of fights involving live birds would be prohibited except in those instances where such fights are to be held in a State or territory where they are not unlawful.'" Daniel Decl. ¶¶ 25, 26, Ex. N; A.R. 128 (quoting H.R. Rep. No. 94-976, at 23 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 783, 797) (emphasis added).

The Suggs Letter also explained that under its mailings standards, "bird fighting magazines are generally mailable, but advertisements of bird fights are nonmailable if the fights are to take place in states that have outlawed the practice." Daniel Decl. ¶ 26; A.R. 128. The letter informed HSUS that because the Publications did not contain advertisements for bird fights in states where bird fights were illegal, the publications were not nonmailable under the DMM, and therefore, the Postal Service had no basis to deny Periodicals mailing privileges to the Publications. Daniel Decl. ¶¶ 26, 27, Ex. N; A.R. 128-29. The letter offered that the Postal Service would be willing to revisit these conclusions if HSUS could identify another authority that would suggest an alternative interpretation of the AWA. Daniel Decl. ¶ 28, Ex. N; A.R. 129.

---

[15] Ms. Suggs held the position of Manager, Mailing Standard on May 22, 2006. This position is currently held by Ms. Sharon Daniel. <u>See</u> Daniel Decl. ¶ 1.

Finally, the letter emphasized that it only administers the mailability portions of the AWA and that Congress specifically vested the Secretary of Agriculture with the authority to enforce the AWA generally, and it recommended that HSUS direct its concerns to the U.S. Department of Agriculture ("USDA").  Daniel Decl. ¶ 28, Ex. N; A.R. 129.

### 3.    HSUS's May 3, 2007 Letter Seeking Reconsideration

Mr. Lovvorn wrote again, in a letter dated May 3, 2007, on behalf of HSUS to Ms. Suggs, seeking reconsideration of its Petition in light of the AFPEA's 2007 amendments to the AWA ("Reconsideration Letter").[16]  Daniel Decl. ¶ 29, Ex. O; A.R. 123-27.  In addition to describing these amendments, HSUS quoted from various portions of the Congressional Record to support HSUS's claim that the amendments were intended to criminalize the mailing of the Publications.  Daniel Decl. ¶ 29; A.R. 124-26.  HSUS also alleged that the AFPEA's ban on animal fighting paraphernalia provided an additional basis for finding the Publications nonmailable under the DMM.  HSUS further stated that the December 2006 publication of *The Gamecock* included an advertisement for a bird fighting venue for purchase in a state where bird fighting was illegal.  Daniel Decl. ¶ 29; A.R. 126.  HSUS renewed its request for the Postal Service to declare the Publications nonmailable and to "initiate proceedings to revoke the Publications' Periodicals mailing privileges." Daniel Decl. ¶ 30; A.R. 127.

### 4.    Postal Service Response to HSUS's Reconsideration Letter

On June 26, 2007, the Postal Service responded to HSUS's Reconsideration Letter with a letter by Sharon Daniel, Manager, Mailing Standards, to Mr. Lovvorn ("Daniel Letter") Daniel Decl. ¶ 31, Ex. P.  The Daniel Letter explained that because the AFPEA did not change the plain language of the provision of the AWA pertaining to animal fighting ventures or alter the

---

[16] The Petition was attached to this letter and incorporated by reference.  A.R. 123.

provision's application to the Postal Service, the Postal Service declined to interpret the AWA to permit a determination that the Publications were nonmailable.  <u>Id.</u> at 1.  Additionally, the Postal Service stated that because the "[a]ct's addition of a provision criminalizing the <u>sale, purchase, transport, or delivery</u>…of bird-fighting accessories" did not include "any ban on <u>advertising</u> of such items . . . the mailability of these magazines, which appear to contain such advertisements, remains unchanged."  <u>Id.</u> (emphasis added).  The letter concluded with an invitation for HSUS to inform the Postal Service regarding further developments in the law or to bring other authorities to the attention of the Postal Service.  <u>Id.</u> at 2.

**D.     Proceedings Before the Court**

Plaintiff filed its Complaint last July.  Before Defendant filed any motions or responsive pleadings, Plaintiff filed a Motion for Summary Judgment and a Motion to Compel Production of the Administrative Record.  In October, Defendant filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, as well as an answer.  The Court denied the motion to dismiss without prejudice, and eventually entered a briefing schedule for the instant dispositive cross motions by the parties.

On November 29, 2008, in accordance with the Court's Order, the parties proposed a briefing schedule whereby the Plaintiff would notify counsel for Defendant of any challenges to the administrative record by December 14.  Defendant filed an administrative record on December 7, and Plaintiff has not notified Defendant of any challenges to the administrative record, nor filed any motions to that effect.

<u>**ARGUMENT**</u>

**I.     LEGAL STANDARDS**

Plaintiff bears the burden of establishing that the Court has jurisdiction.  <u>Grand Lodge of the Fraternal Order of Police v. Ashcroft</u>, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  A Rule 12(b)(1)

motion imposes on the Court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.  Id.

On a motion to dismiss pursuant to Rule 12(b)(6), the Court will dismiss a claim if Plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  "In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."  Trudeau v. FTC, 456 F.3d 178, 183 (D.C. Cir. 2006) (citing EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997)).  The Court must construe the allegations and facts in the complaint in the light most favorable to Plaintiff and must grant Plaintiff the benefit of all inferences that can be derived from the facts alleged.  Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994))).  However, the court need not accept asserted inferences or conclusory allegations that are unsupported by the facts set forth in the complaint.  Kowal, 16 F.3d at 1276.

Under Rule 56(c), a court must grant summary judgment when the evidence in the record demonstrates that there are no disputed issues of material fact and that the moving party is entitled to judgment on the undisputed facts as a matter of law.  Judicial Watch, Inc. v. United States FDA, 514 F. Supp. 2d 84, 87 (D.D.C. 2007).  A genuine issue of material fact exists if the evidence, when viewed in light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the movant to make the initial showing of the absence of a genuine issue of material fact in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party is then entitled to a judgment as a matter of law if the nonmoving party "fails

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id., 477 U.S. at 322.

## II. THE COMPLAINT MUST BE DISMISSED FOR LACK OF JURISDICTION BECAUSE PLAINTIFF LACKS STANDING AND DEFENDANT'S DECISIONS WERE COMMITTED TO AGENCY DISCRETION.

Plaintiff's Complaint must be dismissed under Rule 12(b)(1) for lack of jurisdiction. The allegations of harm in Plaintiff's Complaint are insufficient to establish standing under Article III of the U.S. Constitution. Additionally, Plaintiff cannot satisfy the requirement for prudential standing. Finally, the Postal Service's decisions regarding whether to investigate instances of alleged unlawful written, printed, or graphic matter are committed to agency discretion by law.

### A. The Allegations of Harm In Plaintiff's Complaint Are Insufficient To Establish Article III Standing

Plaintiff's Complaint fails to allege facts sufficient to demonstrate that HSUS, or any of its members, have suffered an "injury in fact" that is "fairly traceable" to the Defendant's conduct and redressable by the relief requested. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Plaintiff does not contend that any of the alleged harms are directly attributable to the mailing or distribution of the Publications via the Postal Service. Rather, causation for all of the harms alleged flows from the alleged "unlawful animal fighting ventures" that Plaintiff claims "would not exist but for Defendant's unlawful actions." See e.g., Complaint ¶¶ 12, 13 (emphasis added). Because Plaintiff's Complaint contains no allegations that the Postal Service or its agents are directly involved in animal fighting ventures or related activities, the harms HSUS alleges are necessarily based on the independent, intervening actions of third parties not before the Court, i.e., those individuals or entities that organize, facilitate, or engage in unlawful animal fighting ventures. Plaintiff's Complaint does not allege facts sufficient to show that an order

- 16 -

declaring that the interstate shipment of both publications unlawful and enjoining the Postal

Service from accepting the publications for mailing will prevent or deter these intervening

actions, and therefore, fails to demonstrate causation or redressability. Friends of the Earth,

Bluewater Network Div. v. Dep't of Interior, 478 F. Supp. 2d 11, 15 (D.D.C. 2007) ("[the] injury

that provides standing 'must be fairly traceable to the challenged action of the defendant, and not

the result of the independent action of some third party not before the court.'") (citing Lujan, 504

U.S. at 560); Brady Campaign To Prevent Gun Violence United With The Million Mom March

v. Ashcroft, 339 F. Supp. 2d 68, 77 (D.D.C. 2004) ("[w]hen the alleged injury stems not directly

from governmental action, but rather from 'the government's allegedly unlawful regulation (or

lack of regulation) of someone else,' more exacting scrutiny is called for with respect to the

traceability and redressability requirements") (citing Lujan, 504 U.S. at 562; Freedom

Republicans, Inc. v. Federal Election Comm'n, 13 F.3d 412, 416 (D.C. Cir. 1994)).

### i.    Plaintiff's Alleged Harms Are Insufficient to Establish Injury In Fact.

Plaintiff's Complaint does not contain any facts or allegations sufficient to establish that

HSUS or its members have suffered an "injury in fact." The Complaint identifies several harms

allegedly attributable to animal fighting ventures generally. These alleged harms appear to fall

into two categories:

> (1) the "diversion" of Plaintiff's "programmatic resources" to provide care and shelter for
> animals injured as the result of animal fighting ventures (Complaint ¶¶ 5, 7, 9-12), and
> the costs HSUS incurs in responding to requests from "law enforcement authorities" to
> assist in "raids at animal fighting ventures" (Complaint ¶¶ 5, 6, 8, 9, 13),
>
> (2) "[a] variety of criminal activities, including gambling, drug possession, rape, illegal
> weapon possession, and homicide," as well as violations of "federal racketeering laws"
> (Complaint ¶¶ 39,40, 48-51, 57, 60-74, 76-77, 89-93); violations of federal tax laws

(Complaint ¶¶ 61-62), and threats to "public health" and "biosecurity" (Complaint ¶¶ 52-53).

The harms described in category (1) above, i.e., the "diversion" of Plaintiff's "programmatic resources" to provide care and shelter for animals injured as the result of animal fighting ventures and the costs HSUS incurs in responding to requests from "law enforcement authorities" to assist in "raids at animal fighting ventures," are insufficient for establishing "actual or imminent" injury because those harms stem from actions HSUS ***voluntarily chooses*** to undertake.[17]  See Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276, 78 (D.C. Cir. 1994) (finding that expenses incurred by the Plaintiff, an organization focused on community outreach and education, were insufficient to establish injury in fact because such expenses were the result of the organization's budgetary choices rather than the alleged discriminatory actions of the defendant employment agency).

Similar to the plaintiffs in Fair Employment, Plaintiff's Complaint provides no basis for concluding that HSUS is obligated or required to provide assistance to law enforcement authorities or to provide for the care and handling of seized animals (Complaint ¶¶ 5-13), and therefore, its allegations of harm are insufficient to support a finding that HSUS has suffered "actual or imminent" injury in fact.  See also National Family Planning and Reproductive Health Assn. Inc., v. Gonzalez, 468 F.3d 826, 830-31 (D.C. Cir. 2006) ("because the association's asserted injury appears to be largely of its own making…[s]uch harm does not amount to an "injury" cognizable under Article III.").  Moreover, Plaintiff's Complaint does not indicate that any individual HSUS member has been adversely affected by the harms described in category (1)

---

[17] These alleged injuries include Plaintiff's allegation that it suffers "ongoing and measurable economic harm (totaling $57, 367.42 to date, including emergency expense [incurred while assisting a state law enforcement agency])."  Pl.'s Mot. Sum. J. at 11 n.4, Attach. A ¶ 18).

above, a requirement for "representational" standing.  See A.N.S.W.E.R. Coalition v.

Kempthorne, 493 F. Supp. 2d 34, 43 (D.D.C. 2007) (stating that whether an organization has

standing to sue on behalf of one of its members depends, in part, on whether the member would

otherwise have standing to sue in his or her own right) (citing Hunt v. Washington State Apple

Advertising Comm'n, 432 U.S. 333, 343 (1977)).

Additionally, the Complaint contains no allegations that any of the harms identified in

category (2) above pose a "concrete and demonstrable" injury to the organization's activities

with a "consequent drain on the organization's resources."  Arden Wood, Inc. v. United States

Citizenship & Immigration Servs., 480 F. Supp. 2d 141, 148 (D.D.C. 2007); Friends of the Earth,

Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 183-84 (2000) (finding that plaintiff

organizations demonstrated concrete and particularized injury in fact through affidavits and

deposition testimony from members of the organizations who lived near a particular river and

who alleged that certain pollutants had curtailed the members' recreational use of the river and

subjected them to other economic and aesthetic harms); Animal Legal Def. Fund v. Glickman,

154 F.3d 426-31 (D.C. Cir 1998) (finding that plaintiffs demonstrated concrete and

particularized injury in fact through an affidavit of an individual plaintiff who frequently visited

certain zoos where certain primates were held, and who claimed to suffer "aesthetic" and

"emotional" injuries as the result of viewing primates in allegedly "inhumane conditions").

Unlike the plaintiffs in Glickman and Laidlaw who could demonstrate that they were personally

and individually affected by the harms they identified, HSUS provides no basis for inferring that

HSUS or one of its members has been affected or will be affected in a direct and individual way

from the "variety of criminal activities," the violations of "federal racketeering laws" or federal

tax laws, or threats to "public health" and "biosecurity" allegedly associated with animal fighting

ventures. As a result, HSUS has failed to show "concrete and particularized" injuries in fact sufficient to establish "organizational" and "representational" standing.

Moreover, Plaintiff's Complaint does not contain any factual allegation that could support an inference that any of the harms identified in its Complaint are "actual or imminent." To establish "actual or imminent" injury in fact, a Plaintiff must allege facts that demonstrate that the Plaintiff will be affected by the Defendant's allegedly unlawful conduct at a specific future point in time. See Lujan, 504 U.S. at 564 ("'some day'; intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury"); Friends of the Earth, Bluewater Network Div. v. Dep't of Interior, 478 F. Supp. 2d 11, 15-20 (D.D.C. 2007) (finding that affidavits submitted by the plaintiff, which included specific descriptions of the adverse impacts of off-road-vehicles ("ORVs") on specific areas of the National Park Service and how ORV use would impede the members' enjoyment of the those areas in the future, "identified specific harms" associated with ORV use and supported a "reasonable inference" that the members would return to the affected park areas in the future, thereby demonstrating injury in fact). Plaintiff's Complaint contains no specific factual allegations that would support an inference that any of the alleged harms will affect HSUS or its members in the near future. Rather, the Complaint contains only general descriptions of unspecific harms and specific descriptions of harms that have already occurred. Thus, such descriptions are insufficient to establish "actual or imminent" injury in fact.

> **ii.    Plaintiff Cannot Demonstrate That The Alleged Harms Are Caused By The Postal Service's Continued Distribution Of The Publications.**

Plaintiff has not alleged any facts that could support an inference that the Defendant's failure to prohibit the acceptance and distribution of the Publications through the mails is a

"substantial factor" in the decisions of the third parties to engage in the activities that form the basis of the alleged harms, a sufficient condition for establishing "causation."   But see Plf. Mot. Sum. J. at 11 n.4.  For example, in Friends of the Earth, the court found that because the National Park Service governed the use of ORVs within the national park system, alleged injuries stemming from ORV use in certain parks were "fairly traceable" to the agency's alleged failure to adequately regulate ORV use.  478 F. Supp. 2d at 21.  Similarly, in Glickman, the court concluded that the USDA had caused the plaintiff's injuries when it failed to issue regulations or take actions that could have protected the plaintiff's interest in observing animals living under humane conditions.  See 154 F.3d at 439-41 (explaining that if the USDA "had found a [particular zoo] out of compliance with current regulations, or if the governing regulations had themselves been more stringent, [the zoo's] owners would have been forced (in order to remain in accord with the law) to either alter their practices or go out of business and transfer their animals to exhibitors willing to operate legally").  The court found that the defendant agency's failure to regulate the activities that allegedly harmed the plaintiff was a "substantial factor" in the decisions of third parties to engage in those activities, and therefore, the Plaintiff was able to establish "causation."  Id.

Unlike the defendant agencies in Friends of the Earth and Glickman, however, which had direct authority to regulate the activities that formed the basis of the plaintiff's injuries, the AWA does not explicitly identify the Postal Service as the agency charged with responsibility for enforcing restrictions on animal fighting ventures, the basis for HSUS's alleged injuries.  The Act identifies the USDA instead.  As a result, Plaintiff's complaint cannot support an inference that the continued distribution of the Publications via the Postal Service is a "substantial factor"

in the decisions of third parties to facilitate or engage in animal fighting ventures.  Friends of the

Earth, 478 F. Supp. 2d at 11, 15 (quoting Tozzi v. HHS, 271 F.3d 301, 309 (D.C. Cir. 2001)).

Moreover, HSUS's Complaint does not support an inference that animal fighting venture

participants and enthusiasts will not use other means to promote their activities if the

Publications are prohibited from the mailstream, a requirement for establishing causation.  See

Brady, 339 F. Supp. 2d at 77-78.  In Brady, the court concluded that the plaintiff organizations

could not establish traceability in their suit against the ATF because they could not produce facts

showing that manufacturers of semiautomatic assault weapons "would *not* seek some alternative

means to repair [the weapons] or take other actions that would continue to increase the number

of available [weapons]" if the ATF discontinued its policy whereby manufacturers could repair

certain weapons and provide them to their owners.  Id. (emphasis added).  Similarly, HSUS has

not alleged facts sufficient to demonstrate that cockfighting venture participants and enthusiasts

will not use alternative channels of communication (e.g., underground magazines, internet

chatrooms, email, etc.) to promote and facilitate their activities.[18]

### iii.    No Facts Alleged In Plaintiff's Complaint Support An Inference That The Relief Requested Will Redress The Alleged Harms.

Plaintiff's Complaint alleges no set of facts that would support a reasonable inference

that the remedies sought by Plaintiff are "likely" to redress the alleged harms.  Branton, 993 F.2d

at 908 (citing Allen v. Wright, 468 U.S. 737 (1984)); but see Plf. Mot. Sum. J. at 11 n.4.  To

establish redressability, Plaintiff must demonstrate that each form of relief sought would redress

the alleged injury.  The Wilderness Society v. Norton, 434 F.3d 584, 590-91 (D.C. Cir. 2006).

---

[18] A relatively recent news article pertaining to dogfights states that because dogfighting is illegal everywhere in the country, breeders and fighters "stay in touch through secret networks and underground magazines."  Paul Duggan, *A Blood Sport Exposed, Vick's Case Puts Dogfighting Culture in the Spotlight*, Washington Post, Aug. 22, 2007, at A1.

The plaintiff in <u>Norton</u>, who challenged the Department of the Interior and the National Park Service ("NPS") for allegedly failing to undertake various legal obligations with respect to the identification and management of certain areas of the National Park System, could not show how an order compelling the NPS to issue boundary maps and legal descriptions identifying certain area of a park as "wilderness" would reduce ORV use in that area, the basis for the alleged injury. <u>Id.</u> at 592. Additionally, the plaintiff could not show how a court order compelling the NPS to review certain areas for "wilderness suitability" would lead to a change in the NPS's management of the land in a way that would reduce or eliminate the use of ORVs in those areas. <u>Id.</u> at 593. Therefore, the court concluded that the plaintiffs could not establish that the relief sought would redress the alleged injury. <u>Norton</u>, 434 F.3d at 593-594.

Plaintiff's Complaint contains the same deficiencies that led the court in <u>Norton</u> to dismiss plaintiffs' claim in that case. Plaintiff's Complaint provides only conclusory assertions that provide no basis for inferring that any of the forms of injunctive relief Plaintiff seeks will eliminate or even reduce animal fighting ventures. <u>See</u> Complaint ¶¶ 11-15, 75-77. It contains no examples of any specific unlawful animal fighting venture that would not have taken place had the Postal Service refused to accept or distribute the Publications, nor does it identify any future unlawful animal fighting venture that will not take place if the publications are banned from the mail. The Complaint also provides no basis for inferring that a prohibition on animal fighting publications that do not contain advertisements for unlawful animal fighting ventures, or on publications without any advertisements for illegal animal fighting ventures, would eliminate or even curtail the unlawful animal fighting ventures Plaintiff describes. Moreover, Plaintiff's alleged harms stem from the activities of actors other than the defendant, and therefore, it is "merely speculative" that the alleged harms will be redressed by a favorable decision even if one

accepts all the <u>factual</u> allegations in the Complaint as true.  <u>Branton v. FCC</u>, 993 F.2d 906, 910-11 (D.C. Cir. 1993); <u>see also</u> <u>Lujan</u>, 504 U.S. at 560-61.  This cannot suffice to support standing.

**B.      Plaintiff Does Not Meet The Requirements For Prudential Standing Under The Zone-of-Interests Test.**

HSUS also lacks prudential standing to bring its claims under the AWA and the Postal Reorganization Act ("PRA") because the plain language and legislative history of both acts indicate that neither HSUS nor its members fall within the "zone-of-interests" to be protected or regulated by their provisions.  <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 162-63 (1996) (quoting <u>Ass'n of Data Processing Serv.Orgs., Inc. v. Camp</u>, 397 U.S. 150, 153 (1970)); <u>Air Courier Conf. v. American Postal Workers Union</u>, 498 U.S. 517 (1991); <u>Glickman</u>, 154 F.3d at 444 (citing <u>NCUA v. First Nat'l Bank & Trust Co.</u>, 522 U.S. 479, 492-493 (1998)); <u>FEC v. Akins</u>, 118 S. Ct. 1777, 1783 (1998)) ; <u>but see</u> Plf. Mot. Sum. J. at 11 n.4.  In <u>Glickman</u>, the court emphasized that the zone-of-interests test "focuses, not on those who[m] Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects."  <u>Id.</u> at 444.

Neither HSUS nor its members satisfy the "zone-of-interests" test in <u>Glickman</u> because the plain language and legislative history of the PRA and the AWA do not indicate that HSUS is a "suitable challenger" under the provisions of either act.  <u>Federation for Amer. Immigration Reform, Inc. v. Reno</u>, 93 F.3d 897, 900-04 (D.C. Cir. 1996).  Although HSUS arguably has an interest in ensuring that the mailability statutes in the PRA are properly applied and enforced, the text and legislative history of PRA neither indicates nor even suggests that individuals or organizations are suitable challengers under the provisions codified at 39 U.S.C. § 3001.

Additionally, the legislative history of the AWA does not suggest that Congress intended to identify HSUS as a suitable challenger to enforce the animal fighting venture provisions of  7 U.S.C. § 2156.  Specifically, the legislative history of the AFPEA only acknowledges the

contributions of animal rights organizations and their support for this legislation.  See e.g., 153

Cong. Rec. E630 (March 23, 2007) ("I applaud the work done by animal rights organizations and

law enforcement agencies to assist with protecting animals from inhumane treatment.") (remarks

of Rep. Rangel), A.R. 280; 153 Cong. Rec. H3033 (March 23, 2007) ("The Humane Society, the

American Veterinary Medical Association, the National Sheriffs Association, and nearly 400

local law enforcement agencies covering all 50 states have all come out in support of this

legislation.") (remarks of Rep. Conyers), A.R. 276.  There is no mention in the legislative history

of the AWA or the AFPEA that Congress expected such organizations to serve in an

enforcement capacity.  To the contrary, the AWA provided enforcement power only to the

USDA and law enforcement agencies by promulgating 7 U.S.C. § 2156(f), a provision that

Congress did not amend when it passed the AFPEA.

> **C.    Decisions Concerning Whether To Investigate Alleged Unlawful Written,
>         Printed, Or Graphic Matter Are Committed to Agency Discretion By Law**

Decisions by the Department of Justice over whether to conduct criminal investigations

into the mailing of certain written, printed, or graphic matter referred to it by the IS are similar to

prosecutorial and investigative decisions by other agencies that have been found to be exempt

from judicial review.  See Assoc. of Irradiated Residents v. EPA, 494 F.3d 1027, 1030 (D.C. Cir.

2007); Secr'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 156-57 (D.C. Cir. 2007); Jerome

Stevens Pharmaceuticals v. FDA, 402 F.3d 1249,  1256-67 (D.C. Cir. 2005); Drake v. FAA, 291

F.3d 59 (D.C. Cir. 2002); accord Sierra Club v. Whitman, 268 F.3d 898 (9th Cir. 2001);

American Disabled for Attendant Programs Today ("A.D.A.P.T.") v. United States HUD, 170

F.3d 381 (3d Cir. 1999).  As noted above, administrative procedures for agency adjudication of

disputes concerning the mailability of matter are explicitly provided for lottery matter, false

advertising matter, and articles and substances.  39 C.F.R. Parts 952, 953.  With respect to

written, printed, or graphic matter that falls outside of these categories, Postmasters are

instructed to send a report to the IS when such matter is found in the mail and appears to be

nonmailable (i.e., mail matter that appears to contain obscene material), in accordance with

section 138.14 of the POM.  The IS *may* then decide to notify the Department of Justice so that

the Department can determine whether a criminal investigation is warranted.  Daniel Decl. ¶ 8.

Such determinations are analogous to the government's exercise of investigatory discretion

which is generally found to be exempt from judicial review.  See ADAPT, 170 F.3d at 384 (3d

Cir. 1999) (noting that "the Supreme Court has established a presumption against judicial review

of agency decisions that involve whether to undertake investigative or enforcement actions")

(citing Heckler v. Chaney, 470 U.S. 821, 838 (1985)).  Similarly, DOJ has discretion as to

whether to prosecute, and it would serve little purpose to force the Postal Service to make a

referral to DOJ, because this Court cannot force DOJ to act on the referral.  The IS decision

whether to make a referral and DOJ's decision whether to prosecute are each, separately,

committed to agency discretion by law.

## III.    PLAINTIFF HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE NEITHER THE APA, THE AWA, NOR THE PRA PROVIDE A CAUSE OF ACTION FOR THE UNDERLYING CONTROVERSY.

Because Plaintiff has no cause of action under the APA, the AWA, or the PRA to

challenge the correspondence at issue here, Plaintiff fails to state a claim "upon which relief can

be granted" under Rule 12(b)(6).  Trudeau, 456 F.3d at 188-89 ("Whether [Plaintiff's claims] are

claims 'upon which relief can be granted' depends in part on whether there is a cause of action

that permits [plaintiff] to invoke the power of the court to redress the violations of law that he

claims the [defendant] has committed.").  First, the APA cannot provide Plaintiff with a vehicle

for challenging such correspondence because the Postal Service is exempt from the judicial

review provisions of the APA.  Second, even if the APA applied to the instant controversy, the

Postal Service's correspondence with HSUS, which contains Postal Service's interpretation of

the AWA and the DMM with respect to mailability of the Publications, is not "final agency

action" that can provide a basis for a cause of action under the APA.  Third, none of the statutes

Plaintiff cites afford the Plaintiff with a private right of action.  Accordingly, the Court should

dismiss Plaintiff's complaint per Rule 12(b)(6).  See Trudeau, 456 F.3d at 187.

### A.    Plaintiff's Claims Under The APA Must Fail Because The Postal Service Is Exempt From The APA In The Context of The Instant Proceeding.

The APA does not provide Plaintiff with a cause of action for its claims because,

pursuant to 39 U.S.C. § 410(a), et seq., Congress explicitly exempted the Postal Service from the

judicial provisions of the APA codified in chapters 5 and 7 of Title 5 of the U.S. Code.  See

Morris v. Runyon, 870 F. Supp. 362, 368 (D.D.C. 1994) (citing National Easter Seal Society for

Crippled Children and Adults v. United States Postal Service, 656 F.2d 754, 767 (D.C. Cir.

1981)); see also Currier v. Potter, 379 F.3d 716, 725 (9th Cir. 2005) (stating that "the [Postal]

Service is exempt from the APA's general mandate of judicial review of agency actions" and

that "the PRA evinces Congress's general intent to withdraw judicial scrutiny of postal

regulations") ; but see Plf. Mot. Sum. J. at 12.  When Congress included those chapters within

section 410(a), it "intended to make clear that the Postal Service would not be subject to the

APA."  National Easter Seal Soc'y v. U.S. Postal Serv., 656 F.2d 754, 766 (D.C. Cir. 1981)

(Postal Service not required to follow APA's requirement of notice-and-comment rulemaking).[19]

_____

[19] In Air Courier Conference of Am. v. Amer. Postal Workers Union, 498 U.S. 517, 523 n.3 (1991), the Supreme Court declined to decide whether section 410(a) barred judicial review under the APA, holding that the government had waived the argument.  Justice Stevens, however, concurring in the judgment, thought the statute was clear:  "There is no ambiguity in the text of 39 U.S.C. § 410(a).  That section of the Postal Reorganization Act provides that the judicial review provisions of the Administrative Procedure Act (APA) do not apply to the exercise of the powers of the Postal Service."  498 U.S. at 531 (Stevens, J., concurring).

The APA itself contemplates that Congress will sometimes wish to prevent the courts from reviewing otherwise reviewable agency action.  See 5 U.S.C. 701(a)(1) ("This chapter applies, according to the provisions thereof, except to the extent that – (1) statutes preclude judicial review").  There is no right to judicial review of agency action if there is "'some clear and convincing evidence of legislative intention to preclude review,'" Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 395 n.9 (1987) (quoting Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 231 n.4 (1986)), or if such an intent is "'fairly discernable in the statutory scheme.'"  Block v. Community Nutrition Inst., 467 U.S. 340, 351 (1984) (quoting Data Processing Serv. Org. v. Camp, 397 U.S. 150, 157 (1970)).

Section 3001(m) of Title 39 U.S.C. does not extend the scope of judicial review under the APA to the opinions and conclusions contained within the correspondence between HSUS and the Postal Service concerning the mailability of the Publications.  The plain language of section 3001(m) indicates that its purpose is to ensure that the Postal Service adheres to the APA only in mailability "proceedings."  HSUS's reliance on this provision is misplaced because the correspondence between the Postal Service and HSUS, which is similar to the correspondence the Postal Service conducts with numerous outside parties on a daily basis in the ordinary course of business, does not constitute "proceedings concerning the mailability of matter."[20]  See Blount

---

[20] Plaintiff also overstates the significance of Aimes Publications, Inc. v. U.S. Postal Serv., 1988 WL 19618 (D.D.C. Feb. 23, 1998), which it cites as support for its claim that the APA applies here.  But see Plf. Mot. Sum. J. at 3.  Aimes did not hold, or even suggest, that correspondence between the Postal Service and a third party concerning the mailings of some other publisher constitute "proceedings concerning the mailability of matter" subject to APA review under 3001(m).  Additionally, because the underlying controversy in Aimes concerned a decision by the Postal Service to deny a Publisher's application to mail a magazine at the rates for Periodicals rather than a determination concerning the mailability of that magazine, Aimes sheds no light on the proper interpretation of section 3001(m).  Aimes Publ'ns, 1988 WL 19618, at *2 n.3 ("Fundamental principles of federal jurisdiction prohibit this court from addressing . . . hypothetical issues suggested by plaintiff because there has not been a determination by the

v. Rizzi, 400 U.S. 410, 412-13 (1971) (describing "proceedings" under former postal statute 39 U.S.C. § 4006 as including the filing of a written complaint by the General Counsel of the former Post Office Department, notice, a hearing, and the rendering of an opinion by the Judicial Officer); see also Daniel Decl. ¶ 32. Moreover, section 3001 can only logically be interpreted to afford APA rights in *mailers* who are adversely affected by mailability rulings that could lead to certain restrictions on their mailing activities or eligibility for preferential rates. Daniel Decl. ¶ 5. If a mailer challenges a hypothetical action by the Postal Service to deny entry of its mail, the APA would apply. In this case however, HSUS is acting in a capacity completely unrelated to its status as a mailer or customer because the Postal Service is not contemplating any action that would affect HSUS's mailing activities. Indeed, HSUS is complaining about someone else's mail—something that has obvious and serious potential for abuse if permitted to proceed. Certainly, neither U.S.C. § 3001 nor 39 C.F.R. Part 953, contemplate that such challenges would be subject to judicial review under the APA.

###### B.   Defendant's Letters Are Not "Final Agency Action" Under the APA.

Assuming *arguendo* that HSUS could successfully claim that it can avail itself of the judicial review provisions of the APA pursuant to 3001(m), the Postal Service's two letters declining to declare the Publications nonmailable or revoke their Periodicals mailing status (Suggs Letter, Daniel Letter) are not a final agency action, and therefore, Plaintiff has no cause of action under the APA. Trudeau, 456 F.3d at 188-89; but see Plf. Mot. Sum. J. at 3. To be "final," an action must mark the consummation of the agency's decisionmaking process and be one by which rights or obligations have been determined or from which legal consequences will flow. See Spear, 520 U.S. at 177-78; John Doe, Inc. v. DEA, 484 F.3d 561, 566 (D.C. Cir.

---

Postal Service that such advertisements [in plaintiff's magazine] would be considered 'nonmailable.'").

2007); Role Models Amer., Inc. v. White, 317 F.3d 327 (D.C. Cir. 2003) (base closings decisions

held to be final agency action); American Telephone & Telegraph Co. v. EEOC, 270 F.3d 973,

975 (D.C. Cir. 2001) (decision to sue over alleged violation did not constitute final agency

action); Appalachian Power Co. v. EPA, 208 F.3d 1015, 1022 (D.C. Cir. 2000).

> Two conditions must be satisfied for agency action to be 'final': First, the action must
> mark the 'consummation' of the agency's decisionmaking process--it must not be of a
> merely tentative or interlocutory nature.  And second, the action must be one by which
> 'rights or obligations have been determined,' or from which 'legal consequences will
> flow[.]

Appalachian Power, 208 F.3d at 1022 (citations omitted).  In analyzing whether an agency

decision is final, courts have looked primarily to whether the agency's position on an issue is

"definitive" and whether the action has a "direct and immediate effect on the day-to-day business

of the parties challenging the action."  See e.g., John Doe, 484 F.3d at 566.

The Postal Service's Daniel Letter to HSUS was not "definitive" because it did not

unequivocally state the agency's position regarding the mailability of the Publications.  See

Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 436-437 (D.C. Cir. 1986).  Rather, the letter provided

Plaintiff with an opportunity to present further information and evidence that the Publications

were nonmailable.  See Response Letter I, at 2 (issued before the enactment of the AFPEA),

Daniel Decl. ¶ 24, Ex. N; A.R. 128; Daniel Letter, at 1; Daniel Decl. ¶ 31, Ex. P.

Additionally, Daniel Letter had no direct or immediate effect on the day-to-day business

of the Plaintiff.  The letter simply provided HSUS with an interpretation of the applicable postal

mailability statutes and regulations to the subject Publications.  Daniel Decl. ¶ 32.  Nor did the

Suggs letter.  Because the letters did not impose any obligation on HSUS, deny HSUS any rights,

or fix any legal relationships, the two letters are not final agency action.  See also Reliable

Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n, 324 F.3d 726, 732 (D.C. Cir. 2003)

(finding that the agency had not yet made any determination or issued any order imposing any obligation on the plaintiff because the agency had not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences).  Thus, there is no final agency action reviewable under the APA.

### C.    Plaintiff Cannot State A Claim Under The AWA Or The PRA Because Neither Act Affords Plaintiff A Private Right Of Action.

Neither HSUS nor its members have an explicit or implied right of action under 39 U.S.C. § 3001 or the AWA to challenge the Postal Service's letter declining to declare the Publications nonmailable and refusing to revoke their Periodicals status.  As explained by the Supreme Court, the "central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action" and "the question of the existence of a statutory cause of action is, of course, one of statutory construction."  Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 76 (1979).  "While it is possible in some cases for courts to imply private rights of actions into statutes not expressly providing for them, in recent decades the Supreme Court has 'retreated from [its] previous willingness to imply a cause of action where Congress has not provided one.'"  Prunte v. Universal Music Group, 484 F. Supp. 2d 32, 42 (D.D.C. 2007) (quoting Corr. Serv. Corp. v. Malesko, 534 U.S. 61, 67 n.3 (2001)).

In Cort v. Ash, 422 U.S. 66 (1975), the Supreme Court held that several factors inform the determination of whether a private right of action is implicit in a statute, including (1) whether the statute was enacted to benefit the plaintiff; (2) whether there is evidence of legislative intent to create or deny such a right, explicitly or implicitly; (3) whether implying such a right is consistent with the overall purpose of the legislation; and (4) whether the cause of action is one traditionally relegated to state law.  422 U.S. at 78.  Subsequent Supreme Court opinions indicate that, although the four factors set forth in Cort are guides to discerning

congressional intent, the factors are not entitled to equal weight, and the first three constitute the central inquiry. See e.g., Redington, 442 U.S. at 575-76; see also Tax Analysts v. IRS, 214 F.3d 179, 185-86 (D.C. Cir. 2000).

An analysis of the first three factors demonstrates that Congress did not intend to create a private right of action under 39 U.S.C. § 3001 that would support the HSUS's claim here. First, neither the plain language nor the legislative history of 39 U.S.C. § 3001 indicate that Congress specifically intended for the statute to benefit HSUS or its members. See Dial A Car v. Transportation, Inc., 132 F.3d 743, 745 (D.C. Cir. 1998) (holding that there was no implied right of action under a statute prohibiting unlicensed taxicab operations in the District of Columbia because the plaintiff taxicab company could not show that the statute was specifically enacted to benefit members of the taxicab industry "as opposed to the taxicab-using public at large").

Second, the plain language and legislative history of the PRA do not indicate that Congress intended to create a private right of action. The key inquiry in determining whether a statute contains an implied right of action is "whether Congress intended to create a private right of action under a federal statute without saying so explicitly." See Nat'l Postal Prof'l Nurses v. U.S. Postal Service, 461 F. Supp. 2d 24, 31, 32 n. 1 (D.D.C. 2006) (quoting Thompson v. Thompson, 484 U.S. 174, 179 (1988)). In Nat'l Postal Prof'l Nurses, the court held a union representing nurses employed by the Postal Service could not establish a private right of action against the Postal Service under section 1001(b) of the Postal Reorganization Act ("PRA") (39 U.S.C. § 1001) to challenge the Postal Service's employment of certain contract physicians. Id. at 26-28. The court found that the plain language and legislative history of the PRA did not demonstrate that Congress intended to create a private cause of action to enforce a statute allegedly prohibiting the hiring of contract employees because the "general prescriptive character

of § 1001(b), which merely directs the Postal Service to establish personnel management procedures," did not indicate a Congressional intent to create a private remedy.  Id.

The plain language of 39 U.S.C. § 3001, which pertains to the nonmailability of certain matter and provides the Postal Service with the authority to dispose of such matter under certain conditions, nowhere indicates that interested members of the public other than mailers are afforded a private right of action to enforce the nonmailability provisions as those provisions are applied to their particular mailings.  Although 39 U.S.C. § 3001(m) provides an avenue for legal challenges to final orders issued by the Postal Service concerning the nonmailability of certain matter, the most sensible reading of section 3001(m), in the context of the chapter in which it is codified (Chapter 30), demonstrates that this provision is only intended to provide customers that may be adversely affected by an official mailability determination with an administrative process through which they can contest such determinations.  For example, section 3001(m), in conjunction with 39 U.S.C. § 3005, provides mailers with an administrative procedure for challenging complaints alleging schemes for obtaining money or property through the mail by means of false representations.  See 39 C.F.R. § 952.  Additionally, the PRA provides the Postal Service with the broad authority to adopt, amend, and repeal rules and regulations necessary to carry out Title 39 and exempts the Postal Service from the APA and other federal laws, thereby limiting the opportunities for judicial review.  See 39 U.S.C. §§ 401, 410(a).  These provisions show that Congress did not intend to create a private right of action that would expand such review, either for other substantive challenges or to third parties generally.

Third, portions of the PRA's legislative history indicate that Congress intended for the Postal Service to have substantial freedom in the conduct of its operations so that it could operate more along the lines of a private company.  See e.g., H.R. Rep. No. 91-1104, 91st Cong., 2d

Sess. 1-2, 7; see also Runyon, 870 F. Supp. at 371 ("the purpose of the statutory reorganization of the Postal Service was 'to permit the Postal Service to operate like a business and to respond with flexibility and imagination to the task of moving the mail'…If this goal is to be effectuated, the courts must permit the Postal Service to Act like a business, without subjecting routine decisions to the cost and delay of judicial interference."). Implying a right of action would contravene the purposes of the PRA by expanding the scope of judicial review of Postal Service decisionmaking well beyond the circumstances Congress envisioned. Thus, the three key factors for determining whether Congress intended to create a private right of action inescapably lead to the conclusion that HSUS is afforded no such private right of action under 39 U.S.C. § 3001.

Likewise, the plain language and legislative history of the AFPEA and the AWA precludes a finding that Congress intended to create a private right of action under the AWA. The AWA does not explicitly provide for private citizens or organizations to file private causes of action for violations of the AWA. Additionally, the legislative history of the AFPEA does not indicate that the AWA and its amendments were specifically intended to benefit HSUS or its members over other members of the public, a key factor to the decision in Dial A Car. 132 F.3d at 745. The AWA's explicit provision for the public enforcement of the animal fighting venture provisions is a strong indication that Congress did not intend to create a vehicle for private enforcement of these provisions.[21] See e.g., id. at 745 ("The DCCA has been reluctant to find a

---

[21] The animal fighting venture provisions specifically identify USDA, in conjunction with federal and state law enforcement agencies including the Federal Bureau of Investigation, as the agency primarily responsible for investigating potential violations of these provisions, including 7 U.S.C. § 2156(c) and (e). See 7 U.S.C. § 2156(f). The legislative history of the AFPEA also contemplates that law enforcement agencies will enforce the AWA provisions. See e.g., 153 Cong. Rec. H3023 (March 26, 2007) ("One of the primary reasons for enacting the increased penalties under Title 18 is the reluctance of U.S. Attorneys to pursue animal fighting cases under the current misdemeanor provisions because they view the penalties as ineffective against an animal fighting industry, which has continued unabated nationwide") (remarks of Rep. Scott);

private right of action implicit in a statute that provides for public enforcement.")  See also

Intern'l Primate Protection League v. Inst. for Behavioral Research, 799 F. 2d 934, 940 (4th Cir.

1986) (finding no provision for private lawsuits in the text and legislative history of the AWA

and reasoning that Congress intended the administrative remedy to be the exclusive remedy).

## IV.    THE ANIMAL WELFARE ACT DOES NOT PROHIBIT THE PUBLICATIONS FROM THE MAILS, NOR DO POSTAL SERVICE REGULATIONS.

Alternatively, if the Court does not dismiss the Complaint, the Court should grant

summary judgment in Defendant's favor because the distribution of the Publications via the

Postal Service is not unlawful under the AWA and the publications are, therefore, mailable under

the PRA and postal regulations pertaining to mailability.  Although there is no apparent dispute

between the parties over the objective content of the Publications at issue in this proceeding,

Plaintiff's Complaint and Motion for Summary Judgment cite and reference testimony and

numerous other documents to attempt to support Plaintiff's claims that the Publications violate

the AWA, the relevant provisions of the PRA, and certain postal regulations in the DMM.  For

the reasons set forth below, Defendant submits that the relevant provisions of the AWA, the

PRA, and the DMM only proscribe advertisements for illegal animal fighting ventures.

Defendant further submits that the issue of whether the Publications contain such advertisements,

and therefore implicate the cited provisions, may be resolved in its entirety by analyzing the

content of the Publications submitted to the Court in the instant proceeding.  Accordingly, the

content of the Publications constitute the only "material facts" germane to the Court's analysis

on the applicability of the AWA, the PRA, and the DMM to the Publications.  Nebraska v.

---

153 Cong. Rec. S452 (January 11, 2007) ("It's time for Congress to strengthen the federal law so that it can provide a meaningful deterrent against animal fighting. State and local law enforcement will have a tough law on the books necessary to help them crack down on this interstate industry.") (remarks of Sen. Cantwell), A.R. 263.

Wyoming, 507 U.S. 584, 591 (1993) ("In determining whether a material factual dispute exists, the Court views the evidence through the prism of the controlling legal standard."); Anderson, 477 U.S. at 248 ("[T]he substantive law will identify which facts are material.") ; but see Plf. Mot. Sum. J. at 12, 19-20.

The AWA does not proscribe the mailing of the Publications because the Publications do not contain advertisements for illegal animal fighting ventures, and therefore, do not "promot[e] or in any other manner [further]" animal fighting ventures within the meaning of 7 U.S.C. § 2156(c). By its terms, the statute defines an animal fighting venture as "any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). The copies or portions of the Publications cited by Plaintiff in its Motion for Summary Judgment and by Defendant in the instant motion, as well as the copies or portions of the Publications reproduced in the Administrative Record, are devoid of any advertisements for animal fighting ventures other than bird fighting ventures legal under applicable state law. But see Plf. Mot. Sum. J. at 7. Because the Publications are not unlawful under section 26 of the AWA, the Publications are mailable under the relevant provisions of the PRA (i.e., the provisions in 39 U.S.C. § 3001). The distribution of the Publications is also consistent with the DMM because the Publications do not contain "advertisements or other commercial speech" that promote or further any unlawful animal fighting venture within the meaning of DMM § 601.12.5.7.

**A.      The AWA Proscribes Only Advertisements For Illegal Animal Fighting Ventures.**

The provision of the AWA that prohibits the use of the mail "for purposes of promoting or in any other manner furthering an animal fighting venture" (7 U.S.C. § 2156(c)) contains an explicit exception for "fighting ventures involving live birds only if the fight is to take place in a

State where it would be in violation of the laws thereof." 7 U.S.C. § 2156(d). Because it is clear from the text and structure of AWA that 7 U.S.C. § 2156(c) does not prohibit the use of the "mail service . . . for purposes of promoting or in any other manner furthering" a legal bird fighting venture, the question of whether certain written, printed, or graphic matter may be distributed via the Postal Service, consistent with 7 U.S.C. § 2156(c), turns on how the language "promoting or in any other manner furthering" is construed.

Plaintiff contends that the AWA's prohibition on the use of the mail "for purposes of promoting or in any other manner furthering an animal fighting venture" applies to a broad range of mail matter, including:

(1) advertisements for illegal animal fighting ventures (Pl.'s Mot. Sum. J. at 14);

(2) advertisements for "birds marketed on the basis of victories at illegal animal fights" (Id.);

(3) advertisements for "fighting animals" generally (Id. at 14-16);

(4) advertisements for "the accoutrements of animal fighting" including, but not limited to, advertisements for weapons used in cockfights (Id. at 16-17);

(5) "list[s] [of] results and champions from recent cockfights" (regardless of whether the cockfights occurred in a state where cockfighting was illegal) (Id. at 14);

(6) any matter that makes the "existence" of animal fighting ventures "known to cockfighters" (Id. at 14-15); and

(7) any matter that has the effect of promoting an illegal animal fighting venture (Id. at 16-17, 22).

Plaintiff's assertions that 7 U.S.C. § 2156(c)'s prohibition applies to the matter described in categories (2) through (7) above have no support in the text of the AWA or the legislative history

of the AWA Amendments. There is no explicit support in the text of § 2156(c) for Plaintiff's position that the matter described in categories (2) through (7) above is proscribed by § 2156(c) as limited by 2156(d) because 2156(c) only refers to "animal fighting ventures." The absence of any reference to fighting birds, animal fighting accoutrement, lists containing results and champions from recent cockfights, or any of the other items or topics in categories (2) through (7), from the text of § 2156(c) convincingly shows that Congress intended for § 2156(c)'s prohibition to apply only to mail matter that directly pertains to illegal animal fighting ventures. But see Plf. Mot. Sum. J. at 13.

Moreover, Plaintiff's broad interpretation of the language "promoting or in any other manner furthering" is potentially inconsistent with § 2156(d), which explicitly exempts fighting ventures involving live birds in states where such ventures are legal from the prohibition in § 2156(c). Under Plaintiff's interpretation, the mailing of an advertisement for a bird fight in a state where such fights are legal, i.e., an advertisement explicitly permitted under 2156(d), would be considered illegal under Plaintiff's interpretation of § 2156(c) if such advertisement were found to have had the effect of "promoting" or "furthering" an animal fighting venture in a state where such fights are illegal (for instance, by encouraging residents of states where the practice is illegal to undertake such activities in those states). Pl.'s Mot. Sum. J. at 22 ("the promotional effects of commercial speech in a nationwide trade publication will never be isolated to a single state"). Thus, Plaintiff's interpretation of the prohibitory language in § 2156(c) has the potential to outlaw activities that Congress explicitly permitted under § 2156(d), thereby rendering subsection (d) ineffectual and meaningless. Moreover, Plaintiff's broad interpretation of this provision would likely be impossible to administer because Plaintiff's interpretation provides no bright-line rule for distinguishing between (1) mail matter that promotes or furthers animal

fighting ventures in violation of 7 U.S.C. § 2156(c), and (2) mail matter that merely discusses or acknowledges the existence of illegal animal fighting ventures but does not promote or further such ventures within the meaning of 7 U.S.C. § 2156(c).

Plaintiff's broad interpretation of the language "promoting or in any other manner furthering" is also inconsistent with the legislative history of the AWA Amendments of 1976 which added § 2156(c) to Title 7 of the U.S. Code.  In the Conference Report accompanying the Animal Welfare Act Amendments of 1976, Congress expressly addressed the subject of "game fowl publications" stating that a cockfighting publication would be mailable unless it contained "advertising of fights involving live birds" occurring in a state that has outlawed such fighting ventures.  H.R. Rep. No. 94–976, 23 (1976), reprinted in 1976 U.S.C.C.A.N. 783, 797.  Consistent with the exemption in 7 U.S.C. § 2156(d), Congress stated that in all other instances, "[g]ame fowl publications would be unaffected" by the AWA Amendments.  Id.  Thus, Plaintiff's claims that the AWA prohibits the Publications, which do not contain advertisements for unlawful animal fighting ventures, is inconsistent with this legislative history. [22]

The rule of lenity, a tool of statutory construction that courts have invoked to construe ambiguous criminal statutes in favor of a defendant, also cautions against a broad reading of 7 U.S.C. § 2156(c).  The Supreme Court has stated that the rule is generally limited to "situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute."  See Moskal

_____

[22] To the extent the Court finds that the Postal Service's interpretation of the AWA should be evaluated under the APA and the two-part test articulated in Chevron U.S.A., Inc. v. Natural Res. Def. Counsel, Inc., 467 U.S. 837 (1984), Defendant submits (see section IV) that: (A) its interpretation of the AWA gives effect to the "expressed intent of Congress" thereby satisfying the Chevron I test, and (B) its interpretation of the AWA is not only "a permissible construction of the statute," but is the best interpretation, and therefore, should be afforded deference under the second part of the Chevron test.  See 467 U.S. at 842-43; Pl.'s Mot. Sum. J. at 12-13, 19-21.

v. United States, 498 U.S. 103, 108 (1990) (quoting Bifulco v. United States, 447 U.S. 381, 387 (1980)); United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1352 (D.C. Cir. 2002).  In light of the arguably ambiguous scope of 7 U.S.C. § 2156(c) and the statute's legislative history, and because 7 U.S.C. § 2156(c) provides criminal penalties for violations, the rule of lenity provides an additional basis for interpreting the statute to apply only to advertisements for illegal animal fighting ventures.  See United States v. Anderson, 59 F.3d 1323, 1326 (D.C. Cir. 1995) (applying the rule of lenity to a criminal statute that contained an ambiguous phrase that could reasonably be interpreted two ways, but where one interpretation would have resulted in more substantial criminal penalties against the defendant than the other interpretation).

> **B.    Contrary to Plaintiff's Assertions, The Animal Fighting Prohibition Enforcement Act's Amendments To The AWA Provide No Basis For Finding The Publications Unlawful or Nonmailable.**

Plaintiff's assertions that the AFPEA's Amendments to the AWA provide a basis for finding the Publications nonmailable are without merit because Congress did not amend the salient language in 7 U.S.C. § 2156(c) (i.e., "promoting or in any other manner furthering") to clarify the statute's application to animal fighting publications or the content therein.  Although various portions of the AFPEA's legislative history suggest that Congress intended to prohibit the mailing of certain animal fighting "magazines" and "catalogs," see e.g., 110 Cong. Rec. E656 (daily ed. Mar. 28, 2007) (quoting Rep. Gallegly)), the AFPEA did not define the terms "promoting" or "furthering" or the phrase "promoting or in any other manner furthering an animal fighting venture" which pertain to the types of matter that would be prohibited under 7 U.S.C. § 2156(c).  Congress also did not substantially change the AWA's definition of "animal fighting venture" or amend the Act's exemption for bird fighting ventures in states where such activities are not illegal.  Congress's apparent decision not to substantially revise 7 U.S.C. § 2156 undermines Plaintiff's assertions that Congress intended to "clarify" the AWA's

application to the Postal Service or the Publications.  See Pl.'s Mot. Sum. J. at 15.

Congress' substitution of the phrase "interstate instrumentality" with the phrase "instrumentality of interstate commerce for commercial speech" in § 2156(c) provides no basis for Plaintiff's claims that the Publications are unlawful under the AWA.  Prior to the enactment of the AFPEA, 7 U.S.C. § 2156(c) provided that:

> [i]t shall be unlawful for any person to knowingly use the mail service of the United States Postal Service or any interstate instrumentality for purposes of promoting or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.

Former 7 U.S.C. 2156(c) (2006).  The phrase "the mail service of the United States Postal Service or any interstate instrumentality" in former 7 U.S.C. § 2156(c) can only reasonably be interpreted as a description of the channels of communication that Congress intended to regulate.[23]  The AFPEA's amendment to § 2156(c) which replaced the words "interstate instrumentality" with "instrumentality of interstate commerce for commercial speech" had no effect on the <u>types</u> of matter subject to § 2156(c)'s prohibition.  Rather, the only effect of this substitution was to modify the description of the channels of communication that Congress intended to regulate under § 2156(c); <u>but see</u> Plf. Mot. Sum. J. at 2, 13, 15-16, 20-21.  As a result, the statute's prohibition against "promoting or in any other manner furthering an animal fighting venture" currently applies to the knowing use of "[(1)] the mail service of the United States Postal Service or [(2)] any instrumentality of interstate commerce for commercial

---

[23] Defendant's interpretation is consistent with 7 U.S.C. § 2156(g)(3) which defines "instrumentality of interstate commerce" as "any written, wire, radio, television or other form of communication in, or using a facility of, interstate commerce."  <u>See also</u> 21 U.S.C. § 843(b) (an "instrumentalit[y]" is something that is "used or [is] useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds [including] mail, telephone, wire, radio").

speech."[24]

The plain language of 7 U.S.C. § 2156(c) as amended also undercuts Plaintiff's apparent claim that the addition of the words "commercial speech" to § 2156(c) expands the scope of the prohibition in § 2156(c) to include the Publications. See Plf. Mot. Sum. J. at 19-22. Even if the words "commercial speech" were interpreted to refer to the types of matter prohibited under the AWA, such "commercial speech" would not be unlawful under § 2156(c) unless it had the "purpose of promoting or in any other manner furthering an animal fighting venture." As discussed in subsection IV.A above, only advertisements for illegal animal fighting ventures fall within § 2156(c)'s prohibition on the use of the mail service for the "purpose of promoting or in any other manner furthering an animal fighting venture." But see Plf. Mot. Sum. J. at 23.

Finally, Plaintiff's allegations that the Publications are nonmailable because they contain advertisements for animal fighting paraphernalia prohibited from transport or delivery under 7 U.S.C. § 2156(e) are also without merit. See Plf. Mot. Sum. J. at 18. Unlike 7 U.S.C. § 2156(c) discussed above, 7 U.S.C. § 2156(e) is not ambiguous; it only criminalizes transactions through interstate commerce. Thus, the selling, buying, transporting, and delivering of matter prohibited by section 2156(e) can be legal when not conducted via interstate commerce and not otherwise prohibited by state or local law. More importantly however, such advertisements were apparently removed from the August/September 2007 issue of *The Gamecock* and the August 2007 issue of *The Feathered Warrior,* the most recent issues cited by either party. Daniel Decl.

---

[24] Defendant's interpretation is also consistent with the legislative history to the AFPEA. See 110 Cong. Rec. S4317 (indicating that the commercial speech provision is among the "new tools" created by Congress "for law enforcement to enforce these laws nationwide") (remarks of co-sponsor Senator Leahy), A.R. 283; 110 Cong. Rec. E656 ("subsection (c) of section 26 of the Animal Welfare Act, which is about interstate instrumentalities and commercial speech, prohibits the websites and magazines where fighting animals are advertised for sale") (remarks of Rep. Gallegly, emphasis added), A.R. 282. See also Plf. Mot. Sum. J. at 16-18.

¶ 15, Exs. G, K.

The presence of an explicit prohibition on the selling, buying, transporting, or delivering of animal fighting accoutrement such as knives, gaffs, or other sharp objects in interstate or foreign commerce in 7 U.S.C. § 2156(e) suggests that Congress intended for 7 U.S.C. § 2156(c) to be read narrowly.  Because there is a strong presumption against interpreting statutes in a way that would render other statutory language superfluous, this Court should be wary of construing the scope of 7 U.S.C. § 2156(c) too broadly.  See McCloy v. USDA, 351 F.3d 447, 451 (10th Cir. 2003) ("Under a long-standing canon of statutory interpretation, one should avoid construing a statute so as to render statutory language superfluous.").  This follows because, in isolation, the prohibition on the use of the mail service for "purposes of promoting or in any other manner furthering an animal fighting venture" in 7 U.S.C. § 2156(c) could be interpreted to apply to a broad range of activities that are arguably associated with animal fighting ventures, but are one step removed from the actual fights, e.g., (1) advertising the fights and (2) selling fighting accoutrement.  However, such an interpretation would render superfluous subsection 2156(e), which explicitly prohibits the latter already.  If subsection (c) should not be interpreted to reach those activities one step removed from the actual fights, it makes little sense to interpret it to reach those activities two steps removed, e.g., marketing or advertising the selling of fighting accoutrement.  Therefore, (c) should be read narrowly to reach only running or advertising actual fights.  This reasoning is fully consistent with the rule of lenity described above.

### C.    The Acceptance And Distribution Of The Publications Via The Postal Service Is Consistent With The Postal Reorganization Act And Postal Regulations Pertaining To Mailability

Because the AWA does not proscribe the subject Publications, the Publications are mailable under the relevant provisions of the PRA (39 U.S.C. § 3001(a)) and postal regulations pertaining to mailability set forth in chapter 601 of the DMM.  Section 3001(a) of Title 39

U.S.C. only deems "nonmailable" matter that is "punishable" under certain sections of Title 18 U.S.C. or "section 26 of the Animal Welfare Act" (i.e., 7 U.S.C. § 2156) when "deposit[ed] in the mails."  But see Plf. Mot. Sum. J. at  23-24.  For the reasons discussed above and in the Postal Service's correspondence with HSUS prior to the filing of Plaintiff's Complaint, the Publications are not subject to the prohibitions in section 26 of the AWA.  Additionally, none of the sections in Title 18 identified in 39 U.S.C. § 3001(a) apply to the publications.  Therefore, the Publications are not "nonmailable" under § 3001(a).

The acceptance and distribution of the Publications via the Postal Service is also consistent with the DMM.  The Postal Service interprets the provision of the DMM pertaining to animal fighting matter (DMM § 601.12.5.7) only to proscribe "[w]ritten, printed, or graphic matter," matter that is prohibited under 7 U.S.C. § 2156, the statute from which the regulation is derived.  Because the Publications are not subject to the prohibitions in 7 U.S.C. § 2156, the acceptance and distribution of the Publications via the Postal Service is fully consistent with DMM § 601.12.5.7.  Additionally, DMM § 601.12.4 only applies to advertisements that "[solicit] or [induce] the mailing of" articles described in the identified sections of the DMM.  DMM § 601.12.4 (emphasis added).  Because none of the advertisements within these Publications solicit or induce the reader or customer to mail an "adult fowl" or any other item described in sections 8.0, 9.0, or 10.0 of chapter 601 of the DMM, the adverting matter within the Publications is not restricted by DMM § 601.12.4.1.  But see Plf. Mot. Sum. J. at 4, 9.  Thus, the continued acceptance and distribution of the Publications is consistent with postal regulations pertaining to mailability.

## CONCLUSION

For the foregoing reasons, Defendant Postal Service respectfully requests that Defendant's motion to dismiss be granted and that the Plaintiff's Complaint be dismissed in its entirety with prejudice, or in the alternative, that Defendant's motion for summary judgment be granted.

January 24, 2008                           Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/_____
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204, alan.burch@usdoj.gov

Of counsel:

ANTHONY F. ALVERNO, ESQ.
DC Bar # 499580
Chief Counsel, Customer Programs
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6138
Washington, DC 20260-1135
(202) 268-2997, 268-5418

MATTHEW J. CONNOLLY, ESQ.
Attorney, Corporate Law
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6332
Washington, DC 20260-1135
(202) 268-8582, 268-5418

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
THE HUMANE SOCIETY                                  )
OF THE UNITED STATES,                               )
                                                    )
            Plaintiff,                              )        Civil Action No.: 07-1233-CKK
                                                    )
      v.                                            )
                                                    )
UNITED STATES POSTAL SERVICE,                       )
                                                    )
            Defendant.                              )
_____)

**<u>DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS</u>**

Pursuant to Local Rules 7(m) and 56.1, Defendant respectfully files this response to

Plaintiff's Statement of Material Facts in support of its alternative motion for summary

judgment.  As demonstrated below, Defendant submits that there are no disputes of material fact

and that Plaintiff's statements of material fact are insufficient as a matter of law to support

judgment in favor of Plaintiff.  Defendant responds to each of Plaintiff's numbered statements

below:

1.  Unopposed.  The Act speaks for itself.

2.  Unopposed.  The DMM speaks for itself.

3.  Unopposed.  The DMM speaks for itself.

4.  Unopposed.  The Act speaks for itself.

5.  Unopposed.  The Act speaks for itself.

6.  Opposed.  Plaintiff's statement is incorrect because the cited comments from Rep.

    Gallegly do not mention the particular periodicals at issue here, much less the most recent

    editions thereof.  Moreover, Plaintiff's statement does not state a factual issue but a legal

conclusion about Congressional "findings," and no response is necessary.  As argued in Defendant's memorandum, in section IV, the text of the statute determines its prohibitions and legal effects.  In addition, any dispute on this point is not material to the Court's decision on summary judgment, such that a trial would be necessary to resolve the dispute.

7.  Unopposed.  The report speaks for itself.

8.  Unopposed.  The Chairman's comments speak for themselves.

9.  Unopposed.  The statements of the Members speak for themselves.  Of course, their opinions do not control the factual findings of this Court, nor does the quoted  statement mention the periodicals at issue here, and even if it did, it does not refer to the most recent issues of the periodicals.  See Daniel Dec. ¶¶ 13-15, Exs. G & K.

10. Opposed.  The statement does not state a fact but a legal conclusion, to which no response is necessary.  Moreover, Senator Cantwell's findings speak for themselves, and any impact they may have on the outcome of this case would constitute a legal conclusion, not an issue of fact.  Moreover, Senator Cantwell's comments do not support the statement that "the publications at issue here[] promote animal fighting in violation of 7 U.S.C. § 2156."  Instead, her comments speak more broadly of magazines that "advertise and promote" such fights, and the evidence here is that the current editions of the two specific journals do not do so in states where such fighting is banned.  See Daniel Dec. ¶¶ 14-15, Exs. G & K.  Moreover, Senator Cantwell's language about a "market for the weapons" does not indicate that the Publications at issue here violate the statute.  In addition, any dispute on this point is not material to the Court's decision on summary judgment, such that a trial would be necessary to resolve the dispute.

11. Unopposed.

12. Opposed.  The statement's evidence speaks for itself, but the conclusion that the
    publications violate the law is not a factual issue, but a legal conclusion, to which no
    response is necessary.  In addition, any dispute on this point is not material to the Court's
    decision on summary judgment, such that a trial would be necessary to resolve the
    dispute.  Administrative Record ("A.R.") 46, 57; Daniel Dec. ¶¶ 14-15, Exs. D at 57, H at
    15.

13. Opposed.  The statement includes no evidence supporting it, appears to be incomplete,
    and is irrelevant to the issues presented in this case.  In addition, any dispute on this point
    is not material to the Court's decision on summary judgment, such that a trial would be
    necessary to resolve the dispute.

14. Opposed.  The statement citation of 68 pages from the periodical (i.e., A.R. 192-261)
    does not identify any particular information supporting the claim that "hundreds" of
    "illegal" gaffs have been "trafficked" by the "Publications."    Moreover, the conclusion
    that the "trafficking" is "illegal" is not a factual issue, but a legal conclusion, to which no
    response is required.

15. Opposed.  The single advertisement cited speaks for itself.  There is no support for the
    conclusion that more than one venue is offered for sale, but the statement is irrelevant to
    the issues presented in this case.  In addition, any dispute on this point is not material to
    the Court's decision on summary judgment, such that a trial would be necessary to
    resolve the dispute.  A.R. 285-86.

16. Unopposed, but irrelevant.  The fights advertised on A.R. 48 & 49 appear to be in
    Louisiana, where such fighting has not yet been banned.  Daniel Dec. ¶ 14, Ex. J

(containing the July 2007 issue of *The Feathered Warrior* which, on page 9, appears to

contain an advertisement for a bird fight in Louisiana).  Plaintiff's assertion that the

advertisement in the July 2007 issue of *The Feathered Warrior* pertains to an

"arrangement" that "amounts to an illegal animal fight" is not a factual issue, but a legal

conclusion, to which no response is required.

17. Opposed, but irrelevant.  The materials shown on A.R. 246 & 250 speak for themselves.

There do not appear to be any such "results" on A.R. 246 and the "results" on A.R. 250

appear to have been posted by someone in Louisiana, where cock fighting is not yet

banned.  In addition, any dispute on this point is not material to the Court's decision on

summary judgment, such that a trial would be necessary to resolve the dispute.

18. Unopposed.  The cited documents speak for themselves.

19. Opposed.  The portion of the A.R. cited by plaintiff (A.R. 128) does not constitute a

"Ruling."  The remainder of Paragraph 19 is unopposed.  The cited documents speak for

themselves.

20. Unopposed.  The cited documents speak for themselves.

21. Opposed.  The document cited by plaintiff does not constitute a "Ruling."  <u>See</u> Daniel

Dec. ¶¶ 31-32, Ex. P.  The remainder of Paragraph 21 is unopposed.  The cited

documents speak for themselves.


January 24, 2008                            Respectfully submitted,


                                           _____
                                           JEFFREY A. TAYLOR, D.C. Bar # 498610
                                           United States Attorney


                                             /s/
                                           _____
                                           RUDOLPH CONTRERAS, D.C. Bar # 434122
                                           Assistant United States Attorney


4

_/s/_
_____
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204, alan.burch@usdoj.gov

Of counsel:

ANTHONY F. ALVERNO, ESQ.
DC Bar # 499580
Chief Counsel, Customer Programs
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6138
Washington, DC 20260-1135
(202) 268-2997, 268-5418