UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**THE HUMANE SOCIETY OF
THE UNITED STATES**,

               Plaintiff,

     v.

**UNITED STATES POSTAL SERVICE**,

               Defendant.

Civ. No. 07-1233 (CKK)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT; AND REPLY
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

*Of Counsel:*

Stuart Philip Ross
Sarhana Livingston
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 662-2000

Ethan Carson Eddy
Rebecca G. Judd
Jonathan R. Lovvorn

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2329
(202) 778-6132 (fax)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................................iii

**INTRODUCTION**.............................................................................................................1

**ARGUMENT**...................................................................................................................2

**I.** **PLAINTIFF HAS STANDING TO BRING THIS ACTION.**.................................3

    **A.** **Plaintiff's Detailed Declaration Illustrates Ongoing Financial Injury.**......................................................................4

    **B.** **Plaintiff's Injuries are Directly Traceable to Defendant's Denial of Plaintiff's Petition, Despite the Fact that Defendant Does Not Engage in Animal Fighting Directly.**.....................................12

    **C.** **Plaintiff's Injuries are Redressable by the Relief Sought.**..................16

    **D.** **Plaintiff Has Prudential Standing.**...............................................19

**II.** **DEFENDANT'S RULING IS A FINAL AGENCY ACTION THAT IS REVIEWABLE BY THIS COURT.**..........................................................22

    **A.** **Plaintiff Brings This Action Under the APA, Not the AWA Or the PRA.**......................................................................22

    **B.** **Defendant's Ruling Is a Mailability Determination That Does Not Fall Within the Exception To APA Review.**..............................23

    **C.** **Defendant's Ruling Is a Quintessential Final Agency Action That This Court May Review.**......................................................27

        **1.** **The Ruling Under Review, In Defendant's Own Words, "Interpret[s]" Law, and Is Thus An Agency "Action."**..............27

        **2.** **Defendant's Ruling Is Sufficiently "Final" for Review.**...........29

            *(a)* *There is Nothing Tentative About Defendant's Ruling.*............30

            *(b)* *The Ruling Has Tangible Legal and Practical Consequences and Is One From Which Rights and Obligations Flow.*.......................................................31

    **D.** **Plaintiff Has Not Challenged An Enforcement Decision.**...................34

III.  **DEFENDANT'S RULING PERMITTING THE MAILING OF SOLICITATIONS FOR THE ILLEGAL SALE AND PURCHASE OF FIGHTING ANIMALS IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO THE AWA.** ...................................................................................... 37

    A.  **Defendant's *Post Hoc* Rationalizations Are Baseless, and Cannot Cure the APA Violation Here.** ........................................................ 37

    B.  **Defendant's *Post Hoc* Rationalizations Fail On Their Own Terms.** ........................................................................................................... 38

**CONCLUSION** .............................................................................................................. 44

# TABLE OF AUTHORITIES

## CASES

A.N.S.W.E.R. Coalition v. Kempthorne,
    493 F. Supp. 2d 34 (D.D.C. 2007)........................................................................ 13, 16

Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,
    469 F.3d 129 (D.C. Cir. 2006)................................................................................ 4, 5

Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,
    789 F.2d 931 (D.C. Cir. 1986)................................................................................ 21

Aid Association for Lutherans v. USPS,
    321 F.3d 1166 (D.C. Cir. 2003).............................................................................. 25, 45

Aimes Publications v. USPS,
    No. 86-1434, 1988 WL 19618 (D.D.C. Feb. 23, 1988)........................................... 26

Air Courier Conference of America v. American Postal Workers Union,
    498 U.S. 517 (1991)................................................................................................ 24

Akins v. FEC,
    524 U.S. 11 (1998)................................................................................................. 17, 35

Alaska Department of Environmental Conservation v. U.S. E.P.A.,
    244 F.3d 748 (9th Cir. 2001) ................................................................................. 30

Alternatives Research & Development v. Glickman,
    101 F. Supp. 2d 7 (D.D.C. 2000)........................................................................... 23

Americans Disabled for Attendant Programs Today v. HUD,
    170 F.3d 381 (3rd Cir. 1999) ................................................................................. 36

America's Community Bankers v. Federal Deposit Insurance Corp.,
    200 F.3d 822 (D.C. Cir. 2000)............................................................................... 12

American Horse Protection Association, Inc. v. Lyng,
    812 F.2d 1 (D.C. Cir. 1987).................................................................................... 29, 33

Animal Legal Defense Fund v Glickman,
    154 F.3d 426 (D.C. Cir. 1998)............................................................................... passim

Animal Welfare Institute v. Kreps,
    561 F.2d 1002 (D.C. Cir. 1977).............................................................................. 19

Appalachian Power Co. v. EPA,
    208 F.3d 1015 (D.C. Cir. 2000).............................................................................. 30

Association of Irritated Residents v. EPA,
        494 F.3d 1027 (D.C. Cir. 2007)........................................................36, 44

Ayuda, Inc. v. Meese,
        687 F. Supp. 650 (D.D.C. 1988).......................................................5, 6, 10

Barnhart v. Thomas,
        540 U.S. 20 (2003)............................................................................31, 44

Bell Atlantic Corp. v. Twombly,
        127 S. Ct. 1955 (2007).............................................................................2

Bennett v. Spear,
        520 U.S. 154 (1997)........................................................................ passim

Beno v. Shalala,
        30 F.3d 1057 (9th Cir. 1994) ............................................................16, 37

Bowen v. Michigan Academy of Family Physicians,
        476 U.S. 667 (1986)...............................................................................20

Brady Campaign to Prevent Gun Violence United With the Million Mom March v.
        Ashcroft, 339 F. Supp. 2d 68 (D.D.C. 2004)............................................16

Burlington Truck Lines, Inc. v. United States,
        371 U.S. 156 (1962)...............................................................................37

Califano v. Sanders,
        430 U.S. 99 (1977).................................................................................37

Capital Network System, Inc. v. F.C.C.,
        3 F.3d 1526 (D.C. Cir. 1993)............................................................29, 36

Carter Chevrolet Agency, Inc. v. U.S. Postal Service,
        19 F. Supp. 2d 1246 (W.D. Okla. 1997) ............................................23, 24

Cellnet Communication, Inc. v. F.C.C.,
        965 F.2d 1106 (D.C. Cir. 1992)..............................................................30

Celotex Corp. v. Catrett,
        477 U.S. 317 (1986).................................................................................4

Center for Automobile Safety v. Claybrook,
        627 F.2d 346 (D.C. Cir. 1980).................................................................32

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
        467 U.S. 837 (1984).........................................................................38, 44

Ciba-Geigy Corp. v. EPA,
   801 F.2d 430 (D.C. Cir. 1986) .................................................................. 30, 33

Citizens to Preserve Overton Park v. Volpe,
   401 U.S. 402 (1971) ............................................................................................. 37

Clark v. Martinez,
   543 U.S. 371 (2005) ............................................................................................. 42

Commonwealth v. Fricchione,
   Crim. No. 0012396-2004 (Pa. Ct. Comm. Pleas 2006) ................................. 32

Common Cause v. Federal Election Commission,
   108 F.3d 413 (D.C. Cir. 1997) ........................................................................... 6

Community Nutrition Institute v. Block,
   698 F.2d 1239 (D.C. Cir. 1983) ....................................................................... 15

Consumer Electronics Association v. FCC,
   347 F.3d 291 (D.C. Cir. 2003) ......................................................................... 40

CropLife America v. E.P.A.,
   329 F.3d 876 (D.C. Cir. 2003) ......................................................................... 34

Drake v. FAA,
   291 F.3d 59 (D.C. Cir. 2002) ........................................................................... 36

E.E.O.C. v. St. Francis Xavier Parochial School,
   117 F.3d 621 (D.C. Cir. 1997) ........................................................................... 2

EPIC v. Pacific Lumber Co.,
   266 F. Supp. 2d 1101 (N.D. Cal. 2003) ......................................................... 32

Evers v. Dwyer,
   358 U.S. 202 (1958) ........................................................................................... 10

Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.,
   28 F.3d 1268 (D.C. Cir. 1994) ................................................................... 11, 12

Fox Television Stations, Inc. v. FCC,
   280 F.3d 1027 (D.C. Cir. 2002) ....................................................................... 29

Friends of the Earth, Bluewater Network Division v. Department of Interior,
   478 F. Supp. 2d 11 (D.D.C. 2007) ................................................................. 13

Fund for Animals, Inc. v. U.S. Bureau of Land Management,
   460 F.3d 13 (D.C. Cir. 2006) ........................................................................... 34

Graham v. FEMA,
  149 F.3d 997 (9th Cir. 1998) ............................................................ 17

Griggs v. WMATA,
  66 F. Supp. 2d 23 (D.D.C. 1999)........................................................ 2

Halverson v. Slater,
  206 F.3d 1205 (D.C. Cir. 2000)...................................................... 20, 41

Harlow v. Fitzgerald,
  457 U.S. 800 (1982)........................................................................ 3

Havens Realty Corp. v. Coleman,
  455 U.S. 363 (1982)..................................................................... 4, 10

Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.,
  912 F.2d 1525 (D.C. Cir. 1990)........................................................ 33

Hocker v. U.S. Department of Agriculture,
  82 F.3d 165 (7th Cir. 1996) ............................................................ 23

Holcomb v. Powell,
  433 F.3d 889 (D.C. Cir. 2006)........................................................... 8

Household Credit Services, Inc. v. Pfennig,
  541 U.S. 232 (2004) ...................................................................... 45

Independent Equipment Dealers Association v. E.P.A.,
  372 F.3d 420 (D.C. Cir. 2004)...................................................... 27, 33

International Ladies' Garment Workers' Union v. Donovan,
  722 F.2d 795 (D.C. Cir. 1983)................................................... 15, 17, 35

Japan Whaling Association v. American Cetacean Society,
  478 U.S. 221 (1986)...................................................................... 13

Jerome Stevens Pharmaceuticals v. FDA,
  402 F.3d 1249 (D.C. Cir. 2005)........................................................ 36

Jost v. Surface Transportation Board,
  194 F.3d 79 (D.C. Cir. 1999)........................................................... 38

Larson v. Valente,
  456 U.S. 228 (1982)................................................................... 16, 18

MGIC Indemnity Corp. v. Weisman,
  803 F.2d 500 (9th Cir. 1986) ........................................................... 15

Menkes v. Department of Homeland Security,
    486 F.3d 1307 (D.C. Cir. 2007)......................................................................... 34

Mistick PBT v. Chao,
    440 F.3d 503 (D.C. Cir. 2006)............................................................................ 20

Motor Vehicle Manufacturer Association v. State Farm Mutual Automobile
    Insurance Co., 463 U.S. 29 (1983).................................................................... 37

Mova Pharmaceutical Corp. v. Shalala,
    140 F.3d 1060 (D.C. Cir. 1998)......................................................................... 19

National Family Planning and Reproductive Health Association, Inc. v. Gonzales,
    468 F.3d 826 (D.C. Cir. 2006)........................................................................... 11

National Petrochemical & Refineries Association v. Environmental Prot. Agency,
    287 F.3d 1130 (D.C. Cir. 2002)......................................................................... 22

National Treasury Employees Union v. U.S.,
    101 F.3d 1423 (D.C. Cir. 1996)......................................................................... 10

National Wrestling Coaches Association v. Department of Education,
    366 F.3d 930 (D.C. Cir. 2004)..................................................................... 13, 16

Natural Resources Defense Council v. EPA,
    489 F.3d 1250 (D.C. Cir. 2007)......................................................................... 39

Norton v. Southern Utah Wilderness Alliance,
    542 U.S. 55 (2004)............................................................................................. 27

Pacific Coast Federation Fishermen's Ass'ns, Inc. v. NMFS,
    265 F.3d 1028 (9th Cir. 2001) ..................................................................... 31, 33

Peoples Gas, Light and Coke Co. v. U. S. Postal Serv.,
    658 F.2d 1182 (7th Cir. 1981) ........................................................................... 23

Pitney Bowes v. USPS,
    27 F. Supp. 2d 15 (D.D.C. 1998)......................................................................... 3

Public Citizen v. U.S. Department of Health and Human Services,
    332 F.3d 654 (D.C. Cir. 2003)........................................................................... 40

Scheuer v. Rhodes,
    416 U.S. 232 (1974)............................................................................................. 3

Schuler v. U.S.,
    617 F.2d 605 (D.C. Cir. 1979)............................................................................. 3

Sec'y of Labor v. Twentymile Coal Co.,
    456 F.3d 151 (D.C. Cir. 2007)........................................................................36

Sierra Club v. Morton,
    405 U.S. 727 (1972)........................................................................................7

Sierra Club v. Whitman,
    268 F.3d 898 (9th Cir. 2001) ........................................................................36

Simon v. Eastern Ky. Welfare Rights Organization,
    426 U.S. 26 (1976)........................................................................................12

Southern California Aerial Advertisers' Association v. Federal Aviation
    Administration, 881 F.2d 672 (9th Cir. 1989) ...............................................34

Spann v. Colonial Village,
    899 F.2d 24 (D.C. Cir. 1990) ........................................................................11

Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,
    950 P.2d 1086 (Cal. 1998)............................................................................10

Tao v. Freeh,
    27 F.3d 635 (D.C. Cir. 1994).........................................................................3

Tozzi v. HHS,
    271 F.3d 301 (D.C. Cir. 2001).......................................................................13

USAA Fed'l Sav. Bank v. McLaughlin,
    849 F.2d 1505 (D.C. Cir. 1988).....................................................................33

U.S. ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson,
    255 U.S. 407 (1921)......................................................................................25

Whitman v. American Trucking Associations,
    531 U.S. at 478........................................................................................28, 30

Whitmore v. Arkansas,
    495 U.S. 149 (1990)....................................................................................7, 8

Yousuf v. Samantar,
    451 F.3d 248 (D.C. Cir. 2006).......................................................................33

**STATUTES**

5 U.S.C. § 551 ....................................................................................27, 28, 29, 34

5 U.S.C. § 701(a)(1).............................................................................................37

5 U.S.C. § 706(2) .................................................................................................27

7 U.S.C. § 2156 ...................................................................................................... passim

7 U.S.C. § 7760 ............................................................................................................ 25

39 U.S.C. § 410(a) ........................................................................................................ 24

39 U.S.C. § 603 ............................................................................................................ 35

39 U.S.C. § 3001 .......................................................................................................... 25

39 U.S.C. § 3001(a) ........................................................................................... 14, 21, 37

39 U.S.C. § 3001(b) ................................................................................................. 34, 35

39 U.S.C. § 3001(f) ...................................................................................................... 26

39 U.S.C. § 3001(m) ....................................................................................... 23, 24, 25, 26

Fed. R. Civ. P. 12(b)(1) .................................................................................................. 2

Fed. R. Civ. P. 56(c) ...................................................................................................... 3

La. Rev. Stat. § 14:102.23 ............................................................................................. 42

## REGULATIONS

39 C.F.R. §§ 952-53 ...................................................................................................... 25

## LEGISLATIVE HISTORY

H.R. Rep. No. 110-27 (2007) ................................................................................... 19, 21

H.R. Rep. No. 94-976 (1976) .......................................................................................... 42

110 Cong. Rec. E656 ...................................................................................... 1, 40, 41, 44

110 Cong. Rec. H3033 ................................................................................................... 21

110 Cong. Rec. H3035 ................................................................................................... 21

110 Cong. Rec. S452 ..................................................................................................... 21

## OTHER

Donna K. Darden and Steven K. Worden, *Marketing Deviance: The Selling of
    Cockfighting*, 4 JOURNAL OF HUMAN-ANIMAL STUDIES 211, 228 (1996) ..................... 14

## INTRODUCTION

This is an Administrative Procedure Act ("APA") challenge to the Defendant agency's denial of Plaintiff's legal petition for relief. The denial is based on a self-described legal "interpretation of the AWA [Animal Welfare Act]" that permits the continued mail order trafficking of illegal fighting animals and implements, in the face of: (1) a broad statutory prohibition on the purposeful mailing of any "commercial speech" that "promot[es] *or in any other manner further[s]* an animal fighting venture," 7 U.S.C. § 2156(c) (emphasis added); and (2) an uncontested expression of Congressional intent that the AWA be read to "*prohibit[ ] the websites and the magazines where fighting animals are advertised for sale.*" 110 CONG. REC. E656 (daily ed. Mar. 28, 2007) (emphasis added). As Plaintiff explained in its opening brief, when the text, structure, legislative history, and purpose of the AWA, as amended by the Animal Fighting Prohibition Enforcement Act of 2007 ("AFPEA"), are considered, it is plain that Defendant's denial of Plaintiff's Petition,[1] which permits the mailing of advertisements soliciting the purchase of contraband – illegal fighting animals, weapons, and even animal fighting pits – cannot stand.

Defendant's technical arguments for why this unlawful conduct should be permitted to continue are unpersuasive, not only because they are impermissible *post hoc* rationalizations created after the fact to justify a decision that the agency never bothered to adequately explain at the time it was made, but also because they ignore the pertinent statutory language and legislative history. Defendant's attorneys are forced to offer such

---

[1]  As explained in Plaintiff's opening brief, Plaintiff filed a Petition with Defendant to declare certain types of material nonmailable, which Defendant denied on June 5, 2006. Plaintiff filed a request for reconsideration of Defendant's denial the same day the AFPEA went into effect, May 3, 2007, which incorporated Plaintiff's original Petition. Defendant denied Plaintiff's second request on June 26, 2007. Defendant's denials of Plaintiff's Petition are hereinafter referred to jointly as Defendant's "Ruling" unless otherwise noted.

thin rationalizations because they recognize that they simply have nothing else to work with in the decision under review.

Nor does Defendant even bother to address, let alone effectively rebut, the detailed allegations and factual information presented in support of Plaintiff's motion for summary judgment demonstrating that Plaintiff has standing under Article III. Finally, and as a last resort, Defendant argues that APA review of a "Department of Justice . . . . decision whether to prosecute" is not proper. Def.'s Mem. at 25.  The problem with this argument, of course, is that Plaintiff has not sued over any such prosecution decision. Rather, as Defendant appears to acknowledge elsewhere in its brief, what Plaintiff takes issue with is the impermissibly constrictive "interpretation of the AWA" in the final agency action under review. Since Defendant's denial of Plaintiff's petition is arbitrary, capricious, and contrary to law, it must be set aside.

## ARGUMENT

Since Defendant has styled its filing as a motion to dismiss, or in the alternative, for summary judgment, Plaintiff will first briefly address why the motion to dismiss is baseless, and then explain why Defendant's summary judgment motion also cannot be granted. None of Defendants' arguments supports dismissal of any of Plaintiff's claims under either Fed. R. Civ. P. 12(b)(1) or 12(b)(6). Under Rule 12(b)(1), the Court may grant a Rule 12(b)(1) motion only if it finds Plaintiff's claims to be "wholly insubstantial and frivolous." *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 623 (D.C. Cir. 1997); *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965, 550 U.S. ___ (2007) (well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The Court may dismiss on a Rule 12(b)(6) motion only "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Griggs v. WMATA*, 66 F. Supp. 2d 23, 26 (D.D.C. 1999). In addition, in

evaluating Defendant's arguments for dismissal under both Rule 12(b)(1) and 12(b)(6), "the complaint must be liberally construed in favor of the plaintiff," *Schuler v. U.S.*, 617 F.2d 605, 608 (D.C. Cir. 1979), and "the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences from those allegations in the plaintiff's favor." *Pitney Bowes v. USPS*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

Applying those principles here, Defendant is simply not entitled to dismissal in this case. Since the Complaint clearly states, and makes factual allegations to support, all elements of an APA claim, including standing to sue – and Defendant does not seriously contend otherwise – there is no substance to the motion to dismiss. *See Scheuer v. Rhodes*, 416 U.S. 232, 236-37 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Moreover, since the Administrative Record and declarations and materials submitted with Plaintiff's motion for summary judgment demonstrate that there is no genuine issue of material fact in dispute, and that Defendant's Ruling flatly contravenes federal statutes and regulations, Plaintiff is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

## I.    PLAINTIFF HAS STANDING TO BRING THIS ACTION.

Defendant's primary argument against Plaintiff's standing is that standing to challenge an agency action can never be premised on injuries caused by the industry regulated by that action. *See* Def.'s Mem. In Supp. Of Def.'s Mot. to Dismiss or In the Alternative, for Summ. J. ("Def.'s Mem.") at 16, 20-22. As explained further below, this argument has no merit, and the absurdity of it is plain on the face of Defendant's brief. *See id.* at 16 (arguing that standing would only be proper if "the Postal Service or its agents are directly involved in animal fighting"). Since Plaintiff's detailed and undisputed attestations

establish all elements for Article III and prudential standing, Defendant's motion for summary judgment must be denied. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## A.    Plaintiff's Detailed Declaration Illustrates Ongoing Financial Injury.

The discrete, measurable financial harms to Plaintiff attested in the Chynoweth Declaration more than suffice to demonstrate cognizable injury in fact under *Havens Realty* and Circuit precedent applying that decision. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *see also* Declaration of Ann Chynoweth at ¶¶ 2-20 (Ex. A to Pl.'s Mot. for Summ. J.) (accounting for expenses in the amount of $57,367.42 incurred when responding to raids of animal fighting ventures with direct ties to the illegal publications at issue here). In *Havens*, the plaintiff organization alleged that it "has been frustrated by defendants' [unlawful] practices" and that it "has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory [ ] practices." *Havens*, 455 U.S. at 379. Finding that this bare allegation sufficed for Article III standing, the Supreme Court held that "drain on an organization's resources . . . constitutes far more than simply a setback to the organization's abstract social interests" and is therefore a "concrete and demonstrable injury to the organization's activities." *Id.*

Courts in this Circuit have "applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). In *Abigail Alliance*, the Court of Appeals found organizational standing where the plaintiff had alleged that "[d]efendant's conduct has frustrated [plaintiff organization's] efforts to assist its members *and the public* . . . and its other activities, including counseling, referral, advocacy, and educational services." *Id.* at 132-33 (citing *Havens Realty*, 455 U.S. at 378-79) (emphasis added). The court also found that the defendant's actions had "caused a drain on [plaintiff

organization's] resources *and time* because the organization has had to divert significant time and resources from these activities toward helping its members and the public address" harm caused by the defendant. *Id.* (emphasis added); *compare* Chynoweth Decl. ¶¶ 7, 9, 12, 14, 17 (accounting for 968 hours of Plaintiff's personnel time responding to raids of animal fighting ventures with direct ties to the illegal publications at issue here).

Likewise, in *Ayuda, Inc. v. Meese*, 687 F. Supp. 650, 659 (D.D.C. 1988), *vacated on other grounds*, *Ayuda, Inc. v. Reno*, 509 U.S. 916 (1993), this Court found that organizational plaintiffs had standing to challenge an Immigration and Naturalization Service regulation that impaired the plaintiffs' ability to perform "a core organizational function," namely, disseminating legal information to their constituents. *Id* at 659. Specifically, the Court found that "[t]he organizations' limited resources are being needlessly squandered because [ ] the INS' regulations" rendered the law's application confusing, and thus more difficult for the plaintiffs to explain the law to their constituents. *Id.* at 656. This additional burden on the organization, in the words of the Court, "divert[s] scarce organizational resources from other aliens who need assistance. Because of this drain on their resources, the organizational plaintiffs' ability to achieve their goals has been severely hampered," thus injuring plaintiffs within the meaning of Article III. *Id.* at 657.

Plaintiff's uncontested attestations here far exceed those found to be sufficient in *Havens Realty*, *Abigail Alliance*, and *Ayuda*. As explained in the Chynoweth Declaration:

> "The HSUS has been called upon by law enforcement agencies . . . to provide direct care and shelter for fighting animals seized by law enforcement agents . . . . in the past two years alone, The HSUS has responded to six major law enforcement actions against illegal animal fighting ventures that have direct ties to [the Publications]" at a total cost of "approximately $57,367.42" to pay for "equipment, transportation, veterinary supplies, and personnel."

Chynoweth Decl. ¶¶ 3-4, 18.

5

For example, Plaintiff was summoned by law enforcement agencies on an emergency basis on May 15, 2005, to assist at a raid of the California Game Farm, an animal fighting compound that advertises in the publications at issue here. Plaintiff provided

> critical animal handling and technical expertise in a law enforcement raid on an unlawful commercial cockfighting and gamefowl breeding operation in Fiddletown, California owned by one of the advertisers in the publications at issue here. Police arrested twenty-eight people for cockfighting and seized copies of those publications as evidence. Officers also found multiple active cockfighting pits. Hundreds of fighting animals were seized during the raid, and due to the large size of the criminal venture, The HSUS had to fly in staff from several states to assist.

*Id.* ¶ 5 (internal references to attachments omitted). More specifically,

> "The total cost to The HSUS of its emergency response at the California Game Farm law enforcement operation was approximately $15,480.00. This includes approximately $4,000.00 in direct expenditures for transport, animal handling supplies, and protective equipment; a $5,000.00 emergency grant for building materials to construct a temporary shelter for seized animals; and 216 personnel hours. [T]hese funds would have otherwise been spent on" Plaintiff's core functions of preventing animal cruelty through "education, advocacy, and outreach."

*Id.* at ¶ 7; *see also* Atts. 2, 3, 5, 9, 11, 12, 18 to *id.* (Plaintiff's accounting documents); *id.* ¶ 6 (HSUS had to construct makeshift animal shelter for fighting animals because "the affected communities could no longer make room for the aggressive birds in their animal shelter dog runs without euthanizing more stray or surrendered dogs").[2]

These measurable financial injuries are much "more than simply a setback to the organization's abstract social interests." *Common Cause v. Federal Election Comm'n*, 108 F.3d 413, 417 (D.C. Cir. 1997). When Plaintiff diverts its resources to respond to these

---

[2] This unlawful venture would never have grown to be a 700-bird animal fighting compound without the purchasing audience provided by mail distribution of the Publications. *See id.* ¶ 36 (absent nationwide mail delivery of their advertisements for fighting animals, "these illegal fighting compounds would either not exist at all, or would not grow to be so large that law enforcement requires The HSUS's assistance to handle and house hundreds of specially trained, hyper-aggressive fighting animals"); *see also* Section I(B), (C) *infra* (discussing causation and redressability requirements for standing to sue).

illegal ventures in an amount of tens of thousands of dollars and hundreds of hours of personnel time, such emergency outlays are no doubt "particular, concrete injur[ies]" that suffice for Article III standing. *Sierra Club v. Morton*, 405 U.S. 727, 740 n.16 (1972).

These financial injuries are also "actual or imminent, not conjectural or hypothetical," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), because they continue to mount even as this matter proceeds. In the mere six months that have elapsed since the filing of the Complaint in this action, Plaintiff has been called upon *twice* in an unexpected and emergency fashion to handle and provide care for fighting animals seized from large animal fighting operations with direct ties to the publications at issue here. There is thus a high likelihood that these expenditures will continue in the same pattern. Defendant's brief does not even bother to mention, let alone address, these recent and substantial expenses.

On October 14, 2007, San Diego law enforcement authorities summoned Plaintiff to assist with handling and care of over 5,000 fighting birds seized during a raid of a cockfighting breeding and fighting compound. Chynoweth Decl. ¶ 15. Over fifty suspects were charged with animal fighting and copies of the publications at issue in this case were seized as evidence of criminal activity. *Id.* ¶ 16; *see also id.* Att. 16 (photographs of these publications taken at the scene). Law enforcement agents described the compound as "a life-to-death operation for these birds. . . . They were raised on site. They would sell the eggs to people that wanted a championship bloodline from these birds." Alex Johnson, *Cockfighting raid may be biggest in U.S. history*, MSNBC (Oct. 16. 2007) (Att. 17 to Chynoweth Decl.). As with the raid on the California Game Farm (an advertiser in the Publications) described above, the magnitude of the San Diego criminal trafficking operation was so large that Plaintiff had to fly in staff from several states to assist, including its Natural Disaster Services Team, at a cost to Plaintiff of approximately $22,294.06 and 504 personnel hours. Chynoweth Decl. ¶ 17.

Plaintiff also responded in a similar fashion to a Sacramento, California cockfighting raid on July 24, 2007, when it diverted over $5,000 from the operating budget of its West Coast Regional Office and Animal Cruelty Campaign to feed and care for rescued fighting birds seized in that raid. *Id.* ¶ 10 (citing Plaintiff's accounting documents). It is only a matter of time before Plaintiff diverts yet more of its scarce programmatic resources to rescue animals at a raid of another of the large-scale animal fighting compounds that advertises fighting animals through the mail with Defendant's blessing. *See* Chynoweth Decl. ¶ 28 ("these publications . . . are seized as evidence of criminal activity at over seventy-five percent of law enforcement raids on cockfighting ventures, including raids at which I have personally been present"). Indeed, despite pending criminal charges, the California Game Farm has resumed advertisements for fighting birds in the publications at issue here, boasting that its interstate trafficking operation is "still alive and – well!" and that it will continue to "ship" fighting birds "Anytime, anywhere." *Id.* ¶ 6 (quoting THE GAMECOCK at page Y (Mar. 2006) (Att. 4 to Chynoweth Decl.); THE FEATHERED WARRIOR 63 (Jun. 2007) (Att. 4 to Chynoweth Decl.)); *see also* THE FEATHERED WARRIOR 52 (Jan. 2008) (same) (attached as Ex. G).

Defendant's dismissive characterization of Plaintiff's expenditures and organizational duties as "voluntary," and a mere "budgetary choice[ ]," Def.'s Mem. at 18, is belied by the plain language of both the Complaint and the sworn statement of Plaintiff's declarant.[3] *See* Compl. ¶ 11 (emergency expenditures are paid for by resources "divert[ed] [from] its limited organizational and programmatic resources"); Chynoweth Decl. ¶ 2, 7

---

[3] While Plaintiff disagrees with Defendant's self-serving characterization of Plaintiff's harm as self-inflicted, Plaintiff submits that this disagreement does not rise to the level of a dispute of material fact that would preclude summary judgment, as Defendant has not actually contested the veracity of the financial outlays themselves. *See Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

("[T]hese funds would have otherwise been spent on" Plaintiff's core functions of preventing animal cruelty through "public education, advocacy, training and legislative activities"). Such financial outlays are obviously not a mere "budgetary choice," since they are reactive, unplanned, and diverted from other funding streams. Plaintiff would vastly prefer that these diverted "resources . . . otherwise be spent" – as originally planned – on programmatic and advocacy activities to prevent cruelty to animals, in furtherance of Plaintiff's goals. Indeed, this is why Plaintiff filed suit to help put an end to these unexpected expenditures.

Even if Plaintiff *could* "budget" in advance for law enforcement raids of an unknown number and scope, such financial costs are still not harms "of [Plaintiff's] own making," Def.'s Mem. at 18, because "[l]aw enforcement officials often make clear that without [Plaintiff's] assistance at raids, they will not enforce the laws against these animal fighters, who will then continue to abuse animals." Chynoweth Decl. ¶ 19. As explained by Plaintiff's declarant, and not contested by Defendant,

> [t]his is because few if any local agencies possess sufficient expertise or resources to seize, handle, and subsequently house, feed, provide veterinary assistance to, and care for large numbers of highly aggressive animals for all or part of the suspect's criminal proceedings and appeals. Municipalities are often forced to drop or settle charges due to the crushing financial burden of caring for seized fighting animals such as those advertised in the publications at issue here, which frustrates The HSUS's goals of preventing cruelty to animals.[4]

---

[4] *See also* Chynoweth Decl. ¶ 20 ("when The HSUS is required to respond to or assist with a law enforcement raid on an unlawful animal fighting venture, it ties up The HSUS's personnel, equipment, vehicles, and supplies, such that those resources cannot be used for days or even weeks. The HSUS is the lead emergency response entity in the United States for animals during natural disasters and other emergencies. If The HSUS's finite resources are tied up on a raid of one of the many unlawful animal fighting ventures promoted and furthered by the illegal distribution of the publications at issue here, The HSUS cannot respond to assist people and animals during a flood, storm, natural disaster, or other rescue operation during that time").

*Id.* This is the quintessential "presence of a direct conflict between the defendant's conduct and the [Plaintiff] organization's mission" that gives rise to cognizable injury in this Circuit. *Nat'l Treasury Employees Union v. U.S.*, 101 F.3d 1423, 1430 (D.C. Cir. 1996); *See also Ayuda*, 687 F. Supp. at 659 (under *Havens Realty*, "it is irrelevant that the organizational interests injured by INS' actions are in substantial part non-economic in nature").

Plaintiff's past, present and future efforts to rescue fighting animals are not motivated by its desire to participate in this litigation, but rather, by its core organizational purpose of preventing cruelty to animals. *See* Chynoweth Decl. ¶ 2. Indeed, courts have found standing to sue even where litigation *is* the motivating purpose behind the plaintiffs' actions. *See, e.g., Havens Realty*, 455 U.S. at 373-74 (standing where plaintiff posed as renter for purpose of discrimination litigation, and finding "[t]hat the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury"); *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1101 (Cal. 1998) (affirming standing where plaintiffs bought cigarettes for sole purpose of "'sting' operations" to test the merits of a claim); *Evers v. Dwyer,* 358 U.S. 202, 204 (1958) (deeming "not significant" to civil rights action the fact that plaintiff boarded a racially segregated bus for the purpose of litigation). The unexpected and reactive financial injuries incurred by Plaintiff are not motivated by litigation and are thus well within the rule circumscribed by the outer boundary of this precedent.

Defendant's cases are not to the contrary. Defendant relies chiefly upon *Fair Employment Council*, which it cites for the proposition that Plaintiff must be somehow extrinsically "obligated or required" to assist law enforcement – perhaps by statute – before such unplanned expenditures may be recognized as injury in fact. Def.'s Mem. at 18 (citing

10

*Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994)). But that standard is found nowhere in *Fair Employment Council* or anywhere else. If Defendant's view were to prevail, private plaintiffs with financial injury would rarely, if ever, be permitted to pursue redress.

As explained above, Plaintiff cannot avoid these financial injuries without compromising its core organizational purpose. Its uncontested assertions of harm are thus wholly unlike the injuries examined in the cases cited by Defendant. *See, e.g., Nat'l Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (characterizing injury based on "uncertainty" of application of regulation as "self-inflicted" where Plaintiff "has within its grasp an easy means of resolving the uncertainty" – *i.e.*, seeking clarification from the defendant agency). Unlike the plaintiffs found not to have standing in *Fair Employment Council* and the other cases cited by Defendant, Plaintiff would most definitely *not* "have been totally unaffected if it had simply refrained from making the re-allocation." *Fair Employment Council*, 28 F.3d at 1277.[5]

Even if Defendant could prevail upon this Court to completely disregard the substantial resources Plaintiff diverts to law enforcement raids based on Defendant's simplistic view of the case law interpreting *Havens Realty*, Plaintiff would nonetheless have standing to sue on the basis of the resources it expends on its *other* advocacy and outreach programs to counteract or offset the mail-based trafficking of fighting animals now permitted under Defendant's June 2007 interpretation of the AWA. *See Spann v. Colonial Village*, 899 F.2d 24, 27-29 (D.C. Cir. 1990); Chynoweth Decl. ¶¶ 2-3. Such counteracting

---

[5] As the nation's largest animal protection organization, when Plaintiff has had an opportunity to rescue animals from animal fighting compounds, it has done so, and will continue to do so. It will not leave animals exposed to abuse in the fighting ring simply because a government agency might someday, in the context of litigation, try to spin Plaintiff's charitable undertakings *against* the Plaintiff to undermine its standing to sue.

efforts are "simply another manifestation of the injury . . . inflicted upon 'the organization's noneconomic interest'" – here, preventing cruelty to animals. *Fair Employment Council*, 28 F.3d at 1277 (citing *Havens Realty*, 455 U.S. at 379). Plaintiff's unchallenged standing attestations suffice on either basis.

### B. Plaintiff's Injuries are Directly Traceable to Defendant's Denial of Plaintiff's Petition, Despite the Fact that Defendant Does Not Engage in Animal Fighting Directly.

Plaintiff has also met its burden to demonstrate that its injuries are also "*fairly*" traceable to Defendant's unlawful action. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (emphasis added). Defendant's principal traceability argument is that since "the Postal Service or its agents are [not] directly involved in animal fighting," the Plaintiff's injuries are not sufficiently traceable for purpose of Article III. Def.'s Mem. at 16. This position is not only impossible to reconcile with the fact that the applicable test requires injuries to be "traceable" and not strictly "direct," but also reflects a misreading of this Circuit's precedent, including cases upon which Defendant chiefly relies.

As the Court of Appeals has repeatedly made clear, including in an *en banc* ruling cited by Defendant, causation and redressability are "met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *Animal Legal Defense Fund v Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (*en banc*) ("*ALDF*"); *see also America's Cmty. Bankers v. Fed'l Deposit Ins. Corp.*, 200 F.3d 822, 827 (D.C. Cir. 2000) (causation where government action "permits a third party to behave in an injurious manner"); *Simon*, 426 U.S. at 45, n.25 (finding that an "alleged injury [ ] was directly traceable to the action of the defendant federal official" where the third party conduct directly causing plaintiff's injury "would have been illegal without that action").

Plaintiff easily meets its burden on this point. The Ruling under review expressly permits, as a matter of legal "interpretation," Def.'s Mem. at 27, the mail advertising of fighting animals, despite the recently enacted Congressional ban on such mailing. *See id.* at 35-36 (advertisements for fighting animals and weapons "are mailable"). Causation and redressability are satisfied where, as here, the "conduct" that injures the plaintiff "would have been illegal in the absence of" the agency's regulatory permission. *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940-41 (D.C. Cir. 2004); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 n.4 (1986) (standing based on agency's failure to adequately regulate third party, which in turn resulted in increased whaling that interfered with plaintiff's whale watching). Defendant's characterization of the regulated industry's actions as "independent" beyond requisite causation, Def.'s Mem. at 17, finds no basis in the law. As the Court of Appeals made clear, "the intervening choices of [regulated] third parties are not truly independent of government policy." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004).

Thus, contrary to Defendant's assertion, its Ruling most certainly *is* a "substantial factor" in the decisions of third parties to grow their animal fighting ventures through mail advertisements. *See* Def.'s Mem. at 21. As this Court recently held, in a case cited by Defendant, agency action is *necessarily* a "'substantial factor' in third party's decision to engage in the activity at issue" where the agency "governs" those activities. *Friends of the Earth, Bluewater Network Div. v. Dep't of Interior*, 478 F. Supp. 2d 11, 20 (D.D.C. 2007) (quoting *Tozzi v. HHS*, 271 F.3d 301, 309 (D.C. Cir. 2001) (traceability where direct cause of harm was off-road vehicle users whose actions were permitted by the agency, rather than the agency itself)); *see also A.N.S.W.E.R. Coalition v. Kempthorne*, 493 F. Supp. 2d 34, 45 (D.D.C. 2007) ("Causality and redressability cannot be contested; [the agency] controls the

permitting process") (cited in Def.'s Mem. at 19) (finding organizational plaintiff had standing).[6] Here, the Defendant's Ruling is the legal prerequisite that permits the continued mailing of illegal materials.

Defendant's assertion that the "Complaint does not support an inference that animal fighting venture participants and enthusiasts will not use other means . . . if the Publications are prohibited from the mailstream," Def.'s Mem. at 22, is likewise without merit. Not only does the *Complaint* contain exactly such express allegations, *see* Compl. ¶¶ 67, 75, Plaintiff's uncontested sworn declaration confirms those allegations, explaining that

> these publications are the *primary source of supply* of cockfighting roosters and cockfighting knives and gaffs. This is why the publications are found at seventy-five percent or more of all law enforcement raids of illegal cockfights. Most of the fighting animals and fighting implements advertised in the publications are not advertised in any other medium, paper or electronic.

Chynoweth Decl. ¶ 32 (emphasis added); *see also id.* ¶¶ 27-30, 36.[7] This is consistent with the findings of the sole academic study on the marketing of fighting animals, which concludes, after applying a "qualitative approach," that "[t]he major third party intermediary or facilitator in the marketing of fighting chickens is the magazine." Donna K. Darden and Steven K. Worden, *Marketing Deviance: The Selling of Cockfighting*, 4

---

[6] It is inapposite that the U.S. Department of Agriculture, and not Defendant, enforces the AWA directly against animal fighting ventures. *See* Def.'s Mem. at 21. Defendant has the authority to regulate the mailing of the publications at issue here. *See* 39 U.S.C. § 3001(a); *see also* Def.'s Mem. at 6 ("mailing standards promulgated by the Postal Service . . . . have the legal effect of federal regulations"). The mail distribution of illegal advertisements, and not the undifferentiated problem of animal fighting generally, is the ultimate cause of the specific injuries at issue here. *See, e.g.,* Chynoweth Decl. ¶ 31.

[7] The publications at issue are "the primary source of supply," Chynoweth Decl. ¶ 32, because they are one-stop shopping for fighting animals: they allow animal fighters to compare fighting animal prices, breeders, bloodlines, and other fighting characteristics. *See, e.g.*, Administrative Record at 192-261 (reproducing April 2007 issue of THE GAMECOCK).

JOURNAL OF HUMAN-ANIMAL STUDIES 211, 228 (1996) (attached as Ex. H).[8] As that study explains, with respect to commerce in fighting animals "[t]here are no wholesalers or sales forces"; "[t]he producer is the seller, who has only the one intermediary/facilitator (the magazines) to worry about." *Id.* at 230.

Thus, advertisers of fighting animals will not continue to circulate these illegal advertisements nationwide if the publications containing them cannot be mailed, for the same reason they have not and do not presently use other media such as the internet. *See* Darden, *infra*, at 228 (concluding as a matter of "ethnographic study" that "[t]he magazines form the core of a community for most cockers," whom the study describes as predominantly "rural"). Without the ability to use the mail service – especially in light of the heavily subsidized periodical postage rate the publications enjoy from the Defendant, *see* Daniel Decl. In Supp. of Def.'s Mot. at ¶ 17 – advertising to a nationwide audience of animal fighters, many of whom do not have access to or do not choose to use other media, would be impractical or cost-prohibitive. *See* Darden, *infra*, at 228 (the publications at issue here "are the only magazines many cockers read"); *see also* Daniel Decl. ¶ 17 (Defendant's declarant explaining that Periodical rate mailing is "particularly desirable, because it generally entitles a publication to receive expeditious service at rates which are less expensive than those charged for the usual alternatives").

In addition, contrary to Defendant's intimations, Plaintiff need not "prove that granting the requested relief is *certain* to alleviate" its injury. *Community Nutrition Institute v. Block,* 698 F.2d 1239, 1248 (D.C. Cir. 1983) (emphasis added); *see also Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983) ("[t]he

---

[8] Plaintiff submits this publically available study for the purpose of rebutting Defendant's standing arguments, and thus the Court can take judicial notice of its contents. *See MGIC Indemn. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir. 1986)

appellants need not negate every conceivable impediment to effective relief no matter how speculative") (citing *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 78 (1978)). Plaintiff's unchallenged attestations thus more than suffice to meet its burden to demonstrate "that third party choices have been or will be made in such manner as to produce causation." *Brady Campaign to Prevent Gun Violence United With the Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 77-78 (D.D.C. 2004).

### C.    Plaintiff's Injuries are Redressable by the Relief Sought.

Plaintiff's unchallenged declaration also satisfies its burden to show that its injuries are "likely" to "be redressed by a favorable decision" of the Court. *Bennett v. Spear,* 520 U.S. 154, 162 (1997). The Supreme Court has made clear that a plaintiff satisfies the redressability requirement when it shows that a favorable decision will relieve *some* of its injuries, and "need not show [it] will relieve [ ] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original). Indeed, a plaintiff must only show that the requested relief "is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994).

As explained above, causation and redressability are both satisfied where, as here, the "conduct" that injures the plaintiff "would have been illegal in the absence of" the agency's regulatory permission. *Nat'l Wrestling Coaches*, 366 F.3d at 941; *see also* *A.N.S.W.E.R. Coalition*, 493 F. Supp. 2d at 45 ("Causality and redressability cannot be contested; [the agency] controls the permitting process"). The agency action under review expressly permits, as a matter of statutory "interpretation," the mail advertising of fighting animals. Def.'s Mem. at 27.

Plaintiff need not affirmatively show that a regulated third party *will* comply with the law, so long as the Court's resolution of the matter establishes the illegality of the third

parties' actions. *Int'l Ladies Garment Workers' Union*, 722 F.2d at 811 (D.C. Cir. 1983) (redress found where third parties could prevent redress "only by taking extraordinary measures – *i.e.,* violating the law"). Similarly here, it would be inappropriate to assume that animal fighters or their allied trade publications will take the "extraordinary measures," *id.,* of violating the law by the same or other means, once the illegality of mailing advertisements for fighting animals is conclusively established. *Graham v. FEMA*, 149 F.3d 997, 1003 (9th Cir. 1998) (speculation that a party "might conspire to evade [the law] does not defeat plaintiffs' standing") (internal citation omitted).[9]

Despite this well-settled proposition, and ignoring, once again, Plaintiff's detailed standing attestations, Defendant complains that the "*Complaint* . . . . does [no]t identify any future unlawful animal fighting venture that will not take place if the publications are banned from the mail." Def.'s Mem. at 23 (emphasis added). This proposition, unadorned with any citation, is not the correct legal standard, but even if it were, Plaintiff has met that impermissibly onerous requirement anyway. *See* Chynoweth Decl. ¶ 6 (attesting that "[a]lthough criminal charges remain pending," the California Game Farm "animal fighting compound nonetheless continues to advertise fighting birds in the publications at issue here, where his advertisements state that the compound is "still alive and – well!" and that

---

[9] The Supreme Court has also rejected the proposition that proving an agency's eventual enforcement action, once the overarching legality of the regulated entity's practice is resolved, is necessary to redressability. In *Akins*, plaintiffs challenged the FEC's decision to exempt a "political committee" from campaign finance disclosure requirements. *Akins v. FEC*, 524 U.S. 11, 14 (1998). FEC argued that, even if it agreed with plaintiff's interpretation of the law, the agency might still choose not to enforce the provision, due to the agency's prosecutorial discretion. *Id.* at 25. The Court rejected that argument, and found that plaintiffs satisfied causation and redressability, despite the fact that the agency might *never* enforce, because "those affected by a discretionary agency decision generally have standing to complain that the agency *based its decision upon an improper legal ground.*" *Id.* (emphasis added); *see also ALDF*, 154 F.3d at 444 (rejecting the argument that redressability "requires a plaintiff to establish that the defendant agency will actually enforce" a new interpretation of the law).

he will continue to 'ship' fighting birds 'Anytime, anywhere.'") (quoting THE GAMECOCK at page Y (Mar. 2006) (Att. 4 to Chynoweth Decl.); THE FEATHERED WARRIOR 63 (Jun. 2007) (Att. 4 to Chynoweth Decl.)); Compl. ¶ 7; *see also* THE FEATHERED WARRIOR 52 (Jan. 2008) (same) (Ex. G In Supp. Of Pl.'s Mot. for Summ. J. (attached)).[10]

Moreover, as explained in Plaintiff's uncontested declaration, each of the fighting animal breeding operations that advertises in the publications is in and of itself, necessarily, an active and ongoing animal fighting venture:

> the fighting animal breeders who engage in nationwide illegal trafficking in fighting animals through these publications must, as part of their breeding and training process, fight their animals to test for aggression and 'gameness' or fighting instinct. The fighters selectively breed for fighting traits by taking the most aggressive animals in a group of 'stags,' or juvenile roosters, mating those roosters with hens born to proven fighting roosters, and then culling the rest. These animals' fighting abilities are tested in actual animal fights.

Chynoweth Decl. ¶ 35. Without the nationwide purchasing audience presently permitted by Defendant's Ruling, many if not all of those ventures will cease to exist, or at the very least, will scale back their operations to meet the demand of exclusively local buyers. *Id.* ¶ 36 ("Without the nationwide buyer network provided through the publications at issue here, these illegal fighting compounds would either not exist at all, or would not grow to be so large"). These detailed explanations more than suffice to meet Plaintiff's burden to show that the relief requested will alleviate *some* of its injuries. *Larson*, 456 U.S. at 243 n.15 (plaintiff "need not show [the relief requested] will relieve [ ] *every* injury").

---

[10] Clearly, not even criminal prosecution deters these advertisers. The lucrative payoff from these extensive trafficking enterprises – made possible by nationwide mailing of the advertisers' criminal solicitations – makes state law misdemeanor penalties an acceptable cost of doing business. To prevent or stop the animal fighting and trafficking that occurs at these compounds, it is necessary to deprive them of their nationwide audience of buyers. *See* Chynoweth Decl. ¶ 32 ("fighters would not attend if they could not procure fighting animals, and these publications are the primary source of supply of cockfighting roosters and cockfighting knives and gaffs").

### D.    Plaintiff Has Prudential Standing.

Both the Supreme Court and the Court of Appeals have "reaffirmed [that] the zone of interests test is generous and relatively undemanding," and that there "'need be no indication of congressional purpose to benefit the would-be plaintiff.'" *ALDF*, 154 F.3d at 444 (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998)). Instead, "the test, a gloss on APA § 10(a), 5 U.S.C. § 702, asks only 'whether the interest sought to be protected is *arguably* within the zone of interests to be protected by the statute.'" *ALDF*, 154 F.3d at 444 (internal citation omitted). To determine "whether the [Plaintiffs] have standing under the zone-of-interests test to bring their APA claims, we look . . . to the substantive provisions of the [statute invoked], the alleged violations of which serve as the gravamen of the complaint." *Bennett*, 520 U.S. at 175. Plaintiff easily satisfies this "generous" test for each of the provisions that has been "violat[ed]." *Id.*

A plaintiff satisfies the zone of interests test if it "in practice can be expected to police the interests that the statute protects." *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998). Not surprisingly, the Court of Appeals has found that animal protection organizations are reasonably expected to police animal welfare laws:

> Where an act is expressly motivated by considerations of humaneness toward animals, who are uniquely incapable of defending their own interests in court, it strikes us as eminently logical to allow groups specifically concerned with animal welfare to invoke the aid of the courts in enforcing the statute.

*Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1007 (D.C. Cir. 1977) (finding prudential standing); *see also* Animal Fighting Prohibition Enforcement Act of 2007, Report of the House Committee on the Judiciary, H.R. REP. NO. 110-27, at 2 (2007) (citing as a "need for the legislation" the fact that "numerous nationally circulated animal fighting magazines still promote these *cruel practices* and advertise fighting animals and the accoutrements of animal fighting") (emphasis added) (Administrative Record 265-266). Here, Defendant has

violated the animal fighting provisions of the Animal Welfare Act, as amended by the AFPEA, *see* Compl. ¶ 89 (citing 7 U.S.C. § 2156(c)), as well as the Postal Reorganization Act ("PRA") and Domestic Mailing Manual ("DMM") provisions that expressly incorporate that exact AWA subsection by reference. *See* Compl. ¶¶ 90-92.

Accordingly, Plaintiff, as the nation's largest animal protection organization, which has for five decades placed special emphasis on combating animal fighting, *see* Chynoweth Decl. ¶ 2, can certainly be "reasonably expected to police" the interests protected by the federal animal fighting law. *ALDF*, 154 F.3d at 445. In contrast, Defendant's crabbed reading of the term "police" would confine prudential standing only to "organizations [that] serve in an enforcement capacity" with respect to the law at issue. Def.'s Mem. at 25. That is far too literal and limiting. There is no authority to suggest that Congress need officially deputize or otherwise confer upon a challenger some kind of official law enforcement power before suit could be permitted under the APA. Under this absurd proposition, the only suitable challenger to most agency actions would be the agency itself, which would eviscerate the zone of interest test and rid the APA of any function at all.

If Plaintiff does not fall within the zone of interests of the AWA animal fighting provisions as upgraded by the AFPEA, then there is no party "who in practice can be expected to police the interests that the statute protects." *ALDF*, 154 F.3d at 445. But not only does such a result contravene the Court of Appeals' admonition that "Congress cannot be presumed to do a futile thing," *Halverson v. Slater*, 206 F.3d 1205, 1207 (D.C. Cir. 2000), it essentially immunizes Defendant from *any* judicial scrutiny of the agency's compliance with Congress's intent, contrary to the "'strong presumption that Congress intends judicial review of administrative action.'" *Mistick PBT v. Chao*, 440 F.3d 503, 509 (D.C. Cir. 2006) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)).

Moreover, where, as here, the Plaintiff "participat[ed] in the passage of the statute at issue," and indeed, was its primary catalyst, the Court of Appeals has presumed that "Congress . . . thus had the interests of such organizations clearly in view when it adopted the legislation." *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 939 (D.C. Cir. 1986); *see also ALDF*, 154 F.3d at 445 (finding zone of interests to encompass humane interests because the "Congressmen responsible for including animal exhibitions within the AWA . . . acknowledged that humane societies were the moving force behind the legislation").[11] Here, Congress repeatedly acknowledged Plaintiff's participation in the legislative process of the AFPEA. *See*, *e.g.*, H.R. REP. NO. 110-27, at 2 (2007); 110 CONG. REC. H3035 (Mar. 26, 2007); 110 CONG. REC. H3033; 110 CONG. REC. S452 (Jan. 11, 2007) (Administrative Record at 264-266, 276, 278). Plaintiff has not located a single case – in this or any other Circuit – where the very interests highlighted in the legislative history were deemed insufficient to support prudential standing.

Since Plaintiff is within the zone of interests of the AWA animal fighting provisions as amended by the AFPEA, it necessarily has prudential standing with respect to violations of the PRA and DMM provisions that expressly cross-reference and incorporate that exact subsection of the AWA.[12] As the Court of Appeals has instructed, "[i]n determining whether a petitioner falls within the zone of interests protected by a statute, we do not look at the specific provision said to have been violated in complete isolation, but rather in combination

---

[11] In making the zone of interests inquiry into Congressional "purpose," a reviewing Court must evaluate not only the actual language of the provision of law at issue, but also the statute's "logic [and] legislative history . . . ." *ALDF*, 154 F.3d at 444.

[12] *See* 39 U.S.C. § 3001(a) ("matter the deposit of which in the mail is punishable under . . . section 26 of the Animal Welfare Act [7 U.S.C. § 2156] is nonmailable"); DMM 601.12.5.7 ("[w]ritten, printed, or graphic matter (e.g., advertisements) promoting or furthering an animal fighting venture . . . is nonmailable under 7 USC 2156").

with other provisions to which it bears *an integral relationship*." *Nat'l Petrochemical & Refineries Ass'n v. Envtl. Prot. Agency*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (emphasis added; quotation omitted). There can be no doubt that an express statutory incorporation by reference suffices to demonstrate "an integral relationship" between the provisions of the AWA, the PRA, and the DMM at issue here.[13] Plaintiff thus has prudential standing with respect to each of the statutory provisions that Defendant's ruling violated.

## II.    DEFENDANT'S RULING IS A FINAL AGENCY ACTION THAT IS REVIEWABLE BY THIS COURT.

In its attempt to evade judicial review, Defendant argues against a straw-man action challenging a hypothetical "Department of Justice . . . . decision whether to prosecute," as explained in Section II(E) below. Def.'s Mem. at 26. But this self-serving characterization of the agency action under review has no basis in either reality or the Complaint. To the contrary, Defendant's brief only underscores why its Ruling denying Plaintiff's Petition amounts to a binding "interpretation of the AWA and the DMM with respect to [the] mailability," *id.* at 27, of illegal advertisements for fighting animals, and hence a final agency action reviewable under the APA. Defendant's other scattershot arguments for dismissal are likewise founded on a faulty premise, and must fail.

### A.    Plaintiff Brings This Action Under the APA, Not the AWA Or the PRA.

Section III(C) of Defendant's motion reads as though Plaintiff had brought its claims for relief directly under the AWA and the PRA. Def.'s Mem. at 31-35. Defendant either misunderstands or misconstrues Plaintiff's claim. As even a cursory reading of the

---

[13] Even if Plaintiff was not within the zone of interests of the PRA provisions that expressly incorporate the AWA animal fighting provisions, standing is nonetheless proper. Plaintiff is undoubtedly within the zone of interests of the AWA, and Defendant's "violation," *Bennett*, 520 U.S. at 175, of the AWA forms an independent basis for Plaintiff's claim, notwithstanding the separate violation of the PRA. Compl. ¶ 89.

Complaint reveals, this case is brought under the APA, not the AWA or the PRA. Compl. ¶¶ 89-93. This and other Courts have reviewed many agency actions alleged to be contrary to the Animal Welfare Act under the APA. *See, e.g., ALDF*, 154 F.3d at 435 (cited in Def.'s Mem. at 19, 24) (challenge to agency action regarding treatment of primates); *Alternatives Research & Dev. v. Glickman*, 101 F. Supp. 2d 7 (D.D.C. 2000) (challenge to agency action regarding rats, mice, and birds); *Hocker v. U.S. Dept. of Agriculture*, 82 F.3d 165 (7th Cir. 1996) (judicial review of agency action regarding dangerous animals was proper).

This matter is thus wholly unlike any of the cases proffered by Defendant on this point, *see* Def.'s Mem. at 31-35 (citing *International Primate*, *Postal Nurses*, *Prunte*, *Cort*, *Tax Analysts*, *Dial-A-Car*, *Thompson*, and *Runyon*), each of which, without exception, involved claims brought directly under the substantive law alleged to be violated, without any reference to a separate statutory cause of action. These authorities merely stand for the common sense proposition that parties may not sue directly under a statute where there is no private right of action *in that statute*. Plaintiff has no quarrel with that basic proposition. But it is of no matter here. Plaintiff does not need, and has not alleged, an *implied* right, because the APA equips it with an *express* right of action.

### B.    Defendant's Ruling Is a Mailability Determination That Does Not Fall Within the Exception To APA Review.

In order for "USPS [to] overcome the strong presumption that agency actions are reviewable," it must provide "'clear and convincing evidence of a contrary legislative intent'" that would preclude judicial review. *Carter Chevrolet Agency, Inc. v. U.S. Postal Service*, 19 F. Supp. 2d 1246, 1247 (W.D. Okla. 1997) (quoting *Peoples Gas, Light and Coke Co. v. U. S. Postal Serv.*, 658 F.2d 1182, 1190 (7th Cir. 1981)). In light of an express Congressional command authorizing judicial review over all Postal Service "proceedings concerning mailability," 39 U.S.C. § 3001(m), Defendant cannot possibly make such a showing here.

Although section 410(a) of Title 39 exempts some Postal Service actions from APA review, *see* 39 U.S.C. § 410(a), Congress made an express exception to this exemption for "proceedings concerning mailability" such as the one under review here. 39 U.S.C. § 3001(m). Section 410(a) provides as a general matter that:

> *except as otherwise provided in this title* or insofar as such laws remain in force as rules or regulations of the Postal Service, no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5 [the APA], shall apply to the exercise of the powers of the Postal Service.

39 U.S.C. § 410(a) (emphasis added). *Air Courier Conference of America v. American Postal Workers Union*, 498 U.S. 517, 523 (1991) and the other authorities proffered by Defendant on this point are inapposite in this case. Those authorities simply apply the general rule in 39 U.S.C. § 410(a), and do not address the specific judicial review provision that controls here, 39 U.S.C. § 3001(m).

Moreover, courts have construed section 410(a) narrowly, holding that section 410(a) in and of itself did not amount to "'clear and convincing evidence of . . . legislative intent'" to preclude judicial review, even with respect to tasks that, unlike the Ruling under review here, are truly ministerial. *Carter Chevrolet*, 19 F. Supp. 2d at 1247 (denying USPS's motion to dismiss action seeking review of procurement contract decision). In light of Section 3001(m), as explained further below, it is plain that Defendant does not come close to overcoming this strong presumption.

More specifically, Section 3001(m) makes clear that "proceedings concerning the mailability of matter under this chapter . . . *shall* be conducted in accordance with chapters 5 and 7 of title 5 [of the U.S. Code; the APA]." 39 U.S.C. § 3001(m) (emphasis added). In an attempt to sidestep this provision, Defendant contends that it has not engaged in any such "proceedings." Def.'s Mem. at 29. The fatal flaw in this argument is that Defendant fails to explain exactly how it is that a process culminating in a written "interpretation of the AWA

and the DMM with respect to mailability," *id.* at 27, does not comprise, in Defendant's words, a "mailability proceeding[ ]," let alone, in Congress's words, a "proceeding[ ] *concerning* the mailability of matter." 39 U.S.C. § 3001(m) (emphasis added).

Since Congress, and not Defendant, has the authority to determine what categories of matter are mailable, *see* 39 U.S.C. § 3001, it is plain that Congress intended the judicial review provision in Section 3001(m) to function as a check when Defendant undertakes to define, in its own words, "the *types* of matter subject to [Congress's] prohibition." Def.'s Mem. at 41 (emphasis in original). This judicial review function is especially vital, where, as here, there is no statutory delegation of authority for the Postal Service to interpret the AWA,[14] and yet Defendant has issued a binding legal "interpretation of the AWA and the DMM with respect to mailability," Def.'s Mem. at 27, that radically redefines the "*types* of matter,*" id.* at 41, made nonmailable by those statutes. *See Aid Assoc. for Lutherans v. USPS*, 321 F.3d 1166, 1167 (D.C. Cir. 2003) (affirming judicial review and injunctive relief where USPS's action "constitute[d] an impermissible reading of the statute"); *U.S. ex rel. Milwaukee Soc. Democratic Publ. Co. v. Burleson*, 255 U.S. 407, 412 (1921) ("executive authority" exercised by the Postal Service "is not only subject to review by the courts . . . but it is also subject to control by Congress"); *id.* at 417 (Brandeis, J., dissenting) (review proper of the "question . . . of statutory construction" as to "what matter shall be unmailable").[15]

---

[14] *Compare* 7 U.S.C. § 7760 ("The United States Postal Service is authorized and directed to make all needful rules and regulations for" inspection of plants and plant products presented for mailing).

[15] Defendant's invitation to judicially limit the meaning of "proceeding" in Section 3001(m) to two particular adjudication procedures found at 39 C.F.R. §§ 952-53, should be rejected. Def.'s Mem. at 29 (citing Daniel Decl. ¶ 5) (relating to "articles and substances other than written, printed or graphic matter," and "false advertising matter and lottery matter"). Had Congress intended to limit review to just two of the many types of mailability

*Aimes Publications, Inc. v. USPS* bears a close resemblance to the case at bar and, despite Defendant's protestations, is highly instructive. No. 86-1434, 1988 WL 19618, at *5 n.10 (D.D.C. Feb. 23, 1988). In *Aimes*, as here, the Court confronted the question of whether a certain type of advertisement would render periodicals nonmailable. *Aimes*, 1988 WL 19618, *1 (phrasing the question for review as "Do LGR's Lottery Advertisements Render it 'Nonmailable'?"). After quoting the rule in 39 U.S.C. § 3001(f) (now section 3001(m)), that "the APA specifically applies to proceedings concerning the mailability of matter," *id.* at *5 n.10, the Court went on to note that in such situations, "[r]eview by the courts is limited to an analysis of the administrative record." *Id.* (citations omitted).

After the Court measured USPS's ruling against the mailability statutes at issue, it went on to determine, as a matter of law, that "[u]nder these statutory provisions, it is clear that the advertisements . . . are 'nonmailable,'" *id.* at *2, and then "conclude[d] that the Postal Service's determination [of nonmailability] in this case was a correct one." *Id.* at *5; *compare* Def.'s Mem. at 28 (entreating the Court to ignore *Aimes* because in Defendant's view *Aimes* "concerned a decision" regarding "rates for Periodicals rather than a determination concerning the mailability of that magazine"). There is no compelling reason why the straightforward review process applied in *Aimes* cannot be employed here as well.

Defendant's position that 39 U.S.C. § 3001(m) be read to limit "APA rights" solely to "mailers" is likewise off base. Defendant offers no support for this legal contention other than the affidavit of its own declarant. Def.'s Mem. at 29. Nothing in that declaration or in Section 3001(m) or in any other part of the PRA limits the terms of the APA, which enables any party with Article III and prudential standing to seek review of final agency action that

---

determinations, it could have done so. Not only did Congress decline to limit section 3001(m) in this fashion, it took the opposite approach, and broadened the scope of review to include all proceedings "*concerning* mailability." 39 U.S.C. § 3001(m) (emphasis added).

is arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2). Accordingly, as in *Aimes*, APA review is proper here.

### C. Defendant's Ruling Is a Quintessential Final Agency Action That This Court May Review.

There can be no doubt that Defendant's written Ruling, which, in its own words, "*interpret*[s] the statute to apply *only* to advertisements for illegal animal fighting ventures" and thus defines entire "*types* of matter subject to [7 U.S.C.] § 2156(c)'s prohibition," Def.'s Mem. at 40-41 (emphasis added), comprises a final agency action within the meaning of the APA. The Ruling under review here meets both of "the dual requirements for 'final agency action': (1) that the action be final - *i.e.,* not tentative or interlocutory; and (2) that the action be one from which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Indep. Equipment Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 426 (D.C. Cir. 2004) (quoting *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997)). This inquiry "begins with the acknowledgment that the term 'agency action' undoubtedly has a broad sweep." *Id.* at 427 (quoting *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 478 (2001)).

### 1. The Ruling Under Review, In Defendant's Own Words, "Interpret[s]" Law, and Is Thus An Agency "Action."

The APA defines the term "agency action" as "the whole or a part of an agency rule" and goes on to define rule broadly as "the whole or a part of an agency statement of *general or particular applicability* and future effect designed to implement*, interpret,* or prescribe *law or policy*." 5 U.S.C. §§ 551(4), (13) (emphasis added); *see also Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (defining "discrete" and "final agency action" by reference to the definition terms set forth in 5 U.S.C. § 551). "[A]gency action" also "includes . . . relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(10)(B). The Supreme Court has instructed that "[t]he bite in the phrase 'final action' is not in the word

'action,' which is meant to cover *comprehensively every manner in which an agency may exercise its power*," but rather the finality of the action. *Am. Trucking*, 531 U.S. at 478.

Far from denying that its Ruling "interpret[s] . . . law or policy," 5 U.S.C. § 551(4), Defendant repeatedly acknowledges, in both its Ruling and its brief, that the Ruling does exactly that. *See, e.g.*:

- Pl.'s Mem., Ex. E (June 26, 2007 Ruling) (announcing Defendant's "interpretation" of "the language of 7 U.S.C. § 2156(c)" as modified by the AFPEA);

- Administrative Record at 128 (June 5, 2006 Ruling) ("we *interpret* our mailing standards to mean that bird fighting magazines are generally mailable" unless they contain "advertisements for upcoming bird fights") (emphasis added);

- Administrative Record at 128 (June 5, 2006 Ruling) (the Ruling comprises an "interpretation" of "the AWA");

- Def.'s Mem. at 36 (proclaiming that "The AWA Proscribes Only Advertisements for Illegal Animal Fighting Ventures");

- *id.* at 40-41 (the Ruling "interpret[s] the statute to apply *only* to advertisements for illegal animal fighting ventures" and thus defines entire "*types* of matter subject to [7 U.S.C.] § 2156(c)'s prohibition");

- *id.* at 36 ("publications [that] do not contain advertisements for illegal animal fighting ventures . . . do not 'promote or in any other manner further' animal fighting ventures");

- *id.* at 35 (seeking "the Court's analysis on the applicability of the AWA, the PRA, and the DMM to the Publications" and asserting that such analysis can be made on the basis of "the content of the Publications");

- *id.* at 40 ("interpreting the statute to apply only to advertisements for illegal animal fighting ventures");

- *id.* at 27 (the Ruling is an "*interpretation* of the AWA and the DMM with respect to [the] mailability" of advertisements for fighting animals") (emphasis added);

- *id.* at 36 (the Ruling sets forth "the meaning of 7 U.S.C. § 2156(c)").

Plainly, the Ruling is a "statement of general or particular applicability and future effect designed to . . . *interpret*, or prescribe policy" regarding the mailing of advertisements for fighting animals. 5 U.S.C. § 551(4) (emphasis added).

The Ruling also amounts to "relief, or the . . . denial thereof," 5 U.S.C. § 551(13), in that Defendant denied Plaintiff's Petition. *See* Pl.'s Mem., Ex. E (June 26, 2007 denial of Plaintiff's Petition); *see also Capital Network System, Inc. v. F.C.C.*, 3 F.3d 1526, 1530 (D.C. Cir. 1993) (quotation omitted) ("refusal to embark on the requested rulemaking" is reviewable agency action so long the "refusal terminally and completely resolve[s] the case before the agency"); *American Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987) (agency's "refus[al] to reconsider" its regulations "even after Congress adopted the legislation" at issue was reviewable under APA) (citing *Geller v. FCC,* 610 F.2d 973 (D.C. Cir. 1979)); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1039 (D.C. Cir. 2002) (decision not to institute rulemaking proceedings constitutes final agency action). Either way, the Ruling is well within the statutory meaning of "agency action."

### 2. Defendant's Ruling Is Sufficiently "Final" for Review.

Defendant further alleges that its Ruling is not a "final" agency action under the APA. Def.'s Mem. at 30. To be "final," an agency action must: (1) "mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature," and (2) be one by which "rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. The Ruling under review here satisfies both elements – it represents the agency's definitive decision that "the relevant provisions of the AWA, the PRA, and the DMM *only* proscribe advertisements for illegal animal fighting ventures," Def.'s Mem. at 35 (emphasis added), and thus determines that animal fighters have a statutory "right[ ]" to mail advertisements for their fighting animals, and further determines that the publishers of animal fighting trade publications have no "obligations" under the AWA to rid their publications of illegal advertisements for fighting animals. *Bennett*, 520 U.S. at 177–78.

29

(a)    *There is Nothing Tentative About Defendant's Ruling.*

The Ruling under review clearly "mark[s] the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177-78. Defendant points to no ongoing agency deliberation with which judicial review "would . . . interfere." *Cellnet Communication, Inc. v. F.C.C.*, 965 F.2d 1106, 1111 (D.C. Cir. 1992). Nothing in the Ruling or in Defendant's brief suggests that the agency is "considering" or "may take" further revision of its views. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) ("absence of equivocal or tentative language indicates that position was sufficiently final for judicial review") (quotation omitted).[16]

Rather, its Ruling unequivocally states that "we interpret our mailing standards to mean that bird fighting magazines are generally mailable" unless they contain "advertisements for upcoming bird fights." Administrative Record at 128 (June 5, 2006 Ruling); *see also* Pl.'s Mem., Ex. E (June 26, 2007 Ruling) (passage of AFPEA "do[es] not . . . affect[ ] my previous interpretation"). Defendant's brief also states in no uncertain terms that "the relevant provisions of the AWA, the PRA, and the DMM *only* proscribe advertisements for illegal animal fighting ventures," Def.'s Mem. at 35 (emphasis added), leaving no ambiguity as to the agency's legal interpretation. Accordingly, Defendant's "own behavior belies [any] claim that its interpretation is not final." *Am. Trucking*, 531 U.S. at 479; *see also Alaska Dep't of Envtl. Conserv. v. U.S. E.P.A.*, 244 F.3d 748, 750 (9th Cir. 2001) (basing finality determination on agency's position in litigation).

---

[16] The last sentence of Defendant's Ruling, which invites Plaintiff to bring "further developments in the law" or "other authority to [Defendant's] attention," (Jun. 26, 2007 Ruling) (Pl.'s Mem., Ex. E), does not, contrary to Defendant's suggestion, render its ruling interlocutory. *See* Def.'s Mem. at 30. If an agency action could be deprived of finality simply because Congress may one day revisit the legislation at issue, there would be nothing left to review under the APA, as that is always a possibility in any circumstance. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (cited in Def.'s Mem. at 30).

(b)    *The Ruling Has Tangible Legal and Practical Consequences and Is One From Which Rights and Obligations Flow.*

In addition to being "final," Defendant's Ruling is also one by which "rights or obligations have been determined [and] from which legal consequences flow." *Bennett*, 520 U.S. at 178. As explained above, the Ruling represents the agency's definitive decision that "the relevant provisions of the AWA, the PRA, and the DMM *only* proscribe advertisements for illegal animal fighting ventures." Def.'s Mem. at 35 (emphasis added). This "construction of the text" of the governing statute is reviewable under the *Chevron* standard, *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003), because it necessarily determines that animal fighters have a statutory "right[ ]" to mail advertisements for their fighting animals, and further determines that the publishers of animal fighting trade publications have no "obligations" under the AWA to discontinue illegal advertisements for fighting animals. *Bennett*, 520 U.S. at 177–78. If a Ruling announcing an agency's "interpretation of . . . . the meaning of" a statute that sets forth an outright prohibition on the shipment and advertising of certain items, Def.'s Mem. at 27, 36, does not fix legal rights and obligations, then nothing does.

Courts have made clear that an agency's decision to exempt an entire class of entities from statutory or regulatory requirements – such as the Ruling under review here – constitutes a final agency action under the APA. Thus, in *Pacific Coast Federation of Fishermen's Ass'ns, Inc. v. NMFS*, the Ninth Circuit Court of Appeals found an agency's prospective "grant [of] immunity" to be a reviewable final agency action. 265 F.3d 1028, 1034 (9th Cir. 2001). Here, Defendant has made clear that "the relevant provisions of the AWA, the PRA, and the DMM *only* proscribe advertisements for illegal animal fight[s]," and do not prohibit mailing of any other type of "commercial speech" that "in any other manner further[s]" animal fighting ventures, including advertisements for fighting animals,

cockfighting weapons, and even actual cockfighting pits. Def.'s Mem. at 35 (emphasis added). Defendant's Ruling exempting entire "types," *id.* at 41, of mail advertising from otherwise applicable federal law thus has the same binding effect as any other reviewable statement relieving regulated entities of statutory responsibilities.[17]

The legal and practical consequences of Defendant's "grant of immunity" are palpable – thousands of fighting animals continue to be advertised and trafficked through the mail service each month, in the face of an unambiguous Congressional command that such mail advertising stop as of May 3, 2007. Not only will these animal fighters continue to profit from their crimes, they will do so with the benefit of reduced-price mailing privileges. *See* Daniel Decl. ¶ 17. Indeed, underground dog fighting trade publications such as the one described in the Complaint, *see* Compl. ¶ 73, the shipment of which has resulted in jail time for the publisher under a law that prohibits "encouraging" animal fighting, *see Com. v. Fricchione*, Crim. No. 0012396-2004 (Pa. Ct. Comm. Pleas, sentenced March 13, 2006) (Ex. D to Pl.'s Mot. for Summ. J.), could now openly present their materials for mailing without consequence, and could even apply for and receive discounted periodical rate mailing permits. Accordingly, there can be no doubt that rights and obligations flow from Defendant's Ruling.

Ignoring the Ruling's obvious legal and practical consequences, Defendant places heavy emphasis on the fact that it announced its legal interpretation in the form of a letter denying Plaintiffs' legal petition, *see* Def.'s Mem. at 29-30, rather than something more formal. But this distinction impermissibly elevates form over substance. The Court of

---

[17] *See also EPIC v. Pac. Lumber Co.*, 266 F. Supp. 2d 1101, 1122 (N.D. Cal. 2003) (review proper where EPA decision had "the direct, immediate legal consequence of continuing to exempt a whole class of [ ] activities from" regulation); *Center for Auto Safety v. Claybrook*, 627 F.2d 346, 348 (D.C. Cir. 1980) (reviewing safety organizations' challenge of decision to exempt certain types of cars from fuel economy standards).

Appeals has admonished that agency may not avoid judicial review "merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation." *Ciba-Geigy*, 801 F.2d at 438 n.9. Where, as here, an agency's "[l]etter" "announce[s] a new interpretation of the regulations" or "denie[s] [ ] relief," it is reviewable under the APA. *Indep. Equip. Dealers*, 372 F.3d at 427. If a letter comprises "a deliberative determination of the agency's position at the highest available level," any "informality in the communication does not negative the substance of what has been done," so long as "it is the final such action of the agency." *USAA Fed'l Sav. Bank v. McLaughlin*, 849 F.2d 1505, 1590 n.1 (D.C. Cir. 1988) (quotation omitted).[18]

Defendant's position that "correspondence" is unreviewable has been considered and rejected by many Federal courts in a variety of situations. *See, e.g., American Horse Protection Ass'n*, 812 F.2d at 5 ("correspondence" containing "refusal to proceed" is reviewable); *Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (agency letter reviewable where it "confirms [agency's] definitive position . . . ; namely the denial of [plaintiffs'] requests that the [agency] promulgate . . . findings"); *Bennett*, 520 U.S. at 178 (opinion letter that had "direct and appreciable legal consequences" was reviewable agency action); *Ciba-Geigy*, 801 F.2d 437–38 (letter response to question regarding labeling law was final agency action); *Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006) (letter response setting forth agency's legal "position" that it was

---

[18] There is likewise no merit to Defendant's "heads we win, tails you lose" argument that its Ruling would only be reviewable agency action if it had reached the opposite result, *i.e.*, a result favorable to Plaintiff. *See* Def.'s Mem. at 30. So long as an agency's ruling cements "rights or obligations" one way or another, it is reviewable under the viewpoint-neutral standards of the APA. *See Pacific Coast Federation*, 265 F.3d at 1034 ("no authority for the proposition that while a 'jeopardy' opinion is reviewable, . . . a 'no jeopardy' opinion is not").

not bound by Federal Rule of Civil Procedure 45 is reviewable agency action).[19] Indeed, in this Circuit, even a press release is reviewable under the APA so long as it "establishes a substantive rule declaring" the agency's interpretation of the governing statute. *CropLife America v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003). What matters is the substance of the agency's writing. When that substance is examined here, it is plain that Defendant's Ruling determines "rights or obligations . . . from which legal consequences flow." *Bennett*, 520 U.S. at 178.

### D.    Plaintiff Has Not Challenged An Enforcement Decision.

Plaintiff agrees with Defendant that "[d]ecisions by the Department of Justice over whether to conduct criminal investigations" are not reviewable under the APA. Def.'s Mem. at 25. But Plaintiff is not seeking review of any such decision here. As explained above, the Ruling at issue centers on, in Defendant's words, its "*interpretation* of the AWA and the DMM with respect to mailability." *Id.* at 27 (emphasis added). The categorization of a *type* of material as mailable, in response to a legal petition, is not enforcement, but is more akin to rulemaking. *See* 5 U.S.C. §§ 551 (4), (5) (13).

Rather, as the PRA itself makes clear, the true enforcement aspect of mailability occurs *after* the materials are presented for mailing: "nonmailable matter *which reaches the office of delivery* . . . shall be disposed of as the Postal Service shall direct." 39 U.S.C. § 3001(b) (emphasis added). At the point of mailing, Defendant is authorized to make the discretionary enforcement decision as to whether it will:

---

[19] *See also Menkes v. Department of Homeland Sec.,* 486 F.3d 1307, 1313 (D.C. Cir. 2007) (letter setting forth agency's "position" regarding a statute is reviewable); *Fund for Animals, Inc. v. U.S. Bureau of Land Management,* 460 F.3d 13, 29 (D.C. Cir. 2006) (intra-agency memorandum regarding legal obligations of field offices constitutes final agency action); *Southern California Aerial Advertisers' Association v. Federal Aviation Administration,* 881 F.2d 672, 674 (9th Cir. 1989) (agency's letter ruling reviewable even when not issued in response to any request by plaintiff).

(1)     "refuse such nonmailable articles for mailing," DMM § 601.1.7; *id.* § 601.8.11 ("USPS employees may refuse an article for mailing . . . otherwise revealed to be nonmailable");

(2)     return nonmailable materials to the person who presents them for mailing, *see id.*;

(3)     "seize" such materials, 39 U.S.C. § 3001(b);

(4)     "detain" such materials, *id.;*

(5)     "dispose of" such materials, *id.*;

(6)     "open and search" a "vehicle," or a "store or office" in which "matter transported contrary to law . . . may be contained," 39 U.S.C. § 603;

(7)     "send a report to the United States Postal Inspection Service" for potential "criminal investigation," Def.'s Mem. at 8; or

(8)     "refer[ ]. . . the matter to the Department of Justice so that it can decide whether to prosecute criminally." *id.*

So long as Defendant's eventual enforcement decision is made within the framework of the correct statutory interpretation, it remains Defendant's option which of these numerous enforcement options it will ultimately choose. Plaintiff has not sued over, and will not sue over, any individual enforcement decision that occurs at that juncture.

Even if the agency *never* has to resort to enforcement action in the future, review is proper where, as here, the agency action addresses the overarching legality of the regulated entity's practice, and in so doing sets forth the "improper legal ground" upon which future enforcement decisions will be governed. *Akins*, 524 U.S. at 24. This common sense rule is based on the presumption that regulated entities will choose to comply with the law as correctly construed, and thus enforcement action may never be needed. *See Int'l Ladies Garment Workers' Union*, 722 F.2d at 811 (refusing to presume that regulated entities will "tak[e] extraordinary measures – *i.e.,* violat[e] the law"). Mailers of the animal fighting advertisements at issue here may or may not one day appear before an Administrative Law

Judge, *see* Daniel Decl. ¶ 5, but if and when that occurs, the agency officer must begin the adjudication with a reading of the AWA that conforms with the statute.

As Plaintiff has not invoked judicial review of an enforcement decision, *Association of Irritated Residents v. EPA*, 494 F.3d 1027, 1030 (D.C. Cir. 2007) and the other authorities cited by Defendant on this point are simply inapposite. In *Irritated Residents*, the Court of Appeals determined that the agency statement at issue was not reviewable because it was "not based on a substantive *interpretation* of the statutes." *Id.* at 1033 (emphasis added). That is plainly not the case here, as indicated in both the Ruling under review and Defendant's own brief. *See* Pl.'s Mem., Ex. E (June 26, 2007 Ruling at 1) (announcing Defendant's "interpretation" of "the language of 7 U.S.C. § 2156(c)" as modified by the AFPEA); Def.'s Mem. at 27 (characterizing the Ruling as Defendant's "*interpretation* of the AWA and the DMM with respect to mailability").[20]

Assuming Defendant's denial of Plaintiff's Petition could somehow be construed as an enforcement action, this particular denial would still be reviewable under the APA. *Capital Network,* 3 F.3d at 1530 (denial of "petition" that "request[ed] . . . . that the Commission enforce" the Communications Act in a particular way amounted to reviewable final agency action under the APA).

Defendant's argument, made in passing, that its decision here is "committed to agency discretion by law," Def.'s Mem. at 25, also lacks merit. There are only two ways an

---

[20] *See also* Def.'s Mem. at 25-26 (citing *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151 (D.C. Cir. 2007) (decision to prosecute mine safety violations); *Jerome Stevens Pharm. v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005) (decision not to enforce deadline for new drug applications); *Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002) (decision not to prosecute regulatory violations by airline); *Sierra Club v. Whitman*, 268 F.3d 898 (9th Cir. 2001) (decision not to prosecute violations of the Clean Water Act); *Am. Disabled for Attendant Programs Today v. HUD*, 170 F.3d 381 (3rd Cir. 1999) (determination not to enforce disabled access requirements)).

action is committed to agency discretion by law, and neither applies here. First, there is no express statutory preclusion of judicial review. 5 U.S.C. § 701(a)(1). Nor is this one of "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971) (citing 5 U.S.C. § 701(a)(2)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). The statutory commands at issue here are sufficiently specific to permit judicial review. *See* 39 U.S.C. § 3001(a) ("matter the deposit of which in the mail is punishable under . . . section 26 of the Animal Welfare Act [7 U.S.C. § 2156] *is* nonmailable") (emphasis added).

## III.  DEFENDANT'S RULING PERMITTING THE MAILING OF SOLICITATIONS FOR THE ILLEGAL SALE AND PURCHASE OF FIGHTING ANIMALS IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO THE AWA.

### A.  Defendant's *Post Hoc* Rationalizations Are Baseless, and Cannot Cure the APA Violation Here.

Defendant's lawyers provide pages of rationalizations, statutory construction theories, and superceded legislative history – all in a vain attempt to justify the extremely narrow construction of the AWA contained in the decision under review in this case. *See* Def.'s Mem. at 35-44. The problem with this, of course, is that the arguments and theories set forth in the brief are nowhere to be found in the actual administrative decision under review. Longstanding administrative law principles require that "[a]n agency action must be upheld, if at all, on the *basis articulated by the agency itself.*" *Beno*, 30 F.3d at 1073–74 (emphasis added); *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court simply "may not accept [agency] counsel's post hoc rationalizations for agency [action]." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Accordingly, this Court's review must be based on the text of the Ruling itself, which offers the following scant reasoning for its drastic limitation on the scope of the Animal Welfare Act:

- "the Act did not alter [the statute's] direct application to the Postal Service," Jun. 26, 2007 Ruling at 1 (Pl.'s Mem., Ex. E);

- "[t]he absence of any change to the plain language of the statute which addresses the Postal Service prevents me from" granting Plaintiff's Petition, *id*.; and

- "the Act did not include among its provisions any ban on advertising of" cockfighting weapons and fighting animals.  *Id.*

Aside from these conclusory statements, the decision being reviewed contains no analysis whatsoever. Since the APA requires that the agency furnish, in its decision, a reasoned explanation of the specific analysis and evidence upon which it relied, Defendant's Ruling should be set aside on that independent basis. *Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) ("the requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result").

In any event, as explained in Plaintiff's opening brief, these three bare assertions are easily disposed of as a matter of law: (1) the AFPEA *did* alter the AWA's application to the Postal Service; (2) there most certainly *was* a change to the plain language of the statute; and (3) regulation of "commercial speech" *is* regulation of "advertising." Pl.'s Mem. In Supp. of Mot. for Summ. J. at 19-25. For those reasons, explained more fully in Plaintiff's opening brief and not repeated here, Defendant's Ruling is arbitrary, capricious, and contrary to law, and must be set aside under the first step of the *Chevron* test. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). At the very least, Defendant's Ruling is not a "permissible construction" of the AWA, and should be set aside under the second step of *Chevron*. *Id.*

**B.    Defendant's *Post Hoc* Rationalizations Fail On Their Own Terms.**

Even if this Court were permitted to consider the reverse-engineered rationalizations that appear for the first time in Defendant's brief, these arguments of the agency's counsel fail to demonstrate that peculiar regulatory carve-out created by the agency is consistent with the AWA. Essentially, Defendant's Ruling takes a broadly-phrased federal law and artificially limits its scope to just one of the several applications intended by Congress. More specifically, the AWA broadly prohibits the purposeful mailing of any "commercial speech" that "*promot[es] or in any other manner further[s]* an animal fighting venture." 7 U.S.C. § 2156(c) (emphasis added). Defendant's Ruling limits the effect of this provision to, in Defendant's words, "*Only* Advertisements For Illegal Animal Fighting Ventures" – and *categorically excludes* advertisements for fighting animals, cockfighting weapons, or even animal fighting pits. Def.'s Mem. at 36 (emphasis added). This narrowing construction is directly at odds with the AWA's text, and also manifestly frustrates its purpose. As the Court of Appeals has admonished, "[t]he bar is high" for trying to "constrict the otherwise broad application of a statute as indicated by its text." *Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1259 (D.C. Cir. 2007). Defendant has not met that high bar here.

Most conspicuously, Defendant makes no effort to address the 2007 legislative history that directly and unequivocally answers the essential question of law at issue here. Lest there be any question as to the scope of section 2156(c) as amended by the AFPEA, the legislation's lead sponsor stated in no uncertain terms that:

> subsection (c) of section 26 of the Animal Welfare Act, which is about interstate instrumentalities and commercial speech, *prohibits the websites and the magazines where fighting animals are advertised for sale*. These publications are commercial speech, and also clearly promote animal fighting.

110 CONG. REC. E656 (daily ed. Mar. 28, 2007) (remarks of Rep. Gallegly; emphasis added) (Administrative Record at 282; all legislative history is in the Administrative Record at 263-283). As Rep. Gallegly explained, the animal fighting trade publications at issue here illegally "*promote* animal fights in every State" not only because they advertise specific animal fights – which they do – but also because "they are sent to or read by buyers in many States, who buy the fighting animals and implements and then use them in animal fights in States where cockfighting is illegal." *Id.*

In the face of this unassailable conclusion, which derives from the "text, structure, legislative history, and purpose" of the AFPEA, *Public Citizen v. U.S. Department of Health and Human Services*, 332 F.3d 654, 662 (D.C. Cir. 2003), Defendant instead abandons the *Chevron* framework and embarks on a series of *post hoc* rationalizations, without squarely confronting either the pertinent statutory language or the uncontested statements of legislative history quoted in Plaintiff's Motion.

Defendant first argues that the scope of section 2156(c) is limited only to "types" of commercial speech that receive "explicit" mention "in the text." Def.'s Mem. at 38, 41. That assertion is flawed. Congress's decision not to enumerate particular "types" of commercial speech should not be read as a limitation, but rather, exactly the opposite, as the broad phrasing of "*any other manner*" suggests. 7 U.S.C. § 2156(c). As explained in Plaintiff's opening brief, if there is any doubt, the legislative history unequivocally supports the inclusive interpretation advanced by Plaintiff. *See* Pl.'s Mem. at 15-18.

Defendant's theory would also be fatal to *its* preferred construction, because Congress did not make "explicit" mention "in the text" of *Defendant's* preferred categorization either. Had Congress intended to limit the reach of this provision to just one category of commercial speech, as Defendant postulates, it could have done so. *Consumer*

*Elec. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) ("statutes written in broad, sweeping language should be given broad, sweeping application"). Nor are there any unequivocal legislative history statements that possibly support Defendant's crabbed reading of the act.

Moreover, Defendant's construction renders the phrase "or in any other manner furthering," 7 U.S.C. § 2156(c) a nullity. Defendant argues – and Plaintiff agrees – that advertisements for illegal animal fights "promote" animal fighting ventures. Def.'s Mem. at 38. Advertisements for illegal fighting animals, weapons, and animal fighting venues, on the other hand, do not directly "promote" animal fights, but *do* "in any other manner further[ ]" those animal fights, for several reasons. *See* Pl.'s Mem. at 13-15 (citing Plaintiff's Petition, Administrative Record at 1-290). Defendant's Ruling deprives this critical AWA provision of any effect, and is thus impermissible. *Halverson*, 206 F.3d at 1207.

Defendant next argues that the exception in section 2156(d) for "ventures involving live birds in states where such ventures are legal" gives a safe harbor to the mailing of animal fighting advertisements *anywhere* in the nation, so long as they are read by *someone* in a jurisdiction where animal fighting has not been banned. But this too can readily be disposed of by reference to the AFPEA's legislative history. As Plaintiff explained on page 22 of its opening brief, the sponsor of the AFPEA stated:

> Subsection (d) is meant to limit subsection (c) with respect to the magazines and other commercial speech promoting cockfights in States where that is legal. It acts as a limitation upon subsection (c), but, as under current law, *only if the effect of that promotion is limited to cockfights in the one State where cockfighting is still legal.* So as a practical matter, (d) does not limit enforcement of (c) against the cockfighting magazines and website advertisements, because these materials promote animal fights in every State—they are sent to or read by buyers in many States, who buy the fighting animals and implements and then use them in animal fights in States where cockfighting is illegal.

110 CONG. REC. E656 (Administrative Record at 282) (emphasis added). Defendant does not allege, and has adduced no proof, that the advertisements at issue are only read by persons

in the only U.S. jurisdiction where it is lawful, until August 15, 2008, under limited circumstances, to engage in cockfighting. *See* H.B. 108, 2007 Reg. Sess. (La. 2007) (to be codified at LA. REV. STAT. § 14:102.23) (criminalizing cockfighting where gambling occurs).

Next, Defendant's brief attempts to revive a dead-end legal theory that even the June 26, 2007 Ruling under review had abandoned. Defendant's original June 5, 2006 Ruling denied Plaintiff's Petition on the sole basis that the House Report to the 1976 amendments to the AWA stated that "'[g]ame fowl publications would be unaffected except that advertising of fights involving live birds would be prohibited except in those instances where such fights are to be held in a State or territory where they are not unlawful.'" June 5, 2006 Ruling at 1 (Administrative Record at 128) (quoting H.R. REP. NO. 94-976, 23 (1976), reprinted in 1976 U.S.C.C.A.N. 783, 797)). Defendant's June 26, 2007 Ruling makes no reference to this superceded legislative history, and for good reason. *But see* Def.'s Mem. at 39. Defendant's renewed reliance upon this more than thirty year old report, which has since been obliterated by the 2007 AFPEA and its legislative history, *see* Administrative Record at 263-283, is nothing short of perplexing.[21]

Turning to Defendant's next *post hoc* argument, and contrary to Defendant's intimations, 7 U.S.C. § 2156(c) *does* prohibits the mailing of advertisements for cockfighting knives and gaffs, notwithstanding the fact that section 2156(e) also bans the actual sales *transactions* and interstate *shipment* of the knives and gaffs themselves. *See* Def.'s Mem. at 43. Perhaps most tellingly, *not even the publishers* of the two main cockfighting trade

---

[21] Defendant's invocation of the rule of lenity, *see* Def.'s Mem. at 39, is likewise inappropriate here. That criminal law doctrine only applies in civil matters in the rare situation that improper interpretation of the statute would "raise a multitude of constitutional problems." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). The AWA has no constitutional problems and Defendant has not pointed the Court to any.

magazines agree with Defendant's outlandish legal interpretation permitting the mailing of advertisements for illegal cockfighting knives and gaffs.

As stated in one of the publications, "The Animal Fighting Prohibition Enforcement Act of 2007 (S. 261) has become [*sic*] Federal Law. So there will be NO MORE gaff, knives [*sic*] advertising in the pages of GAMECOCK. The law reads: [setting forth statutory text]." Def.'s Mem., Ex. E (reprinting THE GAMECOCK 5 (June 2007)). Although these publications do continue to illegally advertise fighting animals, this half-step on the part of the publishers demonstrates that Defendant's Ruling impermissibly narrows the scope of the AWA. It is outrageous, let alone arbitrary and capricious, for Defendant to permit the mailing of advertisements that *even the financially self-interested publishers acknowledge are facially illegal and will not distribute by mail.*

Defendant's argument that it has not acted in contravention of DMM 601.12.4.1, which declares nonmailable "any advertising, promotional, or sales matter that solicits or induces the mailing of any article described in 8.0, 9.0, or 10.0," which in turn includes "adult fowls" or any "live animal" for the purpose of participating in an animal fighting venture, likewise rests on a bizarre premise. Defendant avers that "none of the advertisements within these Publications solicit or induce *the reader or customer to mail* an 'adult fowl' or any other item described in sections 8.0, 9.0, or 10.0 of chapter 601 of the DMM." Def.'s Mem. at 44 (emphasis added). But that reading takes liberty with the language of the DMM, which does not limit its terms to mailing by the "reader" or "customer." Rather, the DMM simply states that "any advertising, promotional, or sales matter that solicits or induces the mailing of any article described in 8.0, 9.0, or 10.0 is nonmailable." DMM 601.12.4.1. If only the recipient of an item, and not its sender, is barred from placing that item in the mail, this provision would have no effect whatsoever, as the recipient is never the one who sends the article in any circumstance. The more plausible

reading is that an advertisement for fighting animals "solicits or induces the mailing" of those animals when the animal fighters who view the advertisement place a mail order for the fighting animals.

As a last resort, Defendant makes the novel argument, which again, is not found in its Ruling, that the "commercial speech" prohibition in section 2156(c) *does not even apply to use of the mail*. The only way Defendant can accomplish this is to artificially separate out, with numbered brackets that do not exist in the statute, the adjacent statutory terms "[(1)] mail service of the United States Postal Service" and "[(2)] any instrumentality of interstate commerce for commercial speech." Def.'s Mem. at 41 (citing 7 U.S.C. § 2156(c); numbering and brackets in Defendant's brief but not in statute).[22] Not surprisingly, Defendant offers no supporting context for this feeble attempt to cleave adjacent parts of the same clause.

Finally, even if all of these *post hoc* machinations convince the Court that the scope of 7 U.S.C. § 2156(c) is "ambiguous," *Chevron*, 467 U.S. at 843, the Ruling is certainly not a "*reasonable* construction of the text" and legislative intent, as it must be to pass muster under the second step of *Chevron. Barnhart*, 540 U.S. at 26 (emphasis added). Far from ridding the mailstream of "[thousands of] pages worth of advertisements for illegal interstate commercial transactions" each year, as Congress directed, 110 CONG. REC. E656 (Administrative Record at 282), Defendant's Ruling instead gives animal fighters and their allied trade publications a "virtual free pass for statutory violations." *Assoc. of Irritated Residents*, 494 F.3d at 1039 n.3 (Rogers, J., dissenting). Since it is contrary to the "particular statutory language at issue, as well as the . . . design of the statute as a whole,"

---

[22] *Compare* 7 U.S.C. § 2156(c) (making it a felony to "knowingly use the mail service of the United States Postal Service or any instrumentality of interstate commerce for commercial speech for purposes of promoting or in any other manner furthering an animal fighting venture").

the Ruling must be set aside. *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004) (internal citation omitted).

## CONCLUSION

The Animal Welfare Act "simply cannot bear the meaning that the Postal Service seeks to give it." *Aid Association for Lutherans*, 321 F.3d at 1178. For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be granted and Defendant's Motion should be denied.

Respectfully submitted,

___/s/_____
Ethan Carson Eddy (D.C. Bar No. 496406)
Rebecca G. Judd (D.C. Bar No. 486315)
Jonathan R. Lovvorn (D.C. Bar No. 461163)

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2329
(202) 778-6132 (fax)
eeddy@hsus.org

*Counsel for Plaintiff*

Stuart Philip Ross (D.C. Bar No. 031658)
Sarhana Livingston (D.C. Bar No. 975886)
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 662-2000

February 14, 2007                    *Of Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**THE HUMANE SOCIETY OF
THE UNITED STATES**,

Plaintiff,

v.

**UNITED STATES POSTAL SERVICE**,

Defendant.

Civ. No. 07-1233 (CKK)

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Civil Rules 7(h) and 56.1, Plaintiff hereby responds to Defendant's Statement of Material Facts Not In Genuine Dispute.

1.      Plaintiff lacks sufficient information to admit or deny this paragraph. Title 39 of the Code of Federal Regulations is voluminous, including approximately six dozen sections and hundreds of subsections, some of which exceed one hundred pages in length. Regardless, it is not material to this case, because Congress has declared advertisements for fighting animals and paraphernalia to be nonmailable. 7 U.S.C. § 2156(c).

2.      Plaintiff lacks sufficient information to admit or deny this paragraph. Regardless, it is not material to this case, because Plaintiff has not challenged any enforcement decision.

3.      Plaintiff does not dispute this paragraph.

4.      Plaintiff does not dispute this paragraph, but states that it is not material to this case so long as the publications advertise illegal fighting animals, implements, or animal fighting venues along with any editorial content.

5.    Plaintiff does not dispute this paragraph. The second sentence is not material to this case, because the May 2007, June 2007, and July 2007 issues of *The Gamecock* contain hundreds of illegal advertisements for illegal fighting animals.

6.    Plaintiff does not dispute this paragraph, but states that it is not material to this case, because the May 2007, June 2007, and July 2007 issues of *The Gamecock* contain hundreds of illegal advertisements for illegal fighting animals.

7.    Plaintiff does not dispute this paragraph. The second sentence is not material to this case, because the May 2007, June 2007, and July 2007 issues of *The Feathered Warrior* contain hundreds of illegal advertisements for illegal fighting animals.

8.    Plaintiff does not dispute this paragraph, but states that it is not material to this case, because the May 2007, June 2007, and July 2007 issues of *The Gamecock* contain hundreds of illegal advertisements for illegal fighting animals.

9.    Plaintiff does not dispute this paragraph, but states that it is not material to this case, because the August/September 2007 issue of *The Gamecock* and the August 2007 issue of *The Feathered Warrior* contain hundreds of illegal advertisements for illegal fighting animals.

10.    Plaintiff does not dispute this paragraph, but states that it is not material to this case, because Defendant's denials of Plaintiff's Petition, which "interpret[ ] the [AWA] to apply *only* to advertisements for illegal animal fighting ventures" and thus define entire "*types* of matter subject to [7 U.S.C.] § 2156(c)'s prohibition," Def.'s Mem. at 40-41 (emphasis added), comprise final agency action within the meaning of the APA.

11.    Plaintiff does not dispute this paragraph, but states that it is not material to this case, because the publications accompanying Plaintiff's Petition and request for

reconsideration contain hundreds, if not thousands, of advertisements for illegal fighting animals, illegal cockfighting implements, and even an actual illegal animal fighting venue.

12.    Plaintiff lacks sufficient information to admit or deny this paragraph. Regardless, it is not material to this case, because Defendant's denials of Plaintiff's Petition, which "interpret[ ] the [AWA] to apply *only* to advertisements for illegal animal fighting ventures" and thus define entire "*types* of matter subject to [7 U.S.C.] § 2156(c)'s prohibition," Def.'s Mem. at 40-41 (emphasis added), comprise final agency action within the meaning of the APA.

13.    This paragraph is a legal conclusion not requiring a response. To the extent a response is deemed required, this paragraph is not material to this case, because Defendant's denials of Plaintiff's Petition necessarily determine that animal fighters have a statutory "right[ ]" to mail advertisements for their fighting animals, and further determines that the publishers of animal fighting trade publications have no "obligations" under the AWA to discontinue illegal advertisements for fighting animals. *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997).

Respectfully submitted,

___/s/_____
Ethan Carson Eddy (D.C. Bar No. 496406)
Rebecca G. Judd (D.C. Bar No. 486315)
Jonathan R. Lovvorn (D.C. Bar No. 461163)

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2329
(202) 778-6132 (fax)
eeddy@hsus.org

*Counsel for Plaintiff*

Stuart Philip Ross (D.C. Bar No. 031658)
Sarhana Livingston (D.C. Bar No. 975886)
Ross, Dixon & Bell, LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 662-2000

February 14, 2007                    *Of Counsel for Plaintiff*

4

Exhibit G

Plaintiff's Memorandum In Opposition to Defendant's
Motion to Dismiss or in the Alternative for Summary
Judgment; and Reply In Support of Plaintiff's Motion
for Summary Judgment

*The Humane Society of the United States v.
United States Postal Service*

Civ. No. 07-1233 (CKK)

# The FEATHERED



*Happy New Year*

# WARRIOR

*–Published Since 1903 in the Interest of Game Fowl Fanciers All Over the World–*

*U.S.A.*
*$26.00 Per Year*

JANUARY 2008

*U.S.A.*
*$6.00 Per Copy*



# CLASSIFIED ADVERTISING

## BUSINESS GETTERS AT JUST 40 CENTS PER WORD

These little "Business Getter" ads at 40 cents per word will "Bring Home the Bacon." Try one, be convinced, then use them often. MINIMUM $10.00.

**HATCH** in Blueface, Jacob, Harold Brown McLean, white and red Ruble. Grey in Joe Redmond, Harold Brown. Red and Brass-back Albany. Black Butchers, Blueberg Muff, Sids, Cardinal Club Kelsos, Racy Mug, Wingate Brownred, Spanish, Allen and Lacy Roundhead. Show birds. Carlis Langford; 398 Burristown Paradise Ln. Gainesboro, TN 38562; 931-268-5249. c/s

**BOND-1960-2008-** Ginn, Law, Shorty Bullock, Jock Wilson Grays. Ginn, Kelso, Roundhead, Leiper Hatch Reds. For brood and Show only. Also some cross bred in the above breeds. Paul Bond; 1333 Sandy Cross Rd. Royston, GA 30662. 706-245-7541. a/s

**RASTA RANCH......** RastaRooster Ranch.com. We now have an active web site also E-mail address: doctafari@wildblue.net. Please check out our fowl and some winter pictures. I-n-I guarantee any and all my fowl. They are for legal purposes ONLY! 916-524-6343.

**CALIFORNIA GAME FARM--** For all of my friends, customers, and past acquaintances who have tried and failed to reach me. I will be available now at: 317-645-5870 and 209-245-6033 or write: P. O. Box 101, Fiddletown, CA 95629. r/b

**SID TAYLORS** Brown Reds, Sweaters and Blue Face, proven bloodlines.. Chicks to cocks. mcbridegamefowl.com. Phone 803-359-3816 or 803-447-9855. hi/s

**TOP FOWL-** In Bullock Greys, YL Hatch, Doc Robinson & Gilmore GL Hatch. Trios $300.00. Gerald Wilson, Ft. Inn SC 29644. 864-862-7168. a/s

**RICHBOURG GAME FARM-** Record speaks for itself! Albany, Roundhead, Claret, Kelso, Yellow-leg Hatch and Sweater. Brood trios $750, Brood cocks $350, Brood Hens $250. I pay shipping in (Cont.) U.S. These fowl for breeding purposes only! (Visitors always welcome to come select). Call: John Richbourg; 580-584-2984; Rt. 1, Box 728; Broken Bow, OK 74728 I/s

**BROOD and SHOW FOWL-** Glen Bosley old time Rubles, Grove, pure Whitehackles, pure Kearney Whitehackles, some William T. Greys. 610-857-2926. b/s

**PONDEROSA GAME FARM-** Cocks $100, Stags $75, Pullets $50, Hens $75, McLean Hatch, Yellow Leg Hatch, Lacy Roundheads, Clarets, Brown Reds. Call: 912-473-2893 or 904-334-1245. NPIP tested #58-532-E. d/s

**FRESH COCKS -** Pre-conditioned $125.00 each. Call William Covington at 828-612-4571 or 828-441-0609. e/s

**HAND PAINTED.....** Hats, jackets, mail boxes, bred boxes, wallets and more. Joy's Studio, 409-727-3160. I/r

## This Two Inch Ad

would cost you ONLY, $33.00 the first month and $28.00 each month thereafter or $230.00 for a full 12 months.

Exhibit H

Plaintiff's Memorandum In Opposition to Defendant's
Motion to Dismiss or in the Alternative for Summary
Judgment; and Reply In Support of Plaintiff's Motion
for Summary Judgment

*The Humane Society of the United States v.
United States Postal Service*

Civ. No. 07-1233 (CKK)

# society & animals

### F O R U M

#### ∗ F O R M E R L Y   P S Y E T A   ∗

| Violence Link | Animals in the Classroom | Publications |
|---|---|---|

LINKING SCHOLARS AND
PROFESSIONALS THROUGH
EDUCATION, TRAINING,
AND ADVOCACY.

| Resources & Educational Material | About | How You Can Help |
|---|---|---|



Society & Animals Journal of Human-Animal Studies

**Volume 4, Number 2**

**Marketing Deviance: The Selling of Cockfighting**

Donna K. Darden 1
Tennessee Technological University

Steven K. Worden
The University of Arkansas

*We use conventional marketing concepts to examine the marketing of the deviant and stigmatized activity of cockfighting and show how the two differ. Our research is based on several years of active participant observation with cockfighters and the examination of several publications devoted to the sport. We find a paradoxical situation wherein people who compete with each other in an illegal activity must also establish their reputations for honesty and trustworthiness. Aspects of a gerontocracy characterize this deviant world.*

· Then one day I was driving through a small town...and I noticed one of the nicest set-ups for gamefowl that I have ever seen. I stopped....and gazed....About that time an old man came out of his house and started towards me....he said he remembers seeing me...buying fowl off a friend of his. The same man who got me started in this sport....I was talking to probably the toughest, most honest and complete rooster man alive today, at least I think so. Anyway, we introduced ourselves and he told me about how he had tried to locate me about a year ago. I asked Sal why he tried to find me of all people and he said because he needed a partner. Well, when he said that, I about fell out of my shoes. Sal then explained that he had just moved to Oklahoma a few years ago and that he wanted someone who was a beginner in this sport, willing to learn what fifty years of cockfighting had taught him. (Whitney, 1991, p. 150)

Prus (1989a, 1989b) has shown us the close relationship which can exist between sociology and much of marketing. As Prus shows, the ethnographic study of marketing in action - the observation of salespeople selling, for example - can add to our knowledge of sociology. Here, we use a qualitative approach to the marketing of game fowl and the sport of cockfighting to illuminate problems which may be common in the deliberate spread and diffusion of other deviant activities, and we note the gamefowl worlds attempts at solutions.

Cockfighting is a hobby and sport for all of its practitioners, and a business venture for the many who sell gamefowl and accessories. Like any small business person, the entrepreneurial cockfighter faces a different set of problems from those that General Motors and IBM contend with, yet he too must work within a set of forces which shapes his activities. We look here at the market forces which affect entrepreneurial cockfighters and the solutions they find as they and their consumers construct the marketing of a deviant sport and the fighting cock as a commercial object. After a brief description of cockfighting, we will describe our research and discuss how cockfighters market their questionable sport. We will show how marketing deviance differs from more conventional marketing.

**Cockfighting**

Cockfighting is a very old sport - some even claim "the oldest" (Dundes, 1994, p. vii). In 386 Saint Augustine used a description of a cockfight in his "De Ordine" to illustrate evil in the world. Although cockfighting is not universal, it may be the closest to a universal sport, occurring almost everywhere that chickens live. There are cultural nuances to the fights which occur in different places, some differences larger than nuances (bare-spurred versus the "slasher" fights, for example, see below), but the elements are fairly standard, owing to the inherent elements of pitting two roosters against each other to fight.

A cockfight consists of several rounds of putting weight-matched pairs of specially bred roosters against each other in a pit. Depending on the circumstances, they usually fight until one is dead. The birds are often brightly colored, and, again depending on the circumstances, a fight may be awesomely savage and, in its way, beautiful, although bloody. Spectators usually make bets on the birds, in any of several fashions, frequently calling out bets even as the fight progresses. Birds may fight bare-heeled (rarely) or with knives ("slashers") or gaffs (slender, pointed spurs) attached. The knife fight is quicker and bloodier, and more rounds are held during a session. During the gaff fight, it is normal for both birds to be wounded and exhausted but still fighting, so they may be dragged to a pit where they lie near each other. One or the other will usually rise up one last time to peck at the other, evidencing the quality of "deep gameness," and winning the fight. They may stay in the drag pit for an hour or more. During that time, other birds are fighting in the main pit. Most of the people involved in cockfighting are men, although there are some women involved. The settings for the fights are usually rural, and range from the informal fight in a farmer's yard to the formal, specially constructed pits in a few areas of the country such as the Neighbors Game Club in Cibola, Arizona, which seats 350 people.

Most often, a cockfight is like other rural, small town events, such as a rodeo or a high school ballgame. Although as Bryant (1994) has pointed out, cockfights attract people from all levels of the stratification system, our data show that people from the high-end of the social hierarchy are underrepresented; rural, poor, construction workers and agriculturalists predominate at most cockfights. People wear levis, overalls, camo outfits, and the occasional sport shirt. They generally sit on wooden benches. There is usually a concession stand. There is often a sign posted saying, "No Profanity, Alcohol, or Gambling." During daylight fights, there is usually gambling, but the alcohol and profanity are also usually minimal. There are at night fights, which can go on all night. Behavior at these fights can get rough, so that there may be as much fighting in the stands as in the pits. During daylight fights, children run around, men stand around and yell tales, women talk. There is little unanimity in the crowd. For a person who does not have money riding on a particular fight, the scene can grow boring. The fighting of the roosters often looks more like a pair of robins arguing over turf in one's front yard than a WWF scene, a lot of wing flapping and little more. If they fight to the death, as is the norm we studied, and the birds both brightly colored, one may see little or no blood, just a lot of dust. The smells and sounds resemble a rodeo more than anything else. The atmosphere is rather like that of a secret club. Cockers do not believe that outsiders and those who oppose the sport know anything about it, but they do not want video pictures taken or newspaper accounts given. They feel like they are "in on something."

Referees are usually cockfighters themselves, men who are not fighting birds at this particular event. They are chosen and paid by the house, and ratified by the people in attendance. If people do not trust them, they will not return to that pit. Most are trusted by the crowds; Worden attended one fight where a referee's wife was fighting, but everyone believed him to be impartial. Referees are most important when the birds are dragged to the pits; they may be accused of counting fast or slow at these occasions.

**Background**

Like marrying your cousin, cockfighting is illegal in most states in this country and frowned upon in the rest. Schiff (1995) called it a "degraded gladiatorial spectacle" (1995), categorizing it with professional wrestling, a comparison students often made for us in classroom discussions, except that student ranked it much lower than wrestling, in a league sometimes with wife-beating. There can be no arguing its disvalued status in much of our society. How do people get involved in such a disvalued activity, especially one that is inherently social, shared with others, rather than a type of secretive deviance? Some cockfighters got into their sport through the propinquity that must also assist people in falling in love with their cousins, as the novelist Harry Crews describes in a short story:

[I been a cocker] all my life. My daddy given me my first chicken when I was twelve year old. Most rooster men that's any good been in it that long.
It don't take but a lifetime to learn it. (Crews 1982, p. 35)

One informant, for example, told us that before he knew about organized cockfighting, he used to shut two roosters in his bathroom and let them fight it out. Cocks do fight each other without human intervention, and people do fall in love without social approval and sanction. However, most cockfighters do not learn the sport from watching their chickens.

Most cockers get involved with the sport through deliberate diffusion instigated by the entrepreneurial cockers. The informant who fought chickens in his bathroom later introduced a friend to the sport this way. The friend, now a cocker too, said that he had not even known that chickens fought before watching in the bathroom pit. Tales such as the archetypal anecdote about Sal with which we begin this article, about how old men pick young men, beginners, give them their first birds, and train and encourage them in the sport of cockfighting and the care and raising of fowl, are quite common. Obituaries are usually written by sons, protégés and admirers of the men who have died, rather than colleagues and peers. As we will show, old men recruit new ones in order to promote the sport and to ensure their own immortality, and young men turn to old ones as the only trustworthy people available in an ambiguous, probably disreputable, world. This gives a distinctively gerontocratic aspect to both the sport and the marketing efforts.

In order to continue the sport, old cockfighters must market it, recruit new cockfighters, sell or give them birds, and encourage them in the sport, and they must do so in a relatively covert manner because of the widespread disvalued nature of the sport and the illegality of it in most parts of the country. In order to sell chickens, they must establish their reputations as honest and knowledgeable old men engaged in an illegal activity, whose only vested interest seems to be in continuing the sport for its own sake.

## Method

This paper is based upon research into cockfighting which began in the spring of 1989 and continued intensively for about three years. The data were obtained through participant observation, intensive interviewing, and analysis of secondary materials. Our naturalistic study took place along the border region of Eastern Oklahoma and Western Arkansas. Worden did the primary research and observation, with Darden's role mostly limited to locating respondents and secondary research. This is not a sport where middle class female college professors are warmly greeted and introduced to the nuances of meaning and behavior. Although there are a few women cockers, some men's wives attend some fights, and "sew-up girls" may repair injured birds, this is a mostly male world. The editor of The Gamecock, however, is a woman.

Worden has observed formal and informal cockfights at varied settings. Interviews with main informants and informal conversations with many different participants were carried out over a period of nineteen months. Finally, an informant (who has since died, allegedly shot by his ex-wife's new boyfriend) read and commented on some of our material and corroborated its major conclusions as well as our interpretations of supporting data.

For this study, we also concentrated on 24 issues of magazines devoted to cockfighting: The Gamecock (various issues ranging from May 1967 to May 1991), Grit and Steel (several issues from 1991), and The Feathered Warrior (several issues from 1991). For comparison, we read the June 1992 and January 1993 issues of Bird Talk, a magazine devoted to exotic bird keeping and talked with a number of owners of such birds and one former breeder. Darden also attended the 1993 Annual Rattlesnake Roundup in Whigham, Georgia, and we looked closely at the program from that event.

## Marketing Deviance

Since we are talking about marketing, it is useful to use paradigms established in that discipline to shape our discussion of the spread of cockfighting and selling gamefowl. Phillip's (1991) version of marketing is one of the most used and best accepted; we will adapt his major concepts for our project. While the models of the conventional marketing process that Kotler (1991) and others present may describe the processes by which mass marketers and many smaller businesses operate, we wonder if they work for the entrepreneur engaged in marketing dangerous or illegal activities: marketing deviance? When, for example, the environment is more than merely hostile, and threatens to arrest the seller and destroy his product and production facilities, can one of these models explain that situation and help the seller to make decisions? How do you sell something illegal, to people who know it is illegal?

Studies of drug sales, prostitution, and other vices hold the key to understanding, but only to an extent. Many studies (Adler & Adler, 1983) have described the various techniques of drug-dealing. Two major differences between drug-dealing and cockfighting are the relative ephemerality of drug dealing compared to cockfighting and chicken-raising, and the relative visibility of the contraband which the owner must hide or disguise.

Although the small, local drug dealer may continuously maintain possession of a large enough amount of drugs to send him or her to prison, the bigger dealer usually maintains possession for a very limited amount of time, if any, before distributing the product to others who will merchandise it in smaller amounts to others. People who grow chickens, however, have committed themselves to several years' worth of labor, possession, and visibility. An airplane full of illegal drugs is extremely visible, but it is also portable and soon emptied. A pound of cocaine or marijuana will fit in an easily carried container. A couple of acres of loud and brightly colored roosters tied to little sheds is also very visible, not portable, and relatively permanent. Law enforcement uses specially trained animals to sniff out drugs, but anyone who knows what to look for can spot a rooster yard.

Prostitutes face the visibility problem from a slightly different perspective. Call-girls, masseuses, and others at the higher end of the profession may have normal, conventional marketing problems, but the street hooker has to be out and available to customers without attracting the attention of law enforcement. This is a tricky act, with various solutions. Some women rely on the portability idea, moving frequently, from corner to corner, which makes repeat sales difficult. Some believe (wrongly) that they can hide or deny their activity by "passing" as dates if they do not mention money first. Some rely on pimps or other forms of word-of-mouth, and likely others pay law enforcement people to ignore them. Again, though, the chicken farmer's size and visibility present problems which prostitutes can handle with relative ease.

Still, cockfighters have not thought of themselves as outlaws, but as little guys who have fallen victims to big guys, little guys who are maintaining a noble tradition with a long and respectable history, including George Washington and Abraham Lincoln, and other notable chicken men of their times - in face of terrific odds. These odds include not only "the many crazy laws that are trying to get passed" (Abacherli, 1991, p. 171) and the animal rights activists, but the "big money men" who fight in the knife fight variation which runs costs up beyond the reach of the average little guy. In this form of cockfighting matches are over rapidly and many more cocks are destroyed (Worden & Darden, 1992).

How do these people continue to think of themselves as embattled practitioners of a noble sport which is illegal? Most believe that the birds will fight anyway, that birds just do fight. Many say that birds do not feel pain, owing to their simple nervous systems. Hearne (1994) would likely disagree with this point. In her essay on "Parrots and Philosophers," for example, she says, "...even a cat isn't as good at keeping control of a conversation as a parrot is" (1994, p. 4). Barber (1993) would definitely disagree with the notion that birds are too simple to feel pain. In his book The Human Nature of Birds, he demonstrates that birds are intelligently aware. While breeders of exotic birds generally take a position somewhere between Barber's and that of cockfighters, owners of pet exotics emphatically agree with Barber, finding their pets not only intelligent but cuddly, lovable, and loving. Cockers, of course, may admire their birds and love their sport, but they do not love their birds.

Case 1:07-cv-01233-LFO     Document 29-3     Filed 02/14/2008     Page 5 of 11

It is a rare rooster who even gets a name. Exotic bird breeders usually leave the naming of birds to the people who will buy and love them, as do dog breeders. Some particularly courageous and game roosters do get names. Pigeons are never named; they all receive numbers and are identified by their numbers only (Worden, 1992).

In defending their sport, cockers also point out that nature itself is bloody. If a poultry farmer has 100 chicks, for example, and eight live, the farmer is doing well. For the cockfighter, who has watered, fed, trained, and tended these birds for at least two years, the argument is simple: these birds get treated better than do those raised for food, and they may die with the dignity that nature intended for them, in a fight. Others ignore the whole question of animal rights by believing that chickens are fowl, not animals. The illegality issue they nullify by saying that the government is overreaching itself, getting into issues that are none of its concern, that the government has no right to regulate a group of gentlemen making wagers.

With the outlawing of the sport, however, and the often highly publicized efforts of both law enforcers and animal rights activists, cockfighting has in recent years attracted adherents who do think of themselves as outlaws. "Just tell me something is illegal, and I'll do it," one informant said. While the "fraternity of cockers," as they often call themselves, probably contains no armed robbers or hit men, many cockers probably grow and sell marijuana on some scale or own illegal weapons. The story circulated among some of our informants that two men had tried unsuccessfully to set up a "clean" pit, and when it failed, they sold out to people rumored to be big drug-dealers in the area. It is likely that at least some drug money is laundered through cockfighting, since cash is the usual standard of exchange.

Kotler uses several core concepts of marketing to look at the processes of conventional marketing, and we will adapt these to look at our data and describe the selling of deviance. These concepts are: needs, wants and demands; product; value; exchange; and market (1991, p. 4).

## Needs, Wants and Demands

According to Kotler, needs are basic and biological. Wants are ways of satisfying needs, and demands are elaborated satisfiers. Consider food, bread, and croissants. While the idea of needs is a little too psychological and too motivational for us, we are willing to talk about wants and desires/demands here. Conventional marketers protest, perhaps rightly, that they engage in satisfying existing wants rather than creating new ones. The case of gamefowl is largely an exception, as the established chicken men must depend on finding new chicken men and getting them to want chickens. Cockfighters talk about wanting entertainment and wanting to continue the traditions of the "great sport" of cockfighting. The novice and the more experienced chicken man who buy chickens want to win money in the pits.

Although marketers usually consider sellers' long-range goals to be the obvious financial profit, those who sell chickens have an additional long-range goal. The epitome of the sport consists of becoming a legend whose fighting record is attested to by having his name attached to the stock which will be preserved by those who come after him.

Sandy Hatch may well not recognize the fowl that bear his name today as having much of a connection with the fowl that he had way back when. The important thing would be that he would be so extremely proud that his name and legend had lived on and was passed down to today's fowl, who contain little true old-time Hatch blood. His name is synonymous with the tenacious, game, powerfully enduring fowl for which his fowl were known for. The qualities of endurance and power liken today's hatch type fowl to those from the hands of the originator himself. (Warbird, 1991, p. 29)

Most cockers want to become trustworthy old men who can choose younger men to train and entrust with their fowl (Prus 1989b, p. 102-130). Immortality is the ultimate desire/demand of the chicken man, seller and buyer. In the short run, this reputation as a trustworthy old man helps to sell chickens, too, and it is often a deliberate construction on the part of the seller.

## Products

Product includes services, and refers to satisfying needs, wants, and desires. Here, the major product is a chicken. Since fighting the chickens is illegal in most states, and shipping animals across state lines for the purposes of fighting is against federal law, most sellers sell brood stock, and the buyers experiment with crossbreeding the fowl to produce battlecocks for fighting. As with drugs and prostitution, there is no product stability or standardization with chickens. The best breeding chickens are usually considered to be the pure lines with the original breeders' names attached.

I continue to read with interest the arguments against pure lines or pure that. Well, if anyone is so shallow or nitpicking as to condemn such a practice by those of us that purchased fowl under this premise, whether we think them to be pure as the original breeder bred them or not, it still remains our right to call them what we want! If anyone wants to nitpick such a trivial difference with you, then tell them to stick it and walk away. You will have done yourself a favor. (Warbird, 1991, p. 29)

If there ever were pure lines of chickens, the resurgence of cockfighting in this country after World War II probably ended them. Whether there once were or not, the establishing of a chicken as a pure breed today is a social construction. One cannot look at a chicken and know from its physical characteristics that he is a Hatch or a Ketso. Color, comb size, leg color, and other features once distinguished the various breeds, but they no longer do. There are many arguments over the ostensible breeds of specific chickens. The chicken that is sold as a "White Hatch" is a socially constructed product in that only through the claims that the breeder makes and the breeder's reputation and fighting record can the buyer form any idea of what he is purchasing. The features of a bird which breeders and buyers stress are things

such as muscle and the quality of his conditioning. A desirable bird has just the right amount, or muscling in his legs. Too much muscle makes a bird unable to act. He can't "cut" (is too slow and cannot aim). A bird that can "cut" can aim his gaff or knife, a skill which comes from an inbred instinct, cockers believe. The bird that cannot cut just flails away in the direction of his opponent. Superb conditioning results in rock-hard strong legs and wings. A bird with "bottom," probably a genetic feature, is one that can sustain punishment. "Gameness" is the key to a superior bird, that ability to persevere in the face of obstacles, to peck his opponent with his last dying breath. That is there until the end. Stories are told about cockers who come with birds in polished wooden cages, put their birds in the pit with those of guys who bring their birds in burlap bags, with mites crawling all over them, and lose to the mite-infested bird that's ready to fight, the birds are ready. They also believe that the bird can feel the confidence and courage that the good handlers impart to them through holding them before a match. They also say that a good handler can feel the electricity go out of a bird during a match, when the handlers separate the birds. Advantages that some handlers are said to use include strychnine, which can cause a bird to attack even his handler, and steroids. Such chemicals are considered invasions on the pure sport by most cockers.

The cheapest fowl probably come from Mexico or the Philippines, but most American and Spanish cockers currently prefer to "Buy American," particularly fowl from the Arkansas-Oklahoma area where it is believed that the cold winters produce birds with fewer parasites and the "ground" is superior. The ground refers to just that, the portion of the earth the chicken uses, but it has become a bit mystified among cockers and includes in its meaning the climate and weather, the other living things which share it, such as parasites, and other uncontrollable forces of nature. There is a fad element to choosing birds, in that at various times and places, one breed will be "in" and others "out." Being in results from winning, or being thought to win, at derbies and other fights. Instability of the chicken as product also results from biological factors. Genetics and breeding are always a gamble and when the birds are kept outside, available to predators and other natural elements, with parentage often unknown, the risks become quite high. A breeder may find his "nick," the absolutely best fowl, in a set of brothers, but may never be able to reproduce them. It takes two years to raise, train and fully test a battlecock. By the time a breeder is certain that he has a superior battlecock, the parents (if he knows which birds they were) are two years older, a long and significant time in the breeding life of a chicken. The care, feeding, and training also matter, so that genetic perfection may not prove out in the pits for an inexperienced owner. This product instability makes the breeder's reputation as a trustworthy, winning old man even more critical and problematic.

Sellers offer services, too. A typical display ad in The Gamecock offers; SPECIAL - With the purchase of fowl you may spend 1 week at my expense seeing how we take care of our fowl and go to a derby with us to watch our roosters perform. (Think about it.) SPECIAL CONSIDERATION GIVEN TO BEGINNERS!!!

Videotapes, magazines, books, personal phone calls, all back up the chicken seller and offer advice on feeding, training, keeping, and handling birds. Often these include strange advice: "A ounce of cure is worth a pound of remedy" according to Long Spur (1991, p. 77). This follow-up service is particularly crucial because the young guys are thought not to know what they are doing, but not to the point of driving them out.

To misinform beginners or purposely mislead someone can probably do more harm to this sport than some other more often talked about enemies. (Roberts, 1991, p. 24)

His customers are experienced cockers that know are battlecocks. Not beginners that don't know a good cock from a bad one. (Fuldrop Jr., 1991, p. 136)

In closing, I have a word for all the beginners out there. Keep with it and be as strong-willed as the gamest cock alive! So often I read short articles about beginners being involved in raw dealings. I have been very fortunate in many. I would just like to tell you there are plenty of experienced cockers that are willing to guide and help the beginners. The beginner only needs one prerequisite, to be strong-willed. (Whitehackle Haven, 1991, p. 87)

If they do not recruit and keep the young guys, the sport will not continue and there will be no one to trust with their immortality. More importantly, they cannot make money in the pits. Much of the money that changes hands in the pits goes from beginners who bet without sufficient knowledge of the real variables - the trainers and handlers - to the more knowledgeable experienced men.

There is other equipment available for breeding and fighting birds. Breeding equipment is pretty basic and seldom used by cockfighters. Incubators for hatching eggs, for example, are expensive and not thought to be worth the money. Medications are sold as for any other kind of livestock, so that one bypasses the veterinarian as often as possible. Worming medications, feed supplements, and other sorts of medications are usually as much related to lore passed down and around as to any part of scientific research that a veterinarian may have access to and charge a lot of money for. In contrast, Bird Talk, a magazine for exotic bird keepers and breeders, has a column written by a veterinarian. Other paraphernalia, such as tie-downs, are also sold. Some breeders tie each rooster to his own little shed, to keep the birds from fighting with each other, wandering away, or getting into any other kind of trouble. Tied-down birds cannot be carried away by predators such as hawks.

The equipment for fighting the fowl, the knives and gaffs, is probably, next to the birds themselves, the single most important item available to the cocker (Worden & Darden, 1992). The world of cockers is divided into those who fight with the gaff, the traditionalists, and those who fight with the more deadly knife. A large variety of these instruments is available, as are cases for containing them. Some men make their own elaborate wooden cases. Attaching the gaff to the bird is considered an art by many, and is often done in secret. It involves wrapping the gaff with tape to attach it to the bird's heel.

The chicken, then, is the major product, other than the sport itself. As we have suggested, the chicken may represent a man's hopes for financial gain and even immortality, but he remains basically a chicken. He is not a pet. He is not beloved, although he may be admired. He is not cuddled or named, only trained, tended and bred. Pictures of winners with trophies are published in cockfighting magazines, whereas Bird Talk pictures pets with Santa Claus and with favorite toys. He is a product.

*Values, Cost and Satisfaction*

Values are "the consumer's estimate of the product's overall capacity to satisfy his or her needs" (Kotler, 1991, p. 6), and are usually expressed in terms of price.

There is very little price competition among gamefowl sellers. The value of chickens at the time of sale is established by the breeder's record in the pits and his reputation.

I have to put in a good word for Papa Buck. Both Tom Johnson and myself have gotten the Brown Reds from Buck. Both of us have had the very best success with them. They are not only agile and able fighters, but have the bottom to hang in there just as long as it takes and then some...not a trait for which Brown Reds are known for. (Warbird, 1991, p. 30)

Because the line of chickens a man produces does not stop at the man's death, especially if he has passed his stock and lore on to a younger man, his obituary may even become part of his reputation and of someone else's promotional material. Probably for these reasons, the obituaries in the magazines tell more about a man's chickens than about the man and his life; perhaps, in this instance, his chickens are his life:

MSGT. Milton M. Hall, U.S. Army Air Corps, born July 24, 1915, died March 23, 1990. Services were held at Cochran Mortuary in Wichita, Kansas. A veteran of World War II, he passed away at home. He was known for his Canadian Mugs, which he had won numerous derbies at different pits in Kansas. Before his death he tied a 33 derby at BJ's in Ponca City, Oklahoma. Winning a hack and four in a row. He leaves a wife, son, and daughter. We will miss him. (Bert White, 1991, p. 214)

In conventional market arenas, where a buyer can rely on sellers' reputations, histories, credit ratings, and so forth, buying still involves "uncertainties, risks, and dilemmas" (Prus 1989a, p. 135).

Despite attempts to make purchasing more "professional"...buying remains a gamble. Not only does buying entail strategies and gaming, trust and cooperation, and deception and competition, but buying activity takes place within a setting of shifting uncertainties and reflects dependencies on others outside the immediate transaction. (Prus, 1989a, p. 139)

Buyers of fighting chickens, quite naturally, fear "phony chicken-peddlers." The real secret to obtaining value in buying chickens lies in the old man who spots a promising youngster, what Prus (1989a) describes as a "seeker," and gives him his chickens. All other deals are suspect:

Mr. KinCannon is the only major breeder that I know that does sell super blood lines (when he does sell fowl). His word is his bond and he sells out every year to repeat customers. (Fulldrop, Jr. 1991, p. 136)

Many informants asked, "Why would a guy sell his best chickens to someone he may meet later in the pits?" Their answer is that most will not, leaving anyone who offers fowl for sale open to the charge of being a "phony chicken peddler." "However a small percentage (of beginners) get hooked up with an honest cocker and tries to learn and goes ahead to make an excellent cocker," according to RWN (1991, p. 30). Sometimes people buy out of state, figuring that a seller who lives at a distance might be willing to sell good chickens, but they know that sellers often fight out of state, too, so they cannot depend on that method of finding a trustworthy seller. The second best method is to buy from a pure line (in conventional marketing, an established brand), but you can never be sure that you are doing that. Our observations confirm the dubiousness of the pure lines: on several occasions Worden watched a breeder stroll through his yard, pick up eggs and put them unmarked into his pocket, so that he had no way of knowing which chickens produced which eggs.

Some deny the importance of the brood fowl, saying that the stock is less important than the regimen of care and training.

I'm sure many of you cockers have read this best selling book on nutrition and I'm going to try to emphasize to you as a game fowl feeder that it is just as important to fowl as it is to a human being. I think we under emphasize feed and proper nutrition and over emphasize the importance of paying large amounts of money for a trio. (Dutcher, 1991, p. 148)

These people offer their secrets, again backed up by pit records and reputations, either free through letters and columns in the magazines or by purchase as books, pamphlets or video tapes:

The purple powder is a strong grease cutting biodegradable detergent that you can buy at a wholesale outlet store for around $2.50 to $3.00 a gallon. (If you can find the orange powder, it is the strongest. (Long Spur, 1992, p. 76)

Customer satisfaction is defined very simply: "When you don't kill 'em." Chickens are usually sold with the admonition, "If you do not like them, kill them." Sellers do not want buyers to give away unsatisfactory chickens, because doing so might dilute the purity of the blood lines. Chickens can be battletested, i.e., pitted against each other unarmed in controlled circumstances to observe their apparent abilities as fighters, at 6 months as "baby stags," and at one year as stags." and at one year as stags. If owners are not pleased by the chickens' performances at these ages, they usually kill the chickens. (And, of course, the full-grown 2-year old or older battlecock who loses in the pit usually dies, too.) A man who keeps the chickens he has bought, then, is a satisfied customer, as is, obviously, a repeat customer.

## Exchange, Transactions and Relationships

This refers to obtaining products we want, offering resources in exchange for them. The epitome here is "relationship marketing," wherein the seller tries to build up long-term trusting relationships with customers (Bigus, 1972; Prus & Irini, 1988). Advertising, promotion, sales force training, distribution, and repair service are all methods of effecting exchange and developing relationships in conventional marketing.

Word-of-mouth is still the most effective means of advertising and promoting in all forms of marketing. For the cockfighter/chicken seller, this extends to winning in the pits and constructing and maintaining a reputation as a good chicken man: usually honest, religious, sometimes considerate and caring, a man of integrity.

Maybe the most important thing, by all means, be honest in all your dealings. This is probably the most important as you can get a bad reputation much quicker than an honest one. I have birds, thru friendship and small amounts of cash, that wasn't for sale at any price. (Cogburn, 1991, p. 158)

Personal sales, where the buyer and seller jointly define the chickens as breeders of potential winners from proven lines, without any or much third-party intervention, account for most sales. Cantrell and Brannan, Ohio cockers, invite potential buyers to "bring two of the best cocks you have or can acquire and we will be more than glad to show you [ours] in action" (The Gamecock, 1991, p. 18). Many people buy mail order chickens, a process which most chicken men agree is absurd. The idea is to find those honest chicken sellers who will sell good chickens out of state and not have to face those chickens in a nearby pit. Most mail-order buyers are disappointed.

The major third party intermediary or facilitator in the marketing of fighting chickens is the magazine. Although professionally printed, all three seem to be the results of desktop publishing of one sort or another. The Gamecock reports a circulation of 13,000. Spelling, grammar and punctuation vary from poor to awful, as does the quality of photographs and their reproduction. The content is about 50% advertising, much of it informal and folksy in tone. The editorial content is about 40% letters and 60% columns, articles, and notices. Most of the editorial content is informational, about choosing and caring for chickens. There are some letters asking for help, but most letters are gratuitous offers of expert information from old cockers with secrets to share, what Prus (1989a, p. 205) might call "cultural entrepreneurship." These likely have the effect, and perhaps the intention, of boosting the writer's reputation:

> After several requests, I have written a Cocker's Guidebook....I hope it will be helpful to many cockers, especially beginners....I have been so blessed in my life that I feel the least I can do is share with those less fortunate. (Roberts, 1991, p. 24)

The information is welcomed by all of the cockfighters we know.

I thank The Feathered Warrior people for publishing a fine magazine, month after month, for the benefit of many. Good information is there to read each month. It seems that it is getting better as time goes on. The many pictures published each month are appreciated by cockers worldwide. (Roberts, 1991, p. 24)

These are the only magazines many cockers read, although some also read Field and Stream, and, interestingly, The Pigeon Journal . Most readers relate to the magazine very personally, as if they knew the editor, the authors, and the other readers.

I enjoy your magazine and the articles by Bill Roberts. He is one good man and doesn't mind helping you in any way he can, and also Sleepy, I went to see him and his better half, they are just as nice as can be. I enjoyed the coffee and chicken talk. They make you feel welcome and at home, and ask if there is any way he can help you. (Trull, 1991, p. 156)

Many of the authors use only their nicknames: Long Spur, Whitehackle Haven, the Traveller. The magazines form the core of a community for most cockers. The relationship is so intense and personal for many that we heard comments such as, "I'm gonna cut his [the editor's] balls off for letting that guy advertise his phony chickens."

Relationships among cockfighters show a great deal of respect and deference. Good friends will tease and interact informally, using nicknames, but acquaintances call each other "Mr." Mr. is usually an honorific, implying an older, respected, experienced man. The articles in the magazines use Mr. and use specific names only when they have something good to say about a person. Perhaps in response to the possibility of slander or castration, an author who has something bad to say about another person usually avoids mentioning that person's name.

Many of the ads in the magazines play on the "old man" theme:

> After 31 years of raising, selling and fighting gamecocks, I am ready to slow down a little and take it easy. ( The Gamecock , 1991, p. 34)

The story among our informants is that one man ran the same ad saying he was old and ready to retire for 20 years.

The idea of vicarious competition is implicit in much of the magazine content and in cockers' conversations. Many cockers are rural, poor, aging athletes, disabled, and overweight - they cannot themselves compete physically, so they enjoy the competition among their birds. Although it is perhaps peripheral, it is worth noting that in every society in which men fight gamecocks, at least one word referring to the birds is also a slang reference to the penis. (Dundes, 1994)

Another theme obvious in the magazines and conversations is fighting birds is death, equanimity in the face of death, stoicism, physical courage, and an unflinching acceptance of pain. These are the old agricultural and masculine values, so it is not surprising to find them here. These values combine easily, too, with the

theme of the God-fearing older man who is the hero of the sport and of most of its stories.

*Markets*

For chicken sellers, the potential market is mostly younger guys, beginners, since older guys usually have their stock or will know whose stock they want and often get it free. The younger guys are seen as naive if not stupid, and in need of a lot of help and advice. The market is crucial, of course, as it always is, but perhaps even more so because it also offers posterity, the ultimate reason many of the chicken men are in the sport.

Kotler (1991) presents the following model of the relationships among the various factors in the conventional market:

Table 1: Kotler's models of conventional marketing processes

| Starting Point | Focus | Means | Ends |
|---|---|---|---|
| Factory | Products | Selling & Promotion (a) The selling concept | Profits through sales volume |

This overall picture shows that marketing deviance differs considerably from conventional marketing. Instead of being an example of one of Kotler's two contrasting strategies (the marketing concept or the selling concept), selling gamefowl appears to be a hybrid of the two, the deviant marketing concept.

Table 2: The deviant marketing concepts

| Starting Point | Focus | Means | Ends |
|---|---|---|---|
| Producer as Factory | Reputation of Product | Word of mouth, uncoordinated activity | Profits through side activities (i.e., gambling), immortality |

There are fewer steps in the process of marketing deviance. The factory, as Dutcher (1991, p. 149) says, is often the producer. The product is unstable and unstandardized. The producer is the seller, who has only the one intermediary/facilitator (the magazines) to worry about. There are no wholesalers or sales forces. Distribution is usually from one hand to another, although occasionally interstate shipments are made, which legally limits the kinds of fowl which can be sold. Word-of-mouth is a strong determinant of sales and is highly dependent on building a reputation as an honest competitor; but the seller as competitor is suspect. Marketing efforts are so uncoordinated as to be fragmented. Profits are made in an ancillary fashion through betting. In the pits and through taking advantage of the people the trustworthy old man must convince of his trustworthiness. And this entrepreneur works within a particularly hostile environment (not so hostile, perhaps, as the drug-dealer or the prostitute, who may be killed); given the size of the setup required to keep and raise chickens, the gamecock breeder's operation is extremely visible and relatively permanent. In some places there is probably collusion with authorities, since a drive down many secondary highways in this country yields the obvious signs of fighting chickens being kept.

The threat to destroy the product is particularly harsh for the chicken man, since his product is also his factory. While the drug-dealer may face huge financial loss if his or her stock and other possessions are confiscated, these things can be replaced. Most arrests for prostitution result in fines, some in jail terms; either way, the prostitute has lost only time and money, not her product. When the law destroys the last of Mr. Smith's Hatches, however, there are no more. And Mr. Smith loses his shot at immortality.

**Conclusions**

We have described the processes involved in the marketing of a deviant activity, cockfighting. Cockfighting is illegal in most states in this country, and yet the

breeding and setting of fighting chickens is legal, and the traditions and history attached to cockfighting maintain that the sport is old, honorable and gentlemanly, descended from such figures as George Washington and Abraham Lincoln. We have found that those engaged in marketing the sport and its paraphernalia, including the chickens, must conduct their activities in ways which differ from the marketing activities of more conventional businesses, as described in the marketing literature. We have found that there is an apparent paradox involved, in that while the participants usually consider themselves fine, upstanding citizens, they trust each other only slightly, knowing that they may well end up pitting their birds against each other. This results in the necessity for establishing one's reputation as an honest, trustworthy person who is engaged in illegal and stigmatized activities. Since the organization of the marketing efforts is very loosely structured, with no sales force and only one third-party medium for advertising, the most effective form of advertising and marketing is word-of-mouth, which can spread rapidly through this community of mostly rural people who communicate through their magazines and through face-to-face encounters at fights and in informal meetings. Having winning birds and winning honestly, without taking advantage of neophytes, is the best method of establishing one's reputation for honesty and trustworthiness. Winning, however, can sometimes come at a cost of the honesty reputation.

The marketing of fighting chickens, because of this deviant nature and stigmatized tradition, has a distinctly gerontocratic aspect. As the stories, perhaps myths, of the old man giving his chickens and his blessing to the promising youngster demonstrate, a chicken man can never trust an opponent. Yet, in order to keep the sport going, to insure that there is a history for a man to go down in, chicken people must recruit new chicken people, who become opponents. The only trustworthy person is the old man who no longer competes (cf. Adler & Adler, 1983). As Whitney (1991, p. 150) concludes:

So to all you other beginners out there, when your driving around and see some old man out tending his birds, stop and introduce yourself. Maybe you're what he's looking for. If not then, good luck.

Does this gerontocratic aspect characterize the marketing of other deviant activities? It probably does to a greater degree than researchers have noticed. The smart drug buyer, for example, tries to maintain an established, trustworthy source; prostitution is stratified in terms of trustworthiness. This gerontocratic aspect of the marketing of deviance deserves further attention.

*Notes*

1. Please direct all correspondence to Donna K. Darden, Department of Sociology and Philosophy, Tennessee Technological University, Cookeville, TN 38505. We thank Bobby Tisdale, Lydia Worden, Coy VanMeter, Mark Watson and Clint Sanders for help with this project.

2. Among both prostitutes and their customers, the callgirl is ranked most highly and the street walker is lowest. The call girl works for a service which vouches for her, has a phone number, and has usually been in business for a long time. The street walker is a transitory person in that role, perhaps even changing street locations several times a night. She has no credentials except, perhaps, a pimp.

*References*

Abacherli, L. (1991, May). Defense Fund Committee. *The Gamecock*, 172.

Adler, P. & Adler, P. (1983). Relationships between dealers: The social organization of illicit drug transactions. *Sociology and Social Research, 67* , 260-278.

Barber, T. X. (1993). *The human nature of birds* . New York: Penguin.

Bigus, O. (1972). The milkman and his customers. *Urban Life and Culture, 1* , 131-165.

Blumer, H. (1969). *Symbolic interactionism* . Englewood Cliffs, NJ: Prentice Hall.

Cogburn, R. (1991, May). Letter to the editor. *The Gamecock*, 157-8.

Crews, H. (1979). Cockfighting: An unfashionable view (pp. 35-41). *Florida frenzy* , Gainesville, FL: University Presses of Florida.

Dewey, J. (1922). On motive. *Human nature and conduct* . Reprinted in G. Stone & H. Farberman, *Social psychology through symbolic interaction* , Waltham, MA: GinnBlaisdell.

Dutcher, M. (1991, May). You are what you eat! *The Gamecock*, 148-149.

Farberman, H. (1991). Symbolic interaction and postmodernism: Close encounters of a dubious kind. *Symbolic Interaction, 14 (4)* , 471-488.

Fulldrop, Jr. (1991, May). Super bloodlines part 2. *The Gamecock* , 136-137.

Kotler, P. (1991). *Marketing management* . Englewood Cliffs, NJ: Prentice Hall.

Lang Saur (1991, May). Published nurs. *The Gamecock*, 76-77.

Society&Animal Forum - Society & Animals Journal

Long, Spot (1771, May). Dudurebud Cure. The Gamecock, 1871.

Merton, R. (1972). Insiders and outsiders: A chapter in the sociology of knowledge. *AJS, 78* , 1738.

Mills, C. (1940). Bibliographical appendices, Section 14: Sociology of language. Reprinted in G. Stone & H. Farberman, (1970), *Social psychology through symbolic interaction* . Waltham, MA: Ginn/Blaisdell.

Prus, R. (1989a). *Pursuing customers: An ethnography of marketing activities* . Newbury Park: Sage.

Prus, R. (1989b). *Making sales: Influence as interpersonal accomplishment* . Newbury Park: Sage.

Prus, R. & Stylianoss, I. (1988). *Hookers, rounders, and desk clerks: The Social organization of the hotel community* . Salem, WI: Sheffield.

RWN, (1991, February). Beginners only. *Grit and Steel* , 30.

Trull, J. (1991). Letter to the editor. *The Gamecock,* 156.

Warbird. (1991, July). A few thoughts. *The Feathered Warrior* , 29-30.

White, B. (1991, July). Obituary for M. M. White. *The Gamecock* , 214.

Whitehackle Haven (1991, May). Reminiscence of Doc Tuttle. *The Gamecock* , 86-87.

Whitney, R. (1991, May). Beginner's luck. *The Gamecock* , 150.

Worden, S. & Darden, D. (1992). *Deviant behavior* . Knives and gaffs: Definitions in the deviant world of cocking. Deviant Behavior, 13, 271-289.

Worden, S. (1992). Fighting chickens and racing pigeons: Animalistic extensions of identity. Mid South Sociological Association, Chattanooga, TN.

For abstracts of all issues, including the most current, click **Article Abstracts**

To order Society & Animals Journal, go to our secure online **ordering page**

You can Search the online issues of Society & Animals, as well as the entire Society & Animals Forum (formerly PSYETA) website, for topics and keywords of your interest:

Google™

◉ Search Our Site

[ Search ]