UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| THE HUMANE SOCIETY | ) | |
| OF THE UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 07-1233 (CKK) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT**

Plaintiff's Complaint should be dismissed for lack of standing under Rule 12(b)(1) and

for failure to state a claim upon which relief can be granted under Rule 12(b)(6).  Plaintiff, the

Humane Society of the United States ("HSUS"), fails to show that its claimed financial or

economic "harm," which are the only "injuries" that Plaintiff has chosen to defend, are caused by

the Postal Service's continued acceptance and distribution of *The Feathered Warrior* and *The

Gamecock* ("Publications").  Furthermore, Plaintiff has failed to state a cause of action under the

Administrative Procedure Act ("APA"), the only statutory vehicle available to Plaintiff in this

proceeding.  Finally, Plaintiff's interpretation of the substantive law central to this case, the

Animal Welfare Act ("AWA"), is incorrect as a matter of law; the AWA does not prohibit the

mailing of the Publications.  Plaintiff's claim that Defendant's Memorandum, nos. [27] and [28],

contains "post hoc rationalizations" for Defendant's failure to grant the relief Plaintiff requested

is baseless and should be disregarded.  There are no genuine disputes of material fact.  The Court

should enter judgment for the Postal Service as a matter of law.

**ARGUMENT**

I.    **PLAINTIFF IGNORES THE APPROPRIATE LEGAL BENCHMARKS FOR DETERMINING WHETHER ITS ALLEGATIONS CAN SURVIVE DEFENDANT'S MOTION TO DISMISS FOR LACK OF STANDING AND FAILURE TO STATE A CLAIM UNDER RULES 12(b)(1) AND 12(b)(6)**

Plaintiff does not contest that it "bears the burden of establishing that the Court has jurisdiction" and that the Court has an "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority" when evaluating a Rule 12(b)(1) motion to dismiss. Def.'s Mem. at 14-15.  Plaintiff's reliance on Bell Atlantic Corp. v. Twombly and EEOC v. St. Francis Xavier Parochial Sch. (Pl.'s Mem. in Opp'n at 2) is misplaced, however, because neither case supports Plaintiff's suggestion that its Complaint can survive a Rule 12(b)(1) motion to dismiss even if "recovery" appears "remote."  See Twombly, 127 S. Ct. 1955, 1964-65 (Rule 12(b)(6)).  In deciding a motion to dismiss under Rule 12(b)(1) for lack of standing, this Court has explained that "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp.  2d 9, 13-14 (D.D.C. 2001) (quoting Wright & Miller, Fed. Prac. & Pro. Civ. 2d, § 1350)) (emphasis added); see also Green v. Stuvesant, 505 F. Supp. 2d 176, 177-78 (D.D.C. 2007) (citing Grand Lodge). Indeed, in deciding a 12(b)(1) motion, the Court is to resolve material disputes of fact.  See, e.g., Herbert v. National Academy of Science, 974 F.2d 192, 197 (D.C. Cir. 1992).

Plaintiff ignores Defendant's argument that under Trudeau v. FTC, this Court should dismiss Plaintiff's Complaint for "failure to state a claim upon which relief can be granted" if Plaintiff has no "cause of action" under the Administrative Procedure Act ("APA"), the Animal Welfare Act ("AWA"), and the Postal Reorganization Act ("PRA").  See Def.'s Mem. at 26 (citing Trudeau, 456 F.3d 178, 188-89 (D.C. Cir. 2006)).  Thus, if Defendant is correct that there

is no claim available to Plaintiff based on any substantive statute, then this Court should dismiss under Rule 12(b)(6) regardless of how "well pleaded" the Complaint is.  Def. Mem. at 26-27; Trudeau, 456 F.3d at 188 ("we refer to a 'cause of action' as the legal authority (e.g., the APA) that permits the court to provide redress for a particular kind of 'claim'").  The authorities cited by Plaintiff are not germane on this point.  See Pl.'s Mem. in Opp'n at 2-3.

## II.    PLAINTIFF LACKS STANDING TO SUE OVER ITS COSTS ASSISTING LAW ENFORCEMENT BY KEEPING SEIZED ANIMALS.

A fair reading of Plaintiff's Opposition Memorandum, no. [29], reveals that Plaintiff's claim to Article III standing is premised solely on the basis of financial costs allegedly incurred in the course of responding to requests from "law enforcement officials" to assist with "enforcement actions against illegal animal fighting ventures."  Mem. in Supp. of Pl.'s Mot. Sum. J., Att. A, Declaration of Ann Chynoweth ("Chynoweth Declaration") ¶¶ 3-20, 36-37. Pl.'s Mem. in Opp'n at 5-12 (citing Chynoweth Decl. throughout); see also Compl. ¶¶ 5-14. Plaintiff has elected not to defend any claim that it is entitled to organizational or representational standing based on any of the following harms allegedly attributable to animal fighting ventures: "criminal activities, including gambling, drug possession, rape, illegal weapon possession[,] homicide," and violations of "federal racketeering laws" (see Compl. ¶¶ 39, 40, 48-51, 57, 60-74, 76-77, 89-93), violations of federal tax laws (Compl. ¶¶ 61-62), and threats to "public health and safety" and "biosecurity" (Compl. ¶¶ 52-53).  See Def. Mem. at 16-20 (demonstrating that none of these harms pose a "concrete and demonstrable" injury to the organization's activities with a "consequent drain on the organization's resources") (citations omitted); Def. Mem. at 20 (demonstrating that that none of these harms are "actual or imminent") (citations omitted).  Thus, the only remaining question before the Court relevant to standing is Plaintiff's allegations of economic or financial injury.

Furthermore, Plaintiff has identified no individual HSUS member harmed by (1) the continued acceptance and distribution of the Publications by Defendant, or (2) the alleged injuries suffered by the HSUS organization.  See Pl.'s Mem. in Opp'n at 3-12.  Therefore, Plaintiff cannot show "representational" standing, which requires an organization purporting to sue on behalf of an individual member to demonstrate that the individual member would have standing to sue in his or her own right.  Def. Mem. at 18-19 (citing A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d 34, 43 (D.D.C. 2007)).

As discussed below, Plaintiff fails to meet its burden of establishing an "injury in fact" that is "fairly traceable" to the Defendant's conduct and "redressable" by the relief requested. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Thus, the Court should dismiss for lack of standing.[1]

### A.  Plaintiff's Assertions of Economic Injuries Associated With Voluntary Assistance To Law Enforcement Is Insufficient to Establish Standing.

#### i.   Plaintiff's Allegations Of Economic Injury Are Insufficient Even Under The Three Cases It Cites In Its Opposition To Establish "Injury In Fact"

The allegations in Plaintiff's Complaint and in the Chynoweth Declaration are insufficient to establish that HSUS has suffered "injury in fact" under the legal standard in the three cases upon which Plaintiff principally relies.  See Pl.'s Mem. in Opp'n at 4-5 (citing Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) (finding standing based on the plaintiff's allegation that defendant's discriminatory practices "perceptively impaired" the plaintiff's "ability to provide counseling and referral services for low- and moderate-income

---

[1] Plaintiff also fails to satisfy the requirements for prudential standing under the PRA because the PRA's legislative history does not indicate that HSUS is a "suitable challenger" under the PRA and because Plaintiff cites no authority for the proposition that a statute that is cross-referenced in another statute necessarily bears an "integral relationship" to that other statute for purposes of establishing prudential standing.  Contrary to Plaintiff's assertion, the Complaint alleges no independent violation of the AWA.  But see Pl.'s Mem. in Opp'n at 22 n.13 (citing Compl. ¶ 89).

4

homeseekers"), <u>Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach</u>, 469

F.3d 129, 133 (D.C. Cir 2006), and <u>Ayuda, Inc. v. Messe</u>, 687 F. Supp. 650, 659 (D.D.C. 1998)).

These cases involved organizational plaintiffs who acted as intermediaries between the defendant

organization or agency and the individuals to whom the plaintiffs provided counseling,

educational, and/or referral services, and it was within those contexts that each court found

organizational standing.  <u>See</u> Pl.'s Mem. in Opp'n at 4-5.  Additionally, the courts in each case

found that the plaintiffs were able to succeed on their standing claims, not solely on the basis of

the expenditures and resources the plaintiffs claimed to have spent in response to the actions of

the defendants, but rather on the basis of the plaintiffs' allegations that the defendants' activities

had a direct, adverse impact on the plaintiffs' programs and services.  <u>See</u> <u>Havens</u>, 455 U.S. at

380; <u>Abigail Alliance</u>, 469 F.3d at 129; <u>Ayuda</u>, 687 F. Supp. 659.  As the court in <u>Fair</u>

<u>Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.</u> explained, "The [<u>Havens</u>]

Court . . . did not base standing on the diversion of resources from one program to another, but

rather on the alleged injury that the defendants' actions themselves had inflicted upon the

organization's programs."  28 F.3d 1268, 1277 (D.C. Cir. 1994).

      Plaintiff fails to meet the standard articulated in <u>Havens</u> and followed in <u>Abigail Alliance</u>,

<u>Ayuda</u>, and <u>Fair Employment</u>, because its Complaint and supporting Declaration contain no

allegations that any of the activities Plaintiff attributes to Defendant's conduct have had, or will

have, a direct, adverse impact on any of its identified programs or activities.  <u>Cf.</u> Compl. ¶ 4

("The HSUS has engaged in public education, advocacy, training and legislative activities to

curb animal fighting."); Chynoweth Decl. ¶¶ 1, 2.  In <u>Havens</u>, the plaintiff alleged that the

defendant's discriminatory activities had a perceptible, adverse impact on the Plaintiff's

counseling and referral activities.  <u>Havens</u>, 455 U.S. at 380   Similarly, the plaintiffs in <u>Abigail</u>

Alliance, and Ayuda alleged that certain rules promulgated by the defendant agencies had impaired their ability to provide counseling services to their members and to members of the public.  Abigail Alliance, 469 F.3d at 129; Ayuda, 687 F. Supp. 659.  In stark contrast, Plaintiff here provides no allegations or evidence that either (1) the acceptance and distribution of the Publications, or (2) the animal fighting ventures Plaintiff claims would not exist "but for" such Publications, directly interfere, frustrate, or impede HSUS's ability to engage in "public education, advocacy, training and legislative activities to curb animal fighting."  Therefore, the three cases upon which Plaintiff principally relies in support of its "injury in fact" claim do not support a finding that plaintiff is entitled to organizational standing.[2]

ii.    Voluntary Economic Costs Provide No Basis For An Injury In Fact.

The alleged harms upon which Plaintiff bases its claim to organizational standing stem exclusively from the expenditures HSUS allegedly incurs, and the resources HSUS allegedly diverts, when it responds to requests for assistance from those law enforcement officers and agencies that take enforcement actions against illegal animal fighting ventures.  See e.g., Pl.'s Mem. in Opp'n at 5-12.  Because these economic harms stem from actions HSUS voluntarily chooses to undertake, however, they are insufficient to establish "injury in fact" under the legal authorities cited by both parties.  See, e.g., Fair Employment, 28 F.3d at 1276, 1278.

---

[2] The Court should not be distracted by Plaintiff's statement that "[it] would nonetheless have standing to sue on the basis of the resources it expends on its other advocacy and outreach programs to counteract or offset the mail-based trafficking of fighting animals now permitted under Defendant's June 2007 interpretation of the AWA."  Pl.'s Mem. in Opp'n at 11 (citing Chynoweth Decl. ¶¶ 2-3) (emphasis in original).  Factual allegations supporting this statement are found nowhere in the Complaint or the Chynoweth Decl. and the statement is unsupported by specific paragraphs of the Chynoweth Decl. cited by Plaintiff.  Additionally, such injuries are not traceable to Defendant's conduct or redressible by the relief requested for the reasons articulated in Sections II.B and II.C below.

In <u>Fair Employment</u>, the organizational plaintiff claimed "injury in fact" based, in part, on (1) the expenditures associated with the plaintiff's "testing program," i.e., a program whereby pairs of individuals sought employment referrals from the defendant employment agency, and (2) the adverse impact of those expenditures on its other programs. 28 F.3d at 1276. The purpose of the plaintiff's testing program was to gather evidence of discrimination so that the plaintiff could establish that the defendant had a "pattern, practice and policy of employment discrimination on the basis of race." <u>Id.</u> at 1270 (quoting the plaintiff's allegations). The Court acknowledged that the plaintiff's testing program "[was] but one means toward" plaintiff's "broad goal of promoting equal opportunity" in employment. <u>Id.</u> at 1276 (comparing plaintiff to the organizational plaintiff in <u>Havens</u>). The court considered the plaintiff's allegations that "[the defendant's] discriminatory actions [had] interfered with [plaintiff's] efforts and programs and . . . required the [plaintiff] to expend resources to counteract [the defendant's] alleged discrimination." <u>Id.</u> at 1273. Furthermore, the court acknowledged that the "plaintiff's allegations closely track[ed] the claims that the Supreme Court found sufficient in <u>Havens</u>." <u>Id.</u> at 1276 (citing <u>Havens</u>, 455 U.S. at 379).

Ultimately, however, the court "explicitly reject[ed]" the plaintiff's suggestion that the "mere expense" of testing the defendant "constitute[d] 'injury in fact' fairly traceable to [the defendant's] conduct." <u>Id.</u> In reaching this conclusion, the Court explained that those expenditures, as well as any adverse effects stemming from the diversion of plaintiff's resources from its "community outreach and public education, counseling, and research projects" to its testing program, were "self-inflicted" because those "harms" resulted "not from any actions taken by the [defendant] but rather from the [plaintiff's] own budgetary choices," and were therefore insufficient for establishing "injury-in-fact." <u>Id.</u> at 1276, 77. The court explained that

if it were to recognize such "harms" as sufficient for "injury in fact," it would "effectively abolish the requirement altogether" by allowing any organization to claim "injury in fact" simply by alleging that it had to divert resources from one program to another. <u>See</u> <u>id</u> at 1277.

The plaintiff's allegations in <u>Fair Employment</u> are materially indistinguishable from HSUS's allegations here.  Like the organizational plaintiff in <u>Fair Employment</u>, HSUS purports to satisfy the "injury in fact" requirement on the basis of the expenditures it allegedly incurs, and the resources it allegedly diverts, in order to provide assistance to those law enforcement officials who enforce animal fighting laws.  <u>See</u> Pl.'s Mem. in Opp'n at 6-7 ("Plaintiff <u>diverts its</u> <u>resources</u> to respond to these illegal ventures…") (emphasis added); Pl.'s Mem. in Opp'n at 7 ("These <u>financial injuries</u>…continue to mount even as this matter proceeds. … There is thus a high likelihood that these <u>expenditures</u> will continue in the same pattern.") (emphasis added).  Additionally, like the <u>Fair Employment</u> testing program, which was one of several activities conducted by the plaintiff to further the plaintiff's "broad goal of promoting equal opportunity," the assistance HSUS provides to law enforcement officers and agencies is, according to Plaintiff, separate from the other activities that HSUS undertakes in furtherance of its "core organizational purpose of preventing cruelty to animals."  <u>See</u> Pl.'s Mem. in Opp'n at 10.

In light of <u>Fair Employment</u>, this Court should reject Plaintiff's argument that the money and resources its diverts from its other programs to assist law enforcement constitutes an "injury in fact," as required by <u>Havens</u>.  <u>Cf.</u> Chynoweth Decl. ¶¶ 7, 9, 10, 12, 17 ("These funds would have otherwise been spent on…education, advocacy, and outreach."); Compl. ¶¶ 5, 11-14; Pl.'s Mem. in Opp'n at 4-11.  "One can hardly say that [the defendant] has injured the [plaintiff] merely because the [plaintiff] has decided that its money would be better spent by testing [the defendant] than by counseling or researching."  <u>Fair Employment</u>, 28 F.3d at 1277.  Although

Plaintiff's alarmist rhetoric suggests that it is somehow compelled or obligated to provide assistance to law enforcement agencies and officials, Plaintiff provides no basis for concluding that the money and resources it provides to such agencies and officials are anything other than "budgetary choices" made by the HSUS organization.[3]  See e.g., Pl.'s Mem. in Opp'n at 9 ("Plaintiff would vastly prefer that these diverted 'resources…otherwise be spent' – as originally planned – on programmatic and advocacy activities to prevent cruelty to animals, in furtherance of Plaintiff's goals.").  Plaintiff's acknowledgement that "vastly prefers" not spending money is the not the stuff of which injury in fact is made.  Cf. Pl.'s Mem. in Opp'n at 11 n.5 (stating that "when plaintiff has had an opportunity to rescue animals from animal fighting compounds, it has done so, and will continue to do so" and characterizing Defendant's application of Fair Employment to the instant proceeding as "spin").

**B.    Plaintiff Cannot Establish Causation, As Shown Even By Its Own Supporting Materials.**

Plaintiff fails to demonstrate that its claimed financial costs and diversions of resources are "fairly traceable" to the Defendant's "action" or "conduct" under the legal authorities cited by both parties.  See Animal Legal Def. Fund v. Glickman, 154 F.3d 426 (D.C. Cir 1998); Friends of the Earth, Bluewater Network Div. v. Dep't of Interior, 478 F. Supp. 2d 11 (D.D.C. 2007).  Plaintiff misunderstands the significance of its failure to allege "that the Postal Service or its agents are directly involved in animal fighting ventures or related activities."  Def.'s Mem. at 16 (quoted in Pl.'s Mem. in Opp'n at 12).  The point here is that Plaintiff must demonstrate a causal link between (A) Defendant's continued acceptance and distribution of the subject

---

[3] Whether Plaintiff can plan ahead for such expenses and diversions is irrelevant to the "injury" analysis and Plaintiff points to no authority to the contrary.  See Pl.'s Mem. in Opp'n at 9.

Publications and (B) the alleged expenses incurred in assisting law enforcement officials. Plaintiff's theory fails at any of several independent links in the necessary chain of causation.

Plaintiff's theory for "traceability" and "redressability" depend first on a theory Defendant's conduct facilitates a "nationwide buyer network" for such animals. See e.g., Pl.'s Mem. in Opp'n at 18 (citing Chynoweth Decl. ¶¶ 35, 36); Pl.'s Mem. in Opp'n at 13, 15-17; Plaintiff's Response to Defendant's Statement of Material Facts ¶¶ 5-9. However, the materials Plaintiff submitted in support of its Opposition Memorandum directly contradict Plaintiff's contention that Defendant's conduct has <u>any</u> "traceable" relationship to the existence of animal fighting ventures, or the buying and selling of fighting animals, fighting implements, or other animal fighting paraphernalia, sufficient for purposes of establishing standing. <u>Brady Campaign To Prevent Gun Violence United With The Million Mom March v. Ashcroft</u>, 339 F. Supp. 2d 68, 77 (D.D.C. 2004) (plaintiff must show that "third party choices have been made or will be made in such manner as to produce causation"). The essay submitted as Exhibit H to Plaintiff's Opposition Memorandum ("Darden Essay")[4] states, in pertinent part, that:

> [w]ord-of-mouth is still the most effective means of advertising and promoting in all forms of marketing. For the cockfighter/chicken seller, this extends to winning in the pits and constructing and maintaining a reputation as a good chicken man . . . . Personal sales, where the buyer and seller jointly define the chickens as breeders of potential winners from proven lines, <u>without any or much third-party intervention</u>, accounts for <u>most</u> sales.
>
>  \*\*\*
>
> The producer is the seller, who has only the one intermediary/facilitator (the magazines) to worry about. There are no wholesaler or sales forces. <u>Distribution is usually from one hand to another</u>, although occasionally interstate shipments are made, which legally limits the kinds of fowl which can be sold. <u>Word of mouth is a strong determinant of sales</u> and is highly dependent on building a reputation as an honest competitor; but the

---

[4] Donna K. Darden and Steven K. Worden, <u>Marketing Deviance: The Selling of Cockfighting</u>, 4 JOURNAL OF HUMAN-ANIMAL STUDIES 211, 228 (1996) (included as Ex. H to Pl.'s Mem. in Opp'n) <u>available at</u> http://www.psyeta.org/sa/sa4.2/darden.html.

seller as competitor is suspect.  Marketing efforts are so uncoordinated as to be fragmented.

Pl.'s Mem. in Opp'n 15, Ex. H at "8 of 11" (emphasis added).  The Darden Essay concludes:

> [w]e have found that <u>those engaged in marketing the sport and its paraphernalia,</u> <u>including the chickens,</u> must conduct their activities in ways which differ from the marketing activities of more conventional businesses, as described in the marketing literature. …Since the organization of the marketing efforts is very loosely structured, with no sales force and only one third-party medium for advertising [the magazines], <u>the</u> <u>most effective form of advertising and marketing is word of mouth,</u> which can <u>spread</u> <u>rapidly</u> through this community of mostly rural people who communicate through their magazines and through <u>face-to-face encounters</u> at fights and in informal meetings.

<u>Id.</u> at "10 of 11."  This contradicts the Chynoweth Declaration ¶¶ 32, 36 and Complaint ¶ 12.

The Darden Essay is fatal to <u>all</u> of Plaintiff's traceability and redressablity claims under the controlling legal authorities because it effectively admits that (1) magazines such as the Publications at issue in this proceeding are not the primary means by which buyers and sellers of fighting animals, fighting implements, or other animal fighting paraphernalia, communicate for the purpose of conducting transactions, and (2) the Postal Service, which is not mentioned even once in the essay, is not the main instrumentality through which such communication takes place.  Therefore, there is no reason to infer that animal fighting venture participants and enthusiasts will not use these other available means and instrumentalities to organize animal fighting ventures, advertise and market their products, or conduct their transactions, if the Publications are prohibited from the mailstream, and Plaintiff has not alleged any facts sufficient to demonstrate otherwise.  <u>See</u> Def. Mem. at 22 (citing <u>Brady</u>, 339 F. Supp. 2d at 77-78).  <u>But</u> <u>see</u> Pl.'s Mem. in Opp'n at 14.  Finding one of the Publications at a single raided cockfight in California does essentially nothing to show causation.  <u>See</u> Pl. Mem. in Opp'n at 6.

Plaintiff's claim that Defendant's conduct "<u>is</u> a 'substantial factor' in the decisions of third parties to grow their animal fighting ventures through mail advertisements" is irrelevant and demonstrates that Plaintiff has misapprehended Defendant's position as well as the

supporting case law.[5]  Cf. Pl.'s Mem. in Opp'n at 13-15 (citing Def.'s Mem. at 21) (emphasis in the original).  As discussed above, Plaintiff's harm is in the costs it incurs, and there are several, unsupported links that it would need to establish to connect that with the background level of animal fighting generally, as opposed to, for example, the number of raids by police of animal fights.  Because both the financial harm to Plaintiff and animal fighting generally are beyond the scope of the Postal Service's regulatory authority, the causation cases cited by both parties provide no support for Plaintiff.  See e.g., Pl.'s Mem. in Opp'n at 12 (citing Glickman, 154 F.3d at 440; America's Cmty. Bankers v. Fed'l Deposit Ins. Corp., 200 F.3d 822, 827 (D.C. Cir. 2000)).[6]  Plaintiff cannot establish "traceability."

## C.    Plaintiff Cannot Establish Redressability.

Plaintiff cannot establish that the relief it seeks, i.e., a court order declaring the Publications nonmailable and enjoining the Defendant from continuing to accept the Publications for mailing (Compl. at 26-27), will redress any of the economic or financial injuries allegedly suffered by the Plaintiff.  As presented, Plaintiff's theory depends on reduction of the level of animal fighting generally.  See Pl.'s Mem. in Opp'n at 16-18 (citing Bennett v. Spear, 520 U.S. 154 (1997); Beno v. Shalala, 30 F.3d 1057 (9th Cir. 1994)).  Perhaps more realistically, it

---

[5] Despite Plaintiff's suggestion, Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 231 n.4 (1986) provides no support for plaintiff's standing claim.  But see Pl.'s Mem. in Opp'n at 13.

[6] See also Wrestling Coaches Ass'n v. Dep't of Educ. 366 F.3d 930, 941 (D.C. Cir. 2004) ("a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action," and that "[c]ausation and redressability thus are satisfied in [a] category of cases [including Glickman and America's Cmty. Bankers] because the intervening choices of third parties are not truly independent of government policy.") (quoted in Pl.'s Mem. in Opp'n at 13).  Accord Def.'s Mem. at 21 ("[T]he AWA does not explicitly identify the Postal Service as the agency charged with responsibility for enforcing restrictions on animal fighting ventures, the basis for HSUS's alleged injuries[.]").  Moreover, because Defendant did not contend that "proving an agency's evidential enforcement action … is necessary to redressability," Plaintiff's arguments to the contrary are irrelevant.  See Pl.'s Mem. in Opp'n at 16-17, 17 n.9.

depends also on a reduction in the number of law enforcement raids on illegal animal fighting. Plaintiff cannot even show the first of those links because it still has not identified "any future unlawful animal fighting venture that will not take place if the [P]ublications are banned from the mail" (Def.'s Mem. at 23 (cited by Pl.'s Mem. in Opp'n at 17)), a requirement that logically follows from the legal standard set forth in The Wilderness Society v. Norton, i.e., that the Plaintiff must show that "each form of relief" will redress the alleged injury or harm.  434 F.3d 584, 590-91 (D.C. Cir. 2006) (citing Friends of the Earth v. Laidlaw, 528 U.S. 167, 185 (2000)).[7] Moreover, the redress Plaintiff seeks will have no effect on the current legal status of bird shipments.  Based on the findings in the Darden Essay, it is highly likely that the "word-of-mouth" advertising and marketing efforts of cockfighting participants and enthusiasts will sustain the alleged "nationwide buyer network" Plaintiff describes even if the Publications are banned from the U.S. mail.  Pl.'s Mem. in Opp'n at 18 (citing Chynoweth Decl. ¶¶ 36).  Plaintiff provides no credible evidence to the contrary.

Plaintiff's redressability claims are further undermined by the fact that the Publications no longer appear to contain advertisements for animal fights (legal or illegal) or for "knives, spurs, gaffs, and other piercing instruments."[8]  Compare Defendant's Statement of Material Facts ¶ 9 with Plaintiff's Response ¶ 9.  Thus, the relief requested by Plaintiff could have no effect whatsoever on any current or future animal fighting venture that would not exist "but for the

---

[7] Contrary to Plaintiff's claim, Chynoweth Decl. ¶ 6 does not contain such an allegation.  See Pl.'s Mem. in Opp'n at 17.

[8] This includes the excerpt of the January 2008 issue of the Feathered Warrior submitted by Plaintiff.  Pl.'s Mem. in Opp'n, Ex. G.

commercial transactions made possible" by the presence of those specific advertisements.

Compl. ¶ 77; cf. Compl. ¶¶ 12, 13, 39, 57, 63, 65, 75, 77; Chynoweth Decl. ¶¶ 29-32. [9]

Furthermore, Plaintiff provides no allegations from which this Court could reasonably

infer that any of its alleged economic or financial injuries would be redressed if the remainder of

the commercial or noncommercial content within the Publications was banned from the mail,

despite Plaintiff's claims to the contrary.  See Def.'s Mem. at 23.  But see Pl.'s Mem. in Opp'n at

5.  Even if such content were banned from the mail, Plaintiff has failed to show that such a ban

would have any effect on the number of cockfighting raids law enforcement agencies will choose

to investigate or pursue, or the amount of money and resources HSUS would voluntarily spend

or divert to assisting law enforcement.  To maintain that the proposed mailing prohibition would

have a decisive effect, Plaintiff's redressability claims implicitly assume that law enforcement

officials are currently employing the maximum possible enforcement efforts against every

existing illegal animal fighting venture, an assumption belied by Plaintiff's Complaint.  See e.g.,

Compl. ¶ 61 ("the seller of the cockfighting pit told an investigator by telephone that …

prospective purchasers of the pit need not worry because … the local sheriff already knew about

the pit and would not take action").  Plaintiff's allegations indicate that it is highly likely that law

enforcement officials are currently pursuing only a subset of those ventures, a subset that could

be unaffected even if the Court grants the requested relief.  See Chynoweth Decl. ¶ 19.

---

[9] Although Plaintiff alleges that the "publication of results and winners" from particular ventures and the advertisements for cockfighting "implements" (other than knives, spurs, gaffs, and other piercing instruments) "promote" animal fighting ventures, Plaintiff does not seriously contend that any current or future animal fighting venture would "cease to exist" if such advertisements were declared nonmailable.  But see Plf. Mem. in Opp'n at 18; cf. Chynoweth Decl. ¶¶ 34, 37; Compl. ¶¶ 40, 64, 66, 72, 75, 87.  Likewise, Plaintiff cannot seriously contend that the requested relief would have any effect on any current or future animal fighting venture that would not exist "but for" one advertisement for an alleged animal fighting venue that appeared in an issue of *The Gamecock* that was published in December 2006.  But see Chynoweth Decl. ¶¶ 13, 14; Compl. ¶ 60.

Additionally, Plaintiff's allegations that the Publications have "direct ties" to the animal fighting ventures themselves are weak at best. Pl.'s Mem. in Opp'n at 5 (quoting Chynoweth Decl. ¶¶ 3-4, 18). In three of the six ventures identified in the Chynoweth Declaration, the only "ties" between the Publications and the identified ventures are Plaintiff's allegations that "copies of the publications were found" at the sites. Chynoweth Decl. ¶¶ 10, 11, 15-16. With respect to two of the ventures, Plaintiff alleges that the owner of the venture site advertised in the Publications. Chynoweth Decl. ¶¶ 5, 8. With respect to the remaining venture, Plaintiff alleges that an advertisement for a cockfighting pit connected with the venture, investigated by HSUS in February 2007, was advertised in *The Gamecock* one month earlier. Chynoweth Decl. ¶¶ 13-14. As Defendant has argued, Plaintiff has provided no reason to believe that any of these specific animal fighting ventures would not have taken place had the Postal Service refused to accept or distribute these Publications. See Def.'s Mem. at 23. Moreover, even if a "favorable decision" for the Plaintiff somehow reduced the total amount of current animal fighting venture activity, there is no reason to believe that such relief would have any effect on the number of requests that HSUS allegedly receives from law enforcement officials, or the money and resources that HSUS will spend to assist with enforcement actions against such activity.

As the Darden Essay highlights, Plaintiff also fails to acknowledge that the causal chain linking the acceptance and distribution of the Publications by the Postal Service to the injuries Plaintiff claims necessarily involves the independent actions of third parties not before the Court. See Def.'s Mem. at 16-17 (citing Friends of the Earth, Bluewater Network Div., 478 F. Supp. 2d at 11, 15 (D.D.C. 2007) (citing Lujan, 504 U.S. at 560); Brady, 339 F. Supp. 2d at 77). These third-parties include (1) the publishers of, and the subscribers to, the Publications, (2) the buyers and sellers of fighting birds, (3) the individuals or entities that organize or facilitate animal

fighting ventures, and (4) the law enforcement agencies and officials who conduct raids on animal fighting ventures, none of whom are a party to the instant proceeding. See e.g., Chynoweth Decl. ¶ 32 ("the fighters would not attend if they could not procure fighting animals"); Chynoweth Decl. ¶ 36 ("these sellers also maintain active animal fighting compounds"); Chynoweth Decl. ¶ 19 ("Law enforcement officials often make clear that without our assistance at raids, they will not enforce the laws against these animal fighters"). Plaintiff's predictive allegations concerning the behavior of such third parties are exactly the types of allegations that the court in Simon v. Eastern Kentucky Welfare Rights Org. found insufficient to establish redressability. See 426 U.S. 26, 42-43, 45 (1976) (holding that an IRS revenue ruling was not "fairly traceable" to the denial of hospital services to plaintiffs when the plaintiffs alleged that the ruling "encouraged" the third-party hospital to deny such service); Florida Audubon Society, et. al. v. Bentsen, 94 F.3d 658, 670 ("a protracted chain of causation fails…because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury…we routinely refuse to permit such predictive assumptions to establish standing") (citing Simon, 426 U.S. at 42-46).

Plaintiff has not and cannot establish redressability. Its aruguments for standing must fail. Branton, 993 F.2d at 908 (citing Allen v. Wright, 468 U.S. 737 (1984)).

III.    **THE APA DOES NOT APPLY TO THE POSTAL SERVICE'S CORRESPONDENCE IN THIS CASE.**

Plaintiff explicitly acknowledges that the only statutory vehicle that it has availed itself to in this proceeding is the Administrative Procedure Act ("APA"). Pl.'s Mem. in Opp'n at 23. Thus, Plaintiff effectively concedes that it cannot state a cause of action under "the substantive law alleged to be violated," i.e., the PRA in conjunction with the AWA. Compare Pl.'s Mem. in

16

Opp'n at 23 <u>with</u> Def.'s Mem. at 26-27. Because the correspondence exchanged between Plaintiff and Defendant is explicitly exempt from APA review and because 39 U.S.C. § 3001(m) is inapplicable to such correspondence, Plaintiff's Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. <u>Trudeau</u>, 456 F.3d at 188-89.

**A.    <u>Aimes Publications</u> Provides No Support For Plaintiff's Claim That The Subject Correspondence Is A "Proceeding" Concerning The Mailability Of Matter Within The Scope Of 39 U.S.C. § 3001(m), The Only Cited Exception To Congress's Prohibition On Judicial Review**

The sole legal authority upon which Plaintiff bases its claim that APA review is proper under 39 U.S.C. § 3001(m) is <u>Aimes Publications, Inc. v. U.S. Postal Serv.</u>, 1988 WL 19618 (D.D.C. Feb. 23, 1998). Pl.'s Mem. in Opp'n at 26-27. However, Plaintiff's Opposition Memorandum fails to explain how the unpublished decision in <u>Aimes Publications</u>, which applied the APA's judicial review provisions to a decision by the Postal Service to deny a Publisher's application to mail its magazine at Periodicals rates, provides any basis for concluding that the correspondence exchanged between Plaintiff and Defendant—regarding third-parties' mailing rights—constitutes a "proceeding" within the meaning of § 3001(m). <u>See</u> <u>generally</u> Def.'s Mem., Section C, at 10-14 (summarizing the correspondence that forms the basis of the Complaint); Def.'s Mem. at 28 n.20. <u>But see</u> Pl.'s Mem. in Opp'n at 26-27. The legal authorities cited by both parties and the Declaration of Sharon Daniel ("Daniel Decl.") demonstrate that a "proceeding concerning the mailability of matter" necessarily must include the mailer and that the mailer's mailing rights and privileges must be at stake.[10] <u>See</u> <u>Aimes</u> <u>Publications</u>, 1988 WL 19618, at *1-*2, *5 n.10 (D.D.C. Feb. 23, 1998) ("A determination of [a

_____

[10] Plaintiff misapprehends the function of the word "concerning" in 39 U.S.C. § 3001(m). <u>See</u> Pl.'s Mem. in Opp'n at 24-26, n. 15. The word "concerning" limits the subject matter of the "proceedings" proscribed by § 3001(m). The word has no bearing on the definition of "proceeding" or the actions or processes that constitute a "proceeding."

mailer's] mailing status is an exercise of administrative discretion and will not be interfered with

by the courts unless clearly wrong.") (citing Sierra Club v. United States Postal Service, 549

F.2d 1199 (9th Cir.1976) (upholding the Postal Service's determination that the mailer applying

for Periodical's mailing privileges did not qualify for "educational institution" privileges));

Def.'s Mem. at 28-29 (citing Daniel Decl. ¶ 5).  But see Pl.'s Mem. in Opp'n at 26-27.

Moreover, these cases strongly indicate that the definitive characteristics of such proceedings are

the filing of a written complaint, notice, a hearing, and the rendering of an opinion by a neutral

fact-finder: in essence, a process that is analogous to the processes described in Title 39 of the

Code of Federal Regulations which contains the "[r]ules of practice in proceedings relative to

mailability."[11]  See 39 C.F.R. § 953; see also Def.'s Mem. at 5-7, 28-29 (citing Blount v. Rizzi,

400 U.S. 410, 412-13 (1971)).  Contrary to Plaintiff's unsupported assertions, the administrative

proceeding that led to the decision reviewed by the court in Aimes Publications does not bear

any resemblance to the correspondence exchanged between the parties in this case which did not

involve any relevant mailer (i.e., the publishers of the Publications) or any procedural

mechanisms that would ensure mailers are afforded due process.  Plaintiff does not seriously

contend otherwise.  But see Pl.'s Mem. in Opp'n at 26-27.[12]

---

[11] The cases cited by Plaintiff do not support Plaintiff's claim that "Congress intended the
judicial review provision in Section 3001(m) to function as a check when Defendant undertakes
to define the types of [prohibited] matter."  Pl.'s Mem. in Opp'n at 25 (emphasis in the original).
Rather, they support Defendant's interpretation of § 3001(m).  See Aid Assoc. for Lutherans v.
USPS, 321 F.3d 1166, 1173-74 (D.C. Cir. 2003) (applying the APA to a legal challenge arising
out of administrative proceedings against two mailers on the sole basis that the Postal Service
was allegedly acting ultra vires); Milwaukee Soc. Democratic Publ. Co. v. Burleson, 255 U.S.
407, 412-417 (1921) (concerning a legal challenge arising out of an administrative proceeding
against a mailer for the revocation of Periodicals, or "second-class," mailing privileges).

[12] To the extent that Plaintiff claims that the term "proceeding" in 39 U.S.C. § 3001(m) refers to
the proceedings before this Court (summarized in Def.'s Mem., Section D at 14), such claim is
not supported by case law and is incoherent on its own terms.  See e.g., Pl.'s Mem. in Opp'n at
26 ("There is no compelling reason why the straightforward review process applied in Aimes

Because there is no support for Plaintiff's claim that 39 U.S.C. § 3001(m) provides for APA review in the instant proceeding, it follows that the subject correspondence is exempt from review under 39 U.S.C. § 410(a). Although Plaintiff contends that "courts have construed section 410(a) narrowly, holding that section 410(a) in and of itself did not amount to 'clear and convincing evidence of …legislative intent' to preclude judicial review," this interpretation is not supported by Plaintiff's citation of <u>Carter Chevrolet Agency, Inc. v. USPS</u>, which was limited to the application of 410(a) to a specific postal procurement action. Pl.'s Mem. in Opp'n at 24 (citing <u>Carter</u>, 19 F. Supp. 2d 1246, 1247 (W.D. Okla. 1997)) (citations and internal quotations omitted). In fact, <u>Carter</u> implicitly acknowledged that § 410(a) did express Congress's intent to exempt <u>some</u> agency actions from APA review, just not all of them. <u>Carter</u>, 19 F. Supp. 2d at 1247. Plaintiff provides no compelling reason why the correspondence the Postal Service conducts with numerous outside parties in the ordinary course of business should be subject to judicial review despite Congress's expression of contrary intent. <u>See generally</u> Def.'s Mem. at 28-29. The Court must therefore dismiss Plaintiff's Complaint for failure to state a claim. Def.'s Mem. at 27 (citing <u>Trudeau</u>, 456 F.3d at 188-89).

**B.    Plaintiff Fails To Explain How The Subject Correspondence "Determined" Any "Rights Or Obligations," And Therefore, Plaintiff Cannot Establish That Such Correspondence Is "Final Agency Action"**

Plaintiff fails to adequately explain how the correspondence between the Postal Service and HSUS, an entity not acting in its capacity as a customer or mailer, affixes any legal rights

---

cannot be employed here as well."). There is no case law that suggests that § 3001(m) applies to "proceedings" before Article III courts. Rather, <u>Aimes Publications</u> and the cases it references only apply § 3001(m) to administrative proceedings such as the ones described in Title 39 C.F.R. <u>See</u> 1988 WL 19618, at *1-*2, *5 n.10. Moreover, such an interpretation would allow a court to initiate APA review over a Complaint <u>before</u> the reviewing court has determined that there is "agency action made reviewable by statute and final agency action for which there is no other adequate remedy." 5 U.S.C. § 706. Such an interpretation is absurd, contrary to law, and without merit.

under the legal standard articulated in <u>Bennet v. Spear</u>, 520 U.S. 154 (1997). <u>But see</u> Pl.'s Mem.

in Opp'n at 31. Plaintiff can point to no evidence indicating that Defendant's letters had or

would have a discernable effect on HSUS's mailing rights or a "direct and immediate effect on

the day-to-day business of the parties challenging the action." Def.'s Mem. at 30 (citations

omitted). Nor can Plaintiff explain how Defendant could adjudicate, and thereby "determine,"

the mailing rights or privileges of the publishers of the Publications, parties not privy to the

subject correspondence, without providing them with notice and an opportunity to be heard

before a neutral fact-finder. <u>But see</u> Pl.'s Mem. in Opp'n at 31-32. Plaintiff effectively demands

the right to adjudicate someone else's mailing rights, in an effectively *ex parte* proceeding. For

the reasons articulated in Defendant's Memorandum, Defendant submits that the subject

correspondence is not final agency action and the Complaint may be dismissed pursuant to Rule

12(b)(6). Def.'s Mem. at 29 (citing <u>Trudeau</u>, 456 F.3d at 188-89).[13]

## IV. THE LEGISLATIVE HISTORY AND TEXT OF THE ANIMAL WELFARE ACT SUPPORT DEFENDANT'S INTERPRETATION OF THE ACT.

### A. The Court Should Not Be Distracted By Plaintiff's Meritless Assertion That Certain Statutory Interpretation Arguments Set Forth In Defendant's Memorandum Are "Post Hoc Rationalizations"

Plaintiff chastises Defendant for allegedly providing "post hoc rationalizations" for its

failure to grant the requested relief, and singles out "Defendant's attorneys" for special rebuke.

---

[13] Although Plaintiff concedes that decisions by the Department of Justice over whether to conduct criminal investigations are not reviewable under the APA (Pl.'s Mem. in Opp'n at 34), Plaintiff fails to follow this position to its logical conclusion. In the absence of an administrative process for determining the mailability of written, printed, or graphic matter such as the Publications, Plaintiff is, by default, challenging either (A) an Inspection Service decision regarding whether to refer the matter to the Department of Justice, or (B) a decision by the Department of Justice not to investigate or take enforcement action against the publishers at this time. Both decisions are committed to agency discretion by law and are not reviewable by this Court. <u>See generally</u> Def.'s Mem. at 25-26. Plaintiff's claims to the contrary do not compel an opposite conclusion. <u>But see</u> Pl.'s Mem. in Opp'n at 34-37.

Pl.'s Mem. in Opp'n at 1, 37-38 (citing <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)). Plaintiff's criticism has no merit because none of the legal authorities cited by Plaintiff support its claim that a reviewing court may not consider "post-hoc" or "post-litigation" arguments offered by Defendant's counsel in the instant proceeding when those arguments concern the meaning or interpretation of federal statutes. <u>See generally</u> <u>Burlington</u>, 371 U.S. at 168 (citing <u>SEC v. Chenery Corporation</u>, 318 U.S. 80 (1943)). Rather, the cases discussing this specific issue have reached the <u>opposite</u> conclusion. <u>Bank of America v. FDIC</u>, 244 F.3d 1309, 1319 (11th Cir. 2001) ("There is no support in either <u>Chenery</u> or its progeny for the proposition that <u>Chenery's</u> prohibition on post-hoc rationales should apply to agency arguments proffered under the first step of the Chevron analysis. It is the duty of the courts to interpret statutory language, and courts should decide whether there is ambiguity in a statute without regard to an agency's prior, or current, interpretation."); <u>Railway Labor Executives' Ass'n</u>, 784 F.2d 958, 969 (9th Cir. 1968) ("Generally, a reviewing court may only judge the propriety of an agency decision on the grounds invoked by the agency… However, the court is not so bound when…the issue in dispute is the interpretation of a federal statute.") (internal citation omitted); <u>SBC Communications v. FCC</u>, 138 F.3d 410, 418-419 (D.C. Cir. 1998) ("we do not normally accept counsel's post hoc rationalizations… Nevertheless, we must determine on our own whether the statute is ambiguous without regard to the [defendant agency's] reasoning") (citing, <u>inter alia</u>, <u>SEC v. Chenery Corporation</u>, 318 U.S. 80 (1943)) and <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402 (1971)). The issue presently before the Court is a pure question of statutory interpretation and the Court may consider all arguments proffered by the parties to determine the statute's meaning. <u>Bank of America</u>, 244 F.3d at 1320.

21

Moreover, Defendant has provided no "post hoc <u>rationalizations</u>" in this case.  Defendant continues to maintain that the Publications are mailable because the relevant provisions of the AWA, the PRA, and the Domestic Mail Manual ("DMM") only proscribe advertisements for illegal animal fighting ventures and because the Publications contain no such advertisements. Def.'s Mem. at 35-44, Section D.  This rationale was fully explained in Defendant's correspondence with Plaintiff and is consistent with the rationale articulated in Defendant's Memorandum.  <u>See e.g.</u>, Def.'s Mem. at 10-14, Section C.  Plaintiff's claim that the Defendant's rationale should be set aside is baseless.  <u>But see</u> Pl.'s Mem. in Opp'n at 38.  <u>See also</u> <u>Nat'l Oilseed Processors Ass'n v. Browner</u>, 924 F. Supp. 1193 (D.D.C. 1996) ("the difference between a post hoc rationalization, which is a new rationale for an agency action, and a post hoc explanation, which is an agency's discussion of the previously-articulated rationale for the challenged action [is that p]ost hoc rationalizations are precluded; post hoc explanations are not.").  Of course, it is also true that if Defendant is correct that the APA does not apply to this case, then the entire issue of "post hoc rationale" evaporates.

### B. The Legislative History Of The Animal Fighting Prohibition Enforcement Act Does Not Prove That The Publications Are Prohibited From The Mail.

Although Plaintiff correctly observes that Defendant's interpretation of the salient language in 7 U.S.C. § 2156 limits the effect of the provision to advertisements for illegal animal fighting ventures, Plaintiff incorrectly asserts that "Defendant makes no effort to address the 2007 legislative history" to the Animal Fighting Prohibition Enforcement Act ("AFPEA"). <u>Compare</u> Pl.'s Mem. in Opp'n at 26 <u>with</u> Def.'s Mem., Section IV.B at 40-43.  In fact, Defendant argued that because Congress chose not to explicitly define the phrase "promoting or in any other manner furthering" (7 U.S.C. § 2156(c)) when it amended the AWA in 2007, the meaning of that phrase should comport with the legislative history of the AWA Amendments in

1976, regardless of any subsequent legislative history suggesting otherwise. Def.'s Mem. at 39-41. But see Pl.'s Mem. in Opp'n at 39-43. Plaintiff's repeated assertions that the legislative history to the AFPEA somehow "superceded" or "obliterated" the legislative history upon which Defendant relies evinces a fundamental misunderstanding of the legal significance of legislative history. See e.g., Pl.'s Mem. in Opp'n at 42.

As an initial matter, the importance of legislative history should not be overstated. See, e.g., Totten v. Bombardier Corp., 380 F.3d 488, 494-95 (D.C. Cir. 2004). Moreover, legislative history does not have the power to legally supersede or repeal other legislative history, and Plaintiff cannot seriously contend otherwise. See, e.g., PDK Laboratories, Ltd. v. DEA, 362 F.3d 786, 794-95 (D.C. Cir. 2004) ("very little, if any, significance"); Tax Analysts v. IRS, 350 F.3d 100, 104 (D.C. Cir. 2003); North Broward Hosp. Dist. v. Shalala, 172 F.3d 90, 98 (D.C. Cir 1999) (citing Supreme Court cases observing that subsequent legislative history is "an unreliable guide to legislative intent"). If it did, Defendant submits that the 1976 legislative history provides better guidance as to the meaning of 7 U.S.C. § 2156(c) than the AFPEA Amendments in 2007, because the 1976 legislative history was produced at the time the salient language was codified into law and is therefore, more illuminating as to Congress's intent.

Despite Plaintiff's claims, Defendant's interpretation of the AWA gives meaning to the entire phrase "promoting or in any other manner furthering" and has the added benefit of delimiting the scope of the prohibition in 7 U.S.C. § 2156(c).[14] See Def.'s Mem. at 36-39. But see Pl.'s Mem. in Opp'n at 41. In contrast, Plaintiff's interpretation provides no discernable

---

[14] Ironically, the only basis in Plaintiff's Opposition Memorandum for Plaintiff's claim that 7 U.S.C. § 2156(c) applies to advertisements for knives and gaffs is the apparent behavior of the Publishers themselves. Pl.'s Mem. in Opp'n at 42-43. Plaintiff provides no authority indicating that such behavior is relevant to the Court's statutory analysis and Defendant's arguments to the contrary are uncontested. Def.'s Mem. at 42-43.

limitation on the scope of 7 U.S.C. § 2156(c) and would thereby undermine the ability of

agencies like the U.S. Department of Agriculture to administer the statute, a conclusion

uncontested by Plaintiff.   Compare Def.'s Mem. at 36-39 with Pl.'s Mem. in Opp'n at 39-42.[15]

     Finally, Plaintiff persists in its mistaken argument that Congress's substitution of the

phrase "interstate instrumentality" with the phrase "instrumentality of interstate commerce for

commercial speech" in § 2156(c) somehow alters or clarifies the statute's application to the

Postal Service in this case.   See Pl.'s Mem. in Opp'n at 38, 44.   Even a cursory reading of the

statute reveals that the clause that pertains to the Postal Service is separated grammatically from

the "commercial speech" clause by Congress's use of the word "or."   7 U.S.C. § 2156(c) ("It

shall be unlawful for any person to knowingly use the mail service of the United States Postal

Service or any instrumentality of interstate commerce for commercial speech for purposes of

promoting or in any other manner furthering an animal fighting venture[.]") (emphasis added).

But see Pl.'s Mem. in Opp'n at 44 (using the word "and" instead of "or" in an attempt salvage its

claim).   There is nothing "artificial" about Defendant's effectively uncontested arguments on this

point.   Instead, Defendant has provided at least the "reasonable construction of the text" required

under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. 467 U.S. 837, 837.   But

see Pl.'s Mem. in Opp'n at 40, 44 (citing Chevron, 467 U.S. at 843).

     Plaintiff's Opposition Memorandum fails to adequately clash with Defendant's thorough

analysis of the AWA and its legislative history.   Plaintiff apparently concedes that if Defendant's

---

[15] Plaintiff's broad interpretation of the AWA could conceivably apply to certain materials
apparently published by Plaintiff.   Compare Chynoweth Decl. ¶ 34 (stating that the Publications
"promote animal fighting ventures … by making their existence known to cockfighters") with
Chynoweth Decl., Attach. 1 (apparently containing an HSUS-published article identifying and
describing a "cockfight" in California) and Administrative Record 21-41 (containing what
appears to be an HSUS report containing information on topics such as "Schooling, Training,
and Conditioning of Dogs," "Vitamins, Drugs and Veterinary Supplies," and "Training,
Conditioning, and Fight Preparation.").

interpretation of the APA is proper, then the content of the Publications constitute the only material facts germane to the Court's analysis.  Def.'s Mem. at 36.  Because there is no apparent dispute between the parties over the objective content of the Publications, the Court may grant Defendant's alternative motion for Summary Judgment on the grounds that the Publications do not contain advertisements for unlawful animal fighting ventures.  Id.

Finally, Plaintiff misapprehends Defendant's argument that the prohibition in DMM § 601.12.4.1 only applies to advertising matter that "solicit[s] or induce[s] the reader or customer to mail an 'adult fowl' or any other item described in sections 8.0, 9.0, or 10.0 of chapter 601 of the DMM."  Compare Def.'s Mem. at 44 (emphasis added) with Pl.'s Mem. in Opp'n at 43.  Plaintiff's arguments, which focus solely on the terms "reader or customer," are inapposite.  For the reasons set forth in Defendant's Memorandum, Defendant Submits that the acceptance and distribution of the Publications is consistent with DMM § 601.12.4.1.

## CONCLUSION

For the foregoing reasons, Defendant respectfully submits that it is entitled to entry of judgment as a matter of law.


March 6, 2008                    Respectfully submitted,


                    _____
                    JEFFREY A. TAYLOR, D.C. Bar # 498610
                    United States Attorney


                      /s/
                    _____
                    RUDOLPH CONTRERAS, D.C. Bar # 434122
                    Assistant United States Attorney


                       /s/
                    _____
                    ALAN BURCH, D.C. Bar # 470655
                    Assistant United States Attorney
                    555 4th St., N.W., Washington, D.C. 20530
                    (202) 514-7204, alan.burch@usdoj.gov

Of counsel:

ANTHONY F. ALVERNO, ESQ.
DC Bar # 499580
Chief Counsel, Customer Programs
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6138
Washington, DC 20260-1135
(202) 268-2997, 268-5418

MATTHEW J. CONNOLLY, ESQ.
Attorney, Corporate Law
United States Postal Service
475 L'Enfant Plaza, S.W. Room 6332
Washington, DC 20260-1135
(202) 268-8582, 268-5418